## Docket No. 24-2199

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

KELLY CAHILL; HEATHER HENDER; SARA JOHNSTON;
LINDSAY ELIZABETH,

*Plaintiffs-Appellees,*

v.

INSIDER, INC.; ADVANCE LOCAL MEDIA, LLC;
AMERICAN CITY BUSINESS JOURNALS,

*Intervenors-Appellees,*

NIKE, INC.,

*Defendant-Appellant.*

_____

*Appeal from a Decision of the United States District Court for the District of Oregon, Portland,
No. 3:18-cv-01477-JR · Honorable Marco A. Hernandez*

## OPENING BRIEF OF DEFENDANT-APPELLANT NIKE, INC.

DANIEL PRINCE, CA BAR 237112
FELICIA A. DAVIS, CA BAR No. 266523
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071-2228
Telephone: (213) 683-6000
danielprince@paulhastings.com
feliciadavis@paulhastings.com

*Attorneys for Defendant-Appellant,
NIKE, Inc.*



## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, Defendant-Appellant NIKE, Inc. states that it has no parent corporation and that no publicly held corporation owns ten (10) percent or more of its stock.

## **ORAL ARGUMENT**

On July 22, 2024, this Court ordered a consolidated oral argument for this appeal and related Appeal No. 24-165. Dkt. No. 32.1. Given the issues raised by the two appeals, NIKE suggests that 25-minutes per side across the appeals would be sufficient and constructive. Alternatively, if the Court hears the two appeals seriatim, NIKE would propose 15-minutes per side per argument.

# <u>TABLE OF CONTENTS</u>

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................... I

ORAL ARGUMENT ........................................................................... II

TABLE OF AUTHORITIES ................................................................ V

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 3

STATEMENT OF THE ISSUES ......................................................... 6

STANDARD OF REVIEW ................................................................. 8

STATEMENT OF THE CASE ........................................................... 10

I.    NIKE PRODUCED THE STARFISH QUESTIONNAIRES
      PURSUANT TO THE PROTECTIVE ORDER BELOW ........................... 12

II.   PLAINTIFFS REDACTED THE EXCERPTS OF THE STARFISH
      QUESTIONNAIRES THAT WERE FILED IN CONNECTION
      WITH THEIR CLASS CERTIFICATION MOTION. ................................ 13

III.  THE OREGONIAN INTERVENED TO ATTEMPT TO UNSEAL
      THE NAMES OF NON-PARTIES IN THE STARFISH
      QUESTIONNAIRES. ................................................................... 13

IV.   PLAINTIFFS' COUNSEL AND THE OREGONIAN MET TO
      EXCHANGE CONFIDENTIAL LITIGATION DOCUMENTS. ................. 15

V.    THE FLURRY OF BRIEFING BEGINS OVER THE DISCLOSED
      QUESTIONNAIRES. ................................................................... 19

SUMMARY OF ARGUMENT ........................................................... 23

ARGUMENT ..................................................................................... 26

I.    THE DISTRICT COURT HAD AUTHORITY TO ISSUE A
      CLAWBACK INJUNCTION AND BAR ON USE. ................................ 26

      A.    The District Court Erred In Denying The Clawback
            Order And Bar On Use. ................................................... 27

      B.    The District Court Erred In Limiting Its Own Inherent
            Authority To Address Assistance To Breaches Of Court
            Orders. ......................................................................... 31

iii

II.   THE DISTRICT COURT ERRED IN FRAMING THE QUESTION: THE FIRST AMENDMENT ALLOWS COURTS TO POLICE THE GATHERING OF INFORMATION. .......................................................... 35

    A.   The Oregonian Does Not Have An Absolute And Unrestrained Right To Gather Information Any Way It Wants. ....................................................................................... 35

    B.   The Court Has The Power To Control Dissemination Of Discovery Without Infringing First Amendment Rights. ......... 36

    C.   The Oregonian Admits It Considered Plaintiffs' Counsel as a Source Triggering *Ground Zero* ........................................ 40

    D.   *New York Times Co. v. United States* Does Not Support a Contrary Result as Subsequent Authority Confirms. ............... 42

III.  THE DISTRICT COURT ERRED IN APPLYING THE WRONG STANDARD OF REVIEW. ........................................................... 45

IV.   THE DISTRICT COURT CLEARLY ERRED IN DENYING NIKE DISCOVERY INTO PLAINTIFFS' UNAUTHORIZED DISCLOSURE OF CONFIDENTIAL LITIGATION DOCUMENTS. ........ 51

V.    CONCLUSION .............................................................................. 53

STATEMENT OF RELATED CASES ................................................... 55

CERTIFICATE OF COMPLIANCE .................................................... 56

CERTIFICATE OF SERVICE .............................................................. 57

iv

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Abbott v. Perez*,
  585 U.S. 579 (2018) ................................................................... 46

*Allen v. Meyer*,
  755 F.3d866 (9th Cir. 2014) ...................................................... 43

*Arista Recs., LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ....................................................... 45

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ................................................................... 39

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ................................................................... 32

*Brown v. Wesley's Quaker Maid, Inc.*,
  771 F.2d 952 (6th Cir. 1985) ....................................................... 7

*Cal. Dep't of Social Serv. v. Leverett*,
  523 F.3d 1025 (9th Cir. 2008) .................................................... 37

*Carson v. American Brands, Inc.*,
  450 U.S. 79 (1981) ....................................................................... 3

*Center for Auto Safety v. Chrysler Grp., LLC*,
  809 F.3d 1092 (9th Cir. 2016) .............................................. 22, 46

*Chavis v. Whitcomb*,
  305 F. Supp. 1359 (S.D. Ind. 1969) ........................................... 25

*Childs v. San Diego Fam. Hous. LLC*,
  22 F.4th 1092 (9th Cir. 2022) ................................................... 3, 4

*Cohen v. Beneficial Indus. Loan Corp.*,
  337 U.S. 541 (1949) ................................................................. 2, 3

*Cook v. Ochsner Found. Hosp.*,
  559 F.2d 270 (5th Cir. 1977) ..................................................... 27

*Coolidge v. Schooner California*,
  637 F.2d 1321 (9th Cir. 1981) ................................................... 48

*CPC Patent Techs. PTY Ltd. v. Apple, Inc.*,
  34 F.4th 801 (9th Cir. 2022) ....................................................... 7

v

*Eli Lilly & Co. v. Gottstein*,
  617 F.3d 186 (2d Cir. 2010) ........................................................................*passim*

*Flournoy v. Marshall*,
  842 F.2d 875 (6th Cir. 1988) .............................................................................48

*Galbreath v. Metro. Tr. Co. of Cal.*,
  134 F.2d 569 (10th Cir. 1943) ...........................................................................25

*Gartner, Inc. v. Hackett Grp., Inc.*,
  No.3:23-CV-688 (SRU), 2023 WL 7335943 (D. Conn. Nov. 7, 2023) ............44

*GoTo.com, Inc. v. WaltDisney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ...........................................................................44

*Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*,
  860 F.3d 1244 (9th Cir. 2017) ........................................................................*passim*

*GS Holistic, LLC v. Natts Smoke II Inc.*,
  No.CV22-06840PSG(AGR), 2023 WL 5017994
  (C.D. Cal. July 12, 2023) ...................................................................................44

*Haines v. Liggett Grp. Inc.*,
  975 F.2d 81 (3d Cir. 1992) .................................................................................47

*Hamilton v. Barnes*,
  806 F. App'x 536 (9th Cir. 2020) .........................................................................7

*Hartley Pen Co. v. Lindy Pen Co.*,
  16 F.R.D. 141 (S.D. Cal. 1954) ..........................................................................25

*In re Gannett News Serv., Inc.*,
  772 F.2d 113 (5th Cir. 1985) ..............................................................................35

*In re San Juan Star Co.*,
  662 F.2d 108 (1st Cir. 1981).........................................................................33, 34

*In re Zyprexa Injunction*,
  474 F. Supp. 2d 385 (E.D.N.Y. 2007), *aff'd sub nom.*
  *Eli Lilly & Co. v. Gottstein*,
  617 F.3d 186 (2d Cir. 2010) ........................................................................*passim*

*International Union of Mine, Mill and Smelter Workers, Locals No. 15 v.
  Eagle–Picher Mining & Smelting Co.*,
  325 U.S. 335 (1945).............................................................................................22

*Kulas v. Flores*,
  255 F.3d 780 (9th Cir. 2001) ...............................................................................7

*Leigh v. Salaz,*
677 F.3d 892 (9th Cir. 2012) ................................................................6

*Madsen v. Women's Health Ctr., Inc.,*
512 U.S. 753 (1994) ...............................................................33, 40

*Mitchell v. Valenzuela,*
791 F.3d 1166 (9th Cir. 2015) ...................................................7, 44, 45

*New York Times Co. v. United States,*
403 U.S. 713 (1971) ...........................................................39, 40, 41

*Osband v. Woodford,*
290 F.3d 1036 (9th Cir. 2002) ..............................................................7

*Perry v. O'Donnell,*
759 F.2d 702 (9th Cir. 1985) ...............................................................27

*PowerShare, Inc. v. Syntel, Inc.,*
597 F.3d 10 (1st Cir. 2010) ................................................................47

*Privitera v. California Bd. of Med. Quality Assurance,*
926 F.2d 890 (9th Cir. 1991) ...............................................................3

*Quint v. Vail Resorts, Inc.,*
89 F.4th 803 (10th Cir. 2023) ..........................................................42, 45

*Ready Transp., Inc. v. AAR Mfg.,*
627 F.3d 402 (9th Cir. 2010) ...............................................................6

*Reynaga v. Cammisa,*
971 F.2d 414 (9th Cir. 1992) ..........................................................42, 43

*S.E.C. v. Merrill Scott & Assocs., Ltd.,*
600 F.3d 1262 (10th Cir. 2010) ............................................................3

*Salcido v. Ditomas,*
No. 22-15294, 2022 WL 3584903 (9th Cir. Mar. 18, 2022) .............................43

*Seattle Times Co. v. Rhinehart,*
467 U.S. 20 (1984) .....................................................................*passim*

*Shoen v. Shoen,*
48 F.3d 412 (9th Cir. 1995) ...............................................................30

*U.S. v. Tacorbian,*
24 F.3d 1 (9th Cir. 1994) .................................................................38

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.,*
982 F.2d 363 (9th Cir. 1992) ...............................................................6

vii

*United States v. Brown*,
250 F.3d 907 (5th Cir. 2001) ................................................................33

*United States v. California Mobile Home Park Mgmt. Co.*,
107 F.3d 1374 (9th Cir. 1997) ........................................................22, 24

*United States v. Cuevas-Lopez*,
934 F.3d 1056 (9th Cir. 2019) ............................................................30

*United States v. Reyna-Tapia*,
328 F.3d 1114 (9th Cir. 2003) (*en banc*) ............................................43

*United States v. Washington*,
596 U.S. 832 (2022)..............................................................................4

*Western Sys., Inc. v. Ulloa*,
958 F.2d 864 (9th Cir. 1992) ................................................................6

*Westinghouse Elec. Corp. v. Newman & Holtzinger, P.C.*,
992 F.2d 932 (9th Cir. 1993) ..............................................................27

*Will v. Hallock*,
546 U.S. 345 (2006).............................................................................3

*Zemel v. Rusk*,
381 U.S. 1 (1965).....................................................................*passim*

**STATUTES**

28 U.S.C. § 626(b)(1)(A) ............................................................42, 43

28 U.S.C. § 636.................................................................45, 46, 47

28 U.S.C. § 636(b)(1)(A) .................................................19, 22, 42, 45

28 U.S.C. § 1292(a)(1).............................................................2, 3

**RULES**

FED. R. CIV. P. 23(f) ...........................................................................12

FED. R. CIV. P. 26(c)(1) .....................................................................33

FED. R. CIV. P. 72 ...................................................................*passim*

FED. R. CIV. P. 72(a) ...................................................................42, 47

FED. R. CIV. P. 72(b) ...................................................................42, 47

**TREATISES**

Wright & Miller, 7C *Fed. Prac. & Proc. Civ.* § 1920 (3d ed.) ................24

Wright & Miller, 12 *Fed. Prac. & Proc.* § 3068.2 (3d ed. Apr. 2023) .................42

Wright & Miller, 12 *Fed. Prac. and Proc.* § 3069 (3d ed. Apr. 2023) ..................47

67A C.J.S. Parties § 126 (May 2024) ......................................................25

CONSTITUTIONAL PROVISIONS

U.S. Const., amend I ......................................................................*passim*

OTHER AUTHORITIES

Erwin Chemerinsky, *Injunctions in Defamation Cases*, 56 Syracuse L. Rev. 157 (2007) ................................................................................44

Jeff Manning, *Class-action lawsuit on NIKE: 'where women are devalued and demeaned'*, THE OREGONIAN, Aug. 10, 2018 (last visited August 2, 2024) ........................................................................9

Jeff Manning, *Unsealed NIKE documents reveal widespread complaints of harassment, pay disparities*, THE OREGONIAN, Jan. 18, 2023 (last visited August 2, 2024) ..........................................................9

Matthew Kish, *Deposition shakes up NIKE pay discrimination lawsuit; NIKE wants it barred*, THE OREGONIAN, Oct. 5, 2023 (last visited August 2, 2024) ..........................................................9

Matthew Kish, *NIKE executives subjects of sex discrimination, harassment complaints, plaintiffs claim*, THE OREGONIAN, Nov. 14, 2023 (last visited August 2, 2024) ..........................................................9

Matthew Kish, *NIKE says it has made changes to improve its work culture. But employees are still making new discrimination complaints amid an ongoing lawsuit, lawyer says*, BUSINESS INSIDER, Sept. 21, 2022 (last visited August 2, 2024) ..........................................................9

Matthew Kish, *The Oregonian/OregonLive wins decision overturning order in Nike documents case - oregonlivecom*, THE OREGONIAN, Jan. 30, 2024 (last visited August 2, 2024) ......................................18

## **INTRODUCTION**

Federal courts have power to enforce their orders. Here, multiple orders have been breached—a temporary stay order and a stay order issued by this Court, as well as a protective order entered by the District Court—and the question is whether an injunction may issue to "clawback" and bar use of documents that were disclosed by Plaintiffs' counsel to a litigant (an intervening newspaper's agent) in violation of these court orders. The law teaches that such an injunction is proper, particularly where, as here, counsel was converted into a source for funneling confidential litigation documents to the media.

The underlying documents relate to allegations of harassment raised by NIKE employees on a confidential basis for internal review. The employees did not consent to the public disclosure of their identities—or their allegations—in litigation or otherwise. For that reason, the documents were produced during discovery pursuant to the civil Protective Order below. This Court subsequently ordered these confidential litigation documents to remain sealed during the pendency of Appeal No. 24-165 (which is now fully-briefed).

Yet, Appellee, the Oregonian, which intervened in the case below to modify the Protective Order and thus made itself a litigant, coordinated with Plaintiffs' counsel and obtained unredacted copies of documents that were to remain sealed pursuant to this Court's express orders. The Oregonian asked for a private meeting

with Plaintiffs' counsel, counsel had pre-assembled a packet of the court-protected materials, and during the meeting, counsel used her iPhone and iPad to transmit this packet to the Oregonian's reporter (which also violated the Protective Order below). The Oregonian, a litigant before the Court, later refused to return or destroy the unredacted documents that are fruits of a poisonous tree. This appeal asks whether there is a remedy. *See Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195 (2d Cir. 2010) (courts can issue injunctions to return documents against "third parties who aid and abet the violation of their protective orders.").

This appeal also presents satellite and related questions, including whether an intervenor is a party (this Circuit's law answers in the affirmative), appropriate standards of review, and the relationship between the rules regarding the policing of gathering information versus the prior restraint doctrine. But the core issue is a court's power to remedy violations of an order when all litigants are before the court.

NIKE offers a more fulsome discussion below. Because the District Court erred on the law, NIKE asks that this Court either (1) reverse and grant NIKE the injunctive relief it seeks, or (2) remand for consideration under the correct law.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction under 28 U.S.C. § 1292(a)(1) and the collateral order doctrine. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

Section 1292(a)(1) "permits appeal as of right from '[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, *refusing* or dissolving *injunctions*[.]'" *Carson v. American Brands, Inc.*, 450 U.S. 79, 83 (1981) (citation omitted, emphasis and alterations in original). NIKE sought and was denied an injunction, like the one in *In re Zyprexa Injunction*, 474 F. Supp. 2d 385 (E.D.N.Y. 2007), *aff'd sub nom. Eli Lilly & Co. v. Gottstein*, 617 F.3d 186 (2d Cir. 2010), issued by Judge Weinstein, which enjoined the use and dissemination of documents that were subject to a protective order. *Id*. at 430 (ordering the "return . . . [of] copies still in [their] possession[]"). *See also Eli Lilly*, 617 F.3d at 194 (the Second Circuit confirmed that this order was an "injunction[.]"); *Privitera v. California Bd. of Med. Quality Assurance*, 926 F.2d 890, 893-94 (9th Cir. 1991) (describing functional approach to section 1292(a)(1) appeals).

The District Court's order also satisfies the collateral order doctrine articulated in *Cohen*, 337 U.S. at 546. Orders that satisfy "the Supreme Court's collateral order doctrine, [ ] must (1) 'conclusively determine the disputed question,' (2) 'resolve an important issue completely separate from the merits of the action,' and (3) 'be effectively unreviewable on appeal from a final judgment.'" *Childs v.*

3

*San Diego Fam. Hous. LLC*, 22 F.4th 1092, 1095 (9th Cir. 2022) (quoting *Will v. Hallock*, 546 U.S. 345, 349 (2006)). Orders denying the return of documents and discovery into disclosures to others satisfy the collateral order test. *See S.E.C. v. Merrill Scott & Assocs., Ltd.*, 600 F.3d 1262, 1270 (10th Cir. 2010) (explaining the collateral order doctrine's application to orders related to third-parties and protective orders).

This appeal of the District Court's April 9, 2024 order, from which NIKE timely appealed, 4-ER-0785, "conclusively" determines the issues surrounding the unauthorized disclosure of confidential litigation documents. These issues are wholly separate from the merits of the action—the Oregonian possesses documents that were obtained only because this Court's order was breached. Such issues are "effectively unreviewable on appeal from a final judgment," as the injuries to non-parties that NIKE seeks to prevent may have already occurred by the time final judgment is reached in this case. *Childs*, 22 F.4th at 1095.

Further, NIKE expects the Oregonian may argue that, in the event this Court affirms in Appeal No. 24-165, the Court need not reach the merits of this appeal invoking some claim of mootness. This would be a mistake. Appeal No. 24-165 only applies to a subset of the full universe of documents provided to the Oregonian in the violation of the Protective Order below. The Oregonian received confidential discovery materials that are subject to the Protective Order, but not at issue in Appeal

No. 24-165.  Thus, regardless of the outcome of Appeal No. 24-165, this Court will need to reach the merits of this appeal.  "A case is not moot, . . . unless 'it is impossible for [us] to grant any effectual relief.'"  *United States v. Washington*, 596 U.S. 832, 837 (2022) (citations omitted).

## STATEMENT OF THE ISSUES

The core question on appeal is a court's power to enforce its orders. The District Court took a narrow view of its power, and in the process, created a Circuit split. The issues here thus include the following:

1.  Did the District Court err as a matter of law when it found that it did not have the power to issue an injunction that would require the Oregonian to (a) return confidential litigation documents, (b) not to disseminate those documents or information contained therein, and (c) destroy any copies of the documents and information in its possession?

2.  Did the District Court err as a matter of law in finding that the First Amendment prohibited it from granting NIKE injunctive relief despite the fact that the injunction would have enforced an order regulating newsgathering methods?

3.  Did the District Court err when it held that the Oregonian was not a party to the case below?

4.  Did the District Court apply the wrong standard of review when it considered the Magistrate Judge's Findings and Recommendations (the "Findings") denying Plaintiffs' Motion to Request Return of Inadvertently Disclosed Materials?

6

5.    Did the District Court commit clear error in denying NIKE discovery

       into the unauthorized disclosure of confidential litigation documents?

## STANDARD OF REVIEW

Whether "a district court possessed [certain] power is a question of law reviewed *de novo.*" *Ready Transp., Inc. v. AAR Mfg*., 627 F.3d 402, 404 (9th Cir. 2010) (reviewing *de novo* the issue of whether the district court had jurisdiction to grant a motion to strike pursuant to its inherent powers); *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp*., 982 F.2d 363, 367 (9th Cir. 1992) (applying a similar dichotomy to the analysis of a district court's ability to exclude evidence under its inherent powers). In the case of an injunction, "[t]he question whether the district court had the power to issue the injunction is therefore reviewed *de novo*, while its decision to exercise that power is reviewed for an abuse of discretion." *Western Sys., Inc. v. Ulloa*, 958 F.2d 864, 867 (9th Cir. 1992).[1]

Here, the District Court pointed to the First Amendment as precluding the requested relief—a power question, not a discretionary one. 1-ER-12-13. *De novo* review therefore applies. *See Leigh v. Salaz*, 677 F.3d 892, 900-01 (9th Cir. 2012) (reversing the denial of a preliminary injunction on a First Amendment issue after conducting *de novo* review on the legal issues).

As to the procedural questions—party status, review of the Magistrate Judge's Findings, and denial of discovery—*de novo* review applies to two of the questions

---

[1] Any factual determinations made by the District Court in deciding whether to issue the injunction will be reviewed for clear error. *Leigh*, 677 F.3d at 896.

and clear error applies to the third.  Specifically, whether an intervenor is a "party" to the case below is a question of law this Court reviews *de novo*.  *See Kulas v. Flores*, 255 F.3d 780, 783-84 (9th Cir. 2001) (legal issues are reviewed *de novo*); *Hamilton v. Barnes*, 806 F. App'x 536, 538 (9th Cir. 2020) (the district court's interpretation of the parties' protective order was reviewed *de novo*).  Next, the authority of magistrate judges "is a question of law subject to *de novo* review." *Mitchell v. Valenzuela*, 791 F.3d 1166, 1168 (9th Cir. 2015) (citation omitted). Whether the District Court erred when it applied the clearly erroneous standard of review to the Magistrate Judge's Findings, rather than *de novo* review, will, itself, be reviewed *de novo*.  *CPC Patent Techs. PTY Ltd. v. Apple, Inc.*, 34 F.4th 801, 810 (9th Cir. 2022) (vacating and remanding a district court's decision because it should have applied *de novo* review).

Last, this Court reviews a district court's denial of objections or a motion to reconsider a magistrate judge's recommendations granting or denying discovery for "clear error."  *Osband v. Woodford*, 290 F.3d 1036, 1041-42 (9th Cir. 2002); *see also Brown v. Wesley's Quaker Maid, Inc.*, 771 F.2d 952, 954 (6th Cir. 1985) (noting court applies the "clearly erroneous" standard of review on appeal of a "*non-dispositive* pretrial motion such as a discovery motion") (emphasis in original).

## STATEMENT OF THE CASE

This appeal arises from the violation of multiple court orders by Plaintiffs' counsel, with the aid of the intervening and receiving press, the Oregonian (a party litigant), and the remedies allowed to address those circumstances.

Plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender filed this action in 2018, seeking to certify a class as to claims under the Federal Equal Pay Act, Oregon Equal Pay Act, and Title VII, alleging discrimination in pay and promotions decisions. 4-ER-738. Although unrelated to allegations concerning unequal pay, Plaintiffs have staked their case on a group of unverified and informal questionnaires containing allegations of workplace harassment, including claims involving intimate misconduct. *E.g.*, 4-ER-749-750 ¶ 54. The questionnaires were created, circulated, and collected by a small group of employees, independently from any official NIKE channel, though approximately 30 were turned over to NIKE representatives in or about February 2018. The completed questionnaires became associated with the phrase "Starfish" or the "Starfish surveys." Because the questionnaires were not prepared or collected with any indicia of scientific reliability, NIKE refers to them in this Opening Brief as the "Starfish questionnaires."

The named Plaintiffs did not submit a Starfish questionnaire and were not otherwise involved in the circulation or collection of the questionnaires. Nor do any

of the Starfish questionnaires pertain to any individual involved in the case below. Interestingly, the alleged questionnaires have become a focal point for Plaintiffs' counsel as the claims of the named Plaintiffs will soon proceed to trial.[2] Indeed, in addition to leaking the Starfish questionnaires to the media, the same Plaintiffs' counsel has facilitated the dissemination of information regarding those questionnaires to news outlets in the Portland, Oregon area.[3]

---

[2] *See, e.g.*, Matthew Kish, *NIKE executives subjects of sex discrimination, harassment complaints, plaintiffs claim*, THE OREGONIAN, Nov. 14, 2023, https://www.oregonlive.com/business/2023/11/nike-executives-subjects-of-sex-discrimination-harassment-complaints-plaintiffs-claim.html (last visited August 2, 2024); Jeff Manning, *Unsealed NIKE documents reveal widespread complaints of harassment, pay disparities*, THE OREGONIAN, Jan. 18, 2023, https://www.oregonlive.com/business/2023/01/unsealed-nike-documents-reveal-widespread-complaints-of-harassment-pay-disparities.html (last visited August 2, 2024); Jeff Manning, *Class-action lawsuit on NIKE: 'where women are devalued and demeaned'*, THE OREGONIAN, Aug. 10, 2018, https://www.oregonlive.com/business/2018/08/class-action_lawsuit_on_nike_w.html (last visited August 2, 2024); Matthew Kish, *NIKE says it has made changes to improve its work culture. But employees are still making new discrimination complaints amid an ongoing lawsuit, lawyer says*, BUSINESS INSIDER, Sept. 21, 2022, https://www.businessinsider.com/nike-employees-continue-to-make-new-discrimination-claims-lawyer-says-2022-9 (last visited August 2, 2024); Matthew Kish, *Deposition shakes up NIKE pay discrimination lawsuit; NIKE wants it barred*, THE OREGONIAN, Oct. 5, 2023, https://www.oregonlive.com/business/2023/10/deposition-shakes-up-nike-pay-discrimination-lawsuit-nike-wants-it-barred.html (last visited August 2, 2024).

[3] *Id.*

11

## I. NIKE PRODUCED THE STARFISH QUESTIONNAIRES PURSUANT TO THE PROTECTIVE ORDER BELOW.

On June 17, 2019, the District Court entered a Protective Order to govern discovery, which required records designated as "Confidential" to be "used only in this proceeding . . . restricted solely to the litigation of this case," only "filed under seal" (if at all) and distributed "solely" to certain attorneys involved in the case (*i.e.*, not the media). 4-ER-727. Even if a party disagreed with another party's confidentiality designation, the party "must nevertheless abide by that designation until the matter is resolved by agreement of the parties or by order of the Court." *Id.* at 732. A party making an unauthorized disclosure must "promptly . . . inform the producing party of all pertinent facts relating to the prior disclosure." *Id.* at 733.

Following motions to compel and a Court order on August 10, 2020, NIKE produced the set of approximately 30 completed questionnaires that were given to NIKE in or about February 2018 to Plaintiffs under the terms of the Protective Order. 4-ER-717, 4-ER-727. Although originally redacting the names of non-parties mentioned in the questionnaires, pursuant to further order, NIKE eventually produced unredacted copies of the Starfish questionnaires to Plaintiffs' counsel, though the questionnaires were unambiguously identified as "Confidential – Attorneys' Eyes Only" documents. 4-ER-707. This legend made clear that the questionnaires should not have been distributed, except as authorized by the Protective Order. 4-ER-727.

12

## II. PLAINTIFFS REDACTED THE EXCERPTS OF THE STARFISH QUESTIONNAIRES THAT WERE FILED IN CONNECTION WITH THEIR CLASS CERTIFICATION MOTION.

In January 2022, Plaintiffs filed redacted copies of certain of the Starfish questionnaires in connection with their motion for class certification. 5-ER-921-85. The parties agreed to unseal the contents of certain questionnaires, although they would continue to redact the names of the complainants, witnesses, and alleged persons of interest identified in the filed documents. 4-ER-688-689 at ¶ 2-3, 4-ER-690. The persons whose names were redacted from the Starfish questionnaires are non-litigant current or former NIKE employees. 4-ER-581-645.

## III. THE OREGONIAN INTERVENED TO ATTEMPT TO UNSEAL THE NAMES OF NON-PARTIES IN THE STARFISH QUESTIONNAIRES.

In April 2022—after Plaintiffs moved for class certification—the Media Intervenors, including the Oregonian, intervened to modify the Protective Order and to unseal the names of the complainants, witnesses, and alleged persons of interest in Starfish questionnaires that were submitted in support of the class certification briefing. 4-ER-669. While the District Court allowed the Media Intervenors to intervene in the case for the purpose of unsealing judicial records, it initially denied their attempt to access the identities of the complainants, witnesses, and alleged persons of interest.[4] 4-ER-647.

_____

[4] Intervenors requested that unredacted versions of the following be publicly filed:

After Plaintiffs lost their motion for class certification and this Court denied their Rule 23(f) petition, 3-ER-523, on August 9, 2023, the Media Intervenors renewed their motion to unseal the non-party names from the filed Starfish questionnaires. 3-ER-499. NIKE opposed their motion, 3-ER-480, but this time, the Magistrate Judge reversed course. The Magistrate Judge recommended granting the Media Intervenors' request to unseal the non-party names from the filed questionnaires. 3-ER-457. NIKE objected to the Magistrate Judge's recommendations pursuant to Fed. R. Civ. P. 72. 3-ER-436. Those objections were opposed. 5-ER-911. While the motion was being considered, NIKE renewed its request for oral argument. 3-ER-341. NIKE also moved to stay the motion's effectiveness pending any appeal of an order by the District Court affirming the Magistrate Judge's Findings. 3-ER-328.

The District Court adopted the Magistrate Judge's Findings, but agreed to NIKE's request for a temporary seven day stay so NIKE could seek relief from this

---

Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, 4-ER-643; Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, 4-ER-639; Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, 4-ER-633; Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, 4-ER-631; Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, 4-ER-629; Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification, 4-ER-618; Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification, 4-ER-581. 3-ER-503.

Court. 3-ER-319. NIKE sought and obtained from this Court both a temporary stay and a full stay pending appeal. 2-ER-306-08. NIKE's motion emphasized the irreparable harm that non-parties would suffer by connecting the names of individuals to unconfirmed allegations of workplace harassment. Appeal No. 24-165, Dkt. No. 3.1. None of these individuals are alleged to have been connected to the underlying pay equity claims or any allegation asserted by the named Plaintiffs; nor have they consented to the disclosure of their names or allegations. *Id*.

After full briefing on NIKE's stay motion, this Court granted a full stay pending appeal. While the District Court granted a seven-day stay of its unsealing order (which would run through January 12, 2024, 3-ER-319), this Court granted a temporary stay of that order on January 11, 2024, 2-ER-308. This Court then granted a full stay pending appeal on January 19, 2024 (the "Stay Order"). 2-ER-306.

Thus, the names reflected in the Starfish questionnaires have been subject to the District Court's Protective Order and multiple orders of this Court, including the Stay Order. All of these orders were violated by Plaintiffs' counsel. Appeal No. 24-165, Dkt. No. 40.1 at 10, 2-ER-222, *see* 2-ER-272.

## IV. PLAINTIFFS' COUNSEL AND THE OREGONIAN MET TO EXCHANGE CONFIDENTIAL LITIGATION DOCUMENTS.

The facts surrounding those violations are troubling, at best. Just *hours* after this Court's full Stay Order, Plaintiffs' Counsel (Laura Salerno Owens) met with a reporter from the Oregonian (Matthew Kish) and disclosed the unredacted Starfish

15

questionnaires that were subject to the Stay Order. 5-ER-883 ¶ 2. In fact, Ms. Salerno Owens disclosed more questionnaires than those which were filed in connection with the class certification briefing. 5-ER-887-88. She disclosed confidential discovery materials—which were subject to the Protective Order—that had never been publicly filed. 5-ER-887. Because of that disclosure (which Plaintiffs' counsel conveniently described as "inadvertent"), the Oregonian now possesses documents that it was prohibited from obtaining, including completed questionnaires containing confidential and unverified allegations of harassment. 5-ER-888.

The details of the meeting with the Oregonian are the stuff of backroom meetings and John Grisham novels.[5] Ms. Salerno Owens and Mr. Kish met during an ice storm at a coffee shop. 2-ER-80, 5-ER-889. The Oregonian requested the meeting. 2-ER-80. The Oregonian wanted information about NIKE. 5-ER-883 ¶¶ 2-3. Plaintiffs' counsel agreed to be used as a source and to provide the Oregonian with documents. 5-ER-883 ¶ 2.

Ms. Salerno Owens claims that she intended to provide Mr. Kish with a prepared comment during coffee shop meeting. *Id.* ¶ 5. She also anticipated

---

[5] As explained in the argument section, these facts are taken from the accounts offered by Plaintiffs' counsel and the Oregonian, though both of have resisted discovery into all facts pertaining to the unauthorized disclosure. *See* Section V, *infra*.

providing him a pre-arranged bundle of confidential litigation documents. *Id.* ¶¶ 3-4.  Ms. Salerno Owens had the documents—which included the unredacted and protected Starfish questionnaires—ready to send to Mr. Kish *before* that coffee shop meeting.  *Id.*

Sitting in the shop with devices in hand or nearby, Ms. Salerno Owens claims that she first emailed Mr. Kish the prepared comment, which "supposedly" referenced some of the publicly-available questionnaires.  *Id.* ¶ 5; 2-ER-284 ¶ 3.[6] Then, Mr. Kish allegedly "noticed [she] referenced the [the questionnaires]" and "asked [ ] which [questionnaires] supported the comment."  5-ER-883 ¶ 6.  Within *four minutes* of her emailing the comment, and supposedly in response to Mr. Kish's question, Ms. Salerno Owens purportedly typed an index with page numbers and allegations, which she then emailed to Mr. Kish—all while sharing a cup of coffee. 5-ER-883, 5-ER-884 ¶ 7.

The story then goes that Mr. Kish advised Ms. Salerno Owens that the page numbers in her index did not appear to be consistent with the documents that were filed on the public docket (amidst, of course, the hundreds of docket entries and

---

[6] The "supposedly" here is intentional.  Although discovery from the Oregonian was denied before the Court ruled, NIKE had moved to compel discovery from Plaintiffs regarding the disclosure.  2-ER-89.  The Magistrate Judge granted NIKE's motion to compel.  Nevertheless, for this appeal, NIKE reflects the facts as presented before the Magistrate Judge's ruling.

filings in the case below). 5-ER-884 ¶ 8. Two minutes later, still sitting across from Mr. Kish, Ms. Salerno Owens forwarded a pre-assembled PDF packet containing unredacted copies of the Starfish questionnaires that were filed with the class certification briefing *and* additional unredacted questionnaires that were produced (but never filed) in the case. *Id*. ¶ 9. All of these documents were subject to the Protective Order.

Again, at the time of the violation, the Oregonian was aware, at minimum, that a temporary stay from the Ninth Circuit was in effect. That temporary stay precluded Mr. Kish and Ms. Salerno Owens from discussing and disclosing the unredacted/sealed information that they both discussed and disclosed. 3-ER-308. In fact, the full Stay Order had *already* issued, and it, too, barred the discussion and disclosure of the unredacted/sealed copies of the Starfish questionnaires in the possession of Plaintiffs' counsel. 2-ER-207 ¶ 5, 2-ER-211-12.

In addition, Ms. Salerno Owens was aware of her obligations under the Protective Order, which included refraining from the public dissemination of confidential litigation documents. 4-ER-728-29 ¶¶ 1-2. Likewise, because the Media Intervenors (including the Oregonian) intervened to modify the Protective Order and opposed NIKE's stay requests, 3-ER-322, 3-ER-328, 3-ER-499, 4-ER-669, Appeal No. 24-165, Dkt. No. 7.2, the Oregonian also knew that it was not allowed to access the unredacted confidential litigation documents, 2-ER-306, 2-ER-

18

308, 3-ER-310, 3-ER-319.

Rather than immediately notifying NIKE, this Court, or the District Court of the unauthorized disclosure, Plaintiffs' counsel tried to convince the Oregonian—a litigant—to return the documents. 5-ER-885-87 ¶¶ 13-19. The Oregonian refused. 2-ER-284 ¶ 7.

Six days passed. During those six days, neither Plaintiffs nor the Oregonian notified NIKE, this Court, or the District Court of the disclosure. 2-ER-206-07 ¶¶ 3-4. Rather, they contacted each other and their lawyers. 5-ER-885-86 ¶ 15. To date, the Oregonian has refused to return and not to use the confidential litigation documents that Plaintiffs' counsel was barred (by multiple orders) from disclosing in the first instance. 5-ER-886-87 ¶¶ 16-19.

## V.   THE FLURRY OF BRIEFING BEGINS OVER THE DISCLOSED QUESTIONNAIRES.

After nearly a week, Plaintiffs' counsel finally notified NIKE that they had violated the Protective Order and the Stay Order. 2-ER-206-07 ¶ 3. Plaintiffs' counsel, through a separate law firm, also filed a motion seeking injunctive relief against the Oregonian, requesting return of the "inadvertently" disclosed materials and an order not to use or disseminate those documents. 5-ER-902.[7]

---

[7] Redacted versions of 5-ER-882 & 5-ER-902 were later filed. 2-ER-240, 2-ER-260.

Reserving its rights, NIKE joined in the request for injunctive relief. 2-ER-207-08 ¶ 6. The Magistrate Judge acted quickly. Noting that the Oregonian was an intervening party before her, the Magistrate Judge applied the law of "inadvertent" productions, and her Findings ordered the Oregonian: (1) to return the confidential litigation documents by January 31, 2024; (2) to agree not to disseminate the documents or the information contained therein; and (3) to destroy any copies in its possession. 2-ER-303.

Three days later, the Oregonian filed a motion to vacate the Magistrate Judge's Findings ("Motion to Vacate"), noting that Plaintiffs' counsel had failed to serve them with the motion. 2-ER-288. The Oregonian filed the request with the District Court rather than the Magistrate Judge. The District Court granted the Motion to Vacate, but ordered the *status quo* remain in effect until the issues were resolved. 2-ER-280. The Magistrate Judge then directed the parties to respond to the arguments made in the Motion to Vacate. 2-ER-277. All the while, Mr. Kish published articles in the Oregonian decrying as unconstitutional the Magistrate Judge's order to return the confidential litigation documents.[8]

---

[8] *See, e.g.*, Matthew Kish, *The Oregonian/OregonLive wins decision overturning order in Nike documents case - oregonlivecom*, THE OREGONIAN, Jan. 30, 2024, https://www.oregonlive.com/business/2024/01/federal-judge-orders-review-of-ruling-in-dispute-over-nike-documents-after-the-oregonianoregonlive-appeals.html (last visited August 2, 2024).

NIKE restated its request for injunctive relief—a return of the documents and an order not to use or disseminate the material. NIKE argued, *inter alia*, that the Oregonian as a party litigant through intervention could be bound by court orders like any other litigant, and that the First Amendment does not bar a court's power to police breaches of its orders. 2-ER-205, 2-ER-217-37. NIKE also requested that the Court issue an order to show cause as to why Plaintiffs' counsel and the Oregonian should not be sanctioned for their breaches. 2-ER-238.

When the Oregonian offered new evidence on reply, 2-ER-188, 2-ER-190, NIKE objected, noting that the new evidence confirmed both the need for discovery and for oral argument. 2-ER-181. The Oregonian opposed NIKE's request. 2-ER-178. No oral argument occurred.

On February 28, 2024, the Magistrate Judge issued her Findings, styled as an order. 1-ER-5; *see* 28 U.S.C. § 636(b)(1)(A). The Magistrate Judge recognized "[P]laintiff's counsel violated the protective order in place in this case[.]" 1-ER-12. Nevertheless, the Magistrate Judge concluded that the Oregonian had no obligation to return the documents at issue because the Oregonian's limited intervention meant it "has not violated any orders to which it is bound" and that the Court lacked authority to "restrain the Oregonian from publishing any information contained in the documents or compel their return,"

because such an order would be an impermissible prior restraint in violation of the First Amendment. 1-ER-12-13.

NIKE and Plaintiffs timely filed Rule 72 objections to the Magistrate Judge's Findings, 2-ER-133, 2-ER-173, which the Oregonian opposed, 2-ER-104. NIKE again sought oral argument and discovery from the Oregonian. 2-ER-133.

Without oral argument, the District Court denied NIKE's objections and affirmed the Magistrate Judge's Findings, which became the Order. 1-ER-2. The District Court applied the "clearly erroneous" or contrary to law standard of review to the Magistrate Judge's Findings—despite NIKE's citation to law confirming that the standard should have been *de novo*. 1-ER-3. The District Court explained that the Order denying return of the documents was "not determinative of a 'party's claim or defense,'" and thus, "not dispositive" for purposes of *de novo* review, even though injunctive relief was sought and the Oregonian's ultimate goal in the litigation was access to the documents. *Id.*

NIKE appealed, Dkt. No. 1.1, 4-ER-785, and sought an emergency injunction pending appeal, Dkt. No. 5.1. The request was denied. Dkt. No. 14.1. *En banc* review of the emergency injunction also was denied. Dkt. No. 23.1.

22

## SUMMARY OF ARGUMENT

A court is not powerless to remedy breaches of its orders. The District Court below thought it was so limited, and it therefore committed errors in the process.

*First,* the District Court erred as a matter of law in both understanding its powers and the law that governed the exercise of those powers. The Oregonian succeeded in convincing the Magistrate Judge that the issue below was entangled in the First Amendment. In reality, the issue lies in a question of the court's authority. Plaintiffs' counsel in the case below gave confidential litigation materials—court-protected documents—to the Oregonian (an intervenor) in violation of not one, but multiple, court orders.

In such circumstances, the District Court had full authority to issue an injunction requiring the return of those documents and a bar on use, pursuant to its broad authority to manage litigants and its proceedings. The policing would not be of speech. It would be of court orders and the manner in which information is *gathered*.

Where, as here, the documents are wrongfully obtained from sources to a litigation (namely, Plaintiffs' counsel), a court has power to control the *gathering* of the information and thus, equally, the power to remedy wrongful gathering. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984). As the Supreme Court has

23

held, the "right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965).

*Second,* the Magistrate Judge erred in concluding that the Oregonian, as an intervenor, was not a party subject to, or controlled by, the Protective Order and thus beyond the Court's remedial powers. This was doubly mistaken.

Under this Circuit's law, the Oregonian *is* a party subject to the very Protective Order it sought to modify: "After intervention, the parties to the litigation have changed. Indeed, intervening parties have full party status in the litigation commencing with the granting of the motion to intervene." *United States v. California Mobile Home Park Mgmt. Co*., 107 F.3d 1374, 1378 (9th Cir. 1997) (citing *International Union of Mine, Mill and Smelter Workers, Locals No. 15 v. Eagle–Picher Mining & Smelting Co*., 325 U.S. 335, 338 (1945)).

Regardless, the District Court was empowered to issue the injunction even if the Oregonian was not a party. *Eli Lilly*, 617 F.3d at 195 (issuing an injunction against those who participated in a breach of a protective order).

*Third,* the District Court erred in the manner in which it reviewed the Magistrate Judge's Findings. The District Court improperly applied the "clearly erroneous" standard of review to the Magistrate Judge's Findings with respect to a matter—an injunction—that magistrate judges have no statutory power to hear. *See* 28 U.S.C. § 636(b)(1)(A); *Center for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d

24

1092, 1107 (9th Cir. 2016) ("the Act precludes a magistrate judge from ruling on such a motion regardless of how it is characterized").

*Fourth,* the Magistrate Judge committed clear error by disallowing discovery and refusing oral argument. The only facts offered below were those crafted by the offending parties. While even those facts revealed enough for the requested relief to issue (there was plenty of smoke surrounding this admitted fire), NIKE was not allowed to investigate the full scope of the breaches before the Court ruled.

For all of these reasons and the reasons stated below, NIKE asks that this Court reverse the denial of its injunctive relief and remand with directions to order the return of the improperly disclosed protected materials and bar their use. In the alternative, NIKE asks that this vacate and remand with instructions to the District Court to apply the correct legal standards.

## ARGUMENT

Protective orders in civil litigation are necessary to the functioning of the courts.  Adherence to the operative Protective Order did not happen here.  Parties subject to court orders met and shared court-protected information.  Yet, knowing a breach happened, one of the parties (the Oregonian) convinced the District Court that it was powerless to undo the breach.  Rather than a vigorous defense of its orders, the District Court believed itself handcuffed by the fact that one of the litigants—the Oregonian—was a member of the press.

This was legal error.

As explained below, this Court has the ability to correct that error, reverse on any number of grounds, and in the process, reconfirm that courts are fully empowered to protect their orders.  The First Amendment is no bar.  The Supreme Court agrees.  Left unchecked, the decision below creates a Circuit conflict on an issue of court power.  Left unchecked, the decision cripples the faith in protective orders that a functioning court system requires.  NIKE asks this Court to reverse.

## I.  THE DISTRICT COURT HAD AUTHORITY TO ISSUE A CLAWBACK INJUNCTION AND BAR ON USE.

The Oregonian maintained, and the Magistrate Judge agreed, that it was not a party to the action, and thus could not be reached by the Court's authority.  *E.g.*, 1-ER-11, 2-ER-111-12.  The Oregonian and the District Court below were wrong on both points.

26

A. **The District Court Erred In Denying The Clawback Order And Bar On Use.**

Under Ninth Circuit law, the Oregonian was an "intervening part[y]" with "full party status" in the litigation. *California Mobile Home*, 107 F.3d at 1378. The Oregonian willfully subjected itself to the jurisdiction of the District Court. It did so, as an intervenor, for the very purpose of *modifying the treatment of the public, but sealed documents* under the very Protective Order that it believes it can now thwart. 4-ER-672-73, 4-ER-677 (acknowledging that intervention is used to "challenge protective orders"), 4-ER-679. Intervenors who choose to approach the District Court to receive their benefits are equally subjected to the orders and authority of the District Court to manage its proceedings and the litigants before it. By *choosing* to avail itself of the District Court's jurisdiction, the Oregonian "join[ed the litigation] subject to the proceedings that have occurred prior to his intervention[.]" Wright & Miller, 7C *Fed. Prac. & Proc. Civ.* § 1920 (3d ed.).

Contrary to the Magistrate Judge's Findings, it is irrelevant that "[i]ntervention was granted well after the Court entered the stipulated protective order[.]" 1-ER-11. Rather, it is well established that "one who intervenes in a suit in equity thereby becomes a party to the suit, and is bound by all prior orders and adjudications of fact and law as though he had been a party from the commencement of the suit." *Galbreath v. Metro. Tr. Co. of Cal.*, 134 F.2d 569, 570 (10th Cir. 1943). Indeed "[i]t is a general principle that intervening defendants enter the case as they

27

find it, bound by all orders and proceedings prior to the date of intervention." *Chavis v. Whitcomb*, 305 F. Supp. 1359, 1363 (S.D. Ind. 1969).[9]

Moreover, the prior order in question—the Protective Order—governs the use of confidential documents by "*part[ies]*" to the proceeding. 4-ER-728. The Protective Order does not define, limit, or qualify "party," such that the Oregonian would be excluded from its definition. *Id.* The Protective Order was submitted by NIKE to govern the exchange of information between *parties* to the proceeding. *Id.* The Oregonian entered the proceeding to obtain documents that were protected under that order. It tied itself to the Protective Order from the minute it made the decision to enter the litigation. Now, it claims immunity from restrictions under the very order it sought to modify to obtain the documents in its possession. Under the Oregonian's view, it can intervene in an action to change the treatment of confidential documents under the Protective Order, but then simply receive them

---

[9] NIKE advised the Magistrate Judge of this law in its papers. *See* 2-ER-228-29. Yet, the law was not referenced in the Findings, nor in the District Court's Order adopting the Findings. "After intervention, the intervener generally is subject to, or governed by, the rules of practice which apply to other parties." 67A C.J.S. Parties § 126 (May 2024). "[O]nce intervention has been granted the intervener becomes a 'party', within the meaning of the Rules[.]" *Hartley Pen Co. v. Lindy Pen Co.*, 16 F.R.D. 141, 153 (S.D. Cal. 1954).

from Plaintiffs' counsel in violation of that order with no repercussions.[10]  The law does not tolerate this absurd result.

The Protective Order limits both who can view confidential documents and how parties can use confidential documents.  4-ER-729 ¶ 3 (stating that confidential documents shall "not be used by any party for any business, commercial, or competitive purposes), 4-ER-731 ¶ 7 (including "every employee, director, officer, or manager of any party to this action" in the parties that can view confidential documents, "but only to the extent necessary to further the interest of the parties in the litigation").  Both of these restrictions were violated.  The District Court is not then left powerless to correct those violations and enforce its orders.

To the contrary, with the potential benefit of becoming a litigant to modify the Protective Order also comes the burdens placed on litigants to obey court orders,

---

[10] Notably, The Oregonian attempted to draw a confusing distinction in its Response to NIKE's Rule 72 objections between gaining access to documents it was not permitted to see on PACER and gaining access to documents that it was not permitted to see through an email from counsel.  2-ER-112.  The Oregonian "was mistakenly granted access via PACER to—and as a result, on June 3, 2022, obtained—unredacted copies of three theretofore non-public documents filed by the plaintiffs in this case."  4-ER-664.  Presumably understanding that such access was not permitted *under the Protective Order*, the Oregonian's counsel contacted the Court to correct the error.  Now, because an attorney for a litigant gave the Oregonian confidential discovery, it believes that the restrictions under the Protective Order are illusory and that the Oregonian is immune from the Court's power.  Whether it is a system of the Court or an officer of the Court (*i.e.*, counsel for one of the parties) that improperly granted the Oregonian access to the documents does not—and should not—change the result.

as well as the court's power to enforce its orders and safeguard the integrity of its proceedings. There is no doubt as to "the existence of the inherent authority of a court to enforce its orders by whatever means," *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985) (citing *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977)), a power that "carries with it the equal power to punish for a disobedience[.]" *Westinghouse Elec. Corp. v. Newman & Holtzinger, P.C.*, 992 F.2d 932, 934 (9th Cir. 1993) (citation omitted). Indeed, "[i]t is one of the equitable powers, inherent in every court of justice so long as it retains control of the subject-matter and of the parties, to correct that which has been wrongfully done by virtue of its process." *In re Zyprexa Injunction*, 474 F. Supp. 2d at 417-18 (citation omitted).

Here, the Protective Order was breached. A *second* court order from this Court—which prevented the Oregonian from accessing the unredacted versions of the Starfish questionnaires that were sealed pending appeal—also was breached. And both were breached with the active participation of the Oregonian, a litigant in this proceeding who purposefully subjected itself to the Court's authority and knew the import of those binding orders. 3-ER-499, 4-ER-669. The District Court had full authority to reach Plaintiffs, their counsel, and the Oregonian and issue an order that would remedy the clear violations. *In re Zyprexa Injunction*, 474 F. Supp. 2d at 417-18.

30

**B.**    **The District Court Erred In Limiting Its Own Inherent Authority To Address Assistance To Breaches Of Court Orders.**

Even without the Oregonian's party status, the District Court could have and should have issued a clawback order and use ban against The Oregonian.  With an admitted violation by a party (Plaintiffs through their counsel), the court's power reaches beyond parties to non-parties who improperly obtained the materials from a party to the litigation—*i.e.,* "third parties who aid and abet the violation of their protective orders." *Eli Lilly*, 617 F.3d at 195.

The Second Circuit confirmed a court's power to reach non-parties for protective order breaches in *Eli Lilly*.  NIKE discussed *Eli Lilly* in depth in its briefing in the District Court.  Unfortunately, neither the Magistrate Judge nor the District Court discussed it in their Findings or the Order.  Proper consideration of the Second Circuit's analysis would have confirmed that the District Court did, indeed, have the power to reach the Oregonian by order.

In *Eli Lilly*, the Plaintiffs' expert witness received documents from Eli Lilly pursuant to a protective order. *Eli Lilly*, 617 F.3d at 189.  A *New York Times* reporter became aware of the protective order in place and colluded with the plaintiffs' expert witness to escape "the order's restrictions and [obtain] protected documents in the expert's possession[.]" *In re Zyprexa Injunction*, 474 F. Supp. 2d at 392.  Knowing the confines of the protective order, the expert instead conspired with third parties to construct a purportedly "lawful" and "independent[]" way to distribute and

31

publicize the documents. *Eli Lilly*, 617 F.3d at 193. The expert reached out to a reporter, who put him in touch with an attorney, who in turn, intervened in an unrelated case and subpoenaed the expert to produce the confidential documents. *Id.* at 189. Once produced, the attorney sent the documents to various individuals, including the New York Times reporter who originally approached the expert witness. *In re Zyprexa Injunction*, 474 F. Supp. 2d at 392. "Almost at once, the New York Times published excerpts from, and summaries of, the protected documents in a series of lead articles under [the reporter's] byline." *Id.* at 392-93.

Eli Lilly, the defendant who produced the documents, was "[u]nderstandably alarmed[,]" *Eli Lilly*, 617 F.3d at 189 (just as NIKE is here), and brought the issue to the attention of the District Court. In a detailed decision by the venerable Judge Jack Weinstein, the District Court saw that the breach of the protective order *had* to be remedied. *In re Zyprexa Injunction*, 474 F. Supp. 2d at 392. Judge Weinstein held that the court's equitable power "encompasses the authority to order the return of the documents stolen by the conspirators in violation of the protective order." *Id.* at 422.

The Second Circuit affirmed. It held that injunctive relief requiring return of the documents was a "perfectly appropriate device to foreclose further dissemination of the confidential documents produced under the protective order." *Eli Lilly*, 617 F.3d at 196. The Second Circuit reasoned:

> If courts cannot bind third parties who aid and abet the violation of their protective orders, then any party, agent, attorney or expert who comes into possession of material he wanted to use against the producing party could simply disseminate the information quickly, then deal with the damages issue after the fact. We understand that the threat of a sizable damages award may deter this action in some cases, but [the] proposed rule would eviscerate courts' ability to manage discovery and hence litigation.

*Id*. at 195.

So too here. Either the power exists or a Circuit split does. *See United States v. Cuevas-Lopez*, 934 F.3d 1056, 1067 (9th Cir. 2019) (relying on the "the goal of avoiding a circuit split"). If the District Court could not enjoin the Oregonian who, at minimum, sought out a meeting with Plaintiffs' counsel for information about NIKE, a known litigation participant, to obtain information, the press would have little reason not to encourage and solicit violations of court orders. The press, who often relies on the courts for orders to protect against the encroachment of litigants who seek information from *them*, *see, e.g., Shoen v. Shoen,* 48 F.3d 412, 416 (9th Cir. 1995), could encourage with impunity violations of other orders when the press seek information from litigants. What would be good for the goose, would not be good the gander.

In its response to NIKE's Rule 72 objections, the Oregonian tried to distinguish the breach here from the one in *Eli Lilly* by arguing that there was "no conspiracy." 2-ER-109. But that argument is a paper tiger belied by Plaintiffs' counsel's declaration.

33

The breach here was not an anonymous envelope in the mail. The Oregonian *asked* to meet with a litigant because the Oregonian considered the litigant a source for confidential litigation documents. 5-ER-883 ¶ 1. The Oregonian *asked* for Plaintiffs' counsel to provide information. 5-ER-884 ¶¶ 7-9. The Oregonian had *asked* before. *See supra* n.2. The Oregonian had published material received from Plaintiffs' counsel before. *Id.* The Oregonian knew that the source of Plaintiffs' counsel's information *was the litigation*. And Plaintiffs' counsel had pre-assembled a packet of the confidential litigation documents that were sent to the Oregonian during their coffee shop meeting. 5-ER-883 ¶¶ 4, 9. Thus, while the Oregonian may never have said the words "let's conspire," their conduct speaks of the mutual cooperation that animated the Second Circuit and Judge Weinstein. *Eli Lilly*, 617 F.3d at 195-96; *In re Zyprexa Injunction*, 474 F. Supp. 2d at 422.

Under these facts, the District Court had the power to issue injunctive relief against the Oregonian to clawback the improperly shared materials and bar their use. "The necessity of enjoining dissemination and requiring return of the sealed documents[,]" in short "is not limited to those who were bound by the terms of [the Protective Order]." *In re Zyprexa Injunction*, 474 F. Supp. 2d at 427. Instead, "[t]he power to enjoin extends to persons and organizations whose activities present a risk of irreparable harm to petitioner that cannot be alleviated by means other than injunction." *Id.*

## II.  THE DISTRICT COURT ERRED IN FRAMING THE QUESTION: THE FIRST AMENDMENT ALLOWS COURTS TO POLICE THE GATHERING OF INFORMATION.

Beyond the District Court's errors as to the Oregonian's party status and its powers, the District Court also erred in its First Amendment analysis. Fundamentally, the District Court erred in framing the question.  It saw the question as one of prior restraint rather than as one policing the gathering of information improperly gathered.  1-ER-13-14.

### A.  The Oregonian Does Not Have An Absolute And Unrestrained Right To Gather Information Any Way It Wants.

The Supreme Court holds that the "right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel*, 381 U.S. at 17.  It "does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972). The press does not enjoy immunity from the application of general laws; nor does it have a "special privilege to invade the rights and liberties of others." *Id.* at 683 (citation omitted).  Where injunctions issue against a "limited group of persons who have engaged in unlawful conduct," even where speech is implicated, they are not prior restraints.  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 778 (1994) (Stevens, J. concurring).

Because the press does *not* enjoy unlimited and unrestrained access to information, "[a] trial court may refuse to allow the media to inspect documents not

35

a matter of public record, including jurors' names and addresses; *such orders are distinct from prior restraints*." *United States v. Brown*, 250 F.3d 907, 914 (5th Cir. 2001) (emphasis added).

## B. The Court Has The Power To Control Dissemination Of Discovery Without Infringing First Amendment Rights.

Had the Court below focused on the regulation of the gathering of information rather than on the prior restraint doctrine, it would have seen the logical syllogism which empowered (rather than disempowered) the Court to act.

It is an "undisputed fact that a court under Rule 26(c)(1) can deny access to information altogether by preventing discovery upon a showing of any 'good cause', specifically including but not limited to such relatively innocuous possibilities as 'annoyance, embarrassment, oppression or undue burden or expense', and that a denial of access does not implicate the First Amendment." *In re San Juan Star Co.,* 662 F.2d 108, 114 (1st Cir. 1981).

There is, in other words, no First Amendment right to discovery. The Supreme Court in *Seattle Times* said so. Tasked with determining whether the court could issue a protective order that prohibited the dissemination of information gathered through discovery, the Supreme Court evaluated the purposes and scope of pretrial discovery to understand the rights of access associated with it:

> At the outset, it is important to recognize the extent of the impairment of First Amendment rights that a protective order, such as the one at issue here, may cause. As in all civil litigation, petitioners gained the

36

> information they wish to disseminate only by virtue of the trial court's
> discovery processes. As the Rules authorizing discovery were adopted
> by the state legislature, the processes thereunder are a matter of
> legislative grace. A litigant has no First Amendment right of access to
> information made available only for purposes of trying his suit. *Zemel*
> v. *Rusk*, 381 U.S. 1, 16-17 (1965) ("The right to speak and publish does
> not carry with it the unrestrained right to gather information").

*Seattle Times*, 467 U.S. at 32.

Unlike public civil trials, discovery matters, such as "pretrial depositions," document productions, and "interrogatories are not *public* components" of the judicial processes. *Seattle Times*, 467 U.S. at 33 (emphasis added). The reason for privacy is apparent. As the First Circuit explained in *In re San Juan*, "the discovery rules are liberal, giving parties broad powers to gather information. As a result, a [litigant] may be obliged to reveal information that will not be admissible at trial. Unlike evidence at trial, it has not passed the strict threshold tests of relevance and admissibility, yet it has been compelled by dint of legal process." *In re San Juan*, 662 F.2d at 115. Also relevant is the fact that the discovery produced may be "irrelevant, prejudicial, or pose an undue invasion of an individual's privacy." *Id.*

The liberality of the discovery rules allows for the free and efficient exchange for information, but it must be balanced against the equally compelling interest of protecting litigants and ensuring fair trials without bias and undue prejudice through the widespread dissemination of discovery documents in the press. For these reasons, federal courts have confirmed that the rights of access to such materials are

different, and it leads to a conclusion that orders controlling such *pre-trial* information are "not the kind of classic prior restraint[s] that require[] exacting First Amendment scrutiny." *Seattle Times*, 467 U.S. at 33; *see also In re Gannett News Serv., Inc.,* 772 F.2d 113, 116 (5th Cir. 1985) ("The results of pretrial discovery may be restricted from the public[]" without constituting a prior restraint).

Thus, the *Seattle Times* Court confirmed that "an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Seattle Times*, 467 U.S. at 33 (citation omitted). Because its holding rested on the inherent privacy concerns in discovery and a court's powers to control its processes, the Supreme Court confirmed that its conclusion was tied to where the information was sourced. A party "may disseminate the identical information covered by the protective order as long as the information is gained *through means independent of the court's processes*." *Id.* at 34 (emphasis added).

Put simply, under *Seattle Times*, a court can police access to litigation documents—pleadings and discovery—including keeping them from the press. *This* Court concurs.

In *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 860 F.3d 1244 (9th Cir. 2017), this Court explained that the law permitted a District Court order barring the press from using "litigation documents," so long as it did not bar

the press from using "independent sources" to gather the information. *Id*. at 1257-58. The Ninth Circuit clarified: "By independent source, we mean what the district court implied: Ground Zero may discuss and distribute the documents in question *so long as it acquires the documents from a source not involved in this litigation*[.]" *Id*. at 1258 (emphasis added) (citation omitted). The implication of this Court's analysis is that, if the press obtains information from a litigant, its use *may* be regulated by the Court.

The logic of these cases, combined with the Court's inherent powers, leads to but one conclusion. If the Court has the power to police what is shared *before* it is shared without prior restraint concerns, then it *also* has the power to enforce its rules and remedy violations when they occur without prior restraint concerns. Under *Zemel*, *Seattle Times*, *Eli Lilly*, and *Ground Zero*, the District Court was free to regulate the Oregonian's improper acquisition of protected documents and information without raising a prior restraint question.

Here, the Oregonian received confidential litigation documents sealed pursuant to a Protective Order and a Stay Order, in addition to confidential discovery documents that have never been filed (triggering *Seattle Times*). The Oregonian received the documents from an attorney for the Plaintiffs (triggering *Ground Zero*).

### C. The Oregonian Admits It Considered Plaintiffs' Counsel as a Source Triggering *Ground Zero*.

The Oregonian's own narrative confirms the application of *Seattle Times* and *Ground Zero*. The Oregonian admitted that "Mr. Kish approached Ms. Salerno Owens as a *source*." 2-ER-110 (emphasis added). But that merely begs the question, how is Ms. Salerno Owens a source *but for* this litigation? Ms. Salerno Owens did not work for NIKE. The Oregonian approached Ms. Salerno Owens because she is privy to information that has been revealed in this litigation to her as a lawyer for one of the parties. She has information (and confidential discovery documents) that other individuals do not have by virtue of the fact that she is an attorney "involved" in the litigation. *Ground Zero*, 860 F.3d at 1258.

Yet, the Oregonian maintained below (and convinced the District Court) that its collection of material the Court barred it from seeing cannot be undone now because it has already received them through Plaintiffs' counsel's violation. The logic fails. The court's authority to make orders to control the dissemination of discovered information is no different from its authority to *enforce* those orders. The power to order also implies the power to enforce. *See, e.g., Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008) (inherent authority to enforce orders); *United States v. Tacoubian*, 24 F.3d 1, 5 (9th Cir. 1994) (inherent authority to enforce compliance with the court's own properly-issued order).

40

As the *Seattle Times* Court noted, "continued court control over the discovered information does not raise the same specter of government censorship that such control might suggest in other situations." *Seattle Times,* 467 U.S. at 32 (citation omitted). And just as explained, courts have the inherent authority to enforce their orders and punish violations of the same. The court must have authority to remedy a breach of a protective order without it constituting a prior restraint, as it is simply an extension of the same authority it already properly exercised.

Judge Weinstein in *In re Zyprexa Injunction,* 474 F. Supp. 2d at 422 held as much, and the Second Circuit agreed. *Eli Lilly*, 617 F.3d at 194-95. NIKE raised Judge Weinstein's analysis in *In re Zyprexa Injunction* to the Magistrate Judge and the District Court, but like with *Eli Lilly*, neither addressed it in their writing. 1-ER-1-14, 2-ER-142, 2-ER-157-59, 2-ER-165, 2-ER-230-31, 2-ER-236. But Judge Weinstein pointed to the Court's inherent equitable powers of the court "to correct that which has been wrongfully done by virtue of its process." *In re Zyprexa Injunction,* 474 F. Supp. 2d at 422 (citation omitted). It did not matter that the documents were given to the newspaper by the conspirators. Rather, the court confirmed that the "confidential documents were procured solely by use of the court's discovery process." *Id*. The third parties had "no right to possession of the confidential documents given to them by the conspirators," and as such the court could properly exercise its equitable powers to order their return. *Id*.

41

Again, so too, here. Plaintiffs only had the shared materials because of Court processes. An injunction that seeks only to correct "*unlawful acquisition*" does not restrain speech because it "restricts dissemination of documents only if those documents were obtained in the first instance by use of the court's processes"—*i.e.*, it is simply an extension of *Seattle Times* and *Ground Zero*.[11] *In re Zyprexa*, 474 F. Supp. 2d at 423 (emphasis added). Enforcement of the orders protects both the privacy of the third parties named within the complaints, as well as court integrity. *Id*. at 424.

### D. *New York Times Co. v. United States* Does Not Support a Contrary Result as Subsequent Authority Confirms.

The *Pentagon Papers* case, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam), cited by the Magistrate Judge is not to the contrary. The *Pentagon Papers* case was about government transparency, not about civil litigation between private parties. The press had not sued in court to receive the documents

---

[11] The issue in *Bartnicki v. Vopper*, 532 U.S. 514 (2001), cited by the Magistrate Judge, was not about the violation of a protective order or a litigant before the Court. Indeed, Judge Weinstein analyzed *Bartnicki* in *Zyprexa* (*see In re Zyprexa Injunction*, 474 F. Supp. 2d at 396), and even still he granted the injunction and return order *over* First Amendment concerns. He reasoned: "Several important governmental interests are served by this injunction. It allows the court to protect the privacy and property rights of litigants appearing before it, which is essential to a fair and efficient system of adjudication. By prohibiting dissemination in violation of the court order the court's ability to enforce its own orders is preserved." *In re Zyprexa*, 474 F. Supp. 2d at 424.

and been told no. "In the *Pentagon Papers* case, there was no suggestion that the documents were purloined at the New York Times' or Washington Post's instigation." *In re Zyprexa Injunction*, 474 F. Supp. 2d at 396. And beyond that, the effect of *New York Times* already has been litigated.

This Court addressed *New York Times* in *Ground Zero.* This Court acknowledged the *New York Times'* holding that even "national security interests . . . are generally insufficient to overcome the First Amendment's 'heavy presumption' against the constitutionality of prior restraints, even against those who disseminate information obtained illegally."[12] *Ground Zero*, 860 F.3d at 1260. That was not the end of its analysis, however. Noting that Ground Zero had obtained the information from the *public* docket (and thus the court could not restrain the speech), the Ninth Circuit explained that "because the district court's Order targets information the Navy released not just to Ground Zero but also to the public, it implicates Ground Zero's First Amendment rights differently than would a properly implemented protective order concerning ordinary pretrial civil discovery, like the one considered

---

[12] In *Madsen*, the Supreme Court examined *New York Times* and made a distinction that is applicable here. In that case, the Court affirmed an injunction preventing anti-abortion protesters from picketing within 300 feet of the residence of abortion clinic employees. *Madsen*, 512 U.S. at 774. The Court rejected the protestors' argument that it should interpret the injunction as a "prior restraint[,]" reasoning that "the injunction was issued not because of the content of petitioners' expression, as was the case in *New York Times Co.*[,] . . . but because of their prior unlawful conduct." *Madsen*, 512 U.S. at 765 n.2.

43

in *Seattle Times*." *Id*. Had Ground Zero received the documents in violation of a protective order, the outcome would have mirrored that in *Seattle Times*.

All of this teaches what *Ground Zero*, *Seattle Times*, *Zyprexa*, *Eli Lilly*, and their progeny suggest, either directly or by implication—the *New York Times* does not create blanket immunity for the press and, while honored, it should not be over-extended. It did not overrule *Zemel*. In cases after *New York Times*, the Supreme Court has not suggested that the First Amendment renders courts impotent to address violations of their orders. *Seattle Times* implies the opposite.

In sum, the Oregonian asked for the Court's aid in accessing confidential documents. 4-ER-669, 3-ER-499. Yet, it was told by the District Court and this Court that it could not have certain documents—at least not until an appeal was done. 2-ER-306, 2-ER-308, 3-ER-319. It asked then for and attended a meeting with a litigant's counsel. 2-ER-80, 5-ER-883 ¶ 2. Then it asked for information learned during the litigation, 5-ER-883 ¶ 2, and received the very documents it was told by this Court that it could not have while an appeal was pending, 5-ER-885 ¶ 13. If there is no power to right that wrong vis-à-vis the Oregonian, then protective orders and sealing orders have no teeth. Because the District Court erred in understanding its powers, NIKE asks this Court to reverse and direct the District Court to grant NIKE the relief it sought.

44

### III. THE DISTRICT COURT ERRED IN APPLYING THE WRONG STANDARD OF REVIEW.

While the core of this appeal lies in questions of a court's equitable powers, the District Court also committed a procedural error requiring reversal. Namely, the District Court erred in applying the "clearly erroneous" or "contrary to law" standard of review to the Magistrate Judge's Findings.

Section 636(b)(1)(A) of Title 28 of the United States Code sets forth the matters that magistrate judges are specifically excluded from hearing and ruling on. 28 U.S.C. § 636(b)(1)(A). "Subsection (1)(A) specifically exempts 'motions for injunctive relief' from the category of pretrial matters upon which a magistrate may enter an order." *Reynaga v. Cammisa,* 971 F.2d 414, 416 (9th Cir. 1992).

If a Magistrate Judge nevertheless rules on such a motion, and a party objects, it "will be governed by the procedures and *de novo* review of Rule 72(b)," because the Magistrate Judge never had authority to make a final ruling on it in the first instance. 12 Charles Alan Wright & Arthur R. Miller, *et al.*, *Federal Practice & Procedure* § 3068.2 (3d ed. Apr. 2023 update); *Quint v. Vail Resorts, Inc.*, 89 F.4th 803, 809 (10th Cir. 2023) ("The district court therefore erred by construing the R&R, which considered a motion seeking injunctive relief, as addressing a nondispositive matter under Rule 72(a) and by applying the clearly-erroneous-or-contrary-to-law review standard.").

The standard of review does not change simply because a motion that requests injunctive relief arises in the context of an appeal to the Court's inherent authority. *De novo* applies to motions that "effectively den[y]" requests for injunctive relief, even if the motion is named differently. *Reynaga,* 971 F.2d at 416. Indeed, "[t]he statute makes it clear that the district judge *must* review the magistrate judge's findings and recommendations *de novo if objection is made*, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*). NIKE objected. 3-ER-436.

Nor does the Magistrate Judge's styling of her recommendations as an "order" matter. Regardless of whether the Magistrate Judge styles it as an order or Findings, the Magistrate Judge's authority is still governed by Section 636(b)(1)(A), and if the motion was an injunction, *de novo* review must be applied. *Allen v. Meyer*, 755 F.3d 866, 869 (9th Cir. 2014) ("On remand, the district court may address the officers' motion to dismiss in the first instance, or, alternatively, may construe the magistrate judge's order as a report and recommendation and afford the parties reasonable time to file objections."); *Salcido v. Ditomas*, No. 22-15294, 2022 WL 3584903, at *1 (9th Cir. Mar. 18, 2022) ("On remand, the district judge may treat the magistrate judge's December 27, 2021 order as a report and recommendation.").

Here, NIKE's request to return the documents, to prohibit dissemination or use of the protected information, and to destroy copies thereof sought a prohibitory

46

injunction, which the Magistrate Judge was barred from hearing. It is recognized in this Circuit and elsewhere that when a party asks that documents be returned or destroyed *as a remedy*, they are seeking a form of injunctive relief. *See, e.g., GS Holistic, LLC v. Natts SmokeII Inc*., No. CV 22-06840 PSG (AGR), 2023 WL 5017994, at \*1 (C.D. Cal. July 12, 2023) ("Plaintiff also seeks injunctive relief for Defendants to be enjoined from infringing on Plaintiff's Marks and for Defendants to destroy all products that infringe on the Marks."); *see also Gartner, Inc. v. Hackett Grp., Inc.*, No.3:23-CV-688 (SRU), 2023 WL 7335943, at \*1 (D. Conn. Nov. 7, 2023) ("I find that a preliminary injunction requiring the defendants to return or destroy all confidential and trade-secret documents belonging to Gartner that were allegedly obtained by improper means is appropriate pending the determination of the merits of Gartner's trade secrets claims.").

And, of course, a bar on use is a prohibitory injunction. *See, e.g., GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210-11 (9th Cir. 2000) (explaining prohibitory injunction). Even the Oregonian tacitly admits that what is at issue is injunctive relief. 2-ER-192 (*citing* Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157 (2007)). Thus, the District Court erred as a matter of law by failing to apply *de novo* review when NIKE filed its Rule 72 objections to the Magistrate Judge's Findings.

47

*Mitchell v. Valenzuela*, 791 F.3d 1166 (9th Cir. 2015), cited by the District Court in rejecting *de novo* review, 1-ER-3, is not contrary. *Mitchell* did two things: (1) it confirmed that Magistrate Judge's authority excludes the matters listed in Section 636(b)(1)(A), including injunctive relief; and (2) it confirmed that *de novo* applies to matters listed in Section 636(b)(1)(A), as well as "*analogous matters*." *Id*. at 1168 (emphasis added).

The *Mitchell* Court was tasked with determining whether a motion to stay—a matter that is not enumerated in Section 636—may be ruled upon by a magistrate judge. *Mitchell*, 791 F.3d at 1170. Noting that the matters in Section 636(b)(1)(A) are often referred to as dispositive matters, the Court then used such reference point to determine whether a motion to stay could be considered an "analogous" matter. *Id*. at 1168. Because the motion to stay was "tantamount to a dismissal" of the unexhausted claims, the motion was considered an analogous matter that afforded *de novo* review. *Id*. at 1170.

While the *Mitchell* Court's reasoning conforms to the law suggesting that the "effect" of the requested relief should be considered in evaluating what standard of review a District Court should apply, that does not suggest a District Court may then

48

ignore the "list [of] eight motions a magistrate judge may not hear and determine." *Quint,* 89 F.4th at 808.[13]

In fact, this Court already has stated the opposite. In *Center for Auto Safety v. Chrysler Grp., LLC*, the Ninth Circuit explained that "[w]e have never addressed the question whether a preliminary injunction motion constitutes a case-dispositive motion for purposes of the Federal Magistrate Act [Section 636] . . . *nor would we have occasion to do so, because the Act precludes a magistrate judge from ruling on such a motion regardless of how it is characterized*." *Center for Auto Safety*, 809 F.3d at 1107 (emphasis added). Thus, it does not matter whether a requested injunction could be considered truly dispositive or not for purposes of the Magistrate Statute, it is "dispositive" for purposes of section 28 U.S.C. § 636, and the District Court erred in not applying *de novo* review.

---

[13] The District Court's reliance on authority regarding discovery orders or discovery sanctions, 1-ER-2-4 (citing cases like *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010) (a subpoena case), was likewise mistaken. NIKE appealed to the District Court's inherent authority to manage the cases and the parties before it. The issues here did not arise in the context of a discovery dispute (*e.g*., a request for admission; a subpoena, etc.) but in the context of a requested injunction (return, destroy, do not use) where an intervening party received materials it was precluded from receiving know that its receipt required violation of a court order. And the relief NIKE sought—*e.g.,* return and a ban on public use or reliance on illicitly gather materials—was a request for an injunction. *See, e.g., Abbott v. Perez,* 585 U.S. 579, 594 (2018) (looking to order's practical effect to determine status as injunction).

49

Even were the Court to disagree (and respectfully, it should not), there is little dispute that the District Court below declined to apply *de novo* review and consider NIKE's legal arguments without deference to the Magistrate Judge. 1-ER-3-4. No argument was scheduled. *Id*. No discussion of NIKE's legal arguments (other than on the standard of review) appears in the District Court's reviewing order. *Id*. Courts already have concluded that when (unlike here) the requested relief is not dispositive within the meaning of 28 U.S.C. § 636—such that the "clearly erroneous" or "contrary to law" standards apply—as to *legal* questions "contrary to law" means plenary review: "[T]he phrase 'contrary to law' indicates plenary review as to matters of law." *Haines v. Liggett Grp. Inc*., 975 F.2d 81, 91 (3d Cir. 1992); *see also* 12 Charles Alan Wright & Arthur R. Miller, *Fed. Practice & Procedure* § 3069 (3d ed. June 2024 update) ("Regarding legal issues, the language 'contrary to law' appears to invite plenary review."). "This means that, for questions of law, there is no practical difference between review under Rule 72(a)'s 'contrary to law' standard and review under Rule 72(b)'s de novo standard." *PowerShare, Inc. v. Syntel, Inc*., 597 F.3d 10, 15 (1st Cir. 2010). Yet, invocation of the rule itself aside, there is nothing in the District Court's denial of NIKE's requested relief, suggesting it understood (or applied) its obligation to review legal questions *de novo.*

Sister Circuits have concluded that a district court's failure to apply the correct standard in reviewing a Magistrate Judge's recommendation is reason enough for

vacatur: "In summary, we hold that by failing to review the magistrate's report under the appropriate 'de novo' standard, the district judge has failed to fulfill his duties as an Article III judge. Although Congress did intend the magistrates to lend assistance to the overburdened district courts when appropriate, the carefully drafted statutory standards for review of the magistrate's findings are meant to insure that the district courts will not abdicate their responsibility." *Flournoy v. Marshall,* 842 F.2d 875, 878–79 (6th Cir. 1988) (vacating and remanding). This Court has agreed. *See, e.g., Coolidge v. Schooner California*, 637 F.2d 1321, 1327 (9th Cir. 1981) ("We hold that because the district court did not follow the statutory requirements the judgment must be reversed and the case remanded.").

While NIKE's strong preference would be for this Court to reverse with directions to grant NIKE its requested relief, at a minimum, it appears this Court should vacate with directions to the District Court to consider the question under the proper *de novo* review.

## IV. THE DISTRICT COURT CLEARLY ERRED IN DENYING NIKE DISCOVERY INTO PLAINTIFFS' UNAUTHORIZED DISCLOSURE OF CONFIDENTIAL LITIGATION DOCUMENTS.

The Magistrate Judge (and thus the District Court) clearly erred by disallowing discovery into the breach of the Protective Order. As even the Findings admit, a violation occurred, 1-ER-12, but NIKE was deprived of learning about the circumstances of that breach. NIKE was likewise deprived of an opportunity for

oral argument. For all of the reasons stated above, the record before the District Court below was enough for the Court to act. The Court's denial of relief was grounded in errors of law. Should the Court reverse without granting NIKE the relief it seeks, NIKE asks that this Court also confirm that the Court below clearly erred in denying discovery before ruling.[14]

*In re Zyprexa Injuction* is indicative of why *evidence* aids in the evaluation of an issue balancing court power with First Amendment concerns. After the court learned that the confidential documents had been shared, the court did not simply accept the version of the initial factual story presented. Depositions were ordered; the Court held a full "evidentiary hearing." *In re Zyprexa Injunction*, 474 F. Supp. 2d at 396, 406. Witnesses were called, and importantly, cross-examined. *Id*. at 396.

The Oregonian's argument in the court below confirms the need for discovery. It tried to distinguish *In re Zyprexa Injunction* by arguing that there must be a "clear meeting of the minds" before the Court can reach a nonparty. 2-ER-109. Of course, this ignores that the entire purpose of the meeting was to meet with a lawyer to obtain documents and discuss the substance of this litigation. Setting this aside, however, the Oregonian's argument only serves to emphasize why discovery would have aided the Court's determination below. It concedes that the courts in *In re Zyprexa*

---

[14] Limited discovery was permitted after the Court's ruling, but not with respect to the Oregonian.

and *Eli Lilly* "*found* that the [parties] had conspired" to disseminate documents "that were 'procured solely by the use of the court's discovery process." 2-ER-109 (emphasis added). The District Court, here, should have *found* the same; not merely assumed that Plaintiffs' counsel and the Oregonian were providing a fulsome view of the facts.

The court below endorsed the Oregonian's view that it was "engaged in the newsgathering process" (which should have made it consider *Zemel*, *In re Zyprexa*, and *Eli Lilly*). 1-ER-10. But the Court did so without evaluating the circumstances of that newsgathering process. As under *Seattle Times* and *Ground Zero,* there was proof enough that the documents were obtained through a *source in this litigation*, but, at minimum, if there was any doubt as to the motivation and circumstances behind the breach, NIKE should have been afforded an opportunity to demonstrate as much, and to protect its non-party employees from unnecessary harm.

Should the Court not simply reverse with a direction to grant NIKE the relief it sought, it should order the Court below to allow NIKE full discovery from the Oregonian regarding the circumstances of the violations.

## V.    **CONCLUSION**

Based on the foregoing, this Court should, at minimum, vacate the District Court's Order denying the clawback injunction and ban on use. The Court can then either remand for consideration under the correct standard of review or, as shown

53

above, it could find that the clawback injunction should issue and direct the District Court to issue an order requiring the Oregonian return the confidential litigation documents, refrain from disseminating them or the information contained therein, and destroy any copies of the documents in its possession.


Date: August 2, 2024                    Respectfully submitted,

PAUL HASTINGS LLP


By: _____*s/Daniel Prince*_____
                DANIEL PRINCE


By: _____*s/Felicia A. Davis*_____
                FELICIA A. DAVIS

Attorneys for *Defendant-Appellant*
NIKE, INC.

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Circuit Rule 28-2.6, Defendant-Appellant NIKE, Inc. certifies that Ninth Circuit Appeal No. 24-165 is a related case because it involves a prior appeal in this case.  This Court has already ordered that the arguments on the two appeals be held before the same panel on the same day.

Date:  August 2, 2024

Respectfully submitted,

PAUL HASTINGS LLP

By: _____*s/Daniel Prince*_____
         DANIEL PRINCE

Attorneys for *Defendant-Appellant* NIKE, INC.

55

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 24-2199

I am the attorney or self-represented party.

**This brief contains** | 12,286 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [        ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Daniel Prince | **Date** | August 2, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      56      *Rev. 12/01/22*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that my firm electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 2, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date:  August 2, 2024               Respectfully submitted,

PAUL HASTINGS LLP

By: _____*s/Daniel Prince*_____
          DANIEL PRINCE

Attorneys for *Defendant-Appellant*
NIKE, INC.