**Docket No. 24-2199**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

KELLY CAHILL; HEATHER HENDER; SARA JOHNSTON;
LINDSAY ELIZABETH,

*Plaintiffs-Appellees,*

v.

INSIDER, INC.; ADVANCE LOCAL MEDIA, LLC;
AMERICAN CITY BUSINESS JOURNALS,

*Intervenors-Appellees,*

NIKE, INC.,

*Defendant-Appellant.*

———————————————

*Appeal from a Decision of the United States District Court for the District of Oregon, Portland,
No. 3:18-cv-01477-JR · Honorable Marco A. Hernandez*

## RECORD EXCERPTS
## VOLUME 3 of 5 – Pages 309 to 579

DANIEL PRINCE, CA BAR 237112
FELICIA A. DAVIS, CA Bar No. 266523
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071-2228
Telephone:  (213) 683-6000
danielprince@paulhastings.com
feliciadavis@paulhastings.com

*Attorneys for Defendant-Appellant,
NIKE, Inc.*

 COUNSEL PRESS · (213) 680-2300

PRINTED ON RECYCLED PAPER 

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>   Plaintiffs,<br><br>  vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>   Defendant. | Case No. 3:18-cv-01477-JR<br><br><br>DEFENDANT NIKE, INC.'S NOTICE OF APPEAL RE: THE DISTRICT COURT'S JANUARY 5, 2024 ORDER ADOPTING THE MAGISTATE JUDGE'S FINDINGS & RECOMMENDATION (ECF NO. 403) |

## NOTICE OF APPEAL

**NOTICE IS HEREBY GIVEN THAT**, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, Defendant NIKE, Inc. ("NIKE"), by and through its undersigned counsel, appeals to the United States Court of Appeals for the Ninth Circuit from the District Court's January 5, 2024 Order adopting the Magistrate Judge's Findings & Recommendation dated October 11, 2023.  A true and correct copy of the District Court's January 5, 2024 Order, from which NIKE appeals and which appears on the docket as ECF No. 403, is attached hereto as Exhibit A.


Date:  January 9, 2024              */s/ Daniel Prince*
                                   Daniel Prince

                                   DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
                                   danielprince@paulhastings.com
                                   FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
                                   feliciadavis@paulhastings.com
                                   PAUL HASTINGS LLP
                                   515 South Flower Street, 25th Floor
                                   Los Angeles, CA 90071
                                   Telephone:  (213) 683-6000
                                   Facsimile:  (213) 627-0705

                                   LAURA E. ROSENBAUM, OSB No. 110061
                                   laura.rosenbaum@stoel.com
                                   STOEL RIVES LLP
                                   760 SW Ninth Avenue, Suite 300
                                   Portland, OR 97205
                                   Telephone:  (503) 224-3380
                                   Facsimile:  (503) 220-2480

                                   Attorneys for Defendant NIKE, INC.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | No. 3:18-cv-01477-JR<br><br>ORDER |
| Plaintiffs, | |
| v. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

HERNÁNDEZ, District Judge,

Magistrate Judge Jolie A. Russo issued a Findings and Recommendation on October 11, 2023, in which she recommends that the Court grant the Media Intervenors' renewed Motion to Unseal Judicial Records and order various exhibits to be unredacted. ECF 363.

On October 25, 2023, Defendant filed objections to the Findings and Recommendation, ECF 376. The matter is now before the Court pursuant to Federal Rule of Civil Procedure 72(a).

1 - ORDER

In accordance with Rule 72(a), "[w]hen a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision." Fed. R. Civ. P. 72(a). The standard of review for an order with objections is "clearly erroneous" or "contrary to law." 28 U.S.C. § 636(b)(1)(A) (applying the "clearly erroneous or contrary to law" standard of review for non-dispositive motions). If a ruling on a motion is not determinative of "a party's claim or defense," it is not dispositive and, therefore, is not subject to *de novo* review.[1]

The Court has carefully considered Defendant's objections and concludes they do not provide a basis to modify the Findings and Recommendation.

## CONCLUSION

The Court adopts Magistrate Judge Russo's Findings and Recommendation, ECF 363. Accordingly, the Court GRANTS the Media Intervenors' Motion to Unseal Judicial Records and ORDERS the following exhibits to be unredacted: Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class

---

[1] Although Judge Russo issued her decision as a Findings and Recommendation, it decides a pretrial matter not dispositive of a party's claim or defense. Accordingly, the Court evaluates Judge Russo's decision under the clearly erroneous or contrary to law standard.

2 - ORDER

Certification, and Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs'

Motion for Class Certification.

IT IS SO ORDERED.


DATED:   January 5, 2024


_____

MARCO A. HERNÁNDEZ
United States District Judge


3 - ORDER

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 6. Representation Statement

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form06instructions.pdf

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

> NIKE, Inc.

Name(s) of counsel (if any):

> Daniel Prince and Felicia A. Davis of Paul Hastings LLP

Address: | 515 South Flower Street, 25th Floor, Los Angeles, CA 90071

Telephone number(s): | (213) 683-6000

Email(s): | danielprince@paulhastings.com; feliciadavis@paulhastings.com

Is counsel registered for Electronic Filing in the 9th Circuit?    ⦿ Yes    ◯ No

---

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

> Non-Party Media Organizations, Insider, Inc., d/b/a Business Insider, Advance Local Media LLC, d/b/a Oregonian Media Group, and American City Business Journals, Inc., d/b/a Portland Business Journal

Name(s) of counsel (if any):

> Timothy Volpert of Tim Volpert, P.C.

Address: | 3934 SE Hawthorne Blvd., Suite 343, Portland, OR 97214

Telephone number(s): | (503) 703-9054

Email(s): | tim@timvolpertlaw.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 6**                                        *1*                              *New 12/01/2018*

ER-0316

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

NIKE, Inc.

Name(s) of counsel (if any):

Laura E. Rosenbaum of Stoel Rives LLP

Address: 760 SW Ninth Avenue, Suite 300

Telephone number(s): (503) 224-3380

Email(s): laura.rosenbaum@stoel.com

Is counsel registered for Electronic Filing in the 9th Circuit?    ● Yes    ○ No

**Appellees**

Name(s) of party/parties:

Non-Party Media Organizations

Name(s) of counsel (if any):

Lisa Zycherman of Reporters Committee for Freedom of the Press

Address: 1156 15th St., NW, Suite 1020, Washington, DC 20005

Telephone number(s): (202) 795-9300

Email(s): lzycherman@rcfp.org

Name(s) of party/parties:

See attached

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                          *2*                          *New 12/01/2018*

ER-0317

Counsel for Plaintiffs-Appellees

Laura Salerno Owens
LauraSalerno@MarkowitzHerbold.com
David B. Markowitz
DavidMarkowitz@MarkowitzHerbold.com
Harry B. Wilson
HarryWilson@MarkowitzHerbold.com
Kathryn P. Roberts
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

Laura L. Ho
lho@gbdhlegal.com
Barry Goldstein
bgoldstein@gbdhlegal.com
James Kan
jkan@gbdhlegal.com
Byron Goldstein
brgoldstein@gbdhlegal.com
Katharine L. Fisher
kfisher@gbdhlegal.com
Mengfei Sun
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

| | |
|---|---|
| **From:** | info@ord.uscourts.gov |
| **Sent:** | Friday, January 5, 2024 2:53 PM |
| **To:** | nobody@ord.uscourts.gov |
| **Subject:** | [EXT] Activity in Case 3:18-cv-01477-JR Cahill et al v. Nike, Inc. Order |

**--- External Email ---**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## District of Oregon

## Notice of Electronic Filing

The following transaction was entered on 1/5/2024 at 2:52 PM PST and filed on 1/5/2024

| | |
|---|---|
| **Case Name:** | Cahill et al v. Nike, Inc. |
| **Case Number:** | 3:18-cv-01477-JR |
| **Filer:** | |
| **Document Number:** | 404(No document attached) |

**Docket Text:**
**ORDER:** The Court finds Defendant has not established a likelihood of success on the merits of its Objections to the October 11, 2023, Findings and Recommendation or that Defendant will be irreparably harmed in the absence of a stay. The Court, therefore, DENIES that portion of Defendant's Motion to Stay, ECF 397.

The Court, however, GRANTS Defendant's alternative request for a temporary 7-day stay to allow time for Defendant to seek a stay from the Ninth Circuit directly. Accordingly, the Court's January 5, 2024 Order, ECF 403 is STAYED for a period of 7 days from the date of this Order. This temporary stay will expire automatically, without further order of the Court, 7 days from the date of this Order. Ordered by District Judge Marco A Hernandez. (jp)

**3:18-cv-01477-JR Notice has been electronically mailed to:**

1

ER-0319

David B. Markowitz     davidmarkowitz@markowitzherbold.com, 6951279420@filings.docketbird.com, docket@markowitzherbold.com, sarahdubrule@markowitzherbold.com, sarapomerening@markowitzherbold.com, tamihall@markowitzherbold.com

Laura R. Salerno Owens     LauraSalerno@MarkowitzHerbold.com, 8359710420@filings.docketbird.com, AbigailAdams@MarkowitzHerbold.com, Docket@MarkowitzHerbold.com, sarahdubrule@markowitzherbold.com, sarapomerening@markowitzherbold.com

Laura E. Rosenbaum     laura.rosenbaum@stoel.com, docketclerk@stoel.com, marilyn.schoos@stoel.com

Felicia A. Davis     feliciadavis@paulhastings.com, arlenefigueroa@paulhastings.com, deisycastro@paulhastings.com, ecf-ord-6374354248433664@inbound.docketalarm.com, lindseyjackson@paulhastings.com

Harry B. Wilson     harrywilson@markowitzherbold.com, 2591600420@filings.docketbird.com, SarahDubrule@MarkowitzHerbold.com, docket@markowitzherbold.com, joannastalheim@markowitzherbold.com, sarapomerening@markowitzherbold.com

Kathryn P. Roberts     KathrynRoberts@MarkowitzHerbold.com, 9717759420@filings.docketbird.com, Docket@MarkowitzHerbold.com, JeniInirio@MarkowitzHerbold.com, SaraPomerening@MarkowitzHerbold.com, SarahDubrule@MarkowitzHerbold.com

Chad A. Naso     chadnaso@markowitzherbold.com, 2609173420@filings.docketbird.com, Docket@MarkowitzHerbold.com, SaraPomerening@MarkowitzHerbold.com, SarahDubrule@MarkowitzHerbold.com, joannastalheim@markowitzherbold.com

Katharine L. Fisher     kfisher@gbdhlegal.com

Laura L. Ho     lho@gbdhlegal.com, efile@gbdhlegal.com, sgrimes@gbdhlegal.com

Byron Goldstein     brgoldstein@gbdhlegal.com, efile@gbdhlegal.com

India Lin Bodien     india@indialinbodienlaw.com, jb@ackermanntilajef.com

Craig J. Ackermann     cja@ackermanntilajef.com, ak@ackermanntilajef.com, bd@ackermanntilajef.com, jb@ackermanntilajef.com

Daniel Prince     danielprince@paulhastings.com, alyssatapper@paulhastings.com, ecf-ord-6705547519524864@inbound.docketalarm.com, francinesheldon@paulhastings.com, lisavermeulen@paulhastings.com, maggiehall@paulhastings.com

Zachary P. Hutton     zachhutton@paulhastings.com

Barry Goldstein     bgoldstein@gbdhlegal.com

James P. Kan     jkan@gbdhlegal.com

Mengfei Sun     msun@gbdhlegal.com, dvaldez@gbdhlegal.com

Brian Walter Denlinger     brian.w.denlinger@gmail.com

ER-0320

Nicole Lueddeke     nicolelueddeke@paulhastings.com

**3:18-cv-01477-JR Notice will <u>not</u> be electronically mailed to:**

3

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>RESPONSE OF NON-PARTY MEDIA ORGANIZATIONS INSIDER, INC. *d/b/a BUSINESS INSIDER*, ADVANCE LOCAL MEDIA LLC *d/b/a OREGONIAN MEDIA GROUP*, AND AMERICAN CITY BUSINESS JOURNALS, INC. *d/b/a PORTLAND BUSINESS JOURNAL* TO DEFENDANT'S EMERGENCY MOTION FOR STAY PENDING APPEAL |

## RESPONSE IN OPPOSITION TO EMERGENCY
## MOTION FOR STAY PENDING APPEAL

Non-party media organizations Insider, Inc. *d/b/a Business Insider*, Advance Local Media

LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland*

*Business Journal* (collectively, the "Media Intervenors") hereby respond to and oppose

**Page 1 – RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR STAY**
**PENDING APPEAL**

Defendant's Emergency Motion for Stay Pending Appeal (ECF No. 397), and renewed Request for Oral Argument (ECF No. 396), on Nike, Inc.'s Objections to the Magistrate Judge's Findings & Recommendation. On October 11, 2023, Magistrate Russo correctly granted Media Intervenors' renewed motion to unseal judicial records related to class certification because, as a proponent of sealing, Nike failed to show compelling reasons supported by specific factual findings that outweigh the historic presumption and public interest in favor of openness. ECF No. 364 ("Magistrate's Findings"). Nike's objections to the Magistrate's Findings are fully briefed by all parties and Media Intervenors, *see* ECF Nos. 376, 383, 384, and argument is not warranted for the Court to make its decision on either the objections or Nike's preemptive motion for stay pending appeal. Indeed, without an order of the Court on Defendant's objections, Nike's emergency motion seeking a stay is both premature and baseless. For the reasons set forth herein, even if this Court were to deny Nike's objections to the Magistrate's Findings and order disclosure, it should deny a stay pending Nike's planned appeal.

## BACKGROUND

Media Intervenors incorporate by reference the factual and procedural background provided in their briefing on Nike's objections to the Magistrate's Findings. ECF No. 383, Media Intervenors' Resp. 2–5. Plaintiffs joined Media Intervenors in opposing Nike's effort to maintain sealing. ECF No. 384. Nike requested oral argument on its objections, *see* ECF No. 376, but neither Media Intervenors nor Plaintiffs made similar requests and the Court has not scheduled a hearing.

## ARGUMENT

"'A stay is not a matter of right, even if irreparable injury might otherwise result.'" *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658,

**Page 2 – RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR STAY PENDING APPEAL**

672 (1926)).  "It is instead 'an exercise of judicial discretion,'" and "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."  *Id.* at 433–34 (quoting *Virginian Ry. Co.*, 272 U.S. at 672–73).  In determining whether to issue a stay pending appeal, courts in this Circuit consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Al Otro Lado v. Wolf*, 952 F.3d 999, 1006–07 (9th Cir. 2020) (quoting *Nken*, 556 U.S. at 434). "The first two factors . . . are the most critical," and the last two are reached "[o]nce an applicant satisfies the first two factors."  *Id*. at 1007 (quoting *Nken*, 556 U.S. at 434–35).  To prevail, the movant must show "[m]ore than a mere possibility of relief" and more than "some possibility of irreparable injury."  *Nken*, 556 U.S. at 434 (citations and internal quotation marks omitted).

Here all four factors weigh in favor of denying Nike's motion to stay this Court's forthcoming order pending appeal.  First, Nike is unlikely to succeed on its claims that purported fears of harm resulting from the disclosure of the names of complainants, witnesses, and employees accused of workplace misconduct are reasonable and sufficiently substantial to overcome the strong presumption of open access to civil proceedings and records.  *See* ECF No. 383, Media Intervenors' Resp. 5–15.  Nike's Emergency Motion, although a transparent attempt to sur-reply the closed briefing on its objections to the Magistrate's decision, offers no new evidence in support of its vague and conclusory claims of potential reputational and privacy

**Page 3 – RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR STAY**
      **PENDING APPEAL**

harms.[1]  *See* ECF No. 397, Emergency Mot. 2–3.  Thus, as the Magistrate correctly found, the record reflects a near total absence of proof supporting Nike's claims.  *See* ECF No. 363, Magistrate's Findings 5 (finding that "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records" (citing *Kamakana v. City & Cnty. Of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); *Bracken v. Fla. League of Cities*, No. 19-cv-602, 2019 WL 1867921, at *4 (D. Or. Apr. 24, 2019))).  A demonstration of serious, non-speculative physical or mental harm—not economic harm, or mere discomfort or embarrassment—is essential to maintain the sealing Nike seeks.  *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130–31 (9th Cir. 2003) (the proponent of sealing must present arguments "supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations of potential harm" (citation omitted)).  Put simply, given the continued absence of record evidence substantiating Nike's assertions of anticipated harm, it has not met its burden of showing likelihood of success on the merits of its planned appeal.

Second, because Nike's likelihood of success on the merits turns on its burden to show a reasonable fear of harm, it follows from the preceding analysis that Nike has not established a threat of irreparable harm.  Staying the Court's forthcoming order would not irreparably injure Nike or the non-party witnesses, *see* ECF No. 383, Media Intervenors' Resp. 5–15, but would harm Media Intervenors and the press and public at large.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

---

[1] For example, while Nike continues to claim that complainants and witnesses were promised confidentiality, ECF No. 397, Emergency Mot. 2, it still has not come forward with any evidentiary showing that such assurances were made.  *See* ECF No. 383, Media Intervenors' Resp. 12-13.

**Page 4 – RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR STAY**
      **PENDING APPEAL**

constitutes irreparable injury."); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975) (linking the press's right of access to the public's "in a society in which each individual has but limited time and resources"). Further delaying access—especially in light of Nike's continued failure to demonstrate any compelling reason for sealing—would significantly injure Media Intervenors.

Furthermore, staying the Court's forthcoming order would be contrary to the public interest. There is a strong public interest in open courts. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Maintaining sealing of information contained in judicial records prevents the press, and by extension the public, from learning key information regarding the allegations at the root of this case and understanding this proceeding's full context and significance. Here, the Court reviewed the redacted identities of Nike complainants, witnesses, and employees who allegedly engaged in misconduct when ruling on the Plaintiffs' Motion for Class Certification. To foster a greater understanding of the judicial process, the public has a right to know what evidence was relied on—and what evidence was rejected—in making decisions in this high-profile litigation. *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002). This interest would be further stymied by a stay pending Nike's planned appeal.

Nike failed to demonstrate the requisite "compelling reasons" that outweigh the public's interest in open litigation. *See Ctr. For Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092 (9th Cir. 2016). Meanwhile, the public's interest in this case is substantial, given that Nike is one of the largest and most prominent brands in the world, and its handling of workplace harassment and discrimination claims is of significant importance to American consumers and shareholders. For these reasons, the Magistrate was correct in concluding that the public interest compels disclosure of the redacted identities. A stay of this Court's forthcoming order would unduly delay that disclosure and undermine the public interest. To rule otherwise would allow Nike to continue to

**Page 5 – RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR STAY PENDING APPEAL**

cloak the identities of individuals involved in complaints of workplace misconduct in secrecy while litigating a case of great public concern.

## CONCLUSION

For the foregoing reasons, Media Intervenors respectfully request that this Court deny Nike's premature emergency motion to stay this Court's forthcoming order and deny Nike's renewed request for oral argument on its objections to the Magistrate's Findings and on its preemptive stay request.

/s/ Lisa Zycherman

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted pro hac vice

Counsel for Media Intervenors

**Page 6 – RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR STAY
PENDING APPEAL**

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No. 3:18-cv-01477-JR |
| Plaintiffs, | DEFENDANT NIKE, INC.'S MOTION FOR A STAY PENDING APPEAL RE: OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION DATED OCTOBER 11, 2023 (ECF NO. 363) |
| vs. | |
| NIKE, INC., an Oregon Corporation, | **EXPEDITED HEARING REQUESTED** |
| Defendant. | **ORAL ARGUMENT REQUESTED** |

ER-0328

# TABLE OF CONTENTS

**Page**

I.   BACKGROUND ................................................................................. 2

II.   LEGAL STANDARD ......................................................................... 3

III.   A STAY PENDING APPEAL IS NECESSARY HERE. ................................... 4

    A.   There Will be Irreparable Injury Without a Stay Pending Appeal. ....................... 4

    B.   NIKE Has Raised Serious Legal Questions on the Merits. ................................. 6

    C.   The Balance of Hardships Tips in Favor of NIKE and its Former Employees. .... 7

    D.   The Public Interest Favors a Stay Pending Appeal. ........................................... 7

IV.   CONCLUSION ................................................................................... 8

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado v. Wolf*,
    952 F.3d 999 (9th Cir. 2020) ...........................................................................3, 4

*Align Tech., Inc. v. SmileDirectClub, LLC*,
    No. 23-CV-00023-EMC, 2023 WL 2347431 (N.D. Cal. Mar. 3, 2023)...............................4, 5

*Ball v. Skillz Inc.*,
    No. 220CV00888JADBNW, 2020 WL 10180904 (D. Nev. Nov. 16, 2020) .......................5, 8

*Benson v. Double Down Interactive, LLC*,
    Case No. 2:18-cv-00525-RBL, 2019 WL 972482 (W.D. Wash. Feb. 28, 2019).....................6

*Does I thru XXIII v. Advanced Textile Corp.*,
    214 F.3d 1058, 1069 (9th Cir. 2000) ...................................................................6

*Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*,
    179 F.R.D. 264 (C.D. Cal. 1998)........................................................................8

*Flores v. Barr*,
    977 F.3d 742 (9th Cir. 2020) ............................................................................4

*Hernandez v. Cnty. of Monterey*,
    No. 13-CV-02354-BLF, 2023 WL 4849877 (N.D. Cal. July 28, 2023)...................................5

*Hooks v. Hood River Distillers, Inc.*,
    No. 3:21-CV-268-SI, 2021 WL 2142609 (D. Or. May 26, 2021) ...........................................4

*Hunton v. Am. Zurich Ins. Co.*,
    No. CV-16-00539-PHX-DLR, 2019 WL 399708 (D. Ariz. Jan. 31, 2019).......................5, 7, 8

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ..........................................................................4, 6

*Nken v. Holder*,
    556 U.S. 418 (2009).....................................................................................3, 5

*WOF SW GGP 1, LLC v. Quasar Energy Group, LLC*,
    No. 3:18-CV-01475-AC, 2020 WL 2758779 (D. Or. Jan. 7, 2020) ......................................6, 7

**Other Authorities**

Fed. R. App. P. 8(a)(1)............................................................................................3

Fed. R. App. P. 8(a)(2)(A)(ii) .............................................................................2, 8

LR 7-1(a).............................................................................................................1

LR 7-1(g) ............................................................................................................2

## LR 7-1(a) CERTIFICATION

Pursuant to Local Rule 7-1(a), counsel for Defendant NIKE, Inc. ("NIKE") conferred in good faith with counsel for the Non-Party Media Organizations, Insider Inc. *d/b/a BUSINESS INSIDER*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal* (collectively the "Intervenors"), and counsel for Plaintiffs Kelly Cahill, Heather Hender, Sara Johnston, and Lindsay Elizabeth ("Plaintiffs"), regarding this motion and the matters contained herein.  NIKE understands that the motion is opposed.

## EMERGENCY MOTION FOR STAY PENDING APPEAL

NIKE filed objections to the Magistrate Judge's Findings and Recommendation (the "Findings") granting the Intervenors' Renewed Motion to unseal this Court's records (collectively, the "Records").[1]  NIKE files this protective motion for an emergency stay in the event the District Court overrules NIKE's objections.  The purpose of this motion is to avoid publication—during the pendency of any appeal—of the identities of complainants, witnesses, and subjects of internal complaints listed in certain, limited documents.  *See* ECF Nos. 343, 346.  Publication of the identities of the above-referenced individuals is likely to cause immediate and irreparable harm, and the subject matter of the appeal would be destroyed without a stay.  NIKE seeks an expedited hearing pursuant to LR 7-1(g).  **Assuming, *arguendo*, that the Court denies this motion, NIKE**

---

[1] Intervenors requested that unredacted versions of the following be publicly filed: Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–6; Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–7; Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–8; Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 285–1; Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 285–2; Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification, ECF No. 288; Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification, ECF No. 290–4.  ECF No. 343 at 5.

Page 1 –  NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

**requests a brief stay be put in place for NIKE to request a stay directly from the Ninth Circuit. Fed. R. App. P. 8(a)(2)(A)(ii).**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      BACKGROUND

On November 13, 2022, the Court granted, in part, NIKE's motion to seal certain portions of documents filed in relation to Plaintiffs' motion for class certification, adopting the Magistrate's recommendations issued on September 30, 2022.  ECF Nos. 275.  The Court also granted the Intervenors' motion to intervene "for the limited purpose of challenging the stipulated redactions related to the briefing surrounding [P]laintiffs' Motion for Class Certification" and denied the Intervenors' request to unseal documents produced under the Protective Order in the case.  *Id.*  The Court denied Plaintiffs' motion for class certification on March 21, 2023 (ECF No. 335), and Intervenors filed their renewed motion on August 9, 2023, seeking to reveal the identities of complainants, witnesses, and subjects of internal complaints listed in certain, limited documents.

Many of the documents subject to the Intervenors' renewed motion already have been publicly filed and their substantive contents have been laid bare.  ***The only information that remains redacted are the names*** of individuals who:  (1) submitted complaints internally to NIKE, with the expectation that the issues raised would be investigated as confidentially as possible; (2) were the subjects of the internal complaints, some of which were not substantiated; or (3) alleged witnesses to purported events, many of whom were interviewed with the understanding that the investigation would remain as confidential as possible.  The Intervenors admitted that NIKE already unredacted extensive information pertaining to these purported complaints.  ECF No. 343, at 7–8.  The remaining redactions seek to avoid embarrassing the individuals named in the documents and to avoid discouraging confidential reporting of wrongdoing, an essential element in protecting workers

Page 2 –   NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

ER-0333

going forward.  The individual employees implicated here are not parties to the litigation, and have no expectation that their identities are subject to exposure for the Intervenors' sole purpose of generating news content.  ***Furthermore, these individuals' identities have absolutely nothing to do with the claims or defenses raised in this case.***

On October 11, 2023, Magistrate Judge Russo recommended that this Court grant the Intervenors' renewed motion, ECF No. 364, and NIKE timely filed objections to the Magistrate Judge's Findings on October 25, 2023, ECF No. 376.  Both Plaintiffs and the Intervenors filed oppositions to NIKE's objections.  ECF Nos. 382–84.  NIKE's objections requested oral argument, and NIKE concurrently filed its renewed request for oral argument alongside this motion.  Within that renewal, NIKE requested a stay of proceedings in the event the District Court overrules NIKE's objections to avoid publication during the time this concurrently filed motion to stay remains under the Court's consideration.

## II.    <u>LEGAL STANDARD</u>

A party seeking a stay pending appeal must ordinarily move for a stay from the District Court before requesting a stay from the Ninth Circuit.  Fed. R. App. P. 8(a)(1).  Either level of review requires the consideration of four factors:

> "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*Al Otro Lado v. Wolf*, 952 F.3d 999, 1006–07 (9th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 434–435 (2009)).  "The first two factors ... are the most critical," while the last two are reached only "[o]nce an applicant satisfies the first two factors."  *Id*.  At core, "[a]n applicant for a stay pending appeal must show that a stay is necessary to avoid likely irreparable injury to the applicant while the appeal is pending."  *Id*.  However, the Ninth's Circuit's "sliding scale"

Page 3 –   NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

approach—which balances the elements of the preliminary injunction test so that a stronger

showing of one element may offset a weaker showing of another—applies equally to a district

court's assessment of whether to stay an order pending appeal. *Al Otro Lado*, 952 F.3d at 1007;

*Hooks v. Hood River Distillers, Inc.*, No. 3:21-CV-268-SI, 2021 WL 2142609, at *18 (D. Or.

May 26, 2021). "If anything, a flexible approach is even more appropriate in the stay context."

*Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam). Thus, a stay may be

granted despite serious questions going to the merits of success on appeal if the balance of

hardships tips in the moving party's favor. *See Flores v. Barr*, 977 F.3d 742, 746 (9th Cir.

2020); *Align Tech., Inc. v. SmileDirectClub, LLC*, No. 23-CV-00023-EMC, 2023 WL 2347431,

at *1 (N.D. Cal. Mar. 3, 2023).

## III.   A STAY PENDING APPEAL IS NECESSARY HERE.

To the extent the District Court overrules NIKE's objections on the redaction issue, if there is

no immediate stay, Plaintiffs likely would file unredacted copies of the documents at issue publicly,

thereby enabling the Intervenors to publish non-party individuals' identities while NIKE's motion

for stay and appeal would be under review. Publication of the records at issue would gut any

potential remedy available to NIKE or the impacted individuals. Thus, if the Court denies NIKE's

instant motion, NIKE respectfully requests an emergency stay of proceedings to allow time for

NIKE to seek a stay directly from the Ninth Circuit pending appeal.

### A.   There Will be Irreparable Injury Without a Stay Pending Appeal.

Adoption of the Magistrate Judge's Findings presents a situation that could result in

irreparable injury to those currently protected by the Court's seal. The Intervenors seek to

immediately publicize the documents at issue. Thus, the risk that publication brings is not

merely that prying eyes will log into PACER and access documents behind the paywall; it is that

Page 4 –   NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

Plaintiffs would provide unredacted copies of the key documents to Intervenors, and that the Intervenors would publish the names contained therein. This concern is not a mere possibility, but rather the fundamental reason why the Intervenors have joined this action seeking to unseal this information (and why Plaintiffs echoed the Intervenors' response to NIKE's objections). *See* ECF Nos. 343, 346. Publication of this information is likely to bring embarrassment, emotional harm and reputational harm to individuals named in the redacted records. And once the unredacted records are filed on the public docket, the information within them can never be fully clawed back. *See Ball v. Skillz Inc.*, No. 220CV00888JADBNW, 2020 WL 10180904, at *2 (D. Nev. Nov. 16, 2020) (finding irreparable injury absent stay because of inability to claw back plaintiff's anonymity from public record); *see also Align Tech., Inc., LLC*, 2023 WL 2347431, at *1 ("'[When] the information is publicly filed, what once may have been [confidential] no longer will be'") (quoting *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 3536800, at *1 (N.D. Cal. Aug. 15, 2012)).

If a stay is not put in place pending appeal of the Court's Order, nothing prevents the Intervenors or anyone else from accessing the Court's records and disclosing that information to the public during NIKE's appeal. *See Hunton v. Am. Zurich Ins. Co.*, No. CV-16-00539-PHX-DLR, 2019 WL 399708, at *3 (D. Ariz. Jan. 31, 2019) (opposing counsel disclosed unsealed information to third party in absence of a stay pending appeal); Understanding that reality, a stay prevents harm to the individuals named in the applicable records, *see, e.g., Nken*, 556 U.S. at 434; *c.f. Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000) (finding district court erred by failing to consider evidence of threatened retaliation to non-parties), while also preserving the merits of NIKE's appeal. *Hernandez v. Cnty. of Monterey*, No. 13-CV-02354-BLF, 2023 WL 4849877, at *2 (N.D. Cal. July 28, 2023) ("Defendants

Page 5 –   NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

correctly point out that once the material in the reports is made public, Defendants would have no effective recourse even if they were to prevail on their appeal of the Sealing Order.").

**B.     NIKE Has Raised Serious and Important Legal Questions on the Merits.**

The likelihood of NIKE's success on appeal also weighs in its favor.  At this stage, NIKE need only establish that success is a "reasonable probability," a "fair prospect," or that "serious legal questions are raised."  *Leiva–Perez*, 640 F.3d at 967-968; *WOF SW GGP 1, LLC v. Quasar Energy Group, LLC*, No. 3:18-CV-01475-AC, 2020 WL 2758779, at *1 (D. Or. Jan. 7, 2020).

Although the Ninth Circuit has not defined "serious legal questions," this Court and others within the Circuit have found that a question is serious "when it raises an issue of first impression within the Ninth Circuit or involves a split of legal authority."  *WOF SW GGP 1, LLC*, 2020 WL 2758779, at *1 (quoting *Vesta Corp. v. Amdocs Mgmt. Ltd.*, No. 3:14-cv-1142-HZ, 2016 WL 10843668, at *2 (D. Or. Nov. 7, 2016)); *Benson v. Double Down Interactive, LLC*, Case No. 2:18-cv-00525-RBL, 2019 WL 972482, at *6 (W.D. Wash. Feb. 28, 2019) (holding that "[e]ven though this Court stands by its prior decision ... there is no clear precedent by the Ninth Circuit or the Supreme Court squarely addressing the issue ... [and thus movant] meets the serious legal question standard").

There is a dearth of authority in the Ninth Circuit on motions to stay pending appeal when the underlying order concerns a motion to unseal the identities of non-party complainants, witnesses, and subjects of internal complaints.  That said, NIKE has presented a serious legal question with respect to whether the "good cause" standard (instead of the "compelling interest" standard) should be applied in the instant case.  This is especially true where, as here, the Court should weigh this factor as well as the other factors that militate in favor of NIKE.

**C.    The Balance of Hardships Tips in Favor of NIKE and its Former Employees.**

There would be no injury to other interested parties as a result of a stay.  For one, all parties hereto have access to the applicable records without redaction.  Plaintiffs did not challenge the Court's June 17, 2019 Protective Order, and in fact, Plaintiffs agreed with NIKE to keep redacted "the names of any individuals named in allegations of sexual harassment or gender discrimination at [NIKE] that have not already been made public[.]"  ECF No. 273 at 12. Of equal import, granting a stay would not impact the current stage of proceedings because the parties can continue the proceedings consistent with the Court's case management order.

The Intervenors likewise would be no worse off to wait until the appellate court can review the legal issues here before gaining access to and/or publishing the records at issue.  Any additional delay that may arise by virtue of any appellate proceedings is outweighed by the interest of justice for the individuals whose identities are currently redacted, and there would be no harm to the litigants themselves.  *See WOF SW GGP 1, LLC*, 2020 WL 2758779, at *2 ("[T]he timeframe for the appeal is not so arduously long that it creates an unnecessary burden on [p]laintiff.").

**D.    The Public Interest Favors a Stay Pending Appeal.**

Finally, public interest weighs in favor of NIKE's position.  If there is no stay and the Court is inclined to overrule NIKE's objections to the Magistrate Judge's Findings, any appeal to the Ninth Circuit likely would be moot—far in advance of the Ninth Circuit's review of the legal arguments.  *Hunton*, 2019 WL 399708, at *3 ("Although the Court could issue a stay that prevents Plaintiff from disclosing these documents to others going forward, it is not clear how the Court can undo the disclosures that already have occurred.").  Allowing parties to seek appellate review without mooting the subject of the inquiry is a significant public interest and

Page 7 –   NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

ER-0338

finding otherwise would effectively create a "race to the courthouse," whereby Plaintiffs and/or

the Intervenors would attempt to publicize the records here before the Court has time to consider

NIKE's appeal.  *C.f. Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*, 179 F.R.D.

264, 271 (C.D. Cal. 1998) ("[C]ourts seek to eliminate the race to the courthouse door in an

attempt to preempt a later suit in another forum.").  By contrast, minimal harm would befall the

public interest if proceedings are stayed pending appeal.  *See Ball*, 2020 WL 10180904, at *2

(finding slight delay in revealing contested information while an appeal is pursued has minimal

effect on public interest).

## IV.    **CONCLUSION**

Assuming, *arguendo*, that the Court overrules NIKE's objections to the Magistrate's

Findings & Recommendation, NIKE respectfully requests an immediate stay of proceedings to

protect the subject matter of any appeal that NIKE would file with the Ninth Circuit concerning the

redactions referenced in NIKE's objections to the Findings.  Assuming, *arguendo*, that the Court

denies this motion, NIKE requests a brief stay be put in place for NIKE to request a stay directly

from the Ninth Circuit. Fed. R. App. P. 8(a)(2)(A)(ii); s*ee Hunton*, 2019 WL 399708, at *3 (granting

party's alternative request for stay to allow time to seek relief directly from the Ninth Circuit).


Date: December 21, 2023           */S/ Daniel Prince*

                                  DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
                                  danielprince@paulhastings.com
                                  FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
                                  feliciadavis@paulhastings.com
                                  PAUL HASTINGS LLP
                                  515 South Flower Street, 25th Floor
                                  Los Angeles, CA 90071
                                  Telephone:  (213) 683-6000
                                  Facsimile:  (213) 627-0705


Page 8 –  NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Defendant NIKE, INC.

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>DEFENDANT NIKE, INC.'S RENEWED REQUEST FOR ORAL ARGUMENT ON NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION DATED OCTOBER 11, 2023 (ECF NO. 363) PURSUANT TO FED R. CIV. P. 72 AND CONDITIONAL REQUEST FOR EMERGENCY STAY<br><br>**ORAL ARGUMENT REQUESTED** |

**Renewed Request for Oral Argument and Request for Emergency Stay**

On October 25, 2023, NIKE filed its objections to the Magistrate Judge's Findings and Recommendation dated October 11, 2023 (the "Findings") granting the Non-Party Media Organizations' (the "Intervenors") Renewed Motion to Unseal Judicial Records (the "Renewed Motion"). NIKE requested oral argument because its objections raise serious and important legal questions. NIKE hereby renews that request. While NIKE continues to believe in its position, NIKE is concurrently filing a motion (on an expedited basis) seeking a stay pending appeal of the Court's decision in the event that the Court overrules NIKE's objections to ensure that Plaintiffs do not furnish records currently redacted to the Intervenors for publication while that appeal is pending.

That motion notwithstanding, at any oral argument, NIKE would seek an additional stay of proceedings if the Court overrules NIKE's objections to account for the period before the Court may consider and rule on NIKE's emergency motion for stay. Without a stay in place during this period, Plaintiffs could and likely would provide unredacted versions of documents that are now-redacted to the Intervenors, which, in turn, would publicize such information even though NIKE would seek an emergency stay and an appeal.[1] ***Thus, in the event NIKE does not have the opportunity to express this in oral argument, NIKE requests an immediate stay of the***

---

[1] Intervenors requested that unredacted versions of the following be publicly filed: Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–6; Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–7; Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–8; Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 285–1; Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 285–2; Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification, ECF No. 288; Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification, ECF No. 290–4. ECF No. 343 at 5.

Page 1 –  RENEWED REQUEST FOR ORAL ARGUMENT AND REQUEST FOR STAY

*Court's Order adopting the Magistrate Judge's findings while NIKE's emergency motion for stay is under consideration.*

As argued in that motion, a stay should be granted during this interim period for the same reasons why it is necessary pending appeal—because a stay avoids irreparable injury and protects the subject matter of any appeal. The Plaintiffs likely would provide, and the Intervenors likely would seek to immediately publicize, unredacted documents containing the identities of complainants, witnesses, and subjects of internal complaints listed in certain, limited documents before the Court rules on NIKE's motion to stay. *See* ECF Nos. 343, 346. Publication of this information is likely to cause emotional and reputational harm and other injury to the individuals named in the redacted records, and once the unredacted records are publicly filed, the information within them can never be fully clawed back. *See Ball v. Skillz Inc.*, No. 220CV00888JADBNW, 2020 WL 10180904, at *2 (D. Nev. Nov. 16, 2020) (finding irreparable injury absent stay because of inability to claw back plaintiff's anonymity from public record); *see also Align Tech., Inc. v. SmileDirectClub, LLC*, No. 23-CV-00023-EMC, 2023 WL 2347431, at *1 ("'[When] the information is publicly filed, what once may have been [confidential] no longer will be'") (quoting *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 3536800, at *1 (N.D. Cal. Aug. 15, 2012)).

A stay also is in the public interest, there would be little to no injury to the Intervenors if a stay is granted, and NIKE's objections raise serious and important legal questions related to individual's privacy interests on the merits. Therefore, if NIKE's objections are overruled, NIKE requests an immediate stay during the Court's consideration of its motion to stay.

Date: December 21, 2023

/S/ Daniel Prince
DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com

Page 2 –  RENEWED REQUEST FOR ORAL ARGUMENT AND REQUEST FOR STAY

FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Defendant NIKE, INC.

**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Counsel for Plaintiffs, Opt-in Plaintiffs and Putative Class

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated, | Case No. 3:18-cv-01477-JR |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION** |
| vs. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | **FILED WITH REDACTIONS** |

## I.    INTRODUCTION AND SUMMARY

In its Objections to the Magistrate Judge's Findings and Recommendation ("F&R"), ECF No. 376 ("Objections"), Nike misrepresents the complaints[1] in question and their relevance to Plaintiffs' individual and class claims. Plaintiffs present this Opposition to correct these errors, which, if uncorrected, could mislead the Court. The complaints are relevant to all of Plaintiffs' claims, particularly the disparate treatment claims under Title VII and the Oregon Equality Act ("OEA"), which allege a pattern and practice of discrimination against women. The information in this Opposition is critical to respond to Nike's factual distortions because the Media Intervenors do not have equivalent access to record evidence or familiarity with the underlying legal arguments as Plaintiffs.

Further, given that Plaintiffs will likely try their individual claims in the coming year and appeal the denial of class certification upon a final judgment, there is an ongoing need for public access to relevant and accurate information to evaluate both the merits of Plaintiffs' claims and the self-interested commentary issued by Nike. Only when the names are unredacted will non-parties become aware that Nike Vice Presidents have been accused of gender-based discrimination and harassment. For example, the spurious nature of Nike's claim that the

---

[1] Nike refers to the complaints as "unsubstantiated." Objs., ECF No. 376 at 6, 17. But, Nike has never introduced evidence disputing the substance of the complaints. Moreover, after Nike received the complaints, Nike's CEO endorsed the validity of the complaints by, among other statements, admitting that "[HR] processes … underserved us in recent years [and Nike needs] to restore trust in places where it has eroded." Sun Decl. Ex. 4, ECF No. 280-4 at 7. Furthermore, on the basis of attorney-client privilege, Nike has refused to produce documents related to its investigations of the complaints, any conclusions about the validity of the complaints, or any actions taken in response. Nike should not be permitted to obtain the benefit of the privilege shield while, at the same time, making arguments about the validity of the complaints. Finally, a corporate witness testifying pursuant to Federal Rule of Civil Procedure 30(b)(6) admitted that "some" employees were forced to "exit" as a result of the complaints but was directed by counsel not to identify those employees. Sun Decl. Ex. 67, ECF No. 286-7 at 6-7.

PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION
PAGE 1

offending conduct was "consensual" between "colleagues" becomes clear when alleged harassers are revealed as executives with power and influence over their targets.

## II.    ARGUMENT

### A.    Nike Misrepresents the Substance of the Complaints.

To support its argument that the redactions should stand, Nike emphasizes the dissimilarity of the complaints and the subject matter of Plaintiffs' individual and class action claims.  But Nike's characterizations are inaccurate and misleading.

According to Nike, "none of the complaints at issue relate to pay disparities" and "[a] handful of claimed harassment complaints tell the Court nothing about whether Plaintiffs can prove a common policy or practice of pay or promotion decisions sufficient to certify a class." But, contrary to these assertions:[2]

- A complainant alleges "inequity in pay," stating that she has "asked twice to have [her] salary reviewed" and her "boss" while saying "that will happen" has "never follow[ed] through."  She "know[s]" that she is "underpaid."  Decl. of Mengfei Sun in Supp. of Pls.' Mot. for Class Certification ("Sun Decl.") Ex. 47, ECF No. 159-7 at 3 (unredacted) / ECF No. 284-7 at 3 (redacted).

- A complaint, submitted by former Nike Vice President ███████████ describes discrimination in the promotion process.[3]  Decl. of Byron Goldstein in Supp. of Pls.' Mot. for Class Certification ("Goldstein Class Cert. Decl.") Ex. 9, ECF No. 290-4 at 19 (redacted) / Sun Decl. Ex. 50, ECF No. 159-10 (unredacted).  ███████ alleges that she proposed three female candidates for promotion but Senior VP[4] ███████ rejected her recommendation by telling her "you need a man in the role." Sun Decl. Ex. 50, ECF No. 159-10 at 2 (unredacted) / Goldstein Decl. Ex. 9, ECF No. 290-4 at 20 (redacted).  After

---

[2] Plaintiffs only refer to the complaints that are the subject of the F&R.  For convenience of the Court, Plaintiffs cite to both the redacted and unredacted versions of these complaints.

[3] ███████ is a former Nike vice president.  Decl. of Byron Goldstein in Supp. of Pls.' Reply in Supp. of Mot. to Compel Produc. of Docs. ("Goldstein Reply MTC Decl.") Ex. 12, ECF No. 369-11 at 10.

[4] On a Nike organization chart, ███████ is listed as "███████████." Sun Decl. Ex. 54, ECF No. 285-4 at 1. This is an example of the benefit of unredacting names.  By identifying ███████ on an unredacted complaint, it becomes clear that a Nike executive, a VP, gave ███████ explicit instructions to discriminate on the basis of gender.

PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION
PAGE 2

hearing this explicit discriminatory direction by a high-ranking Nike executive, ███ had a "lack of faith in a fair & equitable promotion process." *Id.*

- Another complainant, ████████████ alleged that, despite being a "top performer," she was not promoted; she reported the problem to HR but "nothing was done …." Sun Decl. Ex. 46, ECF No. 159-6 at 2 (unredacted) / ECF No. 284-6 at 2 (redacted).

Nike also mischaracterizes the complaints of sexual harassment. According to Nike, "none of the [sex harassment] claims appear to assert allegations of non-consensual conduct." Objs., ECF No. 376 at 6 n.4. Nike further attempts to minimize the seriousness of the complaints by referring to them as "allegations of philandering, consensual sex between colleagues, and workplace bullying." *Id.* at 9-10. In reality, the complaints reveal hostile and unlawful sexual harassment that cannot reasonably be described as "consensual."

- ████████████ alleged that her supervisor, ███████, had a "[b]oys club attitude," "terrorized her," and "wouldn't stop." Sun Decl. Ex. 46, ECF No. 159-6 at 2 (unredacted) / ECF No. 284-6 at 2 (redacted). ████████ added that ███ knows that he "can get away with it," because "████████ [a Nike VP]⁵ turned a blind eye." *Id.*

- Another complainant alleges "examples of sexual harassment" at Nike: "Men sloppy drunk putting their arms around … female coworkers while on work travel," "[m]en trying to sleep with women in their function at lower levels by luring them in through promise of a 'work dinner' to discuss their career," and "VP men sleeping with/getting BJs from women in the organization at much lower level." Sun Decl. Ex. 47, ECF No. 159-7 at 3 (unredacted) / ECF No. 284-7 at 3 (redacted). The Complainant further describes that "ER [Employee Relations] and HR at this company are a joke" and that "████████⁶ [████████████████████████████] was a well known sexual harasser …." *Id.* Additionally, the complainant identifies several Nike executives

---

[5] The unredacted complaint identifies that ████████, who was a Nike VP/GM, Goldstein Reply MTC Decl. Ex. 7, ECF No. 369-6 at 1, "turned a blind eye" to the "[b]oys club" attitude that "terrorized" the complainant, ████████████. Without having access to the name, ████ the public has no way to know that a company executive turned a "blind eye" to sexual harassment.

[6] ████████ was a former ████████████████. Goldstein Reply MTC Decl. Ex. 9, ECF No. 369-8 at 1. Without the unredacted complaint it is not possible to know that the complainant charged that Nike's ████████████ was a "well known harasser."

PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION
PAGE 3



including "███████ [and] ███████,[7]" who are identified in other complaints, as "known philanderers with lower level employees whom they exert influence and power over." *Id.*

- ███████, a former Nike VP,[8] identified "negative, manipulative and sexist behavior over the course of [her] career at Nike." Sun Decl. Ex. 48, ECF No. 159-8 at 3 (unredacted) / ECF No. 284-8 at 3 (redacted). ███████ alleged that a senior Nike executive, ███████[9], engaged in "[d]isparaging, dishonest behavior" and "discredit[ed]" her "reputation" and damaged her career. *Id.* at 4.  In doing so, ███████ made sexist criticisms ("it's like neither your boyfriend nor your husband are happy with you.")  *Id.*

- Two lower-level female complainants recounted severe harassing conduct by Nike VP ███████.  One complainant alleged that "███████ was late for his Personal Training session with me.  I said, 'oh ███████ you are so late today.'  He responded, 'well maybe if you dressed sexier I would be on time.'  He continued with 'take that baggy jacket off and show some skin.'  I tried to laugh but I was humiliated.  I finished the lesson and kept it to myself because of who he is at the company."  She added, "[i]t made me feel bad.  I was intimidated and felt degraded."  Sun Decl. Ex. 51, ECF No. 160-1 at 2 (unredacted) / ECF No. 285-1 at 2 (redacted).  A second complainant alleged that she "walked into the massage room at Nike Sports Center [and w]hen [she] opened the door" she saw a female trainer who was "performing oral sex on ███████."  The episode "put a very bad taste in my mouth about leadership and how men … take advantage of women below them."  Sun Decl. Ex. 52, ECF No. 160-2 at 2 (unredacted) / ECF No. 285-2 at 2 (redacted).

- Finally, a complainant details the problem with reporting sexual harassment to HR.  She alleged how one woman was "not able to do anything about" being called a "bitch" by her manager because HR refused to act after a Nike vice-president, ███████,[10] "phoned in a favor" to protect his friend.  Sun Decl. Ex. 49, ECF No. 159-9 at 2 (unredacted) / Goldstein Class Cert. Decl.

---

[7] ███████ is a Nike VP.  Goldstein Reply MTC Decl. Ex. 9, ECF 369-8 at 1.  Without the unredacted complaint it is not possible for the public to understand that that harassing conduct alleged was committed by a Nike executive and that this Nike executive, as described in other complaints, engaged in harassing conduct with Nike female employees in lower level positions.

[8] ███████ is a former Nike VP.  Sun Decl. Ex. 74, ECF No. 162-4 at 8.

[9] ███████ is a former Nike VP/GM. Goldstein Reply MTC Decl. Ex. 3, ECF No. 369-2 at 1.

[10] The unredacted complaint identifies that ███████, who is a Nike VP, Goldstein Reply MTC Decl. Ex. 12, ECF No. 369-11 at 9, "phoned in a favor" that short-circuited any investigation of the harassment complaint.  Only by knowing the name, ███████, would the public understand that a Nike VP interfered with an HR harassment investigation in order to protect a friend.

PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION
PAGE 4

Ex. 9, ECF No. 290-4 at 27 (redacted).

Nike's refusal to acknowledge the seriousness of these complaints is further evidence of a workplace culture imbued with gender-based discrimination. Unredacting the names would enable the press and the public to investigate or challenge Nike's characterizations and mischaracterizations of the complaints.

**B.    Nike Ignores the Relevance of the Complaints.**

For Plaintiffs' disparate treatment claims under Title VII and the OEA, anecdotal evidence of sexual harassment, such as those in the complaints, helps "establish a general discriminatory pattern." *Obrey v. Johnson*, 400 F.3d 691, 698 (9th Cir. 2005).

**1.    Sexual Harassment by Superiors is Not Consensual.**

Nike's tone-deaf claim that the complaints do not allege "non-consensual" conduct and, instead, refer to "consensual sex between colleagues," Objections, ECF No. 376 at 6 n.4 and 10, ignores the status of the harassers as compared to the female victims. For example, Nike cites two complaints involving sexual contact, referring to the participants as "individuals." *Id.* at 17. But Nike can only maintain the fiction of consent based on the redacted complaints. When the names are unredacted, and the male harasser is identified as a Nike executive, VP █████ █████ and the victims are identified as female employees in the roles of personal trainer and a massage therapist, *see* section II.A, *supra*, the nature of the harassing conduct becomes evident.[11]

It is well established that conduct may constitute unlawful harassment because the harasser was a supervisor who exercised influence over a lower-level employee. *See Zetwick v. County of Yolo*, 850 F. 3d 436, 445 (9th Cir. 2017) (concluding that a reasonable jury could find

---

[11] Similarly, Nike refers to "allegations of philandering," Objections, ECF No. 376 at 9-10, but omits that the complaint identifies "known philanderers," █████ and █████████, as well as other Nike VPs, and that these Nike VPs focused upon "lower level employees whom they exert influence and power over." *See* section II.A, *supra*.

PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION
PAGE 5

that the alleged sexual harassment was actionable, in part, because of the harasser's status as a supervisor).  Courts further recognize the "potentially greater impact of harassment from a supervisor …." *Id*.  "Indeed, the Supreme Court has recognized that a 'supervisor's power and authority invests his or her harassing conduct with a particularly threatening character.'" *Id*. (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)); *see also Lanyon v. Interfor U.S. Inc.*, No. 1:16-cv-2058-MC, 2018 WL 1976023, at *7 (D. Or. Apr. 26, 2018) ("Hostile work environments created by supervisors deserve more scrutiny.").

The complaints describe just this type of abusive sexual harassment, such as "[m]en trying to sleep with women … at lower levels by luring them in through promise of a 'work dinner' to discuss their career" and one complainant reporting that she "was intimidated and felt degraded."  *See* section II.A, *supra*.  Nike takes the offensive and tone-deaf position of evaluating the complaints as if no power imbalance was at play; but this is key to analyzing unlawful harassment.  *See EEOC v. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) ("When evaluating the context in which harassment takes place, we have often focused on the disparity in power between the harasser and the victim") (internal citation & quotation marks omitted); *EEOC v. R & R Ventures*, 244 F. 3d 334, 340 (4th Cir. 2001) (The objective severity of the harassment was compounded by the fact the harasser was an "adult male in a supervisory position over young women barely half his age.").  Nike's attempt to cast coercive sexual harassment as "consensual sex" or "philandering" is not only misguided, but it also ignores well-established and critical aspects of the legal framework that governs the very gender-based discrimination claims asserted by Plaintiffs.

### 2.    Evidence of gender-based hostility is relevant to discrimination claims.

In another misleading pronouncement, Nike categorically states that the complaints "have

<u>nothing</u> to do with the pay equity and promotion claims here," Objections, ECF No. 376 at 6 (emphasis in original and footnote omitted), and "tell … nothing about policy or practices of pay or promotion decisions …." *Id*. at 14.  Nike again ignores a well-established principle, namely that, "[b]ecause hostility against women underlie decisions to discharge or hire women because of their gender, evidence of sexual harassment often will be relevant to claims of gender-based discrimination." *EEOC v. Farmers Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994).  The Ninth Circuit has "long recognized that '[t]he sexual harassment of others, if shown to have occurred, is relevant and probative of [a defendant's] general attitude of disrespect toward his female employees and his sexual objectification of them.'" *Zetwick*, 850 F. 3d at 445 (quoting *Heyne v. Caruso*, 69 F.3d 1475, 1479-81 (9th Cir. 1995)); *see also McGinist v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004) (If "hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff ….").  Here, the pattern of gender-based hostility described in the complaints is relevant to Plaintiffs' claims which, at their core, are premised on the devaluation of female employees.

This is particularly true where, as here, the gender-based hostility is demonstrated by upper-level executives, as shown by the unredacted complaints, *see* section II.A, *supra*.  In such an environment, evidence of sexual harassment can support class pattern or practice claims.  *See, e.g.*, *Ellis v. Costco*, 285 F.R.D. 492, 520 (N.D. Cal. 2012) (evidence of a company culture that "fosters and reinforces stereotyped thinking" supports the claim that the company operates under a "common companywide promotion system"); *Chen-Oster v. Goldman Sachs & Co.*, 325 F.R.D. 55, 76-77 (S.D.N.Y. 2018) (pattern or practice discrimination class established by evidence including "sexualization" of female class members).

Not only do the complaints contain reports of discrimination in pay and promotions

supporting Plaintiffs' equal pay and disparate impact claims, they also evidence a pervasive

hostility to women at Nike and a workplace culture that turns a blind eye to bad behavior of

those with power, in support of Plaintiffs' disparate treatment claims.  Nike's claim that the

complaints lack relevance to the individual or class claims is simply wrong.

### III.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully oppose Nike's objections to the

F&R.

Dated:  November 8, 2023                    Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

_____
Laura L. Ho (admitted *pro hac vice*)
Barry Goldstein, Of Counsel (admitted *pro hac vice*)
James Kan (admitted *pro hac vice*)
Byron Goldstein (admitted *pro hac vice*)
Katharine L. Fisher (admitted *pro hac vice*)
Mengfei Sun (admitted *pro hac vice*)
MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Kathryn P. Roberts, OSB #064854
ACKERMANN & TILAJEF PC
Craig Ackerman (admitted *pro hac vice*)
cja@ackermanntilajef.com
Brian Denlinger (admitted *pro hac vice*)
bd@ackermanntilajef.com
315 S Beverly Drive, Suite 504
Beverly Hills, CA 90212
Tel:  (310) 277-0614
Fax:  (310) 277-0635

INDIA LIN BODIEN, ATTORNEY AT LAW
India Lin Bodien (admitted *pro hac vice*)
india@indialinbodienlaw.com
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Tel:  (253) 212-7913
Fax:  (253) 276-0081

Of Attorneys for Plaintiffs and Opt-In Plaintiffs

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

|  |  |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>RESPONSE OF NON-PARTY MEDIA ORGANIZATIONS INSIDER, INC. *d/b/a BUSINESS INSIDER*, ADVANCE LOCAL MEDIA LLC *d/b/a OREGONIAN MEDIA GROUP*, AND AMERICAN CITY BUSINESS JOURNALS, INC. *d/b/a PORTLAND BUSINESS JOURNAL* TO DEFENDANT'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER PURSUANT TO FED. R. CIV. P. 72(a) |

ER-0355

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................ 1

BACKGROUND .............................................................................. 2

    A.   The Parties' Protective Order and Intervenors' Initial Motion to Intervene and Unseal ........................................................................... 2

    B.   The Magistrate's First Findings and Recommendation on Intervention and Unsealing .................................................................... 3

    C.   Denial of Plaintiffs' Motion for Class Certification ........................... 3

    D.   Remaining Stipulated Redactions ............................................. 4

    E.   Media Intervenors' Renewed Motion to Unseal and the Magistrate's Second Findings and Recommendation on Unsealing ................................ 5

ARGUMENT ................................................................................ 5

    A.   Standard of Review ............................................................. 5

    B.   The Magistrate Judge Correctly Found that "Compelling Reasons" Is the Proper Standard for Evaluating Requests to Seal Judicial Records Filed in Support of Class Certification .............................................. 6

    C.   Nike Continues to Improperly Seek to Shift its Burden to Media Intervenors ................. 9

    D.   Nike's Conclusory Claims of Potential Reputational and Privacy Harms Are Insufficient to Overcome the Burdens Under Both the "Compelling Reasons" and "Good Cause" Standards ........................................... 10

    E.   Nike Mischaracterizes Media Intervenors' Motives ........................... 13

CONCLUSION ............................................................................. 15

## TABLE OF AUTHORITIES

**Cases**

*Adtrader, Inc. v. Google LLC*,
  No. 17-CV-7082, 2020 WL 6391210 (N.D. Cal. Mar. 24, 2020)..........................................8, 11

*Bracken v. Fla. League of Cities*,
  No 1:19-CV-602, 2019 WL 1867921 (D. Or. Apr. 24, 2019) ...................................................12

*CBS, Inc. v. Democratic Nat'l Comm.*,
  412 U.S. 94 (1973)......................................................................................................................14

*Coates v. Farmers Grp., Inc.*,
  No. 15-CV-1913, 2016 WL 8223348 (N.D. Cal. Jan. 25, 2016)..................................................7

*Ctr. for Auto Safety v. Chrysler Grp., LLC*,
  809 F.3d 1092 (9th Cir. 2016) ......................................................................................1, 7, 8, 10

*Fodera v. Equinox Holdings, Inc.*,
  341 F.R.D. 616 (N.D. Cal. 2022)..................................................................................................8

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
  331 F.3d 1122 (9th Cir. 2003) .......................................................................................7, 9, 10, 11

*Hagestad v. Tragesser*,
  49 F.3d 1430 (9th Cir. 1995) .......................................................................................................6

*Heath v. Google LLC*,
  No. 15-CV-1824, 2018 WL 11465387 (N.D. Cal. June 22, 2018)...............................................7

*In re Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig.*,
  101 F.R.D. 34 (C.D. Cal. 1984) ..................................................................................................15

*In re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.*,
  686 F.3d 1115 (9th Cir. 2012) ......................................................................................................7

*Kamakana v. City & Cnty. of Honolulu*,
  447 F.3d 1172 (9th Cir. 2006) .......................................................................................7, 9, 10, 12

*Kautsman v. Carrington Mortg. Servs.*,
  2017 U.S. Dist. LEXIS 153550 (W.D. Wash. Sept. 19, 2017)....................................................7

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974).....................................................................................................................14

*Oliner v. Kontrabecki*,
  745 F.3d 1024 (9th Cir. 2014) ....................................................................................................12

*Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*,
    307 F.3d 1206 (9th Cir. 2002) ...................................................................6, 10

*Polaris Innovations Ltd. v. Kingston Tech. Co.*,
    No. 16-CV-300, 2017 WL 2806897 (C.D. Cal. Mar. 30, 2017)..................12

*Reynolds v. Saad*,
    No. 3:17-CV-67, 2018 WL 259386 (N.D. W. Va. Jan. 2, 2018)....................6

*Sessa v. Ancestry.com Operations Inc.*,
    No. 2:20-CV-2292, 2023 WL 1795856 (D. Nev. Feb. 6, 2023).....................7

*Stoba v. Saveology.com, LLC*,
    No. 13-CV-2925, 2016 WL 1257501 (S.D. Cal. Mar. 31, 2016) ...................7

*Taylor v. Astrue*,
    32 F. Supp. 3d 253 (N.D.N.Y. 2012) .......................................................5, 6

**Other Authorities**

Fed. R. Civ. P. 26(c) .........................................................................................11

Fed. R. Civ. P. 72(a) ...........................................................................................5

Fed. R. Civ. P. 72(b) ...........................................................................................5

Jeff Manning, *Courts Reject Nike's Effort to Keep Executives' Info Secret in
    Discrimination Suit*, The Oregonian (Nov. 18, 2020),
    https://perma.cc/WGC3-78W7 ...................................................................13

Jeff Manning, *Inside Nike's Purge: More than a #MeToo Moment*,
    The Oregonian (July 7, 2018),
    https://perma.cc/9AJK-2BE4 ......................................................................13

Julie Creswell et al., *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*,
    N.Y. Times (Apr. 28, 2018),
    https://perma.cc/2PTE-23LZ .......................................................................13

Kevin Draper & Julie Creswell, *Nike's C.E.O. Vows Changes After Claims of Workplace
    Harassment and Bias*, N.Y. Times (May 5, 2018),
    https://perma.cc/V9YMGEAC .....................................................................13

Matthew Kish, *Exclusive: Departing Nike Executive Trevor Edwards Was Company's
    Highest Paid*, Portland Bus. J. (July 25, 2018),
    https://perma.cc/R3M4-63EE ......................................................................13

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER
- Page iv -**

Matthew Kish, *Nike Files Motion to Keep Sensitive Records in Sweeping Gender Discrimination Lawsuit Sealed*, Insider (Mar. 16, 2022), https://perma.cc/N7V4-GJ7D ........................................................................13

Mike Rogoway, *Nike Sheds Second Top Executive Amid Inquiry into Workplace 'Behavior'*, The Oregonian (Mar. 16, 2018), https://perma.cc/2FTE-M3W2 ....................................................................13

Patrick Dorrian, *Nike Pay Equity Studies Privileged, Off Limits in Sex Bias Suit*, Bloomberg Law (Oct. 13, 2020), https://perma.cc/9EP6-SYML ....................................................................13

Peter Blumberg, *Nike Women Clear First Hurdle in Lawsuit Over Gender Pay Gap*, Bloomberg (Feb. 27, 2019), https://perma.cc/V7M3-Q9EV ....................................................................13

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER - Page v -**

Non-party media organizations Insider, Inc. *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal* (collectively, the "Media Intervenors") respectfully respond to Defendant Nike's objections to the Magistrate Judge's Findings & Recommendation dated October 11, 2023 (ECF No. 363) and request that the Court affirm the Magistrate's order pursuant to Federal Rule of Civil Procedure 72(a).

## INTRODUCTION

The Magistrate correctly granted Media Intervenors' renewed motion to unseal judicial records related to class certification because, as the proponent for sealing, Nike failed to show compelling reasons supported by specific factual findings that outweigh the historic presumption and public interest in favor of openness.  Nike's objections do not demonstrate that any of the Magistrate's findings are clearly erroneous or contrary to law and should be rejected for the following reasons.  ***First***, Nike continues to argue for application of the incorrect "good cause" standard to justify sealing judicial records related to a motion for class certification.  Instead, as the Magistrate found, Nike must meet the more stringent "compelling reasons" standard adopted by the Ninth Circuit for these matters in *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016).  ***Second***, while the public interest in this proceeding, which will determine whether one of the country's most prominent public companies is properly handling claims of sexual harassment and misconduct, is undeniable, Nike continues to improperly seek to shift its burden to justify sealing to Media Intervenors; the Magistrate correctly imposed that burden on Nike.  ***Third***, in lieu of presenting concrete evidence of compelling reasons, or even good cause, to redact the names of all employees identified in workplace misconduct complaints, Nike reiterates vague privacy and reputational concerns that are too general to meet either standard and

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 1 -**

which have already been correctly rejected by the Magistrate Judge. *Finally*, Nike improperly uses its objections to repeat its past *ad hominem* attacks on Media Intervenors' motives for seeking to unseal judicial records in this case, which are unwarranted and irrelevant. In sum, Nike's objections fail to assert any legitimate arguments that would justify rejection or modification of the Magistrate Judge's findings.

## BACKGROUND

**A.    The Parties' Protective Order and Intervenors' Initial Motion to Intervene and Unseal**

On June 17, 2019, this Court entered a stipulated umbrella protective order, ECF No. 82 ("Protective Order"), modeled on the Court's Tier II template to govern the Parties' exchange of discovery materials. Invoking the Protective Order, the Parties thereafter filed thousands of pages of documents under seal. *See* ECF No. 205 Appendix A. In March 2022, Media Intervenors notified the Parties of their intent to intervene for the limited purpose of moving to unseal those documents to vindicate the press and public's presumptive right of access to judicial records. ECF No. 205 at 5–7. Media Intervenors conferred with the Parties to reach a resolution, leading to the public filings of four docket entries previously submitted by Defendant under seal. *Id.* But Defendant ultimately declined to unseal most of the documents at issue, including its Response to the Class Motion, and instead moved to seal the documents the Parties had to that point filed under seal pursuant only to their Protective Order. *Id.* at 7; ECF No. 171. On April 8, 2022, Media Intervenors brought their initial Motion to Intervene for the Limited Purpose of Moving to Unseal Judicial Records and to Oppose Defendant's Motion to Seal. ECF No. 205.

Defendant opposed Media Intervenors' Motion, contesting the public's presumptive right of access to the sealed judicial records and arguing that "[t]hose redactions w[ould] be addressed in due course" under the auspices of the Protective Order. ECF No. 219 at 2. Plaintiffs took no

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 2 -**

position on Media Intervenors' Motion, emphasizing that their lack of a position stemmed not from opposition to unsealing, but from a desire not to disturb the outcome of "months" of "negotiating in good faith with Nike about what documents should remain sealed." ECF No. 218 at 2. Plaintiffs clarified that they "[were] not advocating that any documents should remain sealed," and were "cognizant of the presumption that documents filed with the Court should not be sealed." *Id.*

**B.      The Magistrate's First Findings and Recommendation on Intervention and Unsealing**

On September 30, 2022, Magistrate Judge Russo recommended granting the Motion to Intervene and the Court subsequently entered the Magistrate's Findings and Recommendation on intervention. ECF Nos. 273, 275. The Magistrate recognized that the Media Intervenors' interests were not represented with respect to stipulated redactions produced under the Parties' Protective Order. ECF No. 273 at 11. Because of the Parties' ongoing efforts to unseal and unredact existing filings, and the pendency of the Plaintiffs' class certification motion, Media Intervenors' request for further briefing and to unseal additional documents was denied. *Id.* at 12–14. However, the Magistrate further instructed that "following the final resolution of plaintiffs' Motion for Class Certification, the non-party media organizations may file a renewed motion for the purposes of opposing any remaining stipulated redactions." *Id.* at 14. Meanwhile, Magistrate Judge Russo continued to oversee the Parties' ongoing efforts to "review previously sealed documents and re-lodge unsealed or redacted versions where appropriate." *Id.* at 13. This process led the Parties to refile redacted versions of all but one of the previously sealed documents identified in Appendix A of the Motion to Intervene. *See* ECF No. 229 Updated Appendix A; ECF Nos. 276–309.

**C.      Denial of Plaintiffs' Motion for Class Certification**

On November 22, 2022, Magistrate Judge Russo entered Findings and Recommendation concluding that Plaintiffs' motion for class certification should be denied. ECF No. 310. On

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 3 -**

March 21, 2023, the District Court adopted those Findings and Recommendation.  ECF No. 335.

Plaintiffs petitioned the Ninth Circuit for leave to appeal their motion for class certification.  *See*

ECF No. 337.  On June 1, 2023, the Ninth Circuit denied Plaintiffs' petition.  ECF No. 339.

### D.    Remaining Stipulated Redactions

Once the motion for class certification was resolved, Media Intervenors reviewed the

remaining redacted judicial records related to Plaintiffs' motion for class certification and

identified seven documents where continued redaction withholds key evidence presented in

support of class certification:

- Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-6.

- Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-7.

- Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-8.

- Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 285-1.

- Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 285-2.

- Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification.  ECF No. 288.

- Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification.  ECF No. 290-4.

Although redactions limit Media Intervenors' ability to ascertain the full contents of these

judicial records, they appear to contain information concerning allegations of harassment and

abuse involving Nike executives.

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
- Page 4 -

E.      **Media Intervenors' Renewed Motion to Unseal and the Magistrate's Second Findings and Recommendation on Unsealing**

Pursuant to Local Rule 7-1(a), counsel for Media Intervenors conferred in good faith with counsel for Plaintiffs and Defendant regarding their intended renewed motion to unseal.  Plaintiffs supported Media Intervenors' request to unseal the documents.  ECF No. 343.  Nike did not support Media Intervenors' request and, unable to resolve the dispute, on August 9, 2023, Media Intervenors filed a Renewed Motion to Unseal Judicial Records.  *Id*.  Nike opposed the Renewed Motion, ECF No. 345, and following full briefing, on October 11, 2023, the Magistrate entered Findings & Recommendation granting the renewed motion.    ECF No. 363 (hereinafter "Magistrate's Findings").  Nike filed objections to the Magistrate's Findings and Recommendation on October 25, 2023.  ECF No. 376 (hereinafter "Objections").

## ARGUMENT

A.      **Standard of Review**

The Magistrate Judge's finding should be reviewed by the District Court *de novo*.  Under Federal Rule of Civil Procedure 72(b), when reviewing a pretrial matter dispositive of the party's claim or defense "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3).  Pursuant to Rule 72(a), the district judge must consider any timely objection and "modify or set aside any part of the order that is clearly erroneous or is contrary to law."

For the *de novo* standard to apply, a party's objections must be specific.  If the objecting party "merely reiterates the same arguments made" in the original briefs submitted to the magistrate, then the court conducts only a clear error review.  *See Taylor v. Astrue*, 32 F. Supp. 3d

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 5 -**

253, 260–61 (N.D.N.Y. 2012) (explaining that plaintiff's objections repeated the same arguments made in the brief in support of his motion for judgment on the pleadings and the Magistrate Judge's report-recommendation was free of clear error because he "employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts"); *Reynolds v. Saad*, No. 3:17-CV-67, 2018 WL 259386, at *2 (N.D. W. Va. Jan. 2, 2018) (finding that *de novo* review was not required because petitioner "presented no new material facts or arguments in his objections to the Magistrate Judge's R&R").

Here, Nike objects to the Magistrate Judge's finding that it must demonstrate "compelling reasons" to justify sealing court records filed in support of Plaintiffs' motion for certification. Objections at 7. This is a legal question and should be reviewed *de novo* by this Court. Nike's further objections are otherwise simply a recitation of the same general and conclusory privacy and reputational arguments that were presented to the Magistrate Judge. Whether the Magistrate's findings are reviewed *de novo* or for clear error, these claims lack adequate specificity to overcome the presumption of public access in this case.

### B. The Magistrate Judge Correctly Found that "Compelling Reasons" Is the Proper Standard for Evaluating Requests to Seal Judicial Records Filed in Support of Class Certification

Nike continues to misapply the standard for sealing judicial records filed in connection with a motion for class certification. The Ninth Circuit recognizes a strong presumption in favor of access to judicial records that stems from the "public interest in understanding the judicial process." *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002) (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995) (recognizing that when courts are determining if the common law right of access should be overridden, they must begin with a strong presumption in favor of access to information in civil cases)). To overcome this

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
- Page 6 -

presumption, a party seeking redaction or sealing must show that there are compelling reasons for concealing the information from the public. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). This showing is particularized to ***each*** document or portion of a document the party seeks to seal. *Id.* at 1138–39.

The Ninth Circuit has sometimes applied a more lenient "good cause" standard to justify sealing documents filed in connection with non-dispositive motions. *See In re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (per curiam). The Court has made clear that the relevant standard "turn[s] on whether the motion is more than tangentially related to the merits of a case." Magistrate's Findings at 4 (quoting *Ctr. for Auto Safety*, 809 F.3d at 1101 (applying the compelling reasons standard to documents related to putative class action plaintiffs' motion for preliminary injunction)).[1] Proceedings demanding a higher threshold for sealing involve "the presentation of substantial evidence," "requir[ing] the court to address the merits of [the] case." *Ctr. for Auto Safety*, 809 F.3d at 1099. Thus, the terms "dispositive" and "nondispositive" are not meant to be "mechanical classifications." *Id.* at 1098. Instead, courts must look at how strongly a motion relates to the merits of the case. *Id.* (noting that even routine motions that would generally be considered nondispositive can be particularly relevant to the outcome of a case). Here, adjudication of Plaintiffs' motion for class certification, which required

---

[1]    Nike's reliance on *Sessa v. Ancestry.com Operations Inc.*, No. 2:20-CV-2292, 2023 WL 1795856 (D. Nev. Feb. 6, 2023), to argue that courts in the Ninth Circuit apply the "good cause standard" to seal class certification documents is misplaced. *See* Objections at 8. The *Sessa* court relied on *Kamakana v. City & County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006) and overlooked the Ninth Circuit's clarification in *Center for Auto Safety* that "compelling reasons" is the applicable sealing standard for documents in the class certification context. *Sessa*, 2023 WL 1795856, at *1. All other cases Nike relies upon similarly ignore the Ninth Circuit's operative decision in *Center for Auto Safety*. *See* Objections at 8 (citing *Heath v. Google LLC*, No. 15-CV-1824, 2018 WL 11465387 (N.D. Cal. June 22, 2018); *Kautsman v. Carrington Mortg. Servs.*, 2017 U.S. Dist. LEXIS 153550 (W.D. Wash. Sept. 19, 2017); *Stoba v. Saveology.com, LLC*, No. 13-CV-2925, 2016 WL 1257501 (S.D. Cal. Mar. 31, 2016); *Coates v. Farmers Grp., Inc.*, No. 15-CV-1913, 2016 WL 8223348 (N.D. Cal. Jan. 25, 2016).

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 7 -**

assessments of voluminous evidentiary submissions and the merits of the case, unquestionably requires application of the "compelling reasons" standard to any requests to seal related judicial records. *See* ECF No. 310 at 31–32; ECF Nos. 148–167, 185–187.

Accordingly, the Magistrate Judge correctly noted that Plaintiffs' reliance on internal Nike misconduct complaints, while not entirely determinative, "formed a crucial part of their motion," thus making the compelling reasons standard appropriate for evaluating the continued redaction of names found in those complaints. Magistrate's Findings at 4. Despite this, Nike continues to wrongfully assert that the Motion for Class Certification in this case is nondispositive and therefore subject to the "good cause" standard. Objections at 2. However, courts in the Ninth Circuit routinely apply the "compelling reasons" standard when ruling on motions to seal documents relating to class certification. *See Fodera v. Equinox Holdings, Inc.*, 341 F.R.D. 616, 634–35 (N.D. Cal. 2022) (finding that the requesting party incorrectly applied the "good cause" standard in its motions to seal documents related to class certification and denying the motions for failing to present specific, compelling reasons for sealing); *see also Adtrader, Inc. v. Google LLC*, No. 17-CV-7082, 2020 WL 6391210, at *2 (N.D. Cal. Mar. 24, 2020) (following "numerous other district courts within the Ninth Circuit in concluding that the compelling reasons standard applies to motions to seal documents relating to class certification").

Plaintiffs' Motion for Class Certification was plainly "more than tangentially related to the merits of [this] case." *Ctr. for Auto Safety*, 809 F.3d at 1101. As the Magistrate Judge's order correctly explained, "[t]he evidence sought to be unsealed . . . relates to commonality and for purposes of plaintiffs' disparate impact claims, proof of commonality overlaps with the merits because both look at the reason for a particular employment decision." Magistrate's Findings at 4. A court's decision whether to certify a class is critical to the litigation and it necessarily follows

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
- Page 8 -

that the public in general (including potential class members) should have access to filings relating to that certification decision. Accordingly, Nike must demonstrate "compelling reasons" to maintain under seal key information from judicial records Plaintiffs submitted in support of their class certification motion.

### C.     Nike Continues to Improperly Seek to Shift its Burden to Media Intervenors

Nike maintains that the Magistrate Judge "erroneously focus[ed] on the relationship between the redacted documents and Plaintiffs' Motion for Class Certification." Objections at 9. In so arguing, Nike seeks to shift its burden to Media Intervenors to show the connection between the redacted documents and the substantive rights of the Parties. Nike also repeatedly downplays the public's interest in the redacted information given the purported "lack of relevance of such information to the pay equity and promotion claims asserted in this lawsuit." *Id.* at 12. Again, this line of argument incorrectly burdens Media Intervenors with the task of demonstrating "compelling reasons" to ***unseal***, when in fact, the burden rests with Nike to present compelling reasons to justify sealing the information from the public. *Foltz*, 331 F.3d at 1130–31.

At the start of this case, the Parties agreed to redact the names of Nike complainants, witnesses, and accused harassers, but that agreement has since ceased. Magistrate's Findings at 2 n.1. To date, Nike has provided no specific justifications for continued redaction of the names of the complainants, witnesses, and accused harassers. Further, the Plaintiffs in this case now support the motion to unseal. *Id.* To successfully argue for sealing under the "compelling reasons" standard, the party seeking sealing must demonstrate specific factual findings that outweigh the historic presumption and public interest in favor of access. *Kamakana*, 447 F.3d at 1178–79. Nike is, in effect, asking for a presumption in favor of closure and requiring Media Intervenors to show "compelling reasons" for unsealing this information from the public. Nike's position is

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 9 -**

inconsistent with clear Ninth Circuit holdings that the presumptive right of access "applies fully" to judicial records of this nature.  *Id.*; *Ctr. for Auto Safety*, 809 F.3d at 1101.  It is not the responsibility of Media Intervenors to affirmatively prove why the public deserves this information.

In any event, the public's interest in Nike's case is clear.  Nike is one of the largest and most prominent brands in the world, and its handling of workplace harassment and discrimination claims is of significant importance to American consumers and shareholders.  The Court reviewed the redacted identities of Nike complainants, witnesses, and employees who allegedly engaged in misconduct when ruling on the Plaintiffs' Motion for Class Certification.  To foster a greater understanding of the judicial process, the public has a right to know what evidence was relied on— and what evidence was rejected—in making decisions in this high-profile litigation.  *Phillips ex rel. Estates of Byrd*, 307 F.3d at 1213.

### D. Nike's Conclusory Claims of Potential Reputational and Privacy Harms Are Insufficient to Overcome the Burdens Under Both the "Compelling Reasons" and "Good Cause" Standards

Applying the "compelling reasons" standard, the Magistrate Judge correctly found that Nike's privacy and reputational harm arguments rest on "generalized assertions" regarding the need to redact names and seal information that are insufficient to support continued sealing. Magistrate's Findings at 5; *see also Foltz*, 331 F.3d at 1130–31.  Yet, when given the chance to object, Nike once again fails to provide any specific examples or an evidentiary showing of the potential harm that the complainants, witnesses, and subjects of the complaints would endure if their names were unredacted.  Nike's arguments thus fall far short of the showing necessary to meet its burden under Ninth Circuit law.

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 10 -**

Nike alleges that the Findings and Recommendation ignore the privacy interests of the named individuals and cites the Federal Rules as evidence that such concerns are compelling enough to justify sealing. Objections at 9. But while Federal Rule of Civil Procedure 26(c)(1) allows for sealing to spare a person or party "annoyance, embarrassment, oppression, or undue burden or expense," this rule only applies to the application of the "good cause" standard in the discovery context. As discussed, this is not the controlling standard in this case. Where, as here, the "compelling reasons" standard applies, the proponent of sealing must present arguments "supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations of potential harm." *Foltz*, 331 F.3d at 1130–31 (citation omitted). This showing must be made for ***each*** document or portion of a document that the party wishes to seal. *Id.* at 1138–39. Examples of specific harms that may satisfy this standard include situations where confidential business information could be used improperly by competitors or could be weaponized to gratify private spite. *See, e.g.*, *Adtrader, Inc.*, 2020 WL 6391210, at *2 (finding that, in accordance with local rules, Google submitted a table of all documents they sought to have sealed and provided compelling reasons why each document listed should be redacted in order to "protect Google's sensitive, non-public, confidential, and propriet[ar]y business information"). Nike has made no specific allegation that such harm would result from unsealing any particular document at issue.

Indeed, Nike has still not provided specific reasoning or an evidentiary showing supporting sealing as to each document. Objections at 12; *Foltz*, 331 F.3d at 1138–39. Nike refers to only six of the seven exhibits at issue in its discussion of the supposed personal interests at stake. Objections at 12. And instead of pointing the Court to evidence such as affidavits describing specific potential harm, Nike resorts back to its same imprecise claims of "public scrutiny" and "reputational damage," *id.* at 11–13, that the Magistrate Judge correctly found were insufficient to

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 11 -**

outweigh the public's interest in disclosure.  Magistrate's Findings at 5 (citing *Bracken v. Fla. League of Cities*, No 1:19-CV-602, 2019 WL 1867921, at *4 (D. Or. Apr. 24, 2019) (finding that "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records")).  Put simply, "assertions about possible harm" that are so vague "that there is no meaningful way to realistically gauge how"—or even whether—"disclosure would" actually be harmful are insufficient to seal court records.  *Polaris Innovations Ltd. v. Kingston Tech. Co.*, No. 16-CV-300, 2017 WL 2806897, at *6 (C.D. Cal. Mar. 30, 2017).

Vague privacy and reputational interests do not rise to the level demanded by the "compelling reasons" standard.  Federal courts have consistently found that assertions that information might be embarrassing or damaging to an individual's reputation do not outweigh the public's right of access.  *Kamakana*, 447 F.3d at 1178–79 (holding that, under the compelling reasons standard, "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records"); *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026 (9th Cir. 2014) (holding that "avoid[ing] embarrassment or annoyance" is not a compelling enough reason to justify a request to seal an entire record of proceedings); *Bracken*, 2019 WL 1867921, at *4 (explaining that compelling reasons to justify sealing court records exist only when those records could be used for "improper purposes" and holding that "[t]he desire for privacy is not a compelling reason sufficient to outweigh the public's interest in disclosure" (citation omitted)).

Nike also asserts concerns that "[u]nredacting complainants' names . . . would have a chilling effect on confidential reporting in the workplace," but Nike's claims that it "takes considerable precautions to protect the confidentiality of individuals" who make workplace

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 12 -**

complaints or are subjects and witnesses in these matters are unproven and irrelevant. Objections at 12. Indeed, Nike offers no concrete evidence of the measures it has in place to maintain confidentiality. *Id.* Nike has not presented the Court with any confidentiality agreements signed by complainants or produced any documentation that would suggest third parties provided information under the promise of confidentiality. *Id.* Critically, whatever general privacy or reputational interests Nike asserts can be easily overcome by the public's right to information regarding the handling of sexual harassment and misconduct claims by the largest sportswear brand in the world.[2]

### E.    Nike Mischaracterizes Media Intervenors' Motives

While the Magistrate Judge correctly ignored Nike's baseless attacks on Media Intervenors' supposed motivations for seeking unsealing, Nike uses its objections to double-down on its unsubstantiated argument. Objections at 1. Nike accuses Media Intervenors of trying to "embarrass and shame" individuals by disclosing supposed confidential information, *id.*, and alleges, with no supporting evidence, that "[t]here can be no doubt that the sole purpose of the Media Intervenors' request is to shame and disparage third parties who will have no opportunity

---

[2]     *See, e.g.*, Mike Rogoway, *Nike Sheds Second Top Executive Amid Inquiry into Workplace 'Behavior'*, The Oregonian (Mar. 16, 2018), https://perma.cc/2FTE-M3W2; Julie Creswell et al., *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*, N.Y. Times (Apr. 28, 2018), https://perma.cc/2PTE-23LZ; Kevin Draper & Julie Creswell, *Nike's C.E.O. Vows Changes After Claims of Workplace Harassment and Bias*, N.Y. Times (May 5, 2018), https://perma.cc/V9YMGEAC; Jeff Manning, *Inside Nike's Purge: More than a #MeToo Moment*, The Oregonian (July 7, 2018), https://perma.cc/9AJK-2BE4; Matthew Kish, *Exclusive: Departing Nike Executive Trevor Edwards Was Company's Highest Paid*, Portland Bus. J. (July 25, 2018), https://perma.cc/R3M4-63EE; Peter Blumberg, *Nike Women Clear First Hurdle in Lawsuit Over Gender Pay Gap*, Bloomberg (Feb. 27, 2019), https://perma.cc/V7M3-Q9EV; Jeff Manning, *Courts Reject Nike's Effort to Keep Executives' Info Secret in Discrimination Suit*, The Oregonian (Nov. 18, 2020), https://perma.cc/WGC3-78W7; Patrick Dorrian, *Nike Pay Equity Studies Privileged, Off Limits in Sex Bias Suit*, Bloomberg Law (Oct. 13, 2020), https://perma.cc/9EP6-SYML; Matthew Kish, *Nike Files Motion to Keep Sensitive Records in Sweeping Gender Discrimination Lawsuit Sealed*, Insider (Mar. 16, 2022), https://perma.cc/N7V4-GJ7D.

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 13 -**

to defend their reputation." *Id.* at 11. This attack on Media Intervenors' motives is both untrue and irrelevant.

Nike largely mischaracterizes Media Intervenors' involvement in this case by suggesting that they initially requested private information including the redacted names of third parties mentioned in documents related to the class certification briefing. Objections at 4. In actuality, Media Intervenors first contacted the Parties to inquire about unsealing the docket generally to ensure the public could stay informed about this high-profile matter prior to the Parties' agreement to unseal certain documents with redactions. *See* ECF No. 205 at 5. The Media Intervenors' "sole purpose" thus could not have been to reveal the identities of complainants, witnesses, and accused harassers because the Parties' documents had been pervasively filed under seal and the presence of such information was unknown to non-parties.

Furthermore, Nike's attacks on Media Intervenors' motives do nothing to advance Nike's legal arguments. Courts have historically chosen not to inquire into the press' editorial prerogatives. *See CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 124-25 (1973) ("For better or worse, editing is what editors are for; and editing is selection and choice of material."); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper . . . constitute[s] the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press . . . ."). Consistent with the First Amendment and common law access principles set forth herein, the decision of how to report on the matters Nike seeks to withhold from the public must be made by editors, and not by courts (or Nike).

By failing to meet its burden to justify sealing, Nike once again reveals its true concern with unsealing—unfavorable press coverage. Despite Nike's claims that the names of third parties

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 14 -**

should be redacted to avoid "subject[ing] them to public scrutiny," Objections at 13, records relating to matters of public concern cannot be sealed for this reason alone because "[i]t is not the duty of federal courts to accommodate the public relations interests of litigants." *In re Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig.*, 101 F.R.D. 34, 40 (C.D. Cal. 1984).  Like the Magistrate Judge's Recommendation, the Court should rest its decision on the factual showings made—not general attacks on the media or attempts to mitigate a corporation's public relations crisis.

## CONCLUSION

Media Intervenors respectfully request that this Court affirm the findings of the Magistrate Judge and unseal the redacted information filed in connection with Plaintiffs' Motion for Class Certification.  This important litigation is of interest to both the people of Oregon and the public at large.  Thus, the presumptive right of access to the related judicial records outweighs any of Defendant's asserted and unsupported justifications for continued secrecy.

Dated: November 8, 2023              */s/ Lisa Zycherman*

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 15 -**

**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Anna M. Joyce, OSB #013112**
AnnaJoyce@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR  97204-3730
Telephone: (503) 295-3085
Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (*pro hac vice* application forthcoming)
bgoldstein@gbdhlegal.com
**James Kan** (*pro hac vice* application forthcoming)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Telephone: (510) 763-9800
Fax: (510) 835-1417

Attorneys for Plaintiffs and Opt-In Plaintiffs
[Additional Counsel of Record Listed on Signature Page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477<br><br>**SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**<br><br>**Title VII of the Civil Rights Act of 1964; Federal Equal Pay Act; Oregon Equal Pay Act; Oregon Equality Act; Oregon State Law Against Discrimination**<br><br>**DEMAND FOR JURY TRIAL** |

Page 1 -  SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
COMPLAINT

723323.14

1.    At Nike headquarters, the numbers tell a story of a company where women are devalued and demeaned.  For many women at Nike, the company hierarchy is an unclimbable pyramid—the more senior the job title, the smaller the percentage of women.  The inequity for women at Nike starts before they do, with decisions about starting pay.

2.    But the story is not just about numbers.  Women's career trajectories are blunted because they are marginalized and passed over for promotions.  Nike judges women more harshly than men, which means lower salaries, smaller bonuses, and fewer stock options.  Women's complaints to human resources about discrimination, including unequal pay, unequal promotions, and harassment are ignored or mishandled.  Male bad behavior is rarely penalized.  For a woman to succeed at Nike, she must far outshine her male counterparts.

3.    To stop Nike's discrimination of women, plaintiffs Kelly Cahill, Sara Johnston, Heather Hender, and Lindsay Elizabeth ("Plaintiffs") bring this sex discrimination class and collective action against Nike, Inc. ("Nike"), on behalf of themselves and all other women who are similarly situated ("Class/Collective Members"),[1] and allege as follows.

## I.    SUMMARY OF CLAIMS

4.    Nike pays and promotes women less than men at Nike headquarters.  These disparities occurred, and continue to occur, because of specific employment policies or practices that are developed and carried out in a workplace that is hostile towards and devalues women, and where the ultimate arbiters of these policies or practices are a small group of majority-male high-level executives.  Nike has thus violated, and continues to violate, the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Federal Equal Pay Act ("EPA"), 29 U.S.C. §

---

[1] *See* Sections V and VI for the collective action and class action definitions.

**Page 2 -    SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
                COMPLAINT**

ER-0376

206(d); the Oregon Equal Pay Act, ORS 652.220; and the Oregon Equality Act, ORS 659A.030. The Class/Collective Members seek an order ending Nike's discriminatory policies, patterns, and/or practices and making the Class/Collective Members whole.

5.      In this workplace environment, and with a small group of majority male decision-makers, the following policies, patterns, or practices each independently caused, and continue to cause, an adverse impact on and otherwise discriminate against Class/Collective Members based on their sex.

6.      First, Nike sets starting pay and other compensation-related terms based, in part, on prior compensation. Around May 2018, Nike stated that it will "remove bias from critical moments of the hiring process by . . . *eliminating* the collection of candidate salary history . . . ."[2] (emphasis added). The collection of prior compensation history causes women to receive lower starting salaries and other less favorable compensation-related terms.[3]

7.      Second, as part of its annual performance evaluation process, Nike rates each of its corporate employees. The ratings are assigned according to a forced ranking system. Nike utilizes a curve that limits the number of employees at Nike headquarters who can receive ratings in the top two levels. This system causes Class/Collective Members to receive lower ratings than their male colleagues. Lower ratings cause women to receive less compensation, including smaller annual salary increases, lower annual bonuses, and smaller equity distributions. Ratings

---

[2] *See Nike, Inc. FY16/17 Sustainable Business Report*, 56, https://sustainability-nike.s3.amazonaws.com/wp-content/uploads/2018/05/18175102/NIKE-FY1617-Sustainable-Business-Report_FINAL.pdf. (Nike states that it will "remove bias from critical moments of the hiring process by . . . eliminating the collection of candidate salary history . . . .").

[3] As the Ninth Circuit recently stated, "the wage gap between men and women is not some inert historical relic of bygone assumptions and sex-based oppression," and "[r]eliance on past wages simply perpetuates the past pervasive discrimination that the Equal Pay Act seeks to eradicate." *Rizo v. Yovino*, 887 F.3d 453, 468 (9th Cir. 2018). The Ninth Circuit thus found "that past salary may not be used as a factor in initial wage setting, alone or in conjunction with less invidious factors." *Id.*

**Page 3 -   SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
              COMPLAINT**

723323.14

also affect promotions.  Lower ratings preclude promotions whereas higher ratings can lead to promotions.

8.     Third, Nike's budgeting system for finalizing annual salary increases and annual bonuses adversely impacts and otherwise discriminates against women.  Each year, Nike creates a set pool of money for each of its organizations that is then used to provide annual salary increases and bonuses.  A disproportionately low amount of these budgets is distributed towards women's annual salary increases and bonuses.

9.     Fourth, Nike's Organizational Talent Planning system identifies a disproportionately low number of women for promotional opportunities.

10.    Fifth, Nike has a pattern or practice of channeling women into positions and job assignments that Nike views as less valuable and that are less likely to lead to promotions or increased compensation.

11.    Nike has neither validated nor established the job relatedness of its policies or practices for its systems that determine starting pay, ratings, pay raises, bonuses, equity distributions, and promotions.

12.    Nike has intentionally and willfully discriminated against Class/Collective Members with respect to pay, promotions, and conditions of employment.  Two of Nike's most-senior executives – Trevor Edwards (Nike Brand President and the second most senior executive after the CEO from July 2013 to August 2018) and David Ayre (Vice-President in charge of HR from 2007 through July 2017) – caused and reinforced a workplace that was, and continues to be, hostile towards women and that devalues women.  The above-described policies or practices reflect Nike's discriminatory intent.  In addition, since before the class and collective action periods, Nike has been aware that Class/Collective Members are paid and promoted less than

**Page 4 -   SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
            COMPLAINT**

723323.14

male employees at Nike headquarters. Nike has known that the above-described policies or practices caused women to receive less pay and fewer promotions. Nike has likewise long known that Nike headquarters' workplace is hostile towards and devalues women. For years, women have reported hostility, sexual harassment, and inequality in pay and promotions to Nike's Employee Relations department, which is the department within Nike Human Resources that is primarily tasked with addressing workplace complaints, and to Nike's Human Resources department ("HR"). Instead of addressing these complaints, HR has reinforced and exacerbated the hostile work environment. Regardless of the evidence, HR has regularly found such complaints unsubstantiated, avoided taking any meaningful corrective or preventive actions, and otherwise failed to act to end either the inequality in pay and promotions or the hostility towards women in the workplace.

13.     In addition, Nike retaliated against Plaintiff Heather Hender after she filed her Charge of Discrimination against Nike with the Equal Employment Opportunity Commission (EEOC), alleging sex discrimination against her and other female colleagues, and became a Plaintiff in this Action.

## II.      PARTIES

### A.      Plaintiff Heather Hender.

14.     Plaintiff Heather Hender is a former Nike employee who worked for Nike from April 6, 2015 through October 12, 2020. Her initial title was Manufacturing Engineer II, which Nike re-titled to "Process Engineer" in 2016. Ms. Hender was a Process Engineer II until September 2018, when she was promoted to Senior Process Engineer I.

15.     When Nike hired Ms. Hender, she had nearly twenty years of engineering and technical experience. From 1989 through 2009, she was employed at Hewlett Packard in technical and engineering positions, including as an Electro-Mechanical Technician and a

**Page 5 -   SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
                 COMPLAINT**

Process/Manufacturing Engineer.  After Hewlett Packard, Ms. Hender continued working as an engineer, including as a Process Engineer for SolarWorld Industries America.

16.     Ms. Hender earned her A.S. in Electronics Engineering Technology from Linn-Benton Community College in 1996.  While working at Hewlett Packard, Ms. Hender completed her Bachelor of Sciences degree in Manufacturing Engineering from The Institute of Technology Tallaght, which she received in 2006.

17.     Ms. Hender filed a sex discrimination charge with the EEOC on November 9, 2018.  By notice dated November 15, 2018, the EEOC issued a Notice of Right to Sue to Plaintiff Hender.

18.     Ms. Hender's charge was filed on behalf of herself and all other similarly situated female employees of Nike in the United States who worked in Nike's Corporate Division (non-retail Nike employees).  The similarly situated female employees include current and former female employees who worked at Nike headquarters.  The charge alleges that Ms. Hender and similarly situated female employees were, and continue to be, harmed by Nike's continuing policy, pattern, or practice of sex discrimination with respect to performance evaluations, pay, promotions, and other terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, as well as the Oregon Equality Act, O.R.S. §§ 659A.001, *et seq.*

19.     On June 26, 2020, Ms. Hender filed a Revised Charge of Discrimination alleging that Nike retaliated against her after she filed her November 9, 2018 EEOC Charge and after she became a Plaintiff in this Action ("Revised Charge").  On September 23, 2021, the EEOC issued Ms. Hender a Notice of Right to Sue in relation to the Revised Charge.  Subsequently, Ms. Hender and Nike entered into tolling agreements regarding Ms. Hender's retaliation claims as set

**Page 6 -   SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
                   COMPLAINT**

723323.14

ER-0380

forth in her Revised Charge. The tolling agreements were effective as to Ms. Hender's federal and state law claims relating to the Revised Charge between October 1, 2021 through October 1, 2023.

20.     Ms. Hender is a resident of Oregon. Ms. Hender worked for Nike in Washington County, Oregon.

**B.     Plaintiff Sara Johnston.**

21.     Plaintiff Sara Johnston worked at Nike from June 2008 to November 2017.

22.     From June 2008 to February 2010, Ms. Johnston worked part-time for Nike in the Employee Services department while simultaneously working a full-time job in the human resources department of a non-profit. Ms. Johnston became a full-time Nike employee in February 2010 when she was hired as a Senior Account Service Representative. She remained in that position until August 2012, when she became a Junior Business Systems Analyst. Ms. Johnston became an Intermediate Business Systems Analyst during the first six months of 2014 and remained in that position until she left Nike around November 1, 2017.

23.     Ms. Johnston resigned from Nike because she was paid less and received fewer promotions than male employees doing substantially equal work. She also resigned because of a hostile work environment towards women and the failure of HR to assure a non-hostile work environment that provided equal opportunity.[4] Ms. Johnston seeks reinstatement upon the remediation of Nike's discriminatory systems for pay, promotion, and employee complaints. When she resigned, Ms. Johnston followed Nike's complaint resolution procedure. She requested a meeting with a vice-president in HR. After that request, Ms. Johnston met with HR

---

[4] *See* Section IV(C)(2), *infra*, for details of Nike's failure to assure a non-hostile work environment with respect to Ms. Johnston.

**Page 7 -   SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

and told HR about the unequal and hostile treatment she was subjected to, and Ms. Johnston requested that corrective actions be taken.

24.    Before working at Nike, Ms. Johnston received her B.A. in Economics and an M.B.A., with a focus on quantitative analytics and human resources, from Willamette University. Ms. Johnston had also completed most of the coursework for a B.S. in Business Systems Analysis from the Oregon Institute of Technology.  Before becoming an Account Service Representative at Nike, Ms. Johnston worked in human resources and analytics positions for four years.

25.    On August 9, 2018, Ms. Johnston filed her consent to be a party plaintiff in the EPA collective action pursuant to 29 U.S.C. § 216(b).

26.    Ms. Johnston filed a sex discrimination charge with the EEOC, which was cross-filed with Oregon Bureau of Labor and Industries ("BOLI"), on August 7, 2018.  By notice dated September 28, 2018, the EEOC issued a Notice of Right to Sue to Plaintiff Johnston.

27.    Ms. Johnston's charge was filed on behalf of herself and all other similarly situated female employees of Nike in the United States who worked in Nike's Corporate Division (non-retail Nike employees).  The similarly situated female employees include current and former female employees who worked at Nike headquarters.  The charge alleges that Ms. Johnston and similarly situated female employees were, and continue to be, harmed by Nike's continuing policy, pattern, or practice of sex discrimination with respect to performance evaluations, pay, promotions, and other terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*., as well as the Oregon Equality Act, O.R.S. §§ 659A.001, *et seq*.

**Page 8 -   SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

28.     Ms. Johnston is a resident of Oregon.  Ms. Johnston worked for Nike in Washington County, Oregon.

**C.     Plaintiff Kelly Cahill.**

29.     Plaintiff Kelly Cahill was a full-time Nike employee from October 2013 to July 26, 2017, in a Director position.  From November 2012 to October 2013, Ms. Cahill worked for Nike in a Senior Producer position, a position that Nike classified as an independent contractor.

30.     Ms. Cahill resigned from Nike because of the hostile work environment, HR's ineffective response to her complaints, and the lack of promotion opportunities because of her sex.[5]

31.     Before working at Nike, Ms. Cahill received a B.S. in Sports Marketing from the University of Oregon in 2004 and a Project Management Certification from the University of Washington in 2011.  From 2004 to November 2012, Ms. Cahill worked in marketing, business development, and digital advertising.

32.     On August 9, 2018, Ms. Cahill filed her consent to be a party plaintiff in the EPA collective action pursuant to 29 U.S.C. § 216(b).

33.     On July 25, 2018, Ms. Cahill filed a timely charge against Nike for violations of ORS 659A.030 with BOLI.  By notice dated August 27, 2018, BOLI issued a notice that Ms. Cahill's charge had been withdrawn due to the filing of the Complaint on August 9, 2018.

34.     Ms. Cahill's charge was filed on behalf of herself and all other similarly situated female employees of Nike in the United States who worked in Nike's Corporate Division (non-retail Nike employees).  The similarly situated female employees include current and former female employees who worked at Nike headquarters.  The charge alleges that Ms. Cahill and

---

[5] *See* Section IV(C)(3), *infra*, for details of Nike's failure to assure a non-hostile work environment with respect to Ms. Cahill.

**Page 9 -   SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

similarly situated female employees were, and continue to be, harmed by Nike's continuing

policy, pattern, or practice of sex discrimination with respect to performance evaluations, pay,

promotions, and other terms and conditions of employment.

35.    Ms. Cahill is a resident of Oregon.  Ms. Cahill worked for Nike in Washington

County, Oregon.

**D.    Plaintiff Lindsay Elizabeth.**

36.    Plaintiff Lindsay Elizabeth worked for Nike from March 2015 to October 2018.

From March 2015 to January 2017, Ms. Elizabeth worked in a design position that Nike

classified as an independent contractor.  In January 2017, Ms. Elizabeth became a full-time

employee with the title of Apparel Designer I.

37.    Ms. Elizabeth received her Bachelor of Fine Arts in Apparel Design at the Art

Institute of Portland in 2011.  Prior to joining Nike in 2015, Ms. Elizabeth was a product

designer for various companies as well as her own brand.

38.    On August 24, 2018, Ms. Elizabeth filed her consent to be a party plaintiff in the

EPA collective action pursuant to 29 U.S.C. § 216(b).

39.    Ms. Elizabeth filed a sex discrimination charge with the EEOC, which was cross-

filed with BOLI, on August 23, 2018.  By notice dated September 28, 2018, the EEOC issued a

Notice of Right to Sue to Plaintiff Elizabeth.

40.    Ms. Elizabeth's charge was filed on behalf of herself and all other similarly

situated female employees of Nike in the United States who worked in Nike's Corporate

Division (non-retail Nike employees).  The similarly situated female employees include current

and former female employees who worked at Nike headquarters.  The charge alleges that Ms.

Elizabeth and similarly situated female employees were, and continue to be, harmed by Nike's

continuing policy, pattern, or practice of sex discrimination with respect to performance

**Page 10 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
COMPLAINT**

evaluations, pay, promotions, and other terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, as well as the Oregon Equality Act, O.R.S. §§ 659A.001, *et seq.*

41.    Ms. Elizabeth is a resident of Oregon.  Ms. Elizabeth worked for Nike in Washington County, Oregon.

**E.    Defendant Nike.**

42.    Nike is the largest seller of athletic footwear and apparel in the world.  Its principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories, and services.

43.    Nike is a corporation formed under the laws of Oregon and headquartered in Beaverton, Oregon.  Its fiscal year is from June 1st to May 31st.

44.    Nike headquarters consists of campuses in and around Beaverton, Oregon ("Nike Headquarters").  The Class/Collective Members all work or worked at Nike Headquarters.  The administration of these campuses is centralized, and the operations at Nike Headquarters are integrated.  For example, according to Nike, it is organized and operates as a "matrix organization, where team members often report into two areas, such as a geography and a global function;" in Nike Brand, for example, the Teams "work across . . . product engines[,] . . . categories[,] . . . and in our four geographies - North America; Europe, Middle East & Africa (EMEA); Greater China; and Asia Pacific & Latin America (APLA)."

45.    All of Nike's highest-level executives are located at Nike Headquarters, as are its HR and administrative functions.  There are approximately 10,800 Nike employees at Nike Headquarters.

46.    During all relevant times, Nike was Class/Collective Members' employer within the meaning of all applicable statutes.

**Page 11 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
          COMPLAINT**

### III.    VENUE AND JURISDICTION

47.    This Court has subject matter jurisdiction over the Title VII claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3) because Class/Collective Members assert federal claims arising under the laws of the United States and are brought to recover damages for deprivation of equal rights.  This Court has subject matter jurisdiction over the Equal Pay Act claim pursuant to 28 U.S.C. § 1331.

48.    This Court has supplemental jurisdiction over the Oregon law claims, ORS 652.220 and ORS 659A.030, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.  For example, the same high-level executives, hostile work environment, and policies, patterns, or practices caused the pay disparities in violation of Title VII and the EPA and caused the violations of the Oregon Equal Pay Act and the Oregon Equality Law.

49.    This Court has personal jurisdiction over Nike.  There is general jurisdiction over Nike because Nike Headquarters is located within this district in Beaverton, Oregon and Hillsboro, Oregon.  Nike conducts substantial business throughout this district and in the State of Oregon, and Nike employs thousands of workers in the state.

50.    Declaratory and injunctive relief are sought and authorized by 28 U.S.C. §§ 2201 and 2202 as well as 42 U.S.C. § 2000e-5(g)(1).

51.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3), because Nike maintains offices in this district, Nike conducts business in this district, a substantial part of the events and omissions giving rise to the claims alleged herein

**Page 12 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION**
         **COMPLAINT**

723323.14

occurred in this district, and records relevant to those events and omissions are maintained and administered in this district.

52.    Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites to their Title VII claims.  Plaintiffs Johnston, Elizabeth, and Hender[6] filed charges of sex discrimination with the Equal Employment Opportunity Commission ("EEOC") on behalf of themselves and all other similarly situated female employees who worked at Nike Headquarters in a salaried, corporate position lower than Vice-President.  The charges include disparate impact and disparate treatment claims, including that Nike intentionally and willfully discriminated against Class/Collective Members with respect to pay, promotions, and conditions of employment.  The charges allege that Plaintiffs and similarly situated female employees were paid and promoted less than their male colleagues.  The charges allege that these disparities occurred, and continue to occur, because of specific employment policies or practices that are developed and carried out in a workplace that is hostile towards women.  The charges include allegations that these alleged policies or practices include: basing starting pay and other compensation-related terms on prior compensation; rating women lower than men in annual ratings; distributing a disproportionately low amount of the budget used for salary increases and annual bonuses to women; identifying a disproportionately low number of women for promotional opportunities; channeling women into positions and job assignments that Nike views as less valuable and that are less likely to lead to promotions or increased compensation. Plaintiff Hender exhausted her administrative remedies by filing the Revised Charge with the EEOC.

---

[6] Plaintiff Cahill filed a charge with BOLI.

**Page 13 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

53.     The EEOC issued a Notice of Right to Sue to Plaintiffs Johnston and Elizabeth on

September 28, 2018 and to Plaintiff Hender on November 15, 2018. The First Amended

Complaint in this action was filed within ninety days of each Plaintiff receiving a Notice of Right

to Sue.  Where applicable, under the Ninth Circuit's application of the single-filing rule,

Plaintiffs Elizabeth and Hender may "piggyback" off the previous filing of Plaintiff Johnston

because Plaintiff Johnston's EEOC charge relates to the same claims that the other Plaintiffs

assert. The EEOC issued a Notice of Right to Sue to Plaintiff Hender in relation to her Revised

Charge on September 23, 2021.

### IV.     FACTUAL ALLEGATIONS

**A.     Nike Headquarters has a disproportionately low number of women in higher-level positions and Band Levels.**

54.     At Nike, the more senior the job title, the smaller the percentage of women.  The

most senior job titles during Nike's 2017 fiscal year, after CEO, included President and Vice-

President.  Lower-level positions, in descending order, included Senior Director, Director,

Manager, and additional lower-level positions.

55.     Nike stated that, globally, during its 2017 fiscal year, 71% of its Vice-Presidents

were men and 62% of its Directors and Senior Directors were men.[7]  Men make up significantly

more than 62% of Senior Directors.  At Nike Headquarters, the breakdown of men and women in

the Vice-President, Senior Director, and Director positions has been approximately the same as

the global breakdown.

56.     Nike places all employees at Nike Headquarters in Band Levels.  There are six

Band Levels; the Band Levels spell out the word "VALUES."  The S-Band is the highest level.

---

[7] *See Nike FY 16/17 Sustainable Business Report*, 56, https://sustainability-nike.s3.amazonaws.com/wp-content/uploads/2018/05/18175102/NIKE-FY1617-Sustainable-Business-Report_FINAL.pdf.

**Page 14 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

ER-0388

All salaried corporate employees are in either the L, U, E, or S-Band.  These Band Levels are a corporate-wide system.  This system uniformly affects the salaries and annual bonuses of employees at Nike Headquarters.  The higher the Band Level, the greater the size of the annual bonus and the higher the range of potential salaries.

57.     As the Band Levels increase, the percentage of women decreases.

**B.    Forms of compensation.**

58.     Nike's compensation policies or practices are uniform for all employees at Nike Headquarters who hold a lower-level position than Vice-President.

59.     Employees at Nike Headquarters receive two forms of cash compensation, salary and annual bonus.

60.     Band Levels impact salary.  Within each Band Level, there is a range of salaries.

61.     Band Level also impacts an employee's annual bonus, which is determined according to Nike's "Performance Sharing Plan" ("PSP Bonus").  Nike has, and continues to, calculate the PSP Bonus according to a centrally-determined, uniform formula that consists of two components.  One component is the "Team Award" and the other component is the "Discretionary Award."  Both components include an input based on the employee's Band Level.  Both components also include an input based on the amount of salary paid during the relevant fiscal year.  The Discretionary Award component also includes an input that is based on the employee's annual rating.[8]  Thus, the higher the Band Level, salary, or annual rating, the greater the PSP Bonus.

62.     Nike also distributes equity to some employees at Nike Headquarters.  Like the PSP Bonus, Band Level affects the amount of equity distribution.

_____

[8] *See* Section IV(E)(2), *infra*, for a description of Nike's rating system.

**Page 15 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
            COMPLAINT**

723323.14

ER-0389

63.    At least once per year, Nike implements its "Two Times Pay" policy or practice. During Two Times Pay, some employees at Nike Headquarters receive salary increases and/or other additional compensation.

64.    Nike does not provide its employees with compensation-related information that would permit employees to see whether there was pay equity between women and men.  Nike also discourages employees from discussing their compensation with each other.  When women ask HR for compensation-related information to assess whether there is pay equity, HR refuses to share the requested information.

## C.    Nike's hostile work environment devalues its female employees and adversely impacts their compensation and their promotional opportunities.

65.    Nike did not have regular training for its employees at Nike Headquarters that specifically focused on addressing and preventing sexual harassment until, at the earliest, March 2018.

66.    Meanwhile, throughout the last several years, Nike HR has received numerous complaints about male supervisors, including Directors, Senior Directors, Vice-Presidents, and Presidents that described hostility towards women and/or sexual harassment directed at women.[9]

### 1.    Two of Nike's most-senior executives caused and reinforced a hostile workplace for women.

67.    Among the most significant arbiters of the policies, patterns, or practices concerning the compensation and promotional opportunities of employees at Nike Headquarters, were two executives who caused and exacerbated a hostile work environment towards Class/Collective Members.  These executives were Trevor Edwards, who, from July 2013 to

---

[9] See Alexia Campbell, *Report: HR Managers at Nike Ignored Complaints from Women Employees for Years*, Vox (Apr. 30, 2018), https://www.vox.com/policy-and-politics/2018/4/30/17302130/nike-women-harassment-discrimination-survey (numerous women reported that they found HR unhelpful and sometimes disrespectful).

**Page 16 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

ER-0390

August 2018, was the Nike Brand President and the second most senior executive after the CEO, and David Ayre, who was the Vice-President in charge of HR from 2007 through July 2017.

68.    Mr. Edwards was forced to resign from Nike because he caused and exacerbated a hostile workplace environment towards women.  Prior to March 2018, Nike intended for Mr. Edwards to be the next Nike CEO.  Less than one year before Mr. Edwards' departure was announced, Nike's Board of Directors ("Board") proposed awarding him a $6 million "retention award," which, according to the Board, is "intended to further promote retention of key leaders . . . ."[10]  The Board also proposed a 14.3% increase to Mr. Edwards' 2018 salary, which was a larger percent increase than the proposed salary increases for any other top Nike executive, including the CEO.[11]

69.    After Nike proposed that Mr. Edwards receive a $6 million retention award and a 14.3% increase to his salary, on or around March 5, 2018, a group of female employees presented the CEO with a survey of female employees detailing sex discrimination at Nike.[12] Ten days later, the CEO sent a letter to all employees at Nike Headquarters, stating: "Over the past few weeks, we've become aware of reports of behavior occurring within our organization that do not reflect our core values of inclusivity, respect and empowerment . . . ."[13]  The CEO

---

[10] *See Nike Inc. 2018 Notice of Annual Meeting*, 17, https://www.sec.gov/Archives/edgar/data/320187/000032018718000144/nke-2018xdef14a.htm; *see also* Matthew Kish, *Exclusive: Departing Nike Executive Trevor Edwards was Company's Highest Paid*, Portland Bus. J. (July 25, 2018), https://www.bizjournals.com/portland/news/2018/07/25/exclusive-departing-nike-executive-trevor.html?ana=yahoo&yptr=yahoo.

[11] *See Nike Inc. 2018 Notice of Annual Meeting*, 20, https://www.sec.gov/Archives/edgar/data/320187/000032018718000144/nke-2018xdef14a.htm.

[12] *See* Julie Creswell, *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*, N.Y. Times (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/business/nike-women.html.

[13] *See* Mike Rogoway, *Nike Sheds Second Top Executive Amid Inquiry into Workplace 'Behavior,'* The Oregonian (Mar. 16, 2018), https://www.oregonlive.com/business/index.ssf/2018/03/nike_sheds_second_top_executiv.html.

Page 17 - **SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

ER-0391

further wrote: "in light of my desire to accelerate change, I've made the decision to restructure my leadership team into a different alignment that will allow for closer management and a sharper focus on our culture . . . Trevor Edwards has decided to resign as Nike Brand President and will retire in August."[14]  On or around May 3, 2018, during a company-wide meeting, the CEO told employees that recent executive departures were related to workplace behavior.[15]

70.     Mr. Ayre was the Vice-President in charge of HR from 2007 through approximately June 2017.  Mr. Ayre caused and fostered a hostile work environment towards female Nike employees.  Nike conducted at least two internal investigations concerning whether Mr. Ayre had caused or otherwise contributed to a hostile work environment towards female employees at Nike, including Class/Collective Members.

71.     Mr. Edwards and Mr. Ayre were responsible for supervising performance evaluation, compensation, and promotion practices as well as the system for reviewing and investigating workplace discrimination and harassment complaints.  As the second highest-level executive at Nike after the CEO, Mr. Edwards directly oversaw "all category and geographic business units, the Jordan Brand, Action Sports which includes Hurley International LLC, Digital Sport and brand management throughout the world" as well as Nike's "wholesale, retail and e-commerce operations."[16]  Mr. Edwards had control or influence over all employees at Nike Headquarters with respect to compensation, promotions, job assignments, and other employment terms and conditions.  As the head of HR, Mr. Ayre had "responsibility for Talent Management,

---

[14] *Id.*

[15] *See* Kevin Draper, *Nike's C.E.O. Vows Changes After Claims of Workplace Harassment and Bias*, N.Y. Times (May 5, 2018), https://www.nytimes.com/2018/05/05/business/mark-parker-nike.html.

[16] *See NIKE Announces Strategic Leadership Changes* (Jun. 20, 2013), https://news.nike.com/news/nike-announces-strategic-leadership-changes.

**Page 18 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

Compensation, and Performance Management and Rewards"[17] as well as workplace complaints. Mr. Ayre's responsibilities and actions thus affected all employees at Nike Headquarters.

72.     Nike said that its sex discrimination issues are restricted to "an insular group of high-level managers" who "protected each other and looked the other way."[18]  A longtime Nike executive stated, "Edwards and his team had an autocratic streak," and "everything had to get the blessing of the senior guys."[19]  Likewise, a former executive of one of Nike's affiliate companies said that Mr. Edwards "demanded obedience" and Nike "became very authoritarian."[20]

### 2.     Plaintiff Johnston.

73.     Plaintiff Johnston was subject to and witnessed hostility towards women, was herself sexually harassed, and saw no meaningful corrective actions result from her several complaints to HR.

74.     Around December 2015, after a Nike-organized party, Ms. Johnston received inappropriate sexual propositions in messages from a male co-worker.  Ms. Johnston had to regularly work with this male co-worker and he contributed to Ms. Johnston's performance reviews.  Shortly thereafter, this co-worker sent nude photographs of himself to Ms. Johnston. Ms. Johnston told him to stop sending her any messages not related to work, but he continued to do so.  He then treated her negatively at work, including blaming her unjustifiably for problems

---

[17] *See* Nike's Employment Offer Letter to David Ayre (Jul. 5, 2007), https://www.sec.gov/Archives/edgar/data/320187/000032018707000105/exhibit101.txt.

[18] *See* Julie Creswell, *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*, N.Y. Times (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/business/nike-women.html.

[19] *See* Jeff Manning, *Inside Nike's Purge: More than a #MeToo Moment*, The Oregonian (Jul. 7, 2018), https://www.oregonlive.com/expo/news/erry-2018/07/93d33bff127706/vanquishing_team_edwards_a_new.html.

[20] *Id.*

**Page 19 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

at work, refusing to attend meetings she organized, and withholding information from her that she needed to successfully complete her work.

75.    Around February 2016, Ms. Johnston reported this harassment to Directors who supervised her.  In response, one of the Directors said, in effect, that Nike has a culture that revolves around alcohol, that Ms. Johnston should let the incidents go, that the rise of the internet and cell phones have made drunk messages part of this generation, that she should be less sensitive to these messages, and that people should expect more such messages.  Ms. Johnston sought to move to a position that did not require interaction with the harassing male co-worker, but the Directors told her that she could not move positions.  Neither of these Directors, nor anyone else at Nike, took any meaningful corrective actions.

76.    Shortly after this conversation with her Directors, Ms. Johnston was told that the male co-worker who had harassed her had pushed a female co-worker against a wall and reached his hand up her skirt during the Nike-organized party in December 2015.  A different male co-worker pulled this male co-worker away from the female co-worker who was getting assaulted.  Several Nike employees, including Directors, witnessed this assault.

77.    Around March 2016, Ms. Johnston complained to HR.  She reported the harassment and hostility she had been subjected to; a confrontation she witnessed between a different female co-worker and the same male co-worker that was about harassing messages he had sent this female co-worker; and what she heard about the same male co-worker's December 2015 assault of a female co-worker (see ¶ 75).  Later, around May 2016, Ms. Johnston learned that the same male co-worker had sent sexual messages to several additional women at Nike.  Ms. Johnston then met with HR to report this additional information.  During this meeting, HR told Ms. Johnston that it had completed its investigation, that no disciplinary or other measures

**Page 20 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION**
**COMPLAINT**

723323.14

were needed, and that, if she talked about the sexual harassment with other employees, she could be disciplined for harassing the male co-worker.

78.    Shortly after Ms. Johnston's initial complaints to the Directors, this male co-worker was promoted into a Manager position that would require Ms. Johnston to work more closely with him.  Ms. Johnston then complained about this to the Directors she reported to as well as to HR.  HR's only response to Ms. Johnston was that it would train supervisors to better handle sexual harassment complaints; but, no such training was provided to any of Ms. Johnston's supervisors.

79.    After making the complaints to her Directors and HR, Ms. Johnston did not receive the Highly Successful rating that her Director had previously told her she would receive. Ms. Johnston's Director refused to suggest this rating for Ms. Johnston even though he wrote, in her annual written performance evaluation, that Ms. Johnston was "performing a very difficult role that is a stretch role beyond the expectations of an Intermediate [Business Systems Analyst] and would normally be performed by someone with the experience of a [Senior Business Systems Analyst] or Lead [Business Systems Analyst] position."  Ms. Johnston was denied the higher rating in retaliation for her complaints about sexual harassment.

80.    Ms. Johnston was subject to hostility on other occasions.  For example, Ms. Johnston participated in a Nike-organized golf tournament where she was paired with Directors and a Senior Director.  After a Director hit a tee shot that did not go past the women's tee box, a Senior Director said to Ms. Johnston, in front of the Directors, that the Director who hit that tee shot should have to walk to the next hole with his genitals exposed.  That same Senior Director, on other occasions, gave Ms. Johnston unsolicited suggestions about how she should style her hair, including an occasion when he was simultaneously stroking Ms. Johnston's hair.  In another

**Page 21 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

example, the work desk of a different Director had a photograph, from a Nike "team-building" event, that was visible to anyone who walked by of a male Director appearing to whip a female Director's backside.

### 3. Plaintiff Cahill.

81.    Plaintiff Cahill was subject to and witnessed hostility towards women, and she saw no meaningful corrective actions result from her several complaints to HR.

82.    For example, a Vice-President who worked in the same department as Ms. Cahill, Daniel Tawiah, referred to women as "dykes" on several occasions.

83.    Around April 2016, Ms. Cahill, Mr. Tawiah, and several other employees at Nike Headquarters, including a male Director on her Team, were at a restaurant for dinner.  During the dinner, Mr. Tawiah said that a new Director was getting hired onto their Team.  Ms. Cahill asked Mr. Tawiah about the status of the hiring process because this Director would impact Ms. Cahill's work.  In response, Mr. Tawiah said to Ms. Cahill, in front of the other Nike employees at dinner, that she did not need to know the status of the hiring process and that her opinion did not matter, even though the male Director on her Team was included in the hiring process.

84.    Ms. Cahill witnessed Mr. Tawiah, when he was a Senior Director, berate a female co-worker.  Around May 2016, Mr. Tawiah yelled at this female employee in front of Ms. Cahill and several other employees at Nike Headquarters.  Around July 2016, Mr. Tawiah again yelled at this female co-worker in front of several other employees.  Mr. Tawiah said that this female co-worker was a failure and that the failure of a project was all her fault.  Mr. Tawiah's criticisms were not only public and harsh but also false since Mr. Tawiah was mostly responsible for the failure to timely complete the project.

85.    Ms. Cahill complained to HR on four separate occasions, including about the above-described incidents.  None of her complaints resulted in any meaningful corrective action.

**Page 22 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

Following several of these complaints, as well as complaints from other women to HR and senior managers about Mr. Tawiah, in January 2017, Nike promoted Mr. Tawiah to Vice-President.[21]

### 4.   Plaintiff Elizabeth.

86.     Plaintiff Elizabeth was subject to and witnessed hostility towards women and saw no meaningful corrective action when she complained to HR.

87.     On March 21, 2017, a female employee emailed numerous colleagues, including Ms. Elizabeth, proposing "a friendly game of hoops."  A male Vice-President who worked in the same department as Ms. Elizabeth responded to this group email within ten minutes writing, "Even girls?"  Shortly thereafter, Ms. Elizabeth forwarded this Vice-President's email to HR. Although this Vice-President then apologized for his comment, he was increasingly dismissive of Ms. Elizabeth's work product and ideas.

88.     Ms. Elizabeth's Design Director interrupted Ms. Elizabeth's work on numerous occasions to demand that Ms. Elizabeth clean the workspace that she shared with five to nine other employees on the Team, including the other employees' messes.  Ms. Elizabeth was the only female Designer on the Team and the only Designer told to clean.

89.     Ms. Elizabeth's supervisor did not allow her to present her work to the team. Instead, another male employee presented Ms. Elizabeth's work.  The male employees on Ms. Elizabeth's team presented their own work.

### 5.   Plaintiff Hender.

90.     Plaintiff Hender has been subject to and has witnessed hostility towards women.

91.     For example, there was a password that engineers on her Team needed to do their work.  A male Senior Engineer, who worked with Ms. Hender, told her, in front of numerous

---

[21] Mr. Tawiah was terminated around April 2018.

**Page 23 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
COMPLAINT**

723323.14

other Nike employees, that the new password was "for engineers only," even though Ms. Hender had been and was an engineer.  He then told Ms. Hender that she would need to ask one of three specific male engineers to input the password.  Among this group of male engineers was a new hire.

### 6.    Other female employees.

92.    Nike-organized recruiting parties perpetuated and reinforced Nike's devaluation of women.  For example, a Nike-organized recruiting party in August 2015 had "Nike branding almost everywhere" alongside "scantily clad [female] go-go dancers."[22]

93.    When Nike was recruiting Opt-In Plaintiff Samantha Phillips, she was invited to and did attend a Nike recruiting party.[23]  After Nike hired Ms. Phillips, Nike organized a recruiting party during a conference that Ms. Phillips attended, but did not invite Ms. Phillips even though several of her male peers were invited.  Nike also invited several lower-level female employees who directly reported to Ms. Phillips and who were approximately fifteen years younger than Ms. Phillips.

94.    A different female corporate employee in Oregon reported that, at a Nike-organized event at a restaurant in Las Vegas, Nike hired women for the event who "did not have much clothes on, and toward the end of the event, a lot of our male colleagues were drinking and

---

[22] *See* Andrea Peterson, *Nike is partying in Vegas with Hackers*, The Wash. Post (Aug. 10, 2015), https://www.washingtonpost.com/news/the-switch/wp/2015/08/10/nike-is-partying-in-vegas-with-hackers/?noredirect=on&utm_term=.fa06fa37c10a.

[23] Ms. Phillips filed her consent to join the EPA claim on August 9, 2018.  Nike employed Ms. Phillips from June 2015 to approximately August 10, 2016.  She was in a Director position throughout her employment with Nike.  Ms. Phillips was paid less than male Nike employees for substantially equal work performed under similar working conditions at Nike Headquarters, in and around Beaverton, Oregon.

**Page 24 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

dancing with them," which was "a really uncomfortable position to be in as far as a work-sponsored event."[24]

95.    On a separate occasion, a senior manager mentioned a female employee's breasts in an email.  After HR received a complaint about this email, HR's only response was to give a verbal warning to this senior manager.[25]

96.    Another female employee's male manager bragged to her about the condoms he always carried and the magazines he kept on his desk with scantily clad women on the covers. This female employee complained to HR, which told her that she had made a mistake by not confronting him first.[26]

97.    Women said that their male supervisors discussed women's bodies and called women vulgar names, including, for example, "stupid bitch."

**D.    Nike's employment policies, patterns, or practices discriminate against women.**

**1.    Nike's system for setting starting salaries and Band Levels discriminates against women.**

98.    Nike admitted in approximately May 2018 that it has had a policy or practice of setting employees' starting salaries and Band Levels based, in part, on the employee's past compensation.

99.    Nike requested Plaintiff Cahill's compensation history when she was hired as a full-time employee.  Nike then set Ms. Cahill's starting salary at approximately the same level of pay she was receiving in her prior position, and Nike placed her in the Band Level that contained

---

[24] *See* Erica Morrison, *Nike Sees Executive Departures in Harassment Reckoning*, Nat'l Pub. Radio (May 15, 2018), https://www.npr.org/2018/05/15/610445057/nike-sees-executive-departures-in-harassment-reckoning.

[25] *See* Julie Creswell, *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*, N.Y. Times (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/business/nike-women.html.

[26] *Id.*

**Page 25 – SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

this salary.  Ms. Cahill's prior compensation was a significant factor in Nike's determination of Ms. Cahill's starting salary and Band Level.

100.    Nike asked Plaintiff Hender for her prior salary when she was hired.  After receiving Ms. Hender's prior compensation, Nike set Ms. Hender's starting salary within $2,000 of what she would have been paid in her prior position had she worked full-time there for a full year.

101.    When Nike hired Plaintiff Elizabeth as a full-time employee, Nike utilized her prior salary.  Ms. Elizabeth's starting salary was approximately the amount she would have been paid for a year of working at the hourly rate that she was paid as a contractor for Nike.

102.    Ms. Elizabeth sought to negotiate for a higher salary but, in response to this request, she was told that Nike was unwilling to negotiate her salary.

103.    The consideration of prior compensation when setting starting salary discriminates against women because women are generally paid less than men in the marketplace even when men and women have similar knowledge, skills, abilities, and experiences.  When setting starting salary and Band Level, Nike has a policy, pattern, or practice of attributing significant weight to prior compensation history.

104.    Nike's disproportionate placement of women in lower Band Levels causes Class/Collective Members to receive smaller PSP Bonuses in addition to having lower salaries and less access to equity distribution.

**Page 26 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

2.      **Nike's rating system discriminates against women.**

105.    Nike assigns a rating, on an annual basis, to each of its corporate employees in Oregon who hold a lower-level position than Vice-President.  The ratings, in descending order, are: Exceptional, Highly Successful, Successful, Inconsistent, and Needs Improvement.[27]

106.    The rating affects the size of annual salary increases and PSP Bonuses.  There is a centrally-determined range of salary increases and PSP Bonus percentages that correspond to each rating.  The higher the rating, the higher the high-end and low-end of the range of salary increases and PSP Bonuses.  For example, a Highly Successful rating entitles an employee to a higher range of salary increases and PSP Bonuses than an employee who receives a Successful rating.

107.    The rating process is as follows:  First, each employee's direct manager makes an initial proposed rating.  Then, there are "calibration" meetings, which include higher-level managers, before the final decisions on the ratings, which occur before the end of Nike's fiscal year on May 31.  At the calibration meetings, each employee's rating is reviewed and many of the proposed ratings are changed, especially the Exceptional and Highly Successful ratings.  Because the higher-level managers at Nike are majority male, the participants in the initial and subsequent calibration meetings are majority male.  Likewise, after the calibration meetings, the ultimate arbiters of the ratings are a small, majority male group of senior executives at the highest levels of management.  The ultimate arbiters regularly change the ratings that they receive from the calibration meetings, especially the proposed Exceptional and Highly Successful ratings.

---

[27] For employees hired shortly before the ratings are finalized, Nike marks them as: Too New To Rate.

**Page 27 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

ER-0401

108.    These modifications and final decisions are made pursuant to standardized criteria and corporate-wide policies, patterns, or practices.

109.    The standardized criteria include, first, a uniform definition for each rating level.

110.    Second, there is a forced ranking of all employees on a curve.  Nike policy states that no more than a certain percentage of employees can receive certain ratings.  For example, in 2016, Nike stated that no more than 5% of employees can receive an Exceptional rating, no more than 20% of employees can receive a Highly Successful rating, and at least 10% of employees must receive an Inconsistent rating.

111.    Third, each Class/Collective Member is rated on a curve against employees who are in many different job levels.  For example, employees in Senior Director, Director, Manager, or lower-level positions are all rated against one another on the same curve.

112.    Rating employees on the curve against other employees in the same organization causes the lower-level employees to receive lower ratings because the higher-level employees are more visible to the ultimate arbiters of the ratings.  Higher-level employees are also more likely to have previously received higher ratings.

113.    In addition, Nike has a policy or practice of further limiting the number of Exceptional and Highly Successful ratings that are assigned to the lowest-level positions.  For example, Plaintiff Cahill was directed by a senior manager not to suggest an Exceptional rating for any of her direct reports and to suggest a Highly Successful rating for no more than two of her direct reports.  Senior Directors receive a disproportionately high number of Exceptional and Highly Successful ratings as compared to employees in lower-level positions.  Accordingly, since women hold a disproportionately low amount of higher-level positions, this process contributes to women receiving lower ratings than men.

**Page 28 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

114. Nike's rating system includes criteria that are determined in an unreliable manner and that are not valid and job-related.

115. This rating system causes Class/Collective Members to receive smaller salary increases, annual bonuses, and equity distributions than similarly-situated male employees.

116. The rating system also adversely impacts the promotional opportunities available for Class/Collective Members because receiving a rating that is below Successful precludes promotions and high ratings can lead to promotions.

**3.    Nike's budgeting system for annual salary increases and bonuses discriminates against women.**

117. Nike allocates a set pool of money for each of its organizations that is to be used for salary increases and PSP Bonuses ("Budget" or "Budgeting"). This Budget is less than the sum of money needed to award each employee the highest increase in salary and PSP Bonus that is within the range assigned to their rating. Like the rating system, the Budget for salary increases and PSP Bonuses means that not all employees in the organization will receive the largest percent increase for salary or bonus that corresponds to their rating.

118. The higher-level managers that make the allocation determinations are majority male. The Budget allocation, like Nike's other policies, patterns, or practices, occurs within a workplace that is hostile to women. The Budgeting process thus causes women to receive salary increases and PSP Bonuses that are closer to the low-end of the range associated with their rating than the salary increases and PSP Bonuses that their male colleagues receive.

**4.    Additional Nike systems discriminate against women.**

119. Nike's systems for identifying employees for promotions, including its Organizational Talent Planning system, discriminate against Class/Collective Members'

**Page 29 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

ER-0403

promotional opportunities because the ultimate arbiters are majority male and they make determinations within a workplace that is hostile towards women.

120.    Nike also has a pattern or practice of channeling Class/Collective Members into positions that are less likely to lead to promotions and increased compensation.  Meanwhile, male employees are more likely to get channeled into more valuable positions with greater opportunities for advancement and increased compensation.

121.    Class/Collective Members are discouraged from applying for management positions.  Class/Collective Members are judged according to a higher standard than men.  They are provided fewer opportunities to make themselves visible to the ultimate arbiters within Nike.

122.    These patterns or practices cause Class/Collective Members to receive fewer promotions, smaller salary increases, smaller bonuses, and less equity.

123.    The organizations and teams with higher percentages of women get smaller budgets to distribute for annual salary increases and PSP Bonuses.

124.    For example, when Ms. Johnston became a Junior Business Systems Analyst at the same time as two men, Ms. Johnston was placed on a Team whose members had fewer promotional and increased-compensation opportunities than the two men who were placed on a different Team.

125.    Likewise, many women said that they were marginalized, harassed, and thwarted in their careers while working at Nike Headquarters.[28]

**E.    Although Nike has been aware of the inequality in compensation and promotions,**

---

[28] *See* Julie Creswell, *5 More Nike Executives Are Out Amid Inquiry Into Harassment Allegations*, N.Y. Times (May 8, 2018), https://www.nytimes.com/2018/05/08/business/nike-harassment.html (based on interviews of more than 50 current and former Nike employees).

**Page 30 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

**Nike has maintained its discriminatory employment policies, patterns, or practices.**

126.    Nike has a pattern or practice of ignoring complaints about inequality in pay and promotions as well as complaints against male employees for sexual harassment and workplace hostility.  Often, Nike even promoted and otherwise rewarded these male employees.

127.    Nike has long been aware of the disproportionately low percentage of women in its Director, Senior Director, and Vice-President roles.  For example, in April 2018, the current Vice-President of HR, Monique Matheson, stated, "[w]hile we've spoken about this many times, and tried different ways to achieve change, we have failed to gain traction—and our hiring and promotion decisions are not changing senior-level representation as quickly as we have wanted."[29]

128.    Nike is aware of the pay disparities between its female and male employees because Nike "conducts an annual pay analysis."[30]

129.    Likewise, around June 2017, Nike's former Vice-President of HR, Mr. Ayre, sent an email to all corporate employees stating that Nike was going to examine whether there was a pay disparity between men and women.  About one month later, Mr. Ayre sent another company-wide email stating that Nike had reviewed whether there was sex discrimination, that any issues that had been identified were corrected, and that there were no remaining sex discrimination issues.  Absent from Mr. Ayre's email was any data or other support for his assertions that there were no remaining sex discrimination issues.

**F.    Class/Collective Members are paid and promoted less than male employees at Nike**

---

[29] *See* Sara Germano, *Nike's HR Chief Says Company Fails to Promote Enough Women, Minorities—Memo* (April 4, 2018), https://www.wsj.com/articles/nikes-hr-chief-says-company-fails-to-promote-enough-women-minoritiesmemo-1522871805.

[30] *See* Kathy Gurchiek, *Nike Shoots for Pay Equity with Changes to Reward Program,* Society for Human Resource Management (July 27, 2018), https://www.shrm.org/resourcesandtools/hr-topics/behavioral-competencies/pages/nike-shoots-for-pay-equity-with-changes-to-reward-program.aspx.

**Page 31 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

**Headquarters.**

130.    Nike recognized, in a May 3, 2018 speech by the CEO, that it needs to change its hiring, compensation, and promotion systems.[31]

131.    Still, Nike has failed to eliminate, or even make reasonable and substantial progress on, the wage differentials between men and women.  Nike has also failed to fix its promotions systems, which discriminate against women.

132.    The same high-level executives make Nike's pay and promotion decisions and do so within the workplace's hostile environment towards women.

### 1.    Plaintiff Cahill.

133.    Nike paid and promoted Ms. Cahill less than her male colleagues.  When Ms. Cahill left Nike in July 2017, she was a Director in the E-Band.  Shortly thereafter, Nike replaced Ms. Cahill with a man who was given the title of Senior Director and placed in the S-Band. Because the man who replaced Ms. Cahill was a Senior Director in the S-Band, he had a higher salary, received a larger bonus, and was granted more stock options than Ms. Cahill.

134.    As a Director in North America Marketing, Digital, Ms. Cahill managed the current and future seasonal initiatives on Nike.com.  This included overseeing brand campaigns on Nike.com, aligning Nike campaigns with wholesalers and retail stores, and improving customer experiences on Nike websites.  Ms. Cahill coordinated the strategy and execution of these digital campaigns with Nike's various sports categories.  The male Senior Director who replaced Ms. Cahill had substantially the same responsibilities.

---

[31] *See* Kevin Draper, *Nike's C.E.O. Vows Changes After Claims of Workplace Harassment and Bias*, N.Y. Times (May 5, 2018), https://www.nytimes.com/2018/05/05/business/mark-parker-nike.html.

**Page 32 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

135.     Plaintiff Cahill was paid approximately $20,000 less during Nike's 2017 fiscal year than a male Director on her Team who was doing substantially similar work as she was doing.  Like Ms. Cahill, this male Director worked in North America Marketing, Digital and he oversaw digital brand campaigns and coordinated the strategy and execution of these campaigns with Nike's various sports categories.

136.     At Nike, Ms. Cahill consistently met or exceeded the expectations for her position.  Ms. Cahill received a Highly Successful rating in 2014, 2015, and 2017 and she received a Successful rating in 2016.  Ms. Cahill also handled an increasing amount of work and responsibilities while she was a Director.  For example, in addition to her existing responsibilities, around the fall of 2016, Ms. Cahill took on the responsibilities formally assigned to a Director who left Nike, including the supervision of ten additional employees.

137.     In 2017, Ms. Cahill requested a promotion to Senior Director in North America Marketing, Digital.  Although Ms. Cahill was a Director in the E-Band for four years, had received a Highly Successful rating in 2014, 2015, and 2017, and had increasing responsibility, Nike never promoted her to Senior Director, an S-Band Level position.

### 2.     Plaintiff Johnston.

138.     Nike paid and promoted Ms. Johnston less than her male colleagues.  Ms. Johnston became a full-time Nike employee in 2010, when she was hired as an Account Service Representative ("ASR").   Approximately two months after Ms. Johnston was hired, Nike hired a male ASR.  This male ASR and Ms. Johnston did substantially the same work and in the same working conditions.  The male ASR's workspace was near Ms. Johnston's workspace, and they both worked within the same Team.  Ms. Johnston trained this male ASR on their responsibilities and tasks.  Both Ms. Johnston and this male ASR assisted with logistics for product orders, and they both focused on a specific account that was purchasing Nike products.  They both entered

**Page 33 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

data for the orders, tracked the orders, and communicated with representatives from the account about the orders. Yet, Ms. Johnston's starting salary was $33,000 and this male ASR's starting salary was $35,000. This inequality occurred despite Ms. Johnston's more significant relevant work experience, college degree, and graduate school degree. In contrast, the male ASR's highest-level credential was a high-school diploma and whose only work experience was selling goods at a kiosk in a mall.

139.    Ms. Johnston's next position at Nike was a Junior Business Systems Analyst ("Jr. BSA") position. Ms. Johnston became a Jr. BSA around August 2012 and remained in that position until she was promoted to Intermediate Business Systems Analyst ("Intermediate BSA"), which happened during the first six months of 2014.

140.    BSAs help integrate Nike's business operations with its technology operations. To do this, BSAs communicate with employees in the business operations to understand their goals. BSAs then communicate with employees in the technology operations to get software developed that will meet the business operations' goals. Until the software supports the desired business functions, the BSAs work in an iterative process with the business operations and technology operations. Jr. BSAs are the lowest-level BSAs, it is an entry-level role, and, as Jr. BSAs are trained and gain experience, they are supposed to advance to Intermediate BSA and other higher-level BSA positions. The higher-level BSA positions do substantially the same work as the lower-level BSA positions but with greater responsibilities for the product. There are BSAs on different Teams, and BSAs on different Teams do substantially the same work as described above.

141.    The Jr. BSAs on certain Teams are paid more and promoted faster than the Jr. BSAs on other Teams. When Ms. Johnston applied for and became a Jr. BSA, there were many

**Page 34 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
        COMPLAINT**

Jr. BSA openings within Nike's technology organization. Two of those openings were on a Team that focused on SAP software. Ms. Johnston had experience with SAP, but Nike placed her on a different Team. Around the same time, Nike placed two male Junior BSAs on the team that focused on SAP software even though neither of them had any SAP experience. Ms. Johnston and these two male Jr. BSAs were hired from the same pool of applicants and were placed on their respective Teams from the same pool of recently-hired Jr. BSAs. The Jr. BSAs on the Team that focused on SAP were paid more and promoted faster than Jr. BSAs on other Teams, including Ms. Johnston's Team. Ms. Johnston's Team was majority-female and the Team focusing SAP was majority-male.

142.    Ms. Johnston was promoted later and not as high as the above-mentioned two male Jr. BSAs. Those two male Jr. BSAs were promoted to Intermediate BSAs within one year of their hire and to Senior BSAs, a U-Band position, within two years of their hire. By contrast, even though her manager recommended her for promotion to Intermediate BSA in both 2015 and 2016, Ms. Johnston was not promoted to Intermediate BSA until 2017, two years after she began working as a Jr. BSA, a L-Band position. Even with her promotion, Ms. Johnston remained at the L-Band Level, not the higher U-Band Level to which the male BSAs were promoted.

143.    Even once she was promoted, Ms. Johnston was paid less than the two male Jr. BSAs. Ms. Johnston was performing substantially the same work as higher-level BSAs, but she was paid less than these higher-level BSAs. For example, Ms. Johnston's direct manager wrote, in her fiscal year 2014 written performance evaluation, that Ms. Johnston "has continued[sic] to exceed . . . expectations for an[sic] entry level [Business Systems Analyst] as she continues to consistently perform the same work as the Senior [Business Systems Analysts] with little assistance required."

**Page 35 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

144.    After Ms. Johnston was promoted to Intermediate BSA, she continued to perform the work of higher-level positions but without the corresponding salary and Band Level increase. For example, starting around October 2016, Ms. Johnston became a product owner, which meant that she was the person responsible for the success of her product that the BSAs were helping to develop.  As a product owner, she made decisions about what work needed to be done, outlined the tasks for her team, and ensured the work was completed.  BSAs did not become a product owner, typically, unless they were a Senior BSA or Lead BSA, which are both U-Band level positions.  These are U-Band positions with higher compensation than Ms. Johnston, who remained an Intermediate BSA, an L-Band position.  The Director to whom Ms. Johnston reported wrote her around the end of September 2016 and said that she was in "the role of product owner, where [she] will be evaluated based on this being a stretch role . . . since this role aligns organizationally with [a Senior Business Systems Analyst] and Lead [Business Systems Analyst] job class, and the role of Product Analyst . . . ."

145.    Ms. Johnston was also paid less than and did not receive the promotions of male BSAs who replaced Ms. Johnston after Ms. Johnston left Nike.  Shortly after Ms. Johnston left, Nike split her work and responsibilities into two positions, a man was hired into each of those positions, and both men were placed in the U-Band.  As a result, these two men were each just responsible for part of Ms. Johnston's workload, yet both had larger salaries and bonuses than Ms. Johnston.

### 3.    Plaintiff Elizabeth.

146.    Plaintiff Elizabeth was paid and promoted less than similarly situated male employees.  When Ms. Elizabeth was hired to work as a contractor in Design for Nike, in about March 2015, Nike hired a male intern.  Before Ms. Elizabeth was re-classified to a full-time employee, this male intern had been promoted to Designer I and then promoted to Designer II.

**Page 36 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

147.    When Nike made her a full-time employee in January 2017, Ms. Elizabeth was labeled an Apparel Designer I, which placed her in the L-Band. Around February 2018, Ms. Elizabeth was transferred from a Team in Nike's Jordan Brand to another category. Later that Spring, Nike filled Ms. Elizabeth's former role in Nike's Jordan Brand with a male employee. This male employee thus had Ms. Elizabeth's former responsibilities and the position required substantially the same amount of skill and effort. In contrast to Ms. Elizabeth, Nike provided her male replacement with a higher-level title, Designer II, paid him a larger salary, and he received a larger annual bonus.

148.    Like her male replacement, Nike should have made Ms. Elizabeth a Designer II because she did the work of a Designer II. A Senior Designer working in Nike's Jordan Brand said, on several occasions throughout Ms. Elizabeth's time working in Nike's Jordan Brand, that she was doing the work of a Designer II.

149.    Like other Designers at Nike, Ms. Elizabeth conceptualized and created plans for making Nike apparel. The bulk of this work entailed planning and determining the aesthetics and properties of specific apparel items. Ms. Elizabeth's workspace was in the same room as many other apparel designers, including Apparel Designer IIs. Ms. Elizabeth and the other Apparel Designers spent a substantial amount of time discussing how to plan and determine the aesthetics and properties of the apparel items. In addition, following the conceptualization process, Ms. Elizabeth, like the other Apparel Designers, used Adobe Illustrator, a computer-aided software program, to communicate the design to other members of her Team. After the Team's review of this design, Ms. Elizabeth, like the other Apparel Designers, used Adobe Illustrator to create a more technically detailed design that would be sent to the manufacturing

**Page 37 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

facility to make the apparel.  To complete these tasks, an Apparel Designer had to understand construction of apparel, textiles, the consumer, and Nike's seasonal strategy.

150.    Around January 2017, Ms. Elizabeth requested that she become an Apparel Designer II, but Nike designated her an Apparel Designer I.  Meanwhile, Nike promoted a male Designer I on her Team to Designer II.  Ms. Elizabeth had been working longer at Nike in Design than this male Designer who was promoted, Ms. Elizabeth had been meeting or exceeding expectations in her role, and she had at least as much relevant experience as this male Designer.

151.    At Nike, Ms. Elizabeth consistently met or exceeded the expectations for her position.  For example, around June 2017, the Senior Design Director of Apparel said that Ms. Elizabeth would have gotten a Highly Successful rating, instead of Successful, had she been a full-time employee for longer.  While Ms. Elizabeth was a Designer I, she had the responsibilities of the Designer IIs who worked nearby her.

**4.    Plaintiff Hender.**

152.    Nike paid and promote Ms. Hender less than her male peers.  When Nike hired Ms. Hender as a Manufacturing Engineer II (later re-titled to Process Engineer II), Nike placed her in the L-Band and Nike paid her a salary that was in the lower end of the salary range for that Band Level.  Although Ms. Hender's title was Manufacturing/Process Engineer II, her duties and responsibilities were substantially the same as a male Senior Process Engineer I on her Team who had his workspace near Ms. Hender's workspace.

153.    Ms. Hender, both when she was a Manufacturing/Process Engineer II and then as a Senior Engineer I, worked on the processes and equipment that are used to turn raw materials into components of Nike footwear.  A male Senior Engineer I had the same job duties, including working on the processes and equipment that are used to turn raw materials into components of

**Page 38 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

Nike footwear.  Both Ms. Hender and the male Senior Engineer I specify, integrate, and monitor the equipment and processes that manufacture these components of Nike footwear.  The Process Engineers work with people across the manufacturing system at Nike to align the manufacturing with the business strategy and goals.  To accomplish these tasks and responsibilities, the Process Engineers need to have competence in design software, communication with others working in manufacturing, and project management.

154.    This male Senior Process Engineer I had a higher-level title and a higher Band Level (U-Band) than Ms. Hender.  As a result, this male Senior Process Engineer I had a higher salary and received larger bonuses than Ms. Hender did for, at least, the time that Ms. Hender was a Manufacturing/Process Engineer II.

155.    Since Ms. Hender was promoted to Senior Process Engineer I in the U-Band in September 2018, Ms. Hender's work level, responsibilities, requirements, and direct manager stayed substantially the same.  Ms. Hender also continued to work on the same engineering Team and within the same Organization, Air Manufacturing Innovation, as when she was a Manufacturing/Process Engineer II.

156.    At Nike, Ms. Hender consistently met or exceeded the expectations for her position.  For example, Ms. Hender received a Successful rating in both 2016 and 2017 and a Highly Successful rating in 2018.  Before Ms. Hender's September 2018 promotion to Senior Process Engineer I, her direct supervisor said, in both 2017 and 2018, that Ms. Hender was doing the work of a Senior Process Engineer.

**5.    Opt-in Plaintiff Olson.**

157.    Ms. Olson was paid and promoted less than similarly situated male employees. For example, as described below, shortly after Ms. Olson left Nike in June 2017, Nike assigned

**Page 39 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

Ms. Olson's responsibilities and work to a male employee who was given a higher-level title and Band Level than Ms. Olson.

158.    Nike employed Ms. Olson from 1991 through June 2017.[32]  From 2000 through June 2017, Ms. Olson was a Manager in World Headquarters Security.  On that Team, there were approximately seven Nike employees in World Headquarters Security who reported directly to Ms. Olson, and Ms. Olson was indirectly responsible for managing the approximately seventy employees in World Headquarters Security.  Ms. Olson reported directly to the Senior Director of Global Security.  Before Ms. Olson's Nike employment ended, there were no Senior Managers, other Managers, or Directors in World Headquarters Security.

159.    Ms. Olson was responsible for ensuring that the security procedures at Nike Headquarters were in place and working well.  This included coordinating with law enforcement, planning event security, monitoring security patrols, coordinating access for Nike employees, and ensuring proper procedures for visitors.

160.    Ms. Olson regularly attended meetings with Nike Directors and other managers from other Nike Organizations and Teams, where the meetings focused on how Nike business operations interacted effectively with established security standards.  Ms. Olson was also responsible for coordinating with the other security Teams at Nike during a weekly staff meeting.  There, Ms. Olson and Directors in Nike Security updated one another regarding the status of security-related items and coordinated security.

161.    Ms. Olson met or exceeded the expectations for her position.  For example, Ms. Olson received a Successful rating in 2015 and 2016, and she received a Highly Successful

---

[32] Ms. Olson filed a consent to join the EPA claim on November 8, 2018.  As of the filing of this First Amended Complaint, there are nine opt-in plaintiffs for the EPA claim.

**Page 40 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

rating in 2013, 2014, and 2017. When Ms. Olson left Nike, a Senior Director in Global Security sent an announcement: "over the course of her outstanding career, [Ms. Olson] has developed the WHQ campus security team into what I feel is the best campus security organization in the world, bar none. Her work has influenced countless projects throughout the world, and it's safe to say, Nike would not be as secure as it is, without her tireless leadership. She will be greatly missed by everyone who has had the pleasure of working with her."

162.    Ms. Owen was in the U-Band throughout her entire seventeen years as a Manager in World Headquarters Security, where she was he most-senior level employee below the Senior Director. Yet, even by the time Ms. Olson left Nike in June 2017, Ms. Olson was not at the higher end of the U-Band's salary range.

163.    On numerous occasions, including in 2017, Ms. Olson asked her direct supervisor and other higher-level managers for a promotion to Director and for a Manager to be hired under her to help manage World Headquarters Security. But, Nike never promoted Ms. Olson. Meanwhile, the Senior Director who was Ms. Olson's direct supervisor said that Ms. Olson should be a Director and that, if Ms. Olson left Nike, her replacement would be a Director. Ms. Olson's supervisor made these statements in both 2016 and 2017.

164.    Within approximately four months of Ms. Olson leaving Nike, she was replaced by a man who was given the title that Ms. Olson had requested on numerous occasions, Director in World Headquarters Security. Like Ms. Olson, this male Director worked at Nike Headquarters and reported directly to the Senior Director of Global Security. This male Director's position required substantially the same, or less, responsibility, effort, and skill as was required of Ms. Olson's position. In contrast to Ms. Olson, this male Nike employee received the Director title and was placed in the E-Band. This male Director was thus paid a higher salary

**Page 41 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION**
**COMPLAINT**

than Ms. Olson, received a larger annual bonus than Ms. Olson, and received stock options

whereas Ms. Olson did not receive any stock options.

**G.   Nike Retaliated Against Plaintiff Heather Hender after she Filed a Charge of Discrimination with the EEOC and became a Plaintiff in this Action.**

165.   On November 9, 2018, Plaintiff Hender filed a Charge of Discrimination based on

allegations of sex discrimination against her and other female colleagues at Nike, and on

November 19, 2018, Ms. Hender became a named plaintiff in this Action.

166.   After Ms. Hender filed her November 9, 2018 EEOC Charge and became a

named plaintiff in this Action, Nike began denying and/or withholding work assignments and

engineering roles from her, ostensibly to keep her available for engineering roles she would be

assigned as a member of a new "Nike AirSpeed Team" that was being formed, and which Ms.

Hender agreed to join based on Nike management's representations that it was an opportunity to

work on next-generation problem solving in Ms. Hender's areas of expertise (robotics and

automation), and it was pitched by Nike as a role that would be in addition to her currently-held

role, and not a lateral move.

167.   In addition to denying and/or withholding Ms. Hender work assignments, in

October 2019, when the Nike AirSpeed Team finally launched, Nike transferred Ms. Hender

from her engineering team to the Nike AirSpeed team. As a result, Ms. Hender was also removed

from a critical work group email list, which left Ms. Hender isolated, and she was not assigned to

any technical projects that utilized her areas of expertise in robotics and automation on the

AirSpeed team as she had been promised by Nike, rather, she was only assigned or able to work

on non-technical, administrative, and demeaning work tasks.

168.   Furthermore, after Ms. Hender filed her EEOC Charge and became a named

Plaintiff in this Action, Nike withheld critical "Arc Flash" safety training from Ms. Hender,

**Page 42 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

training that is and was otherwise regularly provided to Nike maintenance technicians and engineers to access electrical cabinets to complete their work assignments. Despite Ms. Hender's repeated requests to participate in the Arc Flash training, and the fact that she needed it to complete the few work assignments Nike assigned her since November 2018, instead of providing the training to her, Nike forced Ms. Hender to routinely ask her male colleagues – some of whom she had once trained in key aspects of the required engineering systems needed to perform work at Nike – for assistance to complete basic tasks (e.g., to open electrical cabinet doors for troubleshooting purposes and to access technical components).

169.    In addition, after Ms. Hender filed her Charge of Discrimination on November 9, 2018, and after she became a named Plaintiff in this Action, Nike began ignoring her communications regarding and/or largely failed to assist her with her patent application to the USPTO to patent a new process she invented to achieve airbag inflation. Nike repeatedly ignored Ms. Hender's communications relating to the patent application process and had to frequently "pester" Nike's IP team to take required actions to keep key aspects of her patent application from being rejected, which is in stark contrast to its treatment of Ms. Hender's male colleagues, who have been assisted with and kept informed regarding how patent applications were progressing.

170.    In sum, after Ms. Hender filed her EEOC Charge of Discrimination on November 9, 2018, and became a named plaintiff in this Action, Nike shunned and isolated her from previous integral work groups, withheld and/or denied her work assignments, gave her demeaning work, denied her critical and necessary training opportunities, and ignored her communications regarding her airbag inflation patent application. As a result of Nike's retaliatory conduct, Ms. Hender's performance evaluations suffered, and Nike's performance

**Page 43 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

evaluations are directly tied to and influence employees' compensation and promotion

opportunities.

## V.    COLLECTIVE ACTION ALLEGATIONS

171.    Plaintiffs and the Collective Action Members re-allege and incorporate the

preceding paragraphs as alleged above.

172.    Plaintiffs bring this collective action for injunctive, declaratory, and monetary

relief pursuant to 29 U.S.C. § 216(b) on behalf of the following Collective Action:

> All female current and former Nike employees at Nike Headquarters in
> Oregon, who were employed by Nike at any time from three years prior to
> opting-in through the resolution of this action, in a salaried, corporate
> position that was or is a lower-level position than Vice-President
> ("Collective Action Definition," "Collective Action," or "Collective Action
> Members").

173.    Excluded from the Collective Action are Nike retail store employees, lawyers

within Nike's Legal department and employees in Nike's Finance and HR departments.

Plaintiffs reserve the right to amend the definition of the Collective Action based on discovery or

legal developments.

174.    Nike has engaged in systemic sex discrimination in pay against Class/Collective

Members.  Nike paid Collective Action Members less than it paid male employees with

substantially equal job duties that required substantially similar skill, effort, and responsibility,

and were performed under similar working conditions within the same establishment.

175.    Nike has caused, contributed to, and perpetuated sex-based pay disparities

through common policies, patterns, or practices, including but not limited to those relating to

starting salary and Band Level, annual ratings, promotions, performance management policies or

practices, centralized decision-making, and a work environment hostile to women.  Plaintiffs and

**Page 44 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
          COMPLAINT**

the Collective Action Members are similarly situated pursuant to 29 U.S.C. § 216(b) because Plaintiffs and the Collective Action Members were paid less than male employees who had substantially equal job duties that required substantially similar skill, effort, and responsibility, and were performed under similar working conditions within the same establishment.

176.   Plaintiffs seek to be appointed as representatives of the Collective Action.

177.   There are many similarly situated Collective Action Members who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit.  Notice should be sent to the Collective Action Members pursuant to 29 U.S.C. § 216(b).

178.   Questions of law and fact common to Plaintiffs and Collective Action Members include, but are not limited to, the following:

    a.   Whether Nike's starting salary and Band Level policies, patterns, or practices caused Collective Action Members to receive less compensation than their male colleagues;

    b.   Whether Nike has a policy, pattern, or practice of requesting prior compensation history upon hiring that discriminates against Collective Action Members;

    c.   Whether Nike's annual ratings of employees at Nike Headquarters discriminates against Collective Action Members;

    d.   Whether the curve and/or employee groupings for the ratings discriminate against Collective Action Members; and

    e.   Whether Nike's campuses in and around Beaverton, Oregon are part of the same "establishment" according to the EPA.

**Page 45 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

179.    Nike is aware or should have been aware that federal law requires it to pay its female employees at a rate commensurate to that of male employees performing substantially similar work.

180.    As part of its regular business practice, Nike willfully, and repeatedly, engaged in a uniform pattern, practice, or policy of violating the EPA with respect to Plaintiffs and Collective Action Members.

181.    Nike's deceptive conduct prevented Collective Action Members from discovering or asserting their claims earlier than they did because Nike, for example, expressly and inaccurately told employees at Nike Headquarters that there was no sex inequality in compensation.

## VI.    CLASS ACTION ALLEGATIONS

182.    Plaintiffs and the Class Members re-allege the foregoing paragraphs of this Complaint as though fully set forth herein.

183.    Plaintiffs bring this action as a class action for injunctive, declaratory, and monetary relief pursuant to Rule 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure for violations of Title VII, ORS 652.220 and ORS 659A.030 on behalf of the following Class:

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed by Nike at any time from October 11, 2017 through the resolution of this action for claims under Title VII, and for the period from August 9, 2017 through the resolution of this action for claims under ORS 652.220 and ORS 659A.030, in a salaried, corporate position that was or is a lower-level position than Vice-President ("Class Definition," "Class," or "Class Members").

184.    Excluded from the Class are Nike retail store employees, lawyers within Nike's Legal department and employees in Nike's Finance and HR departments.  Plaintiffs reserve the right to amend the definition of the Class based on discovery or legal developments.

**Page 46 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

ER-0420

185.    Plaintiffs are members of the Class they seek to represent.

186.    This action is properly maintained as a class action.  The Class satisfies all the requirements of Rule 23 for maintaining a class action.

187.    **Ascertainability.**  The members of the Class are known to Nike.  Nike's business records memorialize their names, sex, compensation, promotions, annual ratings, job titles, and other relevant records.  Moreover, the Class Definition enables every putative class member to identify herself as a member of the Class.

188.    **Numerosity.**  The Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  There are at least 500 members of the Class.

189.    **Existence and predominance of common questions of law or fact.**  There are questions of law or fact that are common to the Class, and these common questions predominate over questions affecting any individual Class Member.  Nike's uniform employment policies, patterns, or practices discriminate against all Class Members.  The uniform policies, patterns, or practices relate to: the setting of starting salary and Band Level; Nike's annual ratings; Nike's Organizational Talent Planning System; a small group of high-level executives who are majority male and the ultimate arbiters with respect to Nike's policies, patterns, or practices; and a work environment that is hostile towards women.  The common nucleus of operative facts also includes: Nike's Band Levels; the Budgeting related to the annual salary increases and the amount of the PSP Bonuses; and the formula used for the PSP Bonus calculation.  Common questions of law or fact include without limitation:

a.    Whether Nike's policies or practices discriminate against Class Members holding a job title that is lower than Vice-President;

**Page 47 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

b.      Whether Nike's starting salary and Band Level policies, patterns, or

practices discriminate against Class Members;

c.      Whether Nike has a policy, pattern, or practice of requesting prior

compensation upon hiring that discriminates against Class Members;

d.      Whether Nike's annual ratings of employees at Nike Headquarters

discriminates against Class Members;

e.      Whether the curve and/or employee groupings for the ratings discriminate

against Class Members;

f.      Whether Nike's compensation system discriminates against Class

Members;

g.      Whether Nike's promotion system discriminates against Class Members;

h.      Whether Class Members are disproportionately and discriminatorily

assigned to and retained in lower Band Levels;

i.      Whether Nike continued pay, promotion, and other terms and conditions

of employment systems that it knew or should have known have

discriminated against Class Members;

j.      Whether a small group of mostly male senior executives are the ultimate

arbiters with respect to compensation, ratings, and promotions;

k.      Whether Trevor Edwards and/or David Ayre caused and/or fostered a

hostile work environment towards women;

l.      Whether a hostile work environment further contributes to discrimination

against Class Members by causing them to receive less compensation and

**Page 48 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
       COMPLAINT**

fewer promotional opportunities than male employees at Nike
Headquarters;

m.    Whether Nike's policies or practices related to setting compensation and
making promotions disparately impacts women compared to men based on
sex;

n.    Whether Nike's policies or practices related to compensation and making
promotions are valid, job-related, and consistent with business necessity;
and

o.    Whether, even if such systems or policies could be justified by business
necessity and shown to be job-related, less discriminatory alternatives
exist and would equally serve any alleged necessity.

190.    **Typicality.**  Plaintiffs' claims are typical of those of the Class Members because
they were subject to the same employment policies or practices, and Nike has no defenses that
are unique to Plaintiffs.

191.    **Adequacy of representation.**  Plaintiffs will fairly and adequately protect the
interests of the class and have no interests adverse or antagonistic to the interests of the other
members of the Class.  Plaintiffs have retained competent counsel who are experienced in the
prosecution of discrimination class actions.

192.    **Superiority.**  A class action is superior to other methods for the fair and efficient
adjudication of the claims asserted herein.  A class action will permit the large number of
similarly situated persons to prosecute their common claims in a single forum simultaneously,
efficiently, and without the duplication of time and expense that the prosecution of numerous
individual actions would entail.

**Page 49 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
COMPLAINT**

193.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Nike has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.  The Class Members are entitled to injunctive relief to end Nike's common, uniform, unfair, and discriminatory policies, patterns, and/or practices.

194.     Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Nike's common, uniform, unfair, and discriminatory policies, patterns, or practices have damaged Class Members and they are entitled to recovery.  Nike has computerized account data, payroll data, and personnel data that will make calculation of damages for specific Class Members efficient and manageable. The propriety and amount of punitive damages are based on Nike's conduct, making these issues common to the Class.

### FIRST CLAIM FOR RELIEF
### Federal Equal Pay Act
### (The Fair Labor Standards Act of 1938, as amended by
### The Equal Pay Act, 29 U.S.C. §§ 206, *et seq*.)
### (On Behalf of Plaintiffs and the Collective Action Members)

195.     Plaintiffs and the Collective Action Members re-allege and incorporate the preceding paragraphs as alleged above.

196.     Nike has discriminated against Plaintiffs and the Collective Action Members in violation of the EPA, 29 U.S.C. § 206(d).  Nike has paid Plaintiffs and the Collective Action Members less than similarly situated male colleagues performing substantially similar work on jobs the performance of which requires similar skill, effort, and responsibility, and which are performed under similar working conditions within the same establishment.

**Page 50 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

197.    The differential in pay between male and female employees is due to sex and not due to seniority, merit, quantity or quality of production, or any other factor other than sex.

198.    Nike did not act in good faith, and caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA. The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Nike has willfully violated the EPA, a three-year statute of limitations applies to the claims of Plaintiffs and Collective Action Members, pursuant to 29 U.S.C. § 255(a).

199.    As a direct result of specific employment policies, patterns, or practices, Collective Action Members have suffered damages including, but not limited to, lost past and future income, compensation, equity distributions, and other benefits.

200.    Plaintiffs and the Collective Action Members request relief as hereinafter described.

## SECOND CLAIM FOR RELIEF
### Title VII – Disparate Impact
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Lilly Ledbetter Fair Pay Act of 2009)**
**(On Behalf of Plaintiffs and the Class Members)**

201.    Plaintiffs and the Class Members re-allege and incorporate the preceding paragraphs as alleged above.

202.    Plaintiffs Johnston, Elizabeth, and Hender each filed a timely charge with the EEOC on behalf of herself and the Class Members.  Plaintiffs Elizabeth and Hender may "piggyback" off the previous filing of Plaintiff Johnston because Plaintiff Johnston's EEOC charge relates to the same claims that the other Plaintiffs assert.

203.    Nike's policies, patterns, or practices have adversely impacted Class Members with respect to starting salary, Band Level, annual ratings, annual salary increases, PSP Bonuses, equity distributions, promotions, job assignments, and a hostile work environment.

Page 51 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
COMPLAINT

723323.14

ER-0425

204.    Nike has violated Title VII because its employment policies, patterns, or practices have caused Plaintiffs and Class Members to be compensated less, promoted less, and to receive less favorable terms related to compensation and promotions than male employees at Nike Headquarters.

205.    Nike has violated Title VII because its employment policies, patterns, or practices have caused Plaintiffs and Class Members to receive less valuable conditions and privileges of employment than male employees at Nike Headquarters.

206.    Nike's reliance on systems, practices, or criteria that are neither job related nor validated to evaluate employee performance, set compensation, select individuals for promotion, and determine other terms and conditions of employment, have an adverse impact on female employees in violation of Title VII and are not, and cannot be, justified as job related for the positions in question or consistent with business necessity.  Even if such systems or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

207.    Nike has maintained these discriminatory policies, patterns, or practices both within and outside the liability period in this case.

208.    As a direct result of Nike's discriminatory policies, patterns, or practices, as described above, Plaintiffs and the Class Members have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

209.    The foregoing policies, patterns, or practices have an unlawful disparate impact on women in violation of 42 U.S.C. §§ 2000e *et seq*.

210.    Plaintiffs and the Class Members request relief as hereinafter described.

**Page 52 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

### THIRD CLAIM FOR RELIEF
**Title VII – Disparate Treatment**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Lilly Ledbetter Fair Pay Act of 2009)**
**(On Behalf of Plaintiffs and the Class Members)**

211.    Plaintiffs and the Class Members re-allege and incorporate the preceding paragraphs as alleged above.

212.    Plaintiffs Johnston, Elizabeth, and Hender each filed a timely charge with the EEOC on behalf of herself and the Class Members.  Plaintiffs Elizabeth and Hender may "piggyback" off the previous filing of Plaintiff Johnston because Plaintiff Johnston's EEOC charge relates to the same claims that the other Plaintiffs assert.

213.    Nike has violated Title VII because Nike has knowingly and purposefully discriminated against Class Members based on their sex.  Nike has engaged in an intentional, company-wide, and systematic policy, pattern, or practice of discrimination against its salaried female employees below Vice-President at Nike Headquarters.

214.    Nike has intentionally discriminated against Class Members in violation of Title VII with respect to, among other things, starting salary, starting Band Level, annual ratings, annual salary increases, PSP Bonuses, equity distributions, promotions, job assignments, and a hostile work environment.  These company-wide policies, patterns, or practices are intended to and do have the effect of discriminating against Class Members because of their sex.  Nike continued these company-wide policies, patterns, or practices even after it knew or should have known of their discriminatory impact based on sex.

215.    Plaintiffs and Class Members were qualified for their jobs and performed as well or better than similarly situated male employees.

**Page 53 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**
723323.14

ER-0427

216.    Nike has violated Title VII because its employment policies, patterns, or practices have caused Plaintiffs and Class Members to receive less valuable conditions and privileges of employment than male employees at Nike Headquarters.

217.    The discriminatory acts that constitute Nike's pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

218.    As a direct result of Nike's discriminatory policies, patterns, or practices as described above, Plaintiffs and the Class Members have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

219.    The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. §§ 2000e *et seq.*

220.    Plaintiffs and the Class Members request relief as hereinafter described.

**FOURTH CLAIM FOR RELIEF**
**Oregon Equal Pay Act**
**(ORS 652.220)**
**(On Behalf of Plaintiffs and the Class Members)**

221.    Plaintiffs and the Class Members re-allege and incorporate the preceding paragraphs as alleged above.

222.    Nike has violated ORS 652.220 because Nike has paid Plaintiffs and Class Members less than Nike's male employees for work of comparable character and the performance of which requires comparable skills.

223.    The pay differential between Class Members and comparable male employees at Nike Headquarters was not due to a seniority system or a merit system that is free of discrimination based on sex.

224.    The pay differential between Class Members and comparable male employees at Nike Headquarters was not based in good faith on factors other than sex.

**Page 54 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION**
**COMPLAINT**

225.    Plaintiffs and the Class Members request relief as hereinafter described.

**FIFTH CLAIM FOR RELIEF**
**Oregon Equality Act – Disparate Impact**
**(ORS 659A.030)**
**(On Behalf of Plaintiffs and the Class Members)**

226.    Plaintiffs and the Class Members re-allege and incorporate the preceding

paragraphs as alleged above.

227.    Nike's policies, patterns, standards, or practices have adversely impacted Class

Members with respect to starting salary, Band Level, annual ratings, annual salary increases, PSP

Bonuses, equity distributions, promotions, job assignments, and a hostile work environment.

228.    Nike has violated ORS 659A.030 because its employment policies, patterns, or

practices have caused Plaintiffs and Class Members to be compensated less, promoted less, and

to receive less favorable terms related to compensation and promotions than male employees at

Nike Headquarters.

229.    Nike has violated ORS 659A.030 because its employment policies, patterns, or

practices have caused Plaintiffs and Class Members to receive less valuable conditions and

privileges of employment than male employees at Nike Headquarters.

230.    Plaintiffs and the Class Members request relief as hereinafter described.

**SIXTH CLAIM FOR RELIEF**
**Oregon Equality Act – Intentional Discrimination**
**(ORS 659A.030)**
**(On Behalf of Plaintiffs and the Class Members)**

231.    Plaintiffs and the Class Members re-allege and incorporate the preceding

paragraphs as alleged above.

232.    Nike has violated ORS 659A.030 because Nike knowingly and purposefully

discriminated against Class Members based on their sex.

**Page 55 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION**
**COMPLAINT**

723323.14

ER-0429

233.    Nike's discrimination against Class Members has been, and continues to be, with respect to starting salary, starting Band Level, annual ratings, annual salary increases, PSP Bonuses, equity distributions, promotions, job assignments, and a hostile work environment.

234.    Plaintiffs and Class Members were qualified for their jobs and performed as well or better than similarly situated male employees.

235.    Nike has violated ORS 659A.030 because its employment policies, patterns, or practices have caused Plaintiffs and Class Members to receive less valuable conditions and privileges of employment than male employees at Nike Headquarters.

236.    Plaintiffs and the Class Members request relief as hereinafter described.

**SEVENTH CLAIM FOR RELIEF**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
**(42 U.S.C. 2000e-3(a))**
**(On Behalf of Plaintiff Hender)**

237.    Plaintiff Hender re-alleges and incorporates the preceding paragraphs as alleged above.

238.    As set forth above, Nike retaliated against Plaintiff Hender as a result of her filing her EEOC Charge on November 9, 2018, and for becoming a named plaintiff in this Action, in violation of Title VII.

239.    Title VII, as set forth in 42 U.S.C. section 2000e-3(a), makes it an unlawful employment practice under Title VII for an employer to take adverse employment actions against any person because the person has opposed any practices forbidden by Title VII. The elements of a prima facie case for retaliation are (1) protected activity, (2) adverse action(s) and (3) plaintiff was subjected to adverse actions because of the protected activity. *See* Ninth Circuit Jury instruction, No. 10.8.

**Page 56 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION**
**COMPLAINT**

723323.14

ER-0430

240.    Here, Plaintiff Hender engaged in protected activity when she filed her Charge of Discrimination with the EEOC on November 9, 2018, and became a named plaintiff in this case on November 19, 2018.

241.    After she filed her Charge of Discrimination with the EEOC and became a named plaintiff in this Action, Nike retaliated against Plaintiff Hender by isolating her from important work groups, denying her critical training opportunities, withholding work assignments from her, and denying her support for her patent application to the USPTO. Due to Nike's retaliatory conduct, Ms. Hender's work performance was negatively impacted and her performance evaluations suffered, which resulted in Nike denying her pay increases and promotion opportunities.

### EIGHTH CLAIM FOR RELIEF
### Retaliation in Violation of Oregon State Law Against Discrimination
### (ORS 659A.001, *et seq.*)
### (On Behalf of Plaintiff Hender)

242.    Plaintiff Hender re-alleges and incorporates the preceding paragraphs as alleged above.

243.    "To establish [a] retaliation claim [under Oregon law], [a] plaintiff [must] prove three elements: (1) he engaged in an activity protected by law, that is, he opposed or reported discrimination or harassment, (2) defendant subjected him to an adverse employment action, and (3) defendant subjected him to the adverse employment action because of plaintiff's opposition to or report of [gender] discrimination or [sexual] harassment." *Summerfield v. Or Liquor Control Comm'n*, 366 Ore 763, 782 (2020).

**Page 57 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

244.     As set forth above, Nike retaliated against Plaintiff Hender as a result of her filing her Charge of Discrimination with the EEOC on November 9, 2018, and after she became a named plaintiff in this Action on November 19, 2018.

245.     Plaintiff Hender engaged in protected activity when she filed her Charge of Discrimination with the EEOC on November 9, 2018, and became a named plaintiff in this Action on November 19, 2018.

246.     As a result, Nike retaliated against Plaintiff Hender by isolating her from important work groups, denying her critical training opportunities, withholding work assignments from her, and denying her support for her patent application to the USPTO. Due to Nike's retaliatory conduct, Ms. Hender's work performance was negatively impacted and her performance evaluations suffered, which resulted in Nike denying her pay increases and promotion opportunities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class/Collective Members pray for relief as follows:

A.     Certify this action as a collective action under the EPA on behalf of Plaintiffs and the Collective Action Members;

B.     Designate Plaintiffs as the representatives of the Collective Action;

C.     Promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated Collective Action Members, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing individual Consent to Join as Party Plaintiff forms pursuant to 29 U.S.C. § 216(b);

D.     Toll the statute of limitations on the claims of all Collective Action Members from the date the original Complaint was filed until the Collective Action Members are provided

**Page 58 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
        COMPLAINT**

with reasonable notice of the pendency of this action and a fair opportunity to exercise their right

to opt in to the Collective Action;

E.      Certify this action as a class action on behalf of the proposed Class for violations

of Title VII, ORS 652.220, and ORS 659A.030;

F.      Designate Plaintiffs as the representatives of the class action;

G.      Designate Plaintiffs' counsel of record as Class counsel for the Class;

H.      A declaratory judgment that the practices complained of herein are unlawful and

violate 29 U.S.C. §§ 216(b), Title VII, ORS 652.220, and ORS 659A.030;

I.      A declaratory judgment that the Nikes' retaliatory practices against Plaintiff

Hender as complained herein are unlawful and violate Title VII, 42 U.S.C. 2000e-3(a) and ORS

659A.001, *et seq*;

J.      A preliminary and permanent injunction against Nike and its partners, officers,

agents, successors, employees, representatives, and all persons acting in concert with them, from

engaging in policies, patterns, or practices that discriminate against Plaintiffs, Class Action

Members, and Collective Action Members because of their sex;

K.      An order that Nike institute and carry out policies, practices, and programs that

provide equal employment opportunities for all employees regardless of sex, and that it eradicate

the effects of their past and present unlawful employment practices;

L.      An order requiring Nike to develop and institute reliable, validated, and job-

related standards for evaluating performance, determining pay, and making promotion decisions;

M.      An order appointing a monitor to ensure that Nike complies with the injunction

provisions of any decree that the Court orders;

**Page 59 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
COMPLAINT**

N.      An order retaining jurisdiction over this action to ensure that Nike complies with such a decree;

O.      An order restoring Plaintiffs and Class and Collective Action Members to their rightful positions at Nike (i.e., reinstatement), or in lieu of reinstatements, an order for front pay benefits;

P.      Back pay for lost compensation and equity distribution (including interest and benefits) for Plaintiffs and Class and Collective Action Members;

Q.      An award against Nike and in favor of Plaintiff Hender for Plaintiff Hender's actual damages, including, but not limited to, an award of back pay, front pay, garden-variety emotional distress[33] and interest associated with her retaliation claims under Title VII and the Oregon Equality Act;

R.      Liquidated damages;

S.      Exemplary and punitive damages in an amount commensurate with Nike's ability to pay and to deter future conduct;

T.      Reasonable attorneys' fees and costs to the extent allowable by law, including, but not limited to, 42 U.S.C. § 2000e-5(k), ORS 659A.885(1), and 29 U.S.C. § 216(b);

U.      Pre-judgment and post-judgment interest, as provided by law; and

V.      Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

---

[33] Plaintiff Hender alleges only "garden variety" emotional distress damages, where there is no diagnosed condition alleged, and no expert testimony will be presented.

**Page 60 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

ER-0434

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and 29 U.S.C. § 216(b),

Plaintiffs and the Class/Collective Members demand a trial by jury in this action.

DATED this 26th day of October, 2023.

GOLDSTEIN, BORGEN, DARDARIAN & HO

By:  *s/Laura L. Ho*
_____
Laura L. Ho (admitted *pro hac vice*)
Barry Goldstein, Of Counsel (*pro hac vice*
application forthcoming)
James Kan (*pro hac vice* application
forthcoming)
Byron Goldstein (admitted *pro hac vice*)
Katharine L. Fisher (admitted *pro hac vice*)
(510) 763-9800

-and-

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Anna M. Joyce, OSB #013112
(503) 295-3085

ACKERMANN & TILAJEF PC
Craig Ackermann (admitted *pro hac vice*)
cja@ackermanntilajef.com
ACKERMANN & TILAJEF PC
1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035
Telephone: (310) 277-0614
Fax: (310) 277-0635

INDIA LIN BODIEN, ATTORNEY AT LAW
India Lin Bodien (admitted *pro hac vice*)
india@indiabodienlaw.com
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Telephone: (253) 212-7913
Fax: (253) 276-0081

Of Attorneys for Plaintiffs and Opt-In Plaintiffs

**Page 61 - SECOND AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
  COMPLAINT**
723323.14

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR  97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No.:  3:18-cv-01477-JR |
| Plaintiffs, | DEFENDANT NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION DATED OCTOBER 11, 2023 (ECF NO. 363) PURSUANT TO FED. R. CIV. P. 72(a) |
| v. | |
| NIKE, INC., an Oregon Corporation, | REQUEST FOR ORAL ARGUMENT |
| Defendant. | |

ER-0436

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................... 1

II.    PROCEDURAL BACKGROUND.................................................................. 3

III.    ARGUMENT ............................................................................................. 5

    A.    Standard Of Review Under Rule 72(a)................................................. 5

    B.    Pursuant To Rule 72(a), The Court Should Set The Findings & Recommendation Aside As Contrary To Law....................................... 7

        1.    The Findings & Recommendation Ignore That The "Good Cause" Standard Applies To Redaction Requests Accompanying Motions Tangentially-Related To The Merits Of The Case. .................................. 7

        2.    The Findings & Recommendation Ignore Case Law Finding Third-Parties' Privacy Is A Compelling Reason To Redact Names. ................... 9

        3.    The Findings & Recommendation Erroneously Rely On Inapposite Case Law............................................................................................. 14

        4.    The Findings & Recommendation Ignore The Reasonableness Of NIKE's Limited Redactions, Which Are Supported By Case Law. ........ 15

IV.    CONCLUSION............................................................................................ 16

Page i    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-0437

## TABLE OF AUTHORITIES

Page(s)

CASES

*Bakki v. Boeing Co.*,
2021 WL 962488 (W.D. Wash. Mar. 15, 2021) .......................................................13

*Bracken v. Fla. League of Cities*,
2019 WL 1867921 (D. Or. Apr. 24, 2019) ..............................................................14

*Coates v. Farmers Grp., Inc.*,
2016 WL 8223348 (N.D. Cal. Jan. 25, 2016) ...........................................................8

*Crispin v. Christian Audigier, Inc.*,
717 F. Supp. 2d 965 (C.D. Cal. 2010) .................................................................5, 6

*Ctr. for Auto Safety v. Chrysler Grp., LLC*,
809 F.3d 1092 (9th Cir. 2016) .........................................................................7, 10

*Delaittre v. Berryhill*,
2017 WL 6310483 (W.D. Wash. Dec. 11, 2017) ....................................................13

*Doe v. Va. Polytechnic Inst. & State Univ.*,
2022 WL 67324 (W.D. Va. Jan. 6, 2022) ...............................................................11

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
331 F.3d 1122 (9th Cir. 2003) ......................................................................10, 15

*Gnassi v. del Toro*,
2022 WL 3867376 (W.D. Wash. Aug. 30, 2022) .....................................................10

*Gregory v. City of Vallejo*,
2014 WL 4187365 (E.D. Cal. Aug. 21, 2014) .........................................................10

*Hanson v. Wells Fargo Home Mortg., Inc.*,
2013 WL 5674997 (W.D. Wash. Oct. 17, 2013) .......................................................7

*Heath v. Google LLC*,
2018 WL 11465387 (N.D. Cal. June 22, 2018) ........................................................8

*Hill v. Xerox Corp.*,
2014 WL 1356212 (W.D. Wash. Apr. 7, 2014) ........................................................8

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
2015 WL 984121 (N.D. Cal. Mar. 4, 2015) ............................................................10

*Ingram v. Pac. Gas & Elec. Co.*,
2013 WL 6174487 (N.D. Cal. Nov. 22, 2013) ..........................................................6

*Kamakana v. City & Cnty. of Honolulu*,
447 F.3d 1172 (9th Cir. 2006) .......................................................................7, 11

*Kautsman v. Carrington Mortg. Servs.*,
2017 U.S. Dist. LEXIS 153550 (W.D. Wash. Sept. 19, 2017) ...................................8

Page ii    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-0438

<u>**TABLE OF AUTHORITIES**</u>
(continued)

Page(s)

*Mirlis v. Greer*,
   952 F.3d 51 (2d. Cir. 2020)...................................................................11

*Moussouris v. Microsoft Corp.*,
   2018 WL 1159251 (W.D. Wash. Feb. 16, 2018) ..................................11

*Music Grp. Macao Com. Offshore Ltd. v. Foote*,
   2015 WL 3993147 (N.D. Cal. June 30, 2015) .....................................10

*Myles v. County of San Diego*,
   2017 WL 274829 (S.D. Cal. Jan. 19, 2017)........................................10

*Nixon v. Warner Commc'ns, Inc.*,
   435 U.S. 589 (1978).............................................................................11

*Philips v. Ford Motor Co.*,
   2016 WL 7374214 (N.D. Cal. Dec. 20, 2016).......................................8

*Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*,
   307 F.3d 1206 (9th Cir. 2002)...............................................................9

*Price v. Equilon Enterprises LLC*,
   2012 WL 12846100 (W.D. Wash. Nov. 20, 2012) .........................14, 15

*Quatama Park Townhomes Owners Ass'n v. RBC Real Estate Fin., Inc.*,
   365 F. Supp. 3d 1129 (D. Or. 2019) .....................................................6

*Rawcar Grp., LLC v. Grace Med., Inc.*,
   2014 WL 12496548 (S.D. Cal. Aug. 4, 2014) .......................................6

*Reflex Media, Inc. v. Doe No. 1*,
   2022 WL 2985938 (D. Nev. July 28, 2022)...........................................3

*Romero v. County of Santa Clara*,
   2014 WL 12641990 (N.D. Cal. June 17, 2014) .....................................3

*SEC v. Ripple Labs, Inc.*,
   2023 WL 3477552 (S.D.N.Y. May 16, 2023) .................................11, 13

*Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*,
   2021 WL 794271 (S.D. Cal. Mar. 1, 2021), *aff'd*,
   2022 WL 706941 (9th Cir. Mar. 9, 2022)..............................................3

*Sessa v. Ancestry.com Operations Inc.*,
   2023 WL 1795856 (D. Nev. Feb. 6, 2023) ............................................8

*Skurkis v. Montelongo*,
   2016 WL 4719271 (N.D. Cal. Sept. 9, 2016) ......................................11

*Spam Arrest, LLC v. Replacements, Ltd.*,
   2013 WL 4478645 (W.D. Wash. Aug. 20, 2013) ................................10

*Stoba v. Saveology.com, LLC*,
   2016 WL 1257501 (S.D. Cal. Mar. 31, 2016) .......................................8

Page iii   -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
          FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

## TABLE OF AUTHORITIES
(continued)

Page(s)

*True Health Chiropractic, Inc. v. McKesson Corp.*,
  2019 WL 11743580 (N.D. Cal. Aug. 13, 2019) ....................................................7

*United States v. Bus. of Custer Battlefield Museum & Store Located at Interstate 90, Exit
  514, S. of Billings, Mont.*,
  658 F.3d 1188 (9th Cir. 2011) ...........................................................................15

*United States v. Mayers*,
  2017 WL 2215805 (W.D. Wash. May 19, 2017)..................................................3

*United States v. McConney*,
  728 F.2d 1195 (9th Cir. 1984) (*en banc*), *overruled on other grounds by*
  *Estate of Merchant v. C.I.R.*,
  947 F.2d 1390 (9th Cir. 1991) ...........................................................................6

*Weeks v. Union Pac. R.R. Co.*,
  2017 WL 1740123 (E.D. Cal. May 3, 2017) .....................................................5, 6

**STATUTES**

28 U.S.C. § 636(b)(1)(A)......................................................................................5

28 U.S.C. § 2106..................................................................................................5

**RULES**

FED. R. CIV. P. 23 ..............................................................................................2, 15

FED. R. CIV. P. 26(c)(1)........................................................................................9

FED. R. CIV. P. 72(a) .......................................................................................3, 5, 6, 7

**TREATISES**

12 Charles Alan Wright and Arthur R. Miller, *et al.*,
  *Federal Practice and Procedure: Civil* § 3069 (3d ed. 2018)...............................6

Page iv    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
            FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-0440

## I.     <u>PRELIMINARY STATEMENT</u>

These objections concern whether the privacy interests of complainants, third-party

witnesses, and alleged persons of interest identified in unsubstantiated and uncorroborated

complaint files outweigh the interests of the Media Intervenors to embarrass and shame

individuals who did not consent to disclosure of their confidential information.[1]  The impact on

privacy is particularly troubling where, as here, the complaints were often made anonymously,

describe events that purportedly occurred many years before a small pamphlet of materials

containing these complaints was provided to NIKE in or about December 2017,[2] and largely

concern former employees whose personal and/or professional reputations ought not be damaged

by unsubstantiated allegations to which they have no opportunity to respond.[3]

As the Court is aware, this is *not* a harassment case.  Yet, even though the

unsubstantiated complaints alleging workplace (mis)conduct have *nothing* to do with the pay

equity and promotion claims here,[4] it is undisputed that the allegations themselves—whether true

or not—have been made available to Plaintiffs, the Media Intervenors, and exist in the public

---

[1] "Media Intervenors" refers to Non-Party Media Organizations Insider Inc. *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal*.

[2] Where possible, NIKE retained outside counsel to investigate the allegations.

[3] Specifically, the Media Intervenors seek to unseal the redacted content in Exhibits 46 (ECF No. 284-6), 47 (ECF No. 284-7), 48 (ECF No. 284-8), 51 (ECF No. 285-1), and 52 (ECF No. 285-2) of the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification ("Goldstein Decl.") (ECF No. 288), and Exhibit 9 to the Goldstein Decl. (ECF No. 290-4) (collectively, the "Documents").  Exhibit 9 to the Goldstein Decl. at pages 17, 18, 25, 31, and 32, includes redactions of the contents of complaints, rather than just the names of complainants, witnesses, and subjects of complaints.  NIKE maintains that the names of any individuals on these pages should be redacted, but does not otherwise oppose lifting the redactions.

[4] Further, none of the claims appear to assert allegations of non-consensual conduct.

Page 1     -     DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                 FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

domain.[5]  In fact, such allegations have been repeated in court filings and news publications. *See, e.g.*, Edward Helmore, *Nike lawsuit records allege culture of sexism, bullying and fear of retaliation,* The Guardian, Dec. 22, 2022 (https://www.theguardian.com/business/2022/dec/20/nike-lawsuit-records-sexual-abuse-toxic-workplace-claim) (last visited October 25, 2023); *see also* ECF No. 146 at 37-39.  None of these shaming allegations—and certainly not the names of the complainants, witnesses, and alleged persons of interest—had any bearing on the Court's finding that Plaintiffs failed to meet their burden under Rule 23 to certify a class action.  Nor did the failure to disclose the identities of complainants, witnesses, and alleged persons of interest preclude the Ninth Circuit from denying Plaintiffs' petition for an immediate appeal.

The Findings & Recommendation (the "Findings"), however, assert that the privacy interests of the complainants, witnesses, and alleged persons of interest are not sufficiently specific here.  ECF No. 363 at 5-6.  But the Findings do not clarify the amount of proof or showing required to establish a specific privacy interest, whether under a "compelling reasons" or "good cause" standard.  As NIKE has argued, the identities of these individuals are completely unrelated to Plaintiffs' Motion for Class Certification, a non-dispositive motion that is only tangentially related to the causes of action.  As a result, the "good cause" standard applies to the narrowly-tailored redactions in this case.  Nevertheless, NIKE sufficiently demonstrated that, under either the "good cause" or the "compelling reasons" standard, the limited redactions

---

[5] Sun Declaration, Exhibits 46, 47, 51, and 52 relate, at least in part, to allegations of sexual harassment or observance of a consensual sexual act, rather than discrimination or pay equity and thus have no bearing on Plaintiffs' claims in this case.

Page 2    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

of the names of complainants, witnesses, and alleged persons of interest should be maintained to protect their privacy.[6]

Certainly, the law does not require that NIKE provide a third-party declaration stating, for example, that a third-party's personal or professional reputation would be harmed if uncorroborated allegations of his/her conduct (including details about his/her private life, relationship, or intimate partners) were revealed in the newspaper. Under the Findings, *even that* would be insufficient to outweigh the Media Intervenors' claimed right of access here. The law is not so rigid. Nor should it be construed to yield this result. Therefore, pursuant to Federal Rule of Civil Procedure 72(a), NIKE respectfully requests that the Findings are set aside as contrary to law. Nike further requests oral argument on its objections.

## II.    **PROCEDURAL BACKGROUND**

Plaintiffs and NIKE had previously agreed to redact select matters from the Parties' class certification briefing, principally the names of complainants, witnesses, and subjects of complaints (the "Third Parties") that were collected incident to the leafletting that occurred on NIKE's campus in late 2017. ECF No. 273 at 13 (the Parties had worked together to "review previously sealed documents and re-lodge unsealed or redacted versions where appropriate."); *id* at 12 (the Parties agreed to keep redacted "the names of any individuals named in allegations of sexual harassment or gender discrimination at Nike that have not already been made public[.]").

---

[6] *See e.g.*, *Reflex Media, Inc. v. Doe No. 1*, 2022 WL 2985938, at *2 (D. Nev. July 28, 2022) (sealing personal identifying information of victims of the alleged extortion business); *Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*, 2021 WL 794271, at *3 (S.D. Cal. Mar. 1, 2021), *aff'd*, 2022 WL 706941 (9th Cir. Mar. 9, 2022) (sealing non-parties' names because it "runs a substantial risk of exposing those individuals to harassment"); *United States v. Mayers*, 2017 WL 2215805, at *2 (W.D. Wash. May 19, 2017) ("sealing the identifying personal information of an unrelated party to this case is a compelling reason to keep that information sealed"); *Romero v. County of Santa Clara*, 2014 WL 12641990, at *3 (N.D. Cal. June 17, 2014) ("Discrete, sensitive identifying information regarding third parties may be redacted.").

Page 3    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

While the allegations contained in the complaints were made public, the Third Parties' names were redacted.  ECF No. 171 at 10.

On April 1, 2022, NIKE's counsel met and conferred with counsel for Plaintiffs and the Media Intervenors regarding the Media Intervenors' request for private information in support of the Parties' class certification briefing.  ECF No. 220, ¶ 3.  The Media Intervenors claimed that they should have the right to access "Confidential" and "AEO" filings to evaluate whether unsealing was justified.  ECF No. 205 at 13-15.

On April 8, 2022, the Media Intervenors brought their initial Motion to Intervene for the Limited Purpose of Moving to Unseal Judicial Records and to Oppose Defendant's Motion to Seal (the "Motion to Intervene").  ECF No. 205.  NIKE and the Media Intervenors fully briefed the motion, and on September 30, 2022, the Court issued a recommendation granting in part and denying in part the Motion to Intervene.  ECF No. 273.  While the Court allowed Media Intervenors to intervene for the limited purpose of unsealing judicial records, it denied their attempts to access or unseal the records in connection with Plaintiffs' Motion for Class Certification.  ECF No. 273 at 11.

On November 22, 2022, the Court entered its Findings and Recommendation, concluding that Plaintiffs' Motion for Class Certification should be denied.  ECF No. 310.  On March 21, 2023, the Court adopted the Findings and Recommendation in its Order denying class certification.  ECF No. 335.  Plaintiffs petitioned the Ninth Circuit for leave to immediately appeal the denial of their class certification motion.  ECF No. 337.  The Ninth Circuit denied their petition.  *Cahill v. Nike, Inc.*, No. 23-80027 (9th Cir. Ct. App. June 1, 2023) (Dkt. 9).

On August 9, 2023, the Media Intervenors filed a renewed motion to unredact the limited items remaining in certain "complaint" files, including, for example, allegations of philandering,

consensual sex between colleagues, and workplace bullying. ECF No. 343. Recognizing the pre-certification stage of this case, and to protect the Third Parties' personal interest in maintaining privacy, NIKE had redacted the names of these third parties; but, the complaints themselves were unsealed. Despite this wealth of information, the Media Intervenors claimed this was not enough and demanded the disclosure of the Third Parties' names. On August 23, 2023, NIKE filed its opposition to the Media Intervenors' renewed motion. ECF No. 345. On September 6, 2023, the Media Intervenors replied. ECF No. 346. The Magistrate Judge issued her Findings & Recommendation on October 11, 2023. ECF No. 363. Therein, and as discussed below in more detail, the Findings recommend removal of the limited redactions remaining to mask the identities of complainants, witnesses, and alleged persons of interest. These objections followed.

## III.   ARGUMENT

### A.   Standard Of Review Under Rule 72(a).

The District Court should review the Magistrate's Findings *de novo*. Federal Rule of Civil Procedure 72(a) governs a district court's review of non-dispositive rulings by a magistrate judge. Fed. R. Civ. P. 72(a). The Rule provides that "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.*; 28 U.S.C. § 636(b)(1)(A). As such, the district court, "[a]cting as an appellate court . . . has the power to 'affirm, modify, vacate, set aside or reverse' the magistrate judge's order and 'may remand the cause and direct the entry of such appropriate judgment, decree or order, or require such further proceedings . . . as may be just under the circumstances.'" *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 971 (C.D. Cal. 2010) (quoting 28 U.S.C. § 2106).

Page 5   -   DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
             FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

Under Rule 72(a), the "contrary to law" standard—which applies to a magistrate judge's finding of law—calls for "independent plenary review." *Weeks v. Union Pac. R.R. Co.*, 2017 WL 1740123, at *5 (E.D. Cal. May 3, 2017) (sustaining objections to a magistrate judge's order under Rule 72(a) after conducting an independent, plenary review); *see also Quatama Park Townhomes Owners Ass'n v. RBC Real Estate Fin., Inc.*, 365 F. Supp. 3d 1129, 1141-42 (D. Or. 2019) (reversing magistrate judge's order as contrary to law under Rule 72(a) after conducting plenary review); *Rawcar Grp., LLC v. Grace Med., Inc.*, 2014 WL 12496548, at *4 (S.D. Cal. Aug. 4, 2014) ("In an objection under [Rule] 72(a), a magistrate judge's legal conclusions are subject to de novo review."); *Crispin*, 717 F. Supp. 2d at 991 (reversing in part and vacating in part a magistrate judge's decision under Rule 72(a) after conducting de novo review). As Judge Simon of this Court observed in undertaking plenary review of a nondispositive decision by a magistrate judge:

> [I]t is also important to avoid the conclusion that district judges are absolutely powerless to alter magistrate-judge resolution of nondispositive matters unless they fall into the clearly erroneous category. . . . Moreover, even for those courts that adhere to a strict application of the 'clearly erroneous' standard, it is limited to factual findings; even the Third Circuit recognized that the phrase 'contrary to law' indicates plenary review as to matters of law. . . . The latter is the situation that we have here.

*Quatama Park*, 365 F. Supp. 3d at 1141-42 (quoting 12 Charles Alan Wright and Arthur R. Miller*, et al., Federal Practice and Procedure: Civil* § 3069 (3d ed. 2018)) (quotation marks and citations omitted). Of note, for issues involving mixed questions of law and fact, *de novo* or plenary review still applies. *See, e.g., Ingram v. Pac. Gas & Elec. Co.*, 2013 WL 6174487, at *7 (N.D. Cal. Nov. 22, 2013) (observing that under Rule 72(a), "[m]ixed questions of fact and law are reviewed *de novo*") (citing *United States v. McConney*, 728 F.2d 1195, 1202-03 (9th Cir. 1984) (en banc)*, overruled on other grounds by Estate of Merchant v. C.I.R.*, 947 F.2d 1390, 1392-93 (9th Cir. 1991)). Finally, an order is "contrary to law" when it "fails to apply or

Page 6    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
           FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

misapplies relevant statutes, case law, or rules of procedure." *Weeks*, 2017 WL 1740123, at *5 (quotation marks and citation omitted).

Here, NIKE's objections to the Findings concern two purely legal questions. First, whether the "good cause" or "compelling reasons" standard should apply to NIKE's request to maintain the limited redactions contained in the complaint files (*i.e.*, the names of complainants, witnesses, and alleged persons of interest). Second, regardless of which standard is applied, whether the privacy rights of Third Parties outweigh the presumption of public access in this case. Thus, the Findings are subject to *de novo* review by this Court.

**B.**    **Pursuant To Rule 72(a), The Court Should Set The Findings & Recommendation Aside As Contrary To Law.**

The Court should set aside the Findings under Rule 72(a) because, as discussed below, it fails to apply the "good cause" standard and, even under a "compelling reasons" standard, fails to find a particularized showing of harm to the Third Parties' privacy, in contravention of the holding in several cases in this Circuit.

**1.**    **The Findings & Recommendation Ignore That The "Good Cause" Standard Applies To Redaction Requests Accompanying Motions Tangentially-Related To The Merits Of The Case.**

Courts employ two legal standards in motions to seal: the 'good cause' standard and the "compelling reasons" standard. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096-97 (9th Cir. 2016). "The Ninth Circuit has not ruled [on the question of] whether a motion for class certification is a dispositive motion for the purposes of determining whether the compelling reasons standard applies to a sealing request." *True Health Chiropractic, Inc. v. McKesson Corp.*, 2019 WL 11743580, at *2 (N.D. Cal. Aug. 13, 2019) (citation omitted). In deciding which legal standard to apply, the Ninth Circuit has distinguished between requests that accompany dispositive and non-dispositive motions, with a focus on whether the motion is

Page 7    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

"more than tangentially related to the merits of a case." *Ctr. for Auto Safety*, 809 F.3d at 1101; *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); s*ee also Hanson v. Wells Fargo Home Mortg., Inc.*, 2013 WL 5674997, at *2 (W.D. Wash. Oct. 17, 2013); *Hill v. Xerox Corp.*, 2014 WL 1356212, at *1 (W.D. Wash. Apr. 7, 2014).

"[C]ourts generally hold that the standard for filing documents under seal in relation to a class certification motion is a showing of 'good cause.'" *Sessa v. Ancestry.com Operations Inc.*, 2023 WL 1795856, at *1 (D. Nev. Feb. 6, 2023) (citing cases; applying good cause standard) (citation omitted); *see, e.g.*, *Heath v. Google LLC*, 2018 WL 11465387, at *2 (N.D. Cal. June 22, 2018) (applying good cause standard to motion to decertify collective action); *Kautsman v. Carrington Mortg. Servs.*, 2017 U.S. Dist. LEXIS 153550, at *2-3 (W.D. Wash. Sept. 19, 2017) (finding good cause existed to seal documents filed to support the non-dispositive class certification motion); *Stoba v. Saveology.com, LLC*, 2016 WL 1257501, at *2 (S.D. Cal. Mar. 31, 2016) (applying good cause standard to motion to unseal documents related to motion for class certification); *Coates v. Farmers Grp., Inc.*, 2016 WL 8223348, at *2 (N.D. Cal. Jan. 25, 2016) (applying good cause standard to seal documents in connection with plaintiff's motion for conditional collective action certification because motion "does not address the merits of Plaintiff's underlying claims").

The "good cause" standard applies here because Plaintiffs' Motion for Class Certification is not more than tangentially related to the merits. Importantly, "[t]he Court need not decide whether, in general, motions for class certification are more than tangentially related to the underlying cause of action. . . . Instead, the Court merely decides that the instant motion for class certification meets this standard." *Philips v. Ford Motor Co.*, 2016 WL 7374214, at *2 (N.D. Cal. Dec. 20, 2016) (internal citation omitted). Here, it does not.

Page 8   -   DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
              FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-0448

However, instead of analyzing the extent to which the Motion for Class Certification is tangentially related to Plaintiffs' claims, the Findings erroneously focus on the relationship between the redacted documents and Plaintiffs' Motion for Class Certification.  For example, the Findings state, "complaints regarding pay disparities and harassment can be significant in an attempt to demonstrate class status" (ECF No. 363 at 4).  But, none of the complaints at issue relate to pay disparities, and Plaintiffs have not brought a harassment cause of action, nor have they attempted to certify a harassment class.  Furthermore, in the Findings and Recommendation denying class certification, the Magistrate Judge noted that these same documents are insignificant.  ECF No. 310 at 53 ("Plaintiffs present approximately 30 complaints from the Starfish Survey and no declarations from opt-in plaintiffs.  Given the size of the putative class, this is insufficient to demonstrate a standard operating procedure of discrimination.").  Indeed, the Findings and Recommendation on Plaintiffs' Motion for Class Certification do not analyze the complaints—for good reason.  A handful of claimed harassment complaints tell the Court nothing about whether Plaintiffs can prove a common policy or practice of pay or promotion decisions sufficient to certify a class.

Because Plaintiffs' Motion for Class Certification was only tangentially related to the underlying merits of the case, the good cause standard applies to this motion to seal.

     **2.**      **The Findings & Recommendation Ignore Case Law Finding Third-Parties' Privacy Is A Compelling Reason To Redact Names.**

NIKE seeks to maintain the limited redactions of the documents at issue because they reveal the names of third-party (1) complainants alleging discrimination or harassment; (2) subjects of those complaints; and (3) witnesses to the alleged conduct.

Good cause exists where disclosure may subject "a party or person [to] annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1); *see also*

Page 9    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                      FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

*Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) ("For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted.").  Under the "compelling reasons" standard, the court must "conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret." *Ctr. for Auto Safety*, 809 F.3d at 1097 (citation omitted).

While the "good cause" standard should apply, even under the "compelling reasons" standard, courts have recognized the privacy interests of third parties by sealing personnel and other identifying information from the public record.  *See Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1137 (9th Cir. 2003) ("third-party medical and personnel records" should be redacted "to protect third-party privacy interests"); *Gnassi v. del Toro*, 2022 WL 3867376, at *3 (W.D. Wash. Aug. 30, 2022) ("Courts may seal records containing identifying information of third parties to protect their privacy interests."); *Myles v. County of San Diego*, 2017 WL 274829, at *2 (S.D. Cal. Jan. 19, 2017) ("[I]nformation about third parties' personal identifying information should not be disclosed to the public."); *Music Grp. Macao Com. Offshore Ltd. v. Foote*, 2015 WL 3993147, at *2 (N.D. Cal. June 30, 2015) ("Disclosure of [identifying] information would infringe the privacy rights of [third party individuals], which constitutes a compelling reason for sealing."); *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 2015 WL 984121, at *2 (N.D. Cal. Mar. 4 ,2015) ("invasion of third parties' privacy" constitutes a compelling reason to file under seal); *Gregory v. City of Vallejo*, 2014 WL 4187365, at *3 (E.D. Cal. Aug. 21, 2014) (identities of third parties should be sealed in internal investigation documents); *Spam Arrest, LLC v. Replacements, Ltd.*, 2013 WL 4478645, at *2 (W.D. Wash. Aug. 20, 2013) (finding compelling reasons justified redacting "email addresses [and] other

Page 10    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                  FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-0450

identifying information for Spam Arrest customers and . . . third parties"). "The privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation when deciding whether to seal certain materials." *SEC v. Ripple Labs, Inc.*, 2023 WL 3477552, at *6 (S.D.N.Y. May 16, 2023) (quoting *Mirlis v. Greer*, 952 F.3d 51, 61 (2d. Cir. 2020)). That concern is particularly important here where the party seeking to unseal the files is not the Plaintiffs (who agreed the names should be sealed), but the Media Intervenors. There can be no doubt that the sole purpose of the Media Intervenors' request is to shame and disparage third parties who will have no opportunity to defend their reputations.

Prevention of unfounded reputational damage is an overriding interest that supports redaction. *See Kamakana*, 447 F.3d at 1178-79; *see also Skurkis v. Montelongo*, 2016 WL 4719271, at *6 (N.D. Cal. Sept. 9, 2016) (granting motion to file complaint under seal where it contained information about allegedly criminal acts of defendants' agents and non-parties). "In general, 'compelling reasons' . . . exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *See Kamakana*, 447 F.3d at 1179 (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)); *see also Doe v. Va. Polytechnic Inst. & State Univ.*, 2022 WL 67324, at *4 (W.D. Va. Jan. 6, 2022) (third parties "did not voluntarily disclose their identities . . .; there is a risk of harm to them as non-parties by being known as persons who asserted that they were victims of sexual violence . . ."). "The privacy interests of non-parties – most of whom raised allegations that they were discriminated against or harassed while employed by [NIKE] – outweighs the public's interest in knowing the identity of the non-parties. Such information is private to the individuals involved, who have not sought to

place that private information in the public sphere." *Moussouris v. Microsoft Corp.*, 2018 WL 1159251, at *6 (W.D. Wash. Feb. 16, 2018) (citation omitted).

Here, the unsubstantiated complaints about and by Third Parties implicate similar, significant privacy interests. For example, Sun Declaration Exhibit 47 accuses a NIKE employee of being a bully and others of being "philanderers." Sun Declaration Exhibit 51 alleges that an individual made inappropriate comments about the dress and body of the anonymous complainant. Sun Declaration Exhibit 52 identifies two individuals who allegedly engaged in a sex act on NIKE's campus. Further, Goldstein Declaration Exhibit 9 includes complaints with the names of women who allegedly complained about gender discrimination and the subjects of those complaints. Paragraph 16 of the Goldstein Declaration lists the subjects of these complaints.

Publication of this confidential information (including uncorroborated information about individuals and their claimed intimate partners) would violate the privacy of several current and former NIKE employees who are not parties to this lawsuit. These privacy interests outweigh the public's right of access to court records, particularly given the lack of relevance of such information to the pay equity and promotion claims asserted in this lawsuit. The individuals whose employment information is at stake here are ordinary citizens who lead private lives. For complainants and persons of interest, a complaint process is supposed to be a safe space for individuals to voice concerns, not for salacious rumor-spreading. Unredacting complainants' names necessarily risks their privacy, which likely would have a chilling effect on confidential reporting in the workplace. The net result is that complainants would be worse off. NIKE takes considerable precautions to protect the confidentiality of individuals who raise concerns, as well as the confidentiality of subjects and witnesses in these matters. Because publication of the

Page 12    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-0452

Third Parties' names would subject them to public scrutiny while serving no countervailing public interest, there are compelling reasons to redact them.

Furthermore, courts have routinely found the protection of third party investigatory or disciplinary records to be a sufficiently compelling interest to justify withholding the information from the public.  *See, e.g.*, *Bakki v. Boeing Co.*, 2021 WL 962488, at *6 (W.D. Wash. Mar. 15, 2021)* (finding, under compelling reasons standard, that the "third party disciplinary document implicates significant privacy interests" and its publication "would violate the employee's privacy and expose him to public scrutiny while serving no countervailing public interest in transparency") (citation omitted); *Delaittre v. Berryhill*, 2017 WL 6310483, at *3-4 (W.D. Wash. Dec. 11, 2017)* (granting motion to seal documents, including disciplinary histories of third party employees).

Moreover, Sun Declaration Exhibit 46 contains investigatory and disciplinary documents regarding a third party, specifically an executive summary of the complaint about the individual and the disciplinary letter the individual received as a result of the investigation.  Thus, the names in Sun Declaration Exhibit 46 should remain redacted to avoid violating the employees' privacy interests and subjecting them to public scrutiny.  The contents of the investigatory documents are already unsealed; there is no reason the public needs to know the individuals' names because their "identities have minimal relevance to the court's decision on the" class certification motion.  *SEC*, 2023 WL 3477552, at *6.

The Findings state, without explanation, that the aforementioned compelling reasons are not "concrete examples" but rather "broad conclusory allegations of harm."  ECF No. 363 at 5.  That is incorrect, and as detailed above, construing the law in this fashion would functionally mean that a third party's privacy may not be protected.  Even if s/he submitted a declaration of

Page 13   -   DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

potential harm to reputation resulting from the public disclosure of intimate partners and the like, the declaration itself would be unsealed/unredacted under the Findings, and likewise would be considered to be speculative and not sufficiently specific. This position is untenable.

### 3.    The Findings & Recommendation Erroneously Rely On Inapposite Case Law.

The Finding's reliance on *Bracken v. Fla. League of Cities*, 2019 WL 1867921, at *4 (D. Or. Apr. 24, 2019)* and *Price v. Equilon Enterprises LLC*, 2012 WL 12846100, at *1 (W.D. Wash. Nov. 20, 2012)* is misplaced. ECF No. 363 at 5-6. In *Bracken*, the plaintiff requested to seal the case file, including the complaint, *in its entirety* "per reasons of privacy of all participants as the fruition of these matters set forth shall prevail." *Bracken*, 2019 WL 1867921, at *4*. The *Bracken* court "reviewed the Complaint for personal information that may be inappropriate for public disclosure and found no such information." *Id.* Here, by contrast, NIKE explained the harm that disclosure of the Third Parties' names would have on each of them and cited to a plethora of case law finding the same.

The Findings point to *Price v. Equilon Enterprises LLC* as an example of a case where a court permitted unsealing a third party's name. ECF No. 363 at 5-6. But in *Price*, the court declined to redact just one third party's name because *his* behavior, as attested to in the relevant document, went directly to the plaintiff's claim that her employer maintained a hostile work environment. *Price*, 2012 WL 12846100, at *1*. Indeed, the plaintiff specifically called out "experienc[ing] harassment and belittling comments" from that individual. *Id.* Notably, for the other third parties, the *Price* court found that simply redacting those individuals' names "is feasible." *Id.* Similarly, here NIKE only seeks to redact these individuals' *names* and none of these individuals is the focus of Plaintiffs' specific allegations in the operative complaint.

Page 14    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-0454

The Findings also state that the identities of the subjects of complaints "bear on [P]laintiffs' claims" and that the identities of complainants and witnesses go "to the merits and credibility of [P]laintiffs' claims." ECF No. 363 at 5-6. Untrue. While the *substance* of the redacted documents may go to Plaintiffs' claims, the *names* of Third Parties in unverified complaints do not. Furthermore, there is no showing that the names of Third Parties purportedly involved in harassment or discrimination (or who may have witnessed harassment or discrimination) were relevant to the Magistrate Judge's finding that Plaintiffs failed to meet their obligation under Rule 23.

### 4. <u>The Findings & Recommendation Ignore The Reasonableness Of NIKE's Limited Redactions, Which Are Supported By Case Law.</u>

The Findings fail to address case law advocating for the use of limited redactions for privacy purposes as NIKE does here. Indeed, one of the two cases upon which the Findings rely to explain the purported relevance of the Third Parties' identities to Plaintiffs' Motion for Class Certification actually supports NIKE's position. *See Price*, 2012 WL 12846100, at *1. "[C]ourts have recognized several concerns that may call for redaction of the materials or withholding of disclosure outright[,]" including privacy interests. *United States v. Bus. of Custer Battlefield Museum & Store Located at Interstate 90, Exit 514, S. of Billings, Mont.*, 658 F.3d 1188, 1195 n.5 (9th Cir. 2011). "Simply redacting the identifying information of third parties (*e.g.*, their names . . .) from these records and disclosing the remaining information … would not injure the third parties[.]" *Foltz*, 331 F.3d at 1137.[7] This is exactly what NIKE has done. It has provided the public with the information it needs to understand the Magistrate Judge's orders,

---

[7] The Findings also cite to this case in reliance on another proposition.

Page 15    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
             FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

while preventing the public scrutiny of Third Parties whose identities provide no added value to

the issues in the Motion for Class Certification.

## IV.    <u>**CONCLUSION**</u>

For the foregoing reasons, Nike respectfully asks the Court to set aside and reverse the

Findings & Recommendation dated October 11, 2023 (ECF No 363).

Dated:  October 25, 2023                 Respectfully submitted,


                                 /s/ Daniel Prince
_____

                                 LAURA E. ROSENBAUM, OSB No. 110061
                                 laura.rosenbaum@stoel.com
                                 STOEL RIVES LLP
                                 760 SW Ninth Avenue, Suite 300
                                 Portland, OR  97205
                                 Telephone:  (503) 224-3380
                                 Facsimile:  (503) 220-2480

                                 DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
                                 danielprince@paulhastings.com
                                 FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
                                 feliciadavis@paulhastings.com
                                 PAUL HASTINGS LLP
                                 515 South Flower Street, 25th Floor
                                 Los Angeles, CA  90071
                                 Telephone:  (213) 683-6000
                                 Facsimile:  (213) 627-0705

                                 Attorneys for Defendant NIKE, INC.

Page 16    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                    FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No. 3:18-cv-01477-JR |
| Plaintiffs, | FINDINGS AND RECOMMENDATION |
| v. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

RUSSO, Magistrate Judge:

    Named plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender brought this action seeking class action status alleging that defendant Nike systematically discriminates against them and other similarly situated women regarding salary and promotions. Several additional plaintiffs filed consents to join this action. During the pendency of plaintiffs' motion for class certification, defendant sought to seal certain portions of the documents filed in relation to the motion. At that time, a group of non-party media organizations, moved to intervene seeking access to sealed documents in the case. The Court granted the motion to seal in part. The Court also granted the motion to intervene for the limited purpose of challenging the parties'

Page 1 – FINDINGS AND RECOMMENDATION

stipulated redactions in regard to the briefing surrounding plaintiffs' motion for class certification. However, the Court denied intervenor's request for further briefing and to unseal or access documents produced under the protective order in place in the case. Nonetheless, the Court invited the media organizations to file a renewed motion for the purpose of opposing any remaining stipulated redactions following final resolution of the motion for class certification. The motion to certify has been denied and the media organizations now move to unredact the following documents:

• Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. <u>284-6</u>.

• Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. <u>284-7</u>.

• Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. <u>284-8</u>.

• Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. <u>285-1</u>.

• Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. <u>285-2</u>.

• Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification. ECF No. <u>288</u>.

• Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification. ECF No. <u>290-4</u>.[1]

---

[1] Defendant does not object to unredacting contents of the complaints in this document but maintains that redactions of the names of individuals listed as complainants, witnesses, and subjects of the complaints must remain. Plaintiffs support the motion to unseal.

Page 2 – FINDINGS AND RECOMMENDATION

For the reasons stated below, the motion is granted.

<div style="text-align:center">DISCUSSION</div>

The redactions at issue involve the names of those making workplace complaints along with the names of the witnesses and subjects of and to the complaints.

The press and the public have a "general right to inspect and copy public records and documents, including judicial records." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). There is a strong presumption in favor of access to court records that "can be overridden given sufficiently compelling reasons for doing so." Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1135 (9th Cir. 2003). However, with respect to judicial records filed in relation to non-dispositive motions, a more lenient standard applies when seeking to seal records. *In re Midland Nat'l Life Ins. Co. Annuity Sales Prac. Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012). In such situations, under Fed. R. Civ. P. 26(c), the party seeking to seal need only demonstrate "good cause." Id.

Thus, the applicable standard depends on the document's relationship to the merits of the plaintiff's claims. See Ctr. for Auto Safety v. Chrysler Grp., *LLC*, 809 F.3d 1092, 1096-99 (9th Cir. 2016) (the focus is on whether the material "at issue is more than tangentially related to the underlying cause of action"). Under the "compelling reasons" standard, the party seeking to seal or redact a judicial record bears the burden of showing that compelling reasons supported by specific factual findings outweigh the presumption of access and the public policies favoring disclosure. Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1178-79 (9th Cir. 2006). The "good cause" standard, in contrast, requires only a showing that "specific prejudice or harm will result." Phillips ex rel. Est. of Byrd v. Gen. Motors Corp., 307 F.3d 1206, 1210-11 (9th Cir. 2002).

Page 3 – FINDINGS AND RECOMMENDATION

The parties disagree over which standard applies with respect to the documents at issue. Defendant asserts the motion to certify is nondispositive and therefore the documents filed in support of the motion are merely subject to the good cause standard.  Certainly, the complaints regarding pay disparities and harassment can be significant in an attempt to demonstrate class status.  See, e.g., Kassman v. KPMG LLP, 416 F. Supp. 3d 252, 281 (S.D. N.Y. 2018) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)) (Plaintiff's may demonstrate commonality in a disparate treatment claim via evidence of a "systemwide pattern or practice" of pervasive discrimination against the class, such that the discrimination is "the regular rather than the unusual practice." ).

Plaintiffs use of the complaints, while insufficient to demonstrate a company-wide policy rather than individualized hiring manager decisions, formed a crucial part of their motion.  Public access to filed motions and their attachments does not merely depend on whether the motion is technically "dispositive," rather, access turns on whether the motion is more than tangentially related to the merits of a case.  Ctr. for Auto Safety, 809 F.3d at 1101 (9th Cir. 2016).  Here, such evidence may also go to the merits of the disparate impact claim itself.  Generally, courts within this circuit apply the compelling reasons standard to motions to seal documents relating to class certification. See Adtrader, Inc. v. Google LLC, 2020 WL 6391210, at *2 (N.D. Cal. Mar. 24, 2020) (collecting cases).  The evidence sought to be unsealed, as noted, relates to commonality and for purposes of plaintiffs' disparate impact claims, proof of commonality overlaps with the merits because both look at the reason for a particular employment decision.  See, e.g., Cooper v. Fed. Rsrv. Bank of Richmond, 467 U.S. 867, 876 (1984).  Accordingly, defendant must show compelling reasons to continue redaction of the names of those making workplace complaints along with the names of the witnesses and subjects of and to the complaints.

Page 4 – FINDINGS AND RECOMMENDATION

Defendant asserts that the privacy interests of third parties in the complaints, especially those made by anonymous complainants rebuts any presumption of public access. Defendant maintains unredacting the names would have a chilling effect on confidential reporting in the workplace and cause reputational damage to the subjects of the complaints especially if the complaints have been unsubstantiated. In addition, defendant asserts revealing the names of witnesses identified in the complaints may expose those witnesses to unwanted attention or ridicule. Finally, defendant asserts the public will reap no additional benefit from revealing the names beyond what they already may glean from the substance of the previously revealed documents.

Defendant largely relies on generalized assertions of purported compelling reasons to redact the names and only once specifically refers to a complaint in which the complainant is not identified. However, the proponent of redactions must provide concrete examples rather than broad conclusory allegations of harm. Foltz, 331 F.3d at 1130–31.

The names included in the documents involve Nike employees and actions that plaintiffs allege demonstrate gender discrimination and harassment by Nike itself. The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records. Kamakana, 447 F.3d at 1179. In addition, the desire for privacy is not a compelling reason sufficient to outweigh the public's interest in disclosure. Bracken v. Fla. League of Cities, 2019 WL 1867921, at *4 (D. Or. Apr. 24, 2019).

To the extent the individuals identified in the complaints are third parties, the public has an interest and right to access the documents that bear on plaintiffs' claims even if those documents identify non-parties to the litigation. Price v. Equilon Enterprises LLC, 2012 WL 12846100, at *1

Page 5 – FINDINGS AND RECOMMENDATION

ER-0461

(W.D. Wash. Nov. 20, 2012).  The identity of Nike employees engaged in the very behavior plaintiffs assert resulted in discrimination certainly bear on plaintiffs' claims.  The identity of complainants and witnesses similarly relate to issues going to the merits and credibility of plaintiffs' claims.  Accordingly, the intervenors' motion to unseal judicial records is granted.

<u>RECOMMENDATION</u>

The Media Intervenors' renewed motion to unseal judicial records (ECF <u>343</u>) should be granted and the following exhibits should be unredacted: Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>284-6</u>); Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>284-7</u>); Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. <u>284-8</u>); Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>285-1</u>); Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>285-2</u>); Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>288</u>); and Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>290-4</u>).

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's

right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 11th day of October, 2023.


_____
/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>REPLY IN SUPPORT OF RENEWED MOTION OF NON-PARTY MEDIA ORGANIZATIONS INSIDER, INC. *d/b/a BUSINESS INSIDER*, ADVANCE LOCAL MEDIA LLC *d/b/a OREGONIAN MEDIA GROUP*, AND AMERICAN CITY BUSINESS JOURNALS, INC. *d/b/a PORTLAND BUSINESS JOURNAL* TO UNSEAL JUDICIAL RECORDS |

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page i -**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I.    INTRODUCTION ................................................................................................... 1

II.   ARGUMENT ........................................................................................................... 2

      A.   Nike Must Demonstrate "Compelling Reasons" to Seal Judicial Records Filed in
           Support of Class Certification. ...................................................................... 2

      B.   Nike Bears the Burden to Show Compelling Reasons to Justify Continued
           Sealing. .......................................................................................................... 3

      C.   Nike's Claims of Potential Embarrassment and Reputational Harm Are
           Insufficient to Justify Sealing Under Either the "Compelling Reasons" or "Good
           Cause" Standard. ........................................................................................... 6

      D.   Nike's Arguments About Media Intervenors' Purported Motives Are Irrelevant. ........... 9

III.  CONCLUSION ...................................................................................................... 11

## TABLE OF AUTHORITIES

**Cases**

*Adtrader, Inc. v. Google LLC*,
No. 17-CV-07082-BLF, 2020 WL 6391210 (N.D. Cal. Mar. 24, 2020) ...................................3

*Bracken v. Fla. League of Cities*,
No. 19-CV-00602-CL, 2019 WL 1867921 (D. Or. Apr. 24, 2019) ............................................7

*Buchanan v. Homeservices Lending LLC*,
No. 11-CV-0922, 2012 WL 5505775 (S.D. Cal. Nov. 13, 2012) ................................................2

*CBS, Inc. v. Democratic Nat'l Comm.*,
412 U.S. 94 (1973) .................................................................................................................10

*Ctr. for Auto Safety v. Chrysler Grp., LLC*,
809 F.3d 1092 (9th Cir. 2016) .......................................................................................1, 2, 3

*Davis v. Soc. Serv. Coordinators, Inc.*,
No. 10-CV-02372-SKO, 2012 WL 2376217 (E.D. Cal. June 22, 2012) ...................................2

*Delplanche v. Window Prods., Inc.*,
No. 16-CV-02319-AA, 2021 WL 1425320 (D. Or. Apr. 15, 2021),
*appeal dismissed*, No. 21-35361, 2021 WL 5237292 (9th Cir. July 19, 2021) ...........................7

*Doe v. Pub. Citizen*,
749 F.3d 246 (4th Cir. 2014) .................................................................................................10

*Dugan v. Lloyds TSB Bank, PLC*,
No. 12-CV-02549-WHA, 2013 WL 1435223 (N.D. Cal. Apr. 9, 2013) ...................................2

*F.T.C. v. AbbVie Prods. LLC*,
713 F.3d 54 (11th Cir. 2013) ...................................................................................................4

*Fodera v. Equinox Holdings, Inc.*,
341 F.R.D. 616 (N.D. Cal. 2022) ..............................................................................................3

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
331 F.3d 1122 (9th Cir. 2003) ...........................................................................................4, 5

*In re Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig.*,
101 F.R.D. 34 (C.D. Cal. 1984) ..............................................................................................10

*In re McClatchy Newspapers, Inc.*,
288 F.3d 369 (9th Cir. 2002) ..................................................................................................11

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS
- Page iii -**

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   No. 09-CV-01967-CW, 2012 WL 5395039 (N.D. Cal. Nov. 5, 2012) ......................................2

*In re Roman Cath. Archbishop of Portland*,
   661 F.3d 417 (9th Cir. 2011) ...........................................................................................8

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11-CV-02509-LHK, 2013 WL 163779 (N.D. Cal. Jan. 15, 2013) ...................................2

*Johnson v. Coos Cnty.*,
   No. 19-CV-01883-AA, 2023 WL 3994287 (D. Or. June 14, 2023) .......................................7

*Kamakana v. City & Cnty. of Honolulu*,
   447 F.3d 1172 (9th Cir. 2006) ...............................................................................4, 5, 6, 7

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974) ......................................................................................................10

*Oliner v. Kontrabecki*,
   745 F.3d 1024 (9th Cir. 2014) .........................................................................................7

*Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*,
   307 F.3d 1206 (9th Cir. 2002) .........................................................................................4

*Polaris Innovations Ltd. v. Kingston Tech. Co.*,
   No. 16-CV-00300-CJC, 2017 WL 2806897 (C.D. Cal. Mar. 30, 2017) ................................5

*Price v. Equilon Enters. LLC*,
   No. 11-CV-1553-JCC, 2012 WL 12846100 (W.D. Wash. Nov. 20, 2012) .............................8

*Reflex Media, Inc. v. Doe No. 1*,
   No. 18-CV-02423-BNW, 2022 WL 2985938 (D. Nev. July 28, 2022) ..................................8

*Rich v. Hewlett-Packard Co.*,
   No. 06-CV-03361-JF, 2009 WL 2168688 (N.D. Cal. July 20, 2009) ...................................2

*Romero v. Cnty. of Santa Clara*,
   No. 11-CV-04812-WHO, 2014 WL 12641990 (N.D. Cal. June 17, 2014) .............................8

*Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*,
   No. 19-CV-1667-LAB, 2021 WL 794271 (S.D. Cal. Mar. 1, 2021) .....................................8

*Skky, LLC v. Facebook, Inc.*,
   191 F. Supp. 3d 977 (D. Minn. 2016) ..............................................................................5

*United States v. Amodeo*,
   71 F.3d 1044 (2d Cir. 1995) ......................................................................................9, 10

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page iv -**

ER-0467

*United States v. Mayers*,
    No. 16-CR-0258-JCC, 2017 WL 2215805 (W.D. Wash. May 19, 2017) ..................................8

*Vietnam Veterans of Am. v. C.I.A.*,
    No. 09-CV-0037-CW, 2012 WL 1094360 (N.D. Cal. Mar. 29, 2012) ....................................2

*Waldrup v. Countrywide Fin. Corp.*,
    No. 13-CV-08833-CAS, 2018 WL 4586188 (C.D. Cal. Sept. 17, 2018)................................10

*Whitecryption Corp. v. Arxan Techs., Inc.*,
    No. 15-CV-00754-WHO, 2016 WL 7852471 (N.D. Cal. Mar. 9, 2016) ..................................5

Non-party media organizations Insider, Inc. *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal* (collectively, the "Media Intervenors") respectfully submit this reply in support of their renewed motion seeking a court order requiring the parties to file unredacted versions of seven judicial records filed in support of Plaintiffs' Motion for Class Certification.

## I.    INTRODUCTION

Nike's opposition to Media Intervenors' Renewed Motion to Unseal seeks to invert the presumptive right of access and misapplies the applicable standard for sealing judicial records filed in connection with a motion for class certification in the Ninth Circuit.  Media Intervenors' Renewed Motion should be granted for the following reasons.  *First*, Nike must meet the stringent "compelling reasons" standard to seal the records at issue.  All the cases cited by Nike in support of the less stringent "good cause" standard pre-date the Ninth Circuit's 2016 decision in *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016), which clarified the sealing standard for class certification records.  *Second*, while Nike would have this Court continue to redact the names of all employees identified in workplace misconduct complaints, concerns about potential embarrassment or reputational harm are insufficient to meet the "compelling reasons" standard, especially given the strong public interest in this proceeding, which will determine whether one of the country's most prominent public companies is properly handling claims of sexual harassment and misconduct.  *Third*, Nike's generalized assertions and conclusory claims of potential harm fail to meet its burden to maintain secrecy.  *Finally*, Nike's attacks on what it claims are Media Intervenors' motives for seeking to unseal judicial records in this case are improper and irrelevant; Nike's desire to control news media coverage of this matter is not determinative of the public's right of access and its arguments to that end must be rejected.

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 1 -**

## II.   ARGUMENT

### A.  Nike Must Demonstrate "Compelling Reasons" to Seal Judicial Records Filed in Support of Class Certification.

After filing thousands of pages of judicial records under seal pursuant only to a stipulated protective order, Nike continues to resist meeting the Ninth Circuit's "compelling reasons" standard to justify sealing of judicial records submitted in support of class certification.  Instead, Nike claims that it need only demonstrate "good cause"—a standard governing the exchange of materials in discovery, not the sealing of judicial records filed in connection with a dispositive motion.  Opp'n 5.  However, *every* case Nike cites in support of its position was issued *before* the Ninth Circuit's decision in *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016), which clarified application of the "compelling reasons" standard in the class certification context.  Consequently, Nike's survey of the caselaw, Opp'n 6–7,[1] elides the Ninth Circuit's unambiguous—and, here, dispositive—direction that where motions and accompanying materials are "more than tangentially related to the merits of a case"—including, specifically, at the class certification stage—a party must demonstrate "compelling reasons," rather than merely "good cause," to seal them from public view.  *Ctr. for Auto Safety*, 809 F.3d at 1101 (reversing district court order applying "good cause" standard to deny motion to unseal records filed in connection with motion for preliminary injunction to require defendant vehicle manufacturer to

---

[1]   Citing *Dugan v. Lloyds TSB Bank, PLC*, No. 12-CV-02549-WHA, 2013 WL 1435223, at *1 (N.D. Cal. Apr. 9, 2013); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2013 WL 163779, at *2 n.1 (N.D. Cal. Jan. 15, 2013); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. 09-CV-01967-CW, 2012 WL 5395039, at *1–2 (N.D. Cal. Nov. 5, 2012); *Vietnam Veterans of Am. v. C.I.A.*, No. 09-CV-0037-CW, 2012 WL 1094360, at *1–2 (N.D. Cal. Mar. 29, 2012); *Buchanan v. Homeservices Lending LLC*, No. 11-CV-0922, 2012 WL 5505775, at *2 (S.D. Cal. Nov. 13, 2012); *Davis v. Soc. Serv. Coordinators, Inc.*, No. 10-CV-02372-SKO, 2012 WL 2376217, at *1 (E.D. Cal. June 22, 2012); *Rich v. Hewlett-Packard Co.*, No. 06-CV-03361-JF, 2009 WL 2168688, at *1 (N.D. Cal. July 20, 2009).

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS
- Page 2 -**

notify proposed class of alleged risks presented by its vehicles); *id*. ("Consistent with our precedent, we make clear that public access to filed motions and their attachments does not merely depend on whether the motion is technically 'dispositive.'").  More recent decisions confirm that "[c]ourts within this circuit apply the compelling reasons standard to motions to seal documents relating to class certification." *Fodera v. Equinox Holdings, Inc.*, 341 F.R.D. 616, 634 (N.D. Cal. 2022); *see Adtrader, Inc. v. Google LLC*, No. 17-CV-07082-BLF, 2020 WL 6391210, at *2 (N.D. Cal. Mar. 24, 2020) (collecting cases).  Simply put, the law of this Circuit is clear: Nike must satisfy that more stringent standard.

Plaintiffs' Motion for Class Certification was plainly "more than tangentially related to the merits of [the] case." *Ctr. for Auto Safety*, 809 F.3d at 1101.  As noted in Media Intervenors' Renewed Motion, the Findings and Recommendation adopted by this Court on class certification specifically addressed the merits of Plaintiffs' underlying claim.  ECF No. 310 at 44–50 (analyzing Plaintiffs' disparate impact claims), 50–53 (analyzing Plaintiffs' disparate treatment claims), 53–54 (analyzing Plaintiffs' Oregon Equal Pay Act claim), 54–55 (analyzing the typicality and adequacy requirements of Rule 23).  This analysis was based on an assessment of voluminous evidence submitted by both parties.  The Court's decision whether to certify a class is critical to the litigation and it necessarily follows that the public in general (including potential class members) should have access to filings relating to that certification decision.  Accordingly, Nike must demonstrate "compelling reasons" to maintain under seal key information from judicial records Plaintiffs submitted in support of their class certification motion.

### B.  Nike Bears the Burden to Show Compelling Reasons to Justify Continued Sealing.

Nike improperly attempts to shift its burden to Media Intervenors, Opp'n 11, but the burden to show compelling reasons that support sealing remains entirely with Nike.  In this case, other than an agreement of the parties—which has now ended—no specific justification was put forward

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 3 -**

by either party for redacting the names of Nike complainants, witnesses, and accused harassers.[2]

And, now, absent that agreement, Nike offers no further justification to continue sealing those names other than the unsupported claim that one or more persons involved might be embarrassed by disclosure. However, as detailed below, embarrassment is not good cause—let alone a compelling reason—for entry of a sealing order or closure order of any kind. *See infra* Section II.C. And, fundamentally, Nike's arguments fall far short of the showing necessary to meet its burden under Ninth Circuit law.

To fulfill the demanding "compelling reasons" standard, a party seeking sealing must show compelling reasons supported by specific factual findings that outweigh the historic presumption and public interest in favor of openness. *Kamakana*, 447 F.3d at 1178–79. This showing is particularized to ***each*** document or portion of a document the party seeks to seal. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1138–39 (9th Cir. 2003). The burden remains on Nike even under the "good cause" standard, which requires the party seeking to shield documents (or portions of documents) to show that specific prejudice or harm will result from public disclosure. *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 & n.1 (9th Cir. 2002). And, again, that burden must be met with respect to "each particular document [the party] seeks to protect." *Foltz*, 331 F.3d at 1130–31. This showing must be made through "specific

---

[2]      Nike argues that the redacted information in filings in support of Plaintiffs' Motion for Class Certification is not of sufficient importance because "these peoples' identities did not form the bases or explanations for the court's decision." Opp'n 12 (citation and internal quotation marks omitted). In essence, Nike argues for a presumptive right of ***closure*** until a court determines that information contained in court filings was critical or necessary to its ultimate decision. That is not the law. The Ninth Circuit has been explicit: the presumptive right of access "applies fully" to judicial records—not just those parts of a court record later deemed relevant to the issues before the court. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); *see also F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 64 (11th Cir. 2013) ("This is a simple rule to apply and does not involve locating the [judicial record] on a continuum by determining the actual role the document played—by, for instance, counting the number of times the district court cited it[.]").

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 4 -**

demonstrations of fact, supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations of potential harm." *Id.* (citation omitted).

Here, Nike has not identified any particularized harm, supported by any facts or evidence, that would result from the disclosure of the names of Nike employees involved in its internal workplace misconduct investigations. Moreover, even if Nike could identify some non-speculative, particularized harm (which it has not done), it would be outweighed by the substantial public interest in this case. Besides broad claims of potential embarrassment and reputational harm, Nike offers no factual support whatsoever for its contention that the court records at issue must continue to be redacted. To the contrary, Nike relies exclusively on broad generalizations about the value of confidentiality and unfounded speculation about the impact of disclosure, Opp'n 9–11. Indeed, it does not offer *any* evidence to show that unsealing any particular employee's name will cause any *specific* harm.

Nike's "generalized rationales" and vague speculation are not an adequate substitute for the factual demonstration of specific harm required to seal court records. *Whitecryption Corp. v. Arxan Techs., Inc.*, No. 15-CV-00754-WHO, 2016 WL 7852471, at *2 (N.D. Cal. Mar. 9, 2016). "[A]ssertions about possible harm" that are so vague "that there is no meaningful way to realistically gauge how"—or even whether—"disclosure would" actually be harmful are insufficient to seal court records. *Polaris Innovations Ltd. v. Kingston Tech. Co.*, No. 16-CV-00300-CJC, 2017 WL 2806897, at *6 (C.D. Cal. Mar. 30, 2017). And courts have repeatedly rejected attempts to seal court records based on such assertions. *See, e.g.*, *Skky, LLC v. Facebook, Inc.*, 191 F. Supp. 3d 977, 980–81 (D. Minn. 2016) ("If Defendants have a factual basis for requiring this information to be sealed, it is Defendants' duty to present that basis; the Court will not speculate based on broad, unsupported attorney advocacy."); *Kamakana*, 447 F.3d at 1182

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 5 -**

(refusing to seal court records based on "conclusory statements" that the documents "are confidential and that, in general, their production would . . . hinder [a police department's] future operations with other agencies, endanger informants' lives, and cast [police] officers in a false light").

### C. Nike's Claims of Potential Embarrassment and Reputational Harm Are Insufficient to Justify Sealing Under Either the "Compelling Reasons" or "Good Cause" Standard.

Nike's primary argument for continued sealing is that revealing the names of Nike employees who complained of, witnessed, or were accused of workplace misconduct would embarrass those unnamed individuals and potentially harm their reputations.  Opp'n 8.  Specifically—and ignoring all other considerations, including the public's interest in access—Nike argues that there is good cause (and even compelling reason) to continue to redact the records at issue because unsealing would result in "embarrassing and shaming" people "solely to appeal to [Media Intervenors'] (or the public's) prurient interests."  *Id.*  Nike's arguments must fail.

Whereas Federal Rule of Civil Procedure 26(c) authorizes courts to issue protective orders to shield "a party or person from annoyance, embarrassment, oppression, or undue burden or expense" in the discovery context, "[d]ifferent interests are at stake with the right of access [to court records] than with Rule 26(c)."  *Kamakana*, 447 F.3d at 1180.  Indeed, even when a party has identified "compelling reasons," a court must then "conscientiously balance[] the competing interests of the public and the party who seeks to keep certain judicial records secret."  *Id.* at 1179 (citations and internal quotation marks omitted).  In general, compelling reasons that could outweigh the public's interest in access and justify sealing court records are rare, found only when the information sought to be sealed could be used for some palpably improper purpose.  *Id.*

Here, in contrast, Nike's conclusory argument casts a single, narrow factor in the good cause analysis—whether "specific prejudice or harm will result" if information is unsealed, Opp'n

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 6 -**

6—as a wholesale exception for anything that might be embarrassing or unfavorable. Nike's broad claims of potential embarrassment are insufficient under either the "compelling reasons" or the "good cause" standard. Federal courts consistently find assertions that information might be embarrassing, incriminating, or reputation-damaging insufficient to overcome the presumption of access. *Kamakana*, 447 F.3d at 1179 (applying compelling reasons standard and holding "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records"); *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026 (9th Cir. 2014) (applying compelling reasons standard and holding "to avoid embarrassment or annoyance to [debtor] and to prevent an undue burden on his professional endeavors [] are not 'compelling'"); *Delplanche v. Window Prods., Inc.*, No. 16-CV-02319-AA, 2021 WL 1425320, at *2 (D. Or. Apr. 15, 2021), *appeal dismissed*, No. 21-35361, 2021 WL 5237292 (9th Cir. July 19, 2021) ("potential employers' knowledge of . . . lawsuit" which "has caused them to ask difficult questions during interviews and made it hard for [litigant] to find work does not meet the 'compelling reasons' standard"); *Bracken v. Fla. League of Cities*, No. 19-CV-00602-CL, 2019 WL 1867921, at *4 (D. Or. Apr. 24, 2019) ("The desire for privacy is not a compelling reason sufficient to outweigh the public's interest in disclosure."); *Johnson v. Coos Cnty.*, No. 19-CV-01883-AA, 2023 WL 3994287, at *3 (D. Or. June 14, 2023) (applying "good cause" standard and finding that while litigants had "a privacy interest at stake and the disclosure of the challenged exhibits may be embarrassing to them, these considerations are substantially outweighed by the remaining factors," including the public interest in disclosure).

Nike argues that some of the redacted witness names were provided in a confidential process (although no evidence has been proffered to support that claim) and that third parties should not be subjected to potential embarrassment or reputational harm, Opp'n 9. But the

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 7 -**

applicable standard applies equally to party litigants and non-parties. The Ninth Circuit has explicitly rejected the suggestion that it "develop a new rule governing the disclosure of discovery material containing confidential information about third parties." *In re Roman Cath. Archbishop of Portland*, 661 F.3d 417, 425–26 (9th Cir. 2011); *see also Price v. Equilon Enters. LLC*, No. 11-CV-1553-JCC, 2012 WL 12846100, at *1 (W.D. Wash. Nov. 20, 2012) (finding even under the good cause standard that the public has an interest and right to know the identity of the non-party whose actions go directly to plaintiffs' claims). Indeed, this discrimination lawsuit is against Nike, which acts through its employees, including those identified in the records at issue.[3]

In addition to offering only insufficient, conclusory arguments to support closure, Nike also radically underplays the public interest in the identities of key witnesses. Nike acknowledges "[t]he public's claimed interest in learning who may have been involved in purported wrongdoing," but argues that interest is "outweighed" by the "intrusion" on individuals' "privacy rights." Opp'n 3. The public interest here goes well beyond that. Despite Nike's inverted understanding of the presumption, the information it contends should remain sealed—*i.e.*, the identities of Nike employees who alleged serious misconduct occurred at the company or who were accused of serious misconduct—is relevant to the adjudication of the substantive rights of the parties. Here, the Court reviewed the redacted information to reach a determination on

---

[3]    None of the cases Nike cites is actually supportive of its argument for sealing individual names to avoid potential "harassment," Opp'n 10, as they either involved the incorrect sealing standard, *Reflex Media, Inc. v. Doe No. 1*, No. 18-CV-02423-BNW, 2022 WL 2985938, at *1 (D. Nev. July 28, 2022) (applying the "good cause" standard); criminal allegations or proceedings, *Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*, No. 19-CV-1667-LAB, 2021 WL 794271, at *3 (S.D. Cal. Mar. 1, 2021) (the sealing of "non-parties' personal identifying information . . . [b]ecause that information connects the individuals to a criminal investigation of a high-profile issue"), *United States v. Mayers*, No. 16-CR-0258-JCC, 2017 WL 2215805, at *2 (W.D. Wash. May 19, 2017); or the denial of a motion to seal, *Romero v. Cnty. of Santa Clara*, No. 11-CV-04812-WHO, 2014 WL 12641990, at *2–3 (N.D. Cal. June 17, 2014).

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 8 -**

Plaintiffs' Motion for Class Certification and the public is entitled to know the factual basis for this Court's legal determinations. Specifically, the public is entitled to know what evidence the Court deemed credible, what evidence carried weight, and what evidence did not.

Media Intervenors seek access to the redacted information in furtherance of reporting on this important litigation. This legitimate purpose does not promote public scandal, but instead fosters public understanding of these proceedings. While Nike may prefer to litigate in private— as its extensive sealed filings before intervention make clear—the public interest in access to the sealed information is especially weighty here and more than enough to overcome any interest in secrecy. On balance, Nike's claimed interest in precluding the public disclosure of Nike employees who claimed or were accused of misconduct does not overcome the public's right of access to the parties' class certification briefing in this case.

### D.  Nike's Arguments About Media Intervenors' Purported Motives Are Irrelevant.

Nike chastises Media Intervenors for supposedly "attempt[ing] to create a media circus," Opp'n 1, and seeking access only to "satisfy [their] (and Plaintiffs') 'morbid craving for that which is sensational and impure,'" *id*. at 3 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1050–51 (2d Cir. 1995)). In addition to being baseless, Nike's ad hominem attack on Media Intervenors' purported motives ignores the fact that, as even the decision Nike relies upon underscores, neither Media Intervenors' nor Plaintiffs' motives are relevant:

> Although the presumption of access is based on the need for the public monitoring of federal courts, those who seek access to particular information may want it for entirely different reasons. However, *we believe motive generally to be irrelevant to defining the weight accorded the presumption of access.* It is true that journalists may seek access to judicial documents for reasons unrelated to the monitoring of Article III functions. Nevertheless, *assessing the motives of journalists risks self-serving judicial decisions tipping in favor of secrecy.* Where access is for the purpose of reporting news, moreover, those interested in

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS
- Page 9 -**

> monitoring the courts may well learn of, and use, the information
> whatever the motive of the reporting journalist.

*Amodeo*, 71 F.3d at 1050 (emphasis supplied); *see also Waldrup v. Countrywide Fin. Corp.*, No. 13-CV-08833-CAS, 2018 WL 4586188, at *3 (C.D. Cal. Sept. 17, 2018).

Courts have dismissed such motive-based arguments for good reason: it is not Nike's (or this Court's) role to impose its views as to the editorial prerogatives of press movants. *See CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 124–25 (1973) ("For better or worse, editing is what editors are for; and editing is selection and choice of material."); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper . . . and treatment of public issues . . . —whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.").  Consistent with the First Amendment and common law access principles set forth in Media Intervenors' Renewed Motion to Unseal, the decision of how to report on the matters Nike seeks to withhold from the public must be made by editors, and not by courts (or Nike).

Nike's hyperbolic criticism of supposedly "'sensational and impure' headlines" it claims Media Intervenors "have used to grab attention for more than four years," Opp'n 8, reveals its real goal is to preserve the company's ability to "spin" future news coverage of this litigation.  To the extent Nike is suggesting that court records may be sealed to avoid negative press coverage, it is wrong: "It is not the duty of federal courts to accommodate the public relations interests of litigants."  *In re Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig.*, 101 F.R.D. 34, 40 (C.D. Cal. 1984); *see, e.g.*, *Doe v. Pub. Citizen*, 749 F.3d 246, 269 (4th Cir. 2014) ("[T]he public and press enjoy a presumptive right of access to civil proceedings and documents filed therein, notwithstanding the negative publicity those documents may shower upon a

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 10 -**

company."); *In re McClatchy Newspapers, Inc.*, 288 F.3d 369, 374 (9th Cir. 2002) (rejecting argument that court records could be sealed based on concerns that news media would publish accusations "without also publishing the skepticism of [the accuser's] credibility").  Needless to say, Nike's public relations concerns do not and cannot justify the continuing infringement of Media Intervenors' (and the public's) rights to access judicial records filed in this case.

## III.   CONCLUSION

Media Intervenors respectfully request that the redacted information filed in connection with Plaintiffs' Motion for Class Certification be made public.  Access will promote public understanding of the events at issue in this important litigation, and the presumptive right of access to judicial records in this case outweighs any interest in secrecy.

<div style="margin-left: 40%;">

/s/Lisa Zycherman

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

</div>

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 11 -**

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR  97205
Telephone:  (503) 294-9642
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NIKE, INC., an Oregon Corporation, <br><br> Defendant. | Case No.:  3:18-cv-01477-JR <br><br> DEFENDANT NIKE, INC.'S OPPOSITION TO RENEWED MOTION OF NON-PARTY MEDIA ORGANIZATIONS INSIDER INC. *d/b/a BUSINESS INSIDER,* ADVANCE LOCAL MEDIA LLC *d/b/a OREGONIAN MEDIA GROUP*, AND AMERICAN CITY BUSINESS JOURNALS, INC. *d/b/a PORTLAND BUSINESS JOURNAL* TO UNSEAL JUDICIAL RECORDS |

DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
INTERVENORS' MOTION TO UNSEAL JUDICIAL RECORDS

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ........................................................................... 1

II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ............................... 3

       A.    The Court Denied Media Intervenors' Unfettered Access To Sealed
             Records. ........................................................................... 3

       B.    The Court Denied The Plaintiffs' Motion For Class Certification. ...................... 4

       C.    Media Intervenors Seek To Unseal The Names Of Individuals Connected
             To Unsubstantiated Harassment Allegations. ........................................ 5

III.   ARGUMENT .............................................................................. 5

       A.    The "Good Cause" Standard Applies Here. ........................................... 5

       B.    Even If A Higher Standard Is Applied, There Are "Compelling Reasons"
             To Redact The Names Of Complainants, Witnesses, And Subjects. ..................... 8

       C.    The Denial Of Class Certification Does Not Heighten The Public's Right
             To Access The Names Of Complainants, Witnesses, And Subjects. ................. 12

       D.    Plaintiffs' Position On Disclosure Is Legally Irrelevant. ...................... 13

IV.    CONCLUSION .......................................................................... 13

ER-0481

## TABLE OF AUTHORITIES

Page(s)

CASES

*Accenture LLP v. Sidhu,*
2011 WL 6057597 (N.D. Cal. Dec. 6, 2011) ............................................................9

*Apple Inc. v. Samsung Elecs. Co., Ltd.,*
727 F.3d 1214 (Fed. Cir. 2013) ............................................................................11

*Buchanan v. Homeservices Lending LLC,*
2012 WL 5505775 (S.D. Cal. Nov. 13, 2012) .......................................................7

*Ctr. for Auto Safety v. Chrysler Grp., LLC,*
809 F.3d 1092 (9th Cir. 2016) .......................................................................6, 11

*Davis v. Soc. Serv. Coordinators, Inc.,*
2012 WL 2376217 (E.D. Cal. June 22, 2012) .......................................................7

*Dugan v. Lloyds TSB Bank, PLC,*
2013 WL 1435223 (N.D. Cal. Apr. 9, 2013) .........................................................6

*Fodera v. Equinox Holdings, Inc.,*
341 F.R.D. 616 (N.D. Cal. 2022) ........................................................................12

*Foltz v. State Farm Mut. Auto. Ins. Co.,*
331 F.3d 1125 (9th Cir. 2003) ........................................................................5, 6

*Forbes Media LLC v. United States,*
61 F.4th 1072 (9th Cir. 2023) ...........................................................................11

*Hounshel v. Battelle Energy All., LLC,*
2013 WL 5375833 (D. Idaho Sept. 24, 2013) ...................................................8, 9

*In re: High-Tech Emp. Antitrust Litig.,*
2013 WL 163779 (N.D. Cal. Jan. 15, 2013) .........................................................6

*In Re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.,*
686 F.3d 1115 (9th Cir. 2012) .............................................................................6

*In re NCAA Student-Athlete Name and Likeness Licensing Litig.,*
2012 WL 5395039 (N.D. Cal. Nov. 5, 2012) ........................................................7

*Kamakana v. City & Cnty. of Honolulu,*
447 F.3d 1172 (9th Cir. 2006) .................................................................5, 6, 9, 11

Page ii    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
INTERVENORS' MOTION TO UNSEAL JUDICIAL RECORDS

ER-0482

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*,
  998 F.2d 157 (3d Cir. 1993)................................................................................13

*Maldonado v. Apple, Inc.*,
  333 F.R.D. 175 (N.D. Cal. 2019)...................................................................12, 13

*Nixon v. Warner Commc'ns, Inc.*,
  435 U.S. 589 (1978)......................................................................................6, 9

*Oliner v. Kontrabecki*,
  745 F.3d 1024 (9th Cir. 2014) .............................................................................12

*Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*,
  307 F.3d 1206 (9th Cir. 2002) ...............................................................................6

*Ramirez v. GEO Grp.*,
  2019 WL 6782920 (S.D. Cal. Dec. 11, 2019)................................................2, 7

*Reflex Media, Inc. v. Doe No. 1*,
  2022 WL 2985938 (D. Nev. July 28, 2022) ........................................................10

*Rich v. Hewlett-Packard Co.*,
  2009 WL 2168688 (N.D. Cal. July 20, 2009).......................................................7

*Romero v. County of Santa Clara*,
  2014 WL 12641990 (N.D. Cal. June 17, 2014).................................................10

*Romero v. Drummond Co.*,
  480 F.3d 1234 (11th Cir. 2007) ...........................................................................13

*Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*,
  2021 WL 794271 (S.D. Cal. Mar. 1, 2021), *aff'd*,
  2022 WL 706941 (9th Cir. Mar. 9, 2022)............................................................10

*Skurkis v. Montelongo*,
  2016 WL 4719271 (N.D. Cal. Sept. 9, 2016) .......................................................9

*United States v. Amodeo*,
  71 F.3d 1044 (2d Cir. 1995).............................................................................3, 8

*United States v. Mayers*,
  2017 WL 2215805 (W.D. Wash. May 19, 2017)..................................................10

*Vietnam Veterans of Am. v. C.I.A.*,
  2012 WL 1094360 (N.D. Cal. Mar. 29, 2012)......................................................7

STATUTES

Oregon Equal Pay Act ..............................................................................................4

Page iii    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
                 INTERVENORS' MOTION TO UNSEAL JUDICIAL RECORDS

ER-0483

**RULES**

FED. R. CIV. P. 23 ................................................................................................ *passim*

FED. R. CIV. P. 26(c)........................................................................................................7

<div align="center">MEMORANDUM OF POINTS AND AUTHORITIES</div>

## I.    INTRODUCTION

By their renewed motion, the Media Intervenors seek to reveal the identities of complainants, witnesses, and alleged victims of claimed wrongdoing based on the collection of unsubstantiated, uncorroborated, and unofficial "complaints" that were circulated to a small group of individuals on NIKE's campus in or about December 2017.[1]  The allegations made in these documents—whether true or not—have been published by various media outlets and documents filed in the class certification briefing.  The sole issue here is whether the privacy interests of the purported victims, witnesses, and alleged wrongdoers outweighs any purported right of the Media Intervenors to embarrass and shame these individuals.  None of this shaming detail had any bearing on the Court's finding that Plaintiffs failed to meet their burden under Rule 23 to certify a class action, or the Ninth Circuit's denial of Plaintiffs' petition seeking an immediate appeal of the denial of class certification.  Nor does the law support an attempt to create a media circus.  Indeed, the following shows why the Court should deny this request.

First, here's a realistic illustration that proves the point.  In the packet of "complaints" distributed and collected by Plaintiffs, an anonymous person stated that they saw Person 1 performing a sex act on Person 2 at some location on NIKE's 286-acre campus in Beaverton, Oregon, and that s/he told Random Person A about the event.  The fact of the allegation was laid bare in the documents produced by NIKE in this litigation.  The Media Intervenors now seek to unredact the identities of Persons 1 and 2, as well as Random Person A, notwithstanding:

---

[1] "Media Intervenors" refers to Non-Party Media Organizations Insider Inc. *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal*.

Page 1   -   DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
             INTERVENORS' MOTION TO UNSEAL

- The complainant here did not reveal her/himself, and there was no showing that this event ever took place. Nor are there any facts on the face of the complaint suggesting that this encounter, if it happened, was non-consensual even if inappropriate.

- Assuming *arguendo* that the event occurred, there is no bona fide reason to reveal the names of Persons 1 and 2—other than to embarrass them. But if the complaint was fabricated, identifying Persons 1 and 2 publicly likely would do violence to those individuals' personal and professional reputations, including their standing within the community, compromising (or destroying) personal and familial relationships, and endangering current employment or future employment prospects.

- Naming Random Person A also serves no legitimate purpose. That person is not a witness to the alleged event; his/her knowledge would be hearsay. In addition, publicly disclosing the identities of third parties (and witnesses) seems antithetical to the goal of encouraging confidential reporting of wrongdoing in a system that protects alleged victims. Media Intervenors—and Plaintiffs who joined this motion—should care about this objective. Their advocacy suggests otherwise.

Second, Media Intervenors are incorrect on the law. While they argue that a "compelling reasons" standard should apply in determining whether to unredact the names of purported victims, witnesses, and alleged wrongdoers, a majority of district courts in the Ninth Circuit hold that court records filed in connection with a motion for class certification are subject to a lower "good cause" standard because class certification motions are not dispositive. *See Ramirez v. GEO Grp.*, 2019 WL 6782920, at *3 (S.D. Cal. Dec. 11, 2019). The "good cause" standard

Page 2    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA INTERVENORS' MOTION TO UNSEAL

ER-0486

applies in this case, particularly where, as here, the litigation continues even after this Court and the Ninth Circuit ruled in NIKE's favor.  In the above example, the risk of reputational and emotional harm to Persons 1 and 2 supports the limited redactions.

Third, the same result is obtained under a "compelling reasons" standard.  The public's claimed interest in learning who may have been involved in purported wrongdoing is outweighed by the intrusion into Persons 1 and 2's privacy rights.  Nor does the Media Intervenors' curiosity support a stifling of the complaint and investigation process as a whole, where the confidentiality of persons of interest is a key feature of a system that encourages victims to come forward so that allegations of wrongdoing may be fully investigated.  Courts routinely support the limited redactions at issue here, particularly where there is no showing that unredacting the individuals' names would assist the public in understanding Rule 23's requirements or any issue tied to the class certification briefing.  The sole objective of the renewed motion is to satisfy the Media Intervenors' (and Plaintiffs') "morbid craving for that which is sensational and impure."  *United States v. Amodeo*, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (citation omitted).

The Media Intervenors' renewed motion should be denied.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Court Denied Media Intervenors' Unfettered Access To Sealed Records.

Notwithstanding their recent change of heart, Plaintiffs and NIKE previously agreed to redact select matters from the parties' class certification briefing, principally the names of complainants, witnesses, and subjects of "complaints" that were collected incident to the leafletting that occurred on NIKE's campus in late 2017.  ECF No. 273 at 13 (the Parties had worked together to "review previously sealed documents and re-lodge unsealed or redacted versions where appropriate."); *id* at 12 (the Parties agreed to keep redacted "the names of any individuals named in allegations of sexual harassment or gender discrimination at Nike that have

Page 3    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
                 INTERVENORS' MOTION TO UNSEAL

not already been made public[.]").  To be clear, this means that the allegations contained in the "complaints" would be made public; only the specific identities of witnesses and persons of interest would be redacted.

On April 1, 2022, NIKE's counsel met and conferred with counsel for Plaintiffs and Media Intervenors regarding the Media Intervenors' request to private information in support of the parties' filings in connection with the class certification briefing.  ECF No. 220 ¶ 3.  The Media Intervenors claimed that they should have the right to access "Confidential" and "AEO" filings to evaluate whether unsealing was justified.  ECF No. 273 at 13.

On April 8, 2022, Media Intervenors' brought their initial Motion to Intervene for the Limited Purpose of Moving to Unseal Judicial Records and to Oppose Defendant's Motion to Seal (the "Motion to Intervene").  ECF No. 205.  The parties fully briefed the motion, and on September 30, 2022, the Court issued a recommendation granting in part and denying in part the Motion to Intervene.  ECF No. 273.  While the Court allowed Media Intervenors to intervene for the limited purpose of unsealing judicial records, it denied their attempts to access or unseal the records in connection with Plaintiffs' Motion for Class Certification.  ECF No. 273 at 11.

### B.    The Court Denied The Plaintiffs' Motion For Class Certification.

On November 22, 2022, the Court entered its Findings and Recommendations, concluding that Plaintiffs' Motion for Class Certification should be denied.  ECF No. 310.  The Court found, *inter alia*, that Plaintiffs had failed to establish (1) a common practice regarding NIKE's alleged use of prior pay to set starting pay; (2) a common practice regarding bonus payments; (3) commonality regarding their Oregon Equal Pay Act claim; and (4) typicality, predominance, and superiority.  On March 21, 2023, the Court adopted those Findings and Recommendations in its Order denying class certification.  ECF No. 335.  Plaintiffs petitioned the Ninth Circuit for leave to immediately appeal the denial of their class certification motion.

Page 4    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
INTERVENORS' MOTION TO UNSEAL

ECF No. 337.  The Ninth Circuit denied their petition.  ECF No. 339.

    **C.**    **Media Intervenors Seek To Unseal The Names Of Individuals Connected To Unsubstantiated Harassment Allegations.**

Media Intervenors have filed a renewed motion to unredact the limited items remaining in certain "complaint" files.  Specifically, Media Intervenors seek to unseal the redacted content in Exhibits 46 (ECF No. 284-6), 47 (ECF No. 284-7), 48 (ECF No. 284-8), 51 (ECF No. 285-1), and 52 (ECF No. 285-2) of the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification ("Goldstein Decl.") (ECF No. 288), and Exhibit 9 to the Goldstein Decl. (ECF No. 290-4).[2]  As Media Intervenors admit, NIKE already unredacted extensive information in the documents identified.  ECF No. 343 at 7-8.  Generally speaking, the remaining redactions seek to protect the privacy interest of individuals who (1) submitted complaints so that the issues they raised could be investigated confidentially; (2) were alleged as persons of interest; or (3) alleged witnesses to purported events.

**III.**    **ARGUMENT**

    **A.**    **The "Good Cause" Standard Applies Here.**

The Media Intervenors contend that there must be "compelling reasons" to override their claim of access to the names of complainants, witnesses, and subjects identified in the "complaint" files at issue.  *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006) ("specific factual findings" of prejudice must "outweigh the general history of access and the public policies favoring disclosure") (citations omitted); *Foltz v. State Farm Mut.*

---

[2] Exhibit 9 to the Goldstein Decl. at pages 17, 18, 25, 31, and 32, includes redactions of the contents of complaints, rather than just the names of complainants, witnesses, and subjects of complaints.  Nike maintains that the names of any individuals on these pages should be redacted, but does not oppose lifting the redactions of anything besides that.

*Auto. Ins. Co.*, 331 F.3d 1125, 1135 (9th Cir. 2003) (the right to access court records "is not

absolute and can be overridden given sufficiently compelling reasons for doing so.").

However, there is an exception for sealed materials filed in relation to non-dispositive

motions, which warrant a more lenient standard.  *See Kamakana*, 447 F.3d at 1178-79; *see also*

*In Re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d 1115, 1119 (9th Cir.

2012) (same).  Under this exception, a party need only satisfy the less exacting "good cause"

standard.  *See Foltz*, 331 F.3d at 1135.  The "good cause" standard requires the sealing party to

show that "specific prejudice or harm will result" if information is unsealed.  *Phillips ex rel.*

*Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002).  As the Ninth

Circuit has held, when materials are attached to a non-dispositive motion, "the private interests

of litigants are the only weights on the scale," and public access may be denied for "good cause"

alone.  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (citation

and quotation marks omitted).

Under both standards, courts continue to have a strong interest in preventing abuse of

their processes; otherwise, judicial records would become a "vehicle for improper purposes,"

such as a tool to "gratify private spite," or "promote public scandal."  *Nixon v. Warner*

*Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (citations omitted).

Numerous courts have held that the "good cause" standard applies to class certification

motions.  *See e.g., Dugan v. Lloyds TSB Bank, PLC*, 2013 WL 1435223, at *1 (N.D. Cal. Apr. 9,

2013) ("Unless the denial of a motion for class certification would constitute the death knell of a

case, the vast majority of courts within this circuit treat motions for class certification as non-

dispositive motions to which the 'good cause' sealing standard applies.") (citation and quotation

marks omitted); *In re:  High-Tech Emp. Antitrust Litig.*, 2013 WL 163779, at *2 at n.1 (N.D.

Page 6    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
                 INTERVENORS' MOTION TO UNSEAL

Cal. Jan. 15, 2013) (in finding that the motion for class certification is non-dispositive, "the Court applies a 'good cause' standard here in accordance with the vast majority of other courts within this circuit"); *In re NCAA Student-Athlete Name and Likeness Licensing Litig.*, 2012 WL 5395039, at *1-2 (N.D. Cal. Nov. 5, 2012) (applying "good cause" standard to motion to seal class certification briefing; *Vietnam Veterans of Am. v. C.I.A.*, 2012 WL 1094360, at *1-2 (N.D. Cal. Mar. 29, 2012) (same); *Buchanan v. Homeservices Lending LLC,* 2012 WL 5505775, at *2 (S.D. Cal. Nov. 13, 2012) (same); *Davis v. Soc. Serv. Coordinators, Inc.*, 2012 WL 2376217, at *1 (E.D. Cal. June 22, 2012) ("the party seeking to seal a document related to a non-dispositive motion [exhibits attached to a declaration in support of a motion for conditional class certification] must meet the 'good cause' standard set forth by Federal Rule of Civil Procedure 26(c) that applies to protective orders."); *Rich v. Hewlett-Packard Co.*, 2009 WL 2168688, at *1 (N.D. Cal. July 20, 2009) (Because "[t]he contested issues in Plaintiffs' motion for class certification involve the procedural requirements of Fed. R. Civ. P. 23 and relate only tangentially to the underlying merits of Plaintiffs' claim[,] [t]he motion thus is not 'dispositive' . . . and a showing of good cause is sufficient to justify filing these documents under seal.").

There is no argument here that the denial of class certification would constitute the "death knell" of this case, particularly where Plaintiffs continue to litigate their claims and are in the midst of post-certification discovery concerning the same. In *Ramirez*, 2019 WL 6782920, at *3, the court found a class certification motion to be non-dispositive and applied the "good cause" standard for documents attached to it to be filed under seal because the plaintiff "would presumably have financial incentive to pursue individual litigation even if he could not do so on behalf of a class." There are no presumptions here—the named Plaintiffs are proceeding with their claims.

The "good cause" standard attaches in this case.  NIKE has demonstrated specific harm to the personal and professional reputations of individuals who would be publicly associated with alleged wrongdoing (including consensual sex acts) during the course of their employment at NIKE.  This harm would be amplified if the anonymous reports were false—that would cause harm which is impossible to compensate by money damages alone.

**B.**     **Even If A Higher Standard Is Applied, There Are "Compelling Reasons" To Redact The Names Of Complainants, Witnesses, And Subjects.**

While the "good cause" standard is applicable here, even under the "compelling reasons" standard, the Court should deny the Media Intervenors' renewed motion.  *See Amodeo*, 71 F.3d at 1050-51 (privacy interests of third parties rebut the presumption of public access, particularly where the request for public access hinges on "a morbid craving for that which is sensational and impure.") (citation omitted).  All that the Media Intervenors (and Plaintiffs) seek in this case is a repetition of the same "sensational and impure" headlines that they have used to grab attention for more than four years, except this time, they do not believe that the allegations alone are sufficient.  Media Intervenors and Plaintiffs seek to double down by embarrassing and shaming (perhaps innocent) people regardless of the reputational and professional costs, solely to appeal to their own (or the public's) prurient interests.  There are "compelling reasons" to override their claim of public access in this case.

First, a significant number of the "complaints" collected here were anonymous, which presents critical questions relating to the veracity of the matters identified in those documents and the harm to individuals who may be publicly identified in connection with unverified, "sensational and impure" allegations.  But as a general matter, individuals who submit complaints have no expectation that their own privacy might be compromised due to republication of their names in litigation (or the newspaper).  *See Hounshel v. Battelle Energy*

Page 8    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA INTERVENORS' MOTION TO UNSEAL

*All., LLC*, 2013 WL 5375833, at *1 (D. Idaho Sept. 24, 2013) (party's "discovery requests raise significant privacy concerns for third-party employees who ha[d] no involvement in the case"). The complaint process is supposed to be a safe space for individuals to voice concerns, not for salacious rumor-spreading. Unredacting complainants' names necessarily risks the privacy of such third parties, which likely would have a chilling effect on confidential reporting in the workplace. The net result is that victims would be worse off.[3]

Second, there are "compelling reasons" to redact the names of subjects of the complaints in sexual harassment and/or gender discrimination matters, particularly where the allegations are unsubstantiated. Prevention of unfounded reputational damage is an overriding interest that supports sealing. *See Kamakana*, 447 F.3d at 1178-79; *see also Skurkis v. Montelongo*, 2016 WL 4719271, at *6 (N.D. Cal. Sept. 9, 2016) (granting motion to file complaint under seal where it contained information about allegedly criminal acts of defendants' agents and non-parties).

Here, NIKE only seeks to redact these individuals' names. "The inclusion of unfounded accusations unrelated to the claims brought by [Plaintiffs] suggests that" their names are being used "as a vehicle for character assassination." *Accenture LLP v. Sidhu*, 2011 WL 6057597, at *3 (N.D. Cal. Dec. 6, 2011) (holding that unfounded accusations should remain under seal because they could become the vehicle for improper purposes). Numerous "courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption." *Nixon*, 435 U.S. at 598 (citing cases). There is no showing that the names of those purportedly involved in harassment or discrimination here (or who may have witnessed harassment or discrimination) would have been relevant to the Court's finding that Plaintiffs failed to meet their obligation

---

[3] It is particularly unfortunate that Plaintiffs, who purport to represent the interests of Nike's women employees, have suddenly decided that they now "support un-redaction of the documents at issue." ECF No. 343 at 10.

Page 9    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
                   INTERVENORS' MOTION TO UNSEAL

under Rule 23.  The only purpose served would be to harm the reputations and infringe upon the privacy rights of individuals who have not been found to have engaged in inappropriate conduct. This is improper.

Third, the names of witnesses (either third-party observers or victims of alleged harassment or discriminatory treatment by others) should be redacted.  Presumably, the Media Intervenors wish these names to be disclosed, along with those of complainants and persons of interest, for the purposes of writing salacious stories that potentially would expose such individuals to unwarranted attention or ridicule.

As provided above, the current record shows the potential for harm.  In Exhibit 52 of the Sun Declaration, there is an *anonymous* complaint that two individuals (Persons 1 and 2, whose names have been redacted) engaged in a sex act at some point while employed at NIKE.  ECF No. 285-2.  The complaint neither alleges nor suggests that the act was non-consensual.  Thus, revealing these individuals' names in a public filing serves no purpose other than to harass and shame.  Courts routinely prohibit this.  *See e.g.*, *Reflex Media, Inc. v. Doe No. 1*, 2022 WL 2985938, at *2 (D. Nev. July 28, 2022) (sealing personal identifying information of victims of the alleged extortion business); *Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*, 2021 WL 794271, at *3 (S.D. Cal. Mar. 1, 2021), *aff'd*, 2022 WL 706941 (9th Cir. Mar. 9, 2022) (sealing non-parties' names because it "runs a substantial risk of exposing those individuals to harassment"); *United States v. Mayers*, 2017 WL 2215805, at *2 (W.D. Wash. May 19, 2017) ("sealing the identifying personal information of an unrelated party to this case is a compelling reason to keep that information sealed); *Romero v. County of Santa Clara*, 2014 WL 12641990, at *3 (N.D. Cal. June 17, 2014) ("Discrete, sensitive identifying information regarding third parties may be redacted.").  The public already has access to the facts relevant to that

Page 10   -   DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
                INTERVENORS' MOTION TO UNSEAL

"complaint," including the allegation that a sex act occurred on NIKE's 286-acre campus at some point in history. There is no additional benefit to disclosing these individuals' names; but, dire personal and professional consequences could result if their identities are published (*e.g.,* there are likely impacts with respect to these individuals' personal relationships, relationships with family members, at their current employment, in the community or other professional circles, etc.). These individuals' lives would be put under a spotlight for the sole purpose of the Media Intervenors' (and Plaintiffs') enjoyment. The case law does not support the same.

Finally, the Media Intervenors' reliance on the "compelling reasons" standard falls flat because it misses the key point in the case law—the touchstone of the inquiry is whether removal of the redactions would assist the "public interest in ***understanding the judicial process***[.]" *Kamakana*, 447 F.3d at 1178-79 (emphasis added, citation omitted); *Forbes Media LLC v. United States*, 61 F.4th 1072, 1076 (9th Cir. 2023) ("[m]atters decided in the courts are often of considerable public interest," but the question is "not one of public interest but [of] public access."). That interest "does not extend to mere curiosity about . . . confidential information where that information is not central to a decision on the merits." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 727 F.3d 1214, 1228 (Fed. Cir. 2013); *see also Ctr. for Auto Safety*, 809 F.3d at 1099 (the focus of the analysis is on whether the material "at issue is more than tangentially related to the underlying cause of action.").

There is no evidence—by the Media Intervenors or the Plaintiffs—that the names of the complainants, witnesses, and subjects referenced in the unverified "complaints" would assist the public in understanding the judicial process relating to the Court's ruling on class certification or the Ninth Circuit's denial of Plaintiffs' petition. There is no logical argument as to why the identities of Persons 1 and 2, and Random Person A, might help anyone understand the

Page 11   -   DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA INTERVENORS' MOTION TO UNSEAL

requirements of Rule 23. The Media Intervenors have not identified a single reference in *any* ruling by *any* court indicating that the court's legal or factual conclusions might rest upon the identities of a person of interest in the unverified "complaint" files. The Media Intervenors' renewed motion should be denied.

### C. The Denial Of Class Certification Does Not Heighten The Public's Right To Access The Names Of Complainants, Witnesses, And Subjects.

Media Intervenors argue that the Court's ruling on class certification increases the public interest in accessing documents that informed judicial decision-making. They then cite an array of inapplicable cases that, in fact, cut against the Media Intervenors' arguments.

For example, Media Intervenors cite *Oliner v. Kontrabecki*, 745 F.3d 1024, 1025 (9th Cir. 2014), for the proposition that court records provide important bases for a court's decisions. But the case is inapposite. In *Oliner*, the party sought to seal the *entire record* of the court proceedings, including the opinion itself. By contrast, here, the opinion denying class certification and the great majority of the evidence supporting the opinion are publicly accessible. In fact, the critical facts underlying the "complaints" are publicly available. Only the individuals' names remain redacted and these peoples' identities did not form the "bases or explanations for [the] court's decision." *Id*.

In *Fodera v. Equinox Holdings, Inc.*, 341 F.R.D. 616, 635 (N.D. Cal. 2022), another case cited by Media Intervenors, the basis for the court's holding that sealing the records would make it difficult for the public to understand the facts underlying the motion for class certification was "the nature and volume of the sealing requests." In *Fodera*, the parties sought to seal approximately 175 records. Here, there are only seven documents at issue with a very limited redaction focus—protecting the privacy rights and interests of non-parties.

*Maldonado v. Apple, Inc.*, 333 F.R.D. 175 (N.D. Cal. 2019), is similarly unhelpful to the

Page 12   -   DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
               INTERVENORS' MOTION TO UNSEAL

Media Intervenors' position.  The *Maldonado* court merely held that the information that defendants sought to seal was too broad, albeit acknowledging that the categories were "likely to include sealable information."  *Id.* at 194.  The court confirmed that it would not seal information that is "***necessary*** to understand plaintiffs' theory of liability and hence this Order."  *Id.* (emphasis added).  Media Intervenors cannot earnestly argue that a third-party individual's name is necessary to understanding plaintiffs' claims or the Court's denial of class certification.[4]

### D.   Plaintiffs' Position On Disclosure Is Legally Irrelevant.

Finally, Media Intervenors argue that because Plaintiffs now seemingly support the disclosure of the names of the individuals in these complaints, unsealing is appropriate.  Plaintiffs' position is legally irrelevant and immaterial.  It is interesting that Plaintiffs support disclosure of information (without consent) pertaining to the victims they claim to represent, but unlike any previous briefing on sealing, the sole question here is whether the law supports redaction of the names of complainants, witnesses, and subjects in "complaints" alleging sexual harassment and discrimination.[5]  The great weight of authority supports NIKE's position here.

## IV.   CONCLUSION

For the foregoing reasons, Nike respectfully submits that Media Intervenors' Motion to Unseal should be denied in its entirety.

---

[4] Media Intervenors' out-of-circuit cases are similarly distinguishable.  In *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 164 (3d Cir. 1993), the Circuit Court vacated the district court's order that a party could not intervene, but did not hold that certain documents relevant to a motion should have been unsealed.  In *Romero v. Drummond Co.*, 480 F.3d 1234, 1245-46 (11th Cir. 2007), the court applied the "good cause" standard.  While the Eleventh Circuit found there was not good cause, it only did so because the party seeking to seal failed to articulate any good cause.  By contrast, Nike has explained in detail the harm that could come from unsealing these documents.
[5] In the previous round of sealing briefing, the Court unredacted the names of (former) NIKE employees referenced in the "complaints" because those specific references tracked information that had already been made public.  ECF No. 273 at 7-8.

Page 13   -   DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
              INTERVENORS' MOTION TO UNSEAL

Dated:  August 23, 2023

Respectfully submitted,

/s/ Daniel Prince

Daniel Prince, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
Felicia A. Davis, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Laura E. Rosenbaum, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  (503) 294-9642
Facsimile:  (503) 220-2480

Attorneys for Defendant NIKE, INC.

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*


# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NIKE, INC., an Oregon Corporation, <br><br> Defendant. | Case No. 3:18-cv-01477-JR <br><br> RENEWED MOTION OF NON-PARTY MEDIA ORGANIZATIONS INSIDER, INC. *d/b/a BUSINESS INSIDER*, ADVANCE LOCAL MEDIA LLC *d/b/a OREGONIAN MEDIA GROUP*, AND AMERICAN CITY BUSINESS JOURNALS, INC. *d/b/a PORTLAND BUSINESS JOURNAL* TO UNSEAL JUDICIAL RECORDS |

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page i -**

ER-0499

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

LR 7-1(a) CERTIFICATION ............................................................................... 1

RENEWED MOTION TO UNSEAL JUDICIAL RECORDS .................................. 1

MEMORANDUM OF LAW IN SUPPORT ........................................................... 2

   I.   INTRODUCTION ....................................................................................... 2

   II.   BACKGROUND AND SEALED DOCUMENTS AT ISSUE ......................... 2

      A.   The Parties' Protective Order and Intervenors' Initial Motion to Intervene and Unseal ................................................................................................. 2

      B.   This Court's Findings and Recommendation on Intervention and Unsealing ............. 4

      C.   Denial of Plaintiffs' Motion for Class Certification ..................................... 4

      D.   Remaining Stipulated Redactions ............................................................. 5

      E.   Media Intervenors' Renewed Outreach to the Parties .................................. 5

   III.  ARGUMENT ............................................................................................... 6

      A.   The Press and Public Enjoy a Presumptive Right to Access Judicial Records Submitted in Support of Class Certification Which Can Only Be Overcome By a Stringent "Compelling Reasons" Standard. ....................................... 6

      B.   Additional Factors Now Favor Access. .................................................... 9

         i.   Now that a final determination has been rendered on class certification, there is increased public interest in accessing documents that informed judicial decision-making. ......................................................................... 9

         ii.   Plaintiffs have clarified their position in favor of disclosure. ..................... 11

   IV.  CONCLUSION ........................................................................................... 11

## TABLE OF AUTHORITIES

**Cases**

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) .................................................................... 7

*Ctr. for Auto Safety v. Chrysler Grp., LLC*,
    809 F.3d 1092 (9th Cir. 2016) ............................................................ 7, 8, 9, 10

*Fodera v. Equinox Holdings, Inc.*,
    341 F.R.D. 616 (N.D. Cal. 2022) ............................................................ 8, 9

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
    331 F.3d 1122 (9th Cir. 2003) ............................................................... 6, 9

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
    860 F.3d 1244 (9th Cir. 2017) ................................................................... 8

*In re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.*,
    686 F.3d 1115 (9th Cir. 2012) .................................................................. 6

*In re Nat'l Sec. Agency Telecomms. Records Litig.*,
    No. 06-1791 VRW, 2007 WL 549854 (N.D. Cal. Feb. 20, 2007)............................. 11

*Kamakana v. City & Cnty. of Honolulu*,
    447 F.3d 1172 (9th Cir. 2006) ............................................................... 6, 8

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*,
    998 F.2d 157 (3d Cir. 1993) ................................................................. 10

*Maldonado v. Apple, Inc.*,
    333 F.R.D. 175 (N.D. Cal. 2019)............................................................ 8, 10

*Nixon v. Warner Commc'ns, Inc.*,
    435 U.S. 589 (1978).......................................................................... 6

*Oliner v. Kontrabecki*,
    745 F.3d 1024 (9th Cir. 2014) ................................................................ 9

*Romero v. Drummond Co.*,
    480 F.3d 1234 (11th Cir. 2007) ............................................................. 10

*Schmidt v. I.R.S.*,
    533 F. Supp. 3d 952 (E.D. Cal. 2020) ........................................................ 8

*Uniloc 2017 LLC v. Apple, Inc.*,
    964 F.3d 1351 (Fed. Cir. 2020) ............................................................ 8, 9

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page iii -**

*Vesta Corp. v. Amdocs Mgmt. Ltd.*,
    312 F. Supp. 3d 966 (D. Or. 2018) ............................................................................................ 8

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).................................................................................................................... 7

## LR 7-1(a) CERTIFICATION

Pursuant to Local Rule 7-1(a), counsel for Media Intervenors conferred in good faith with counsel for Plaintiffs Cahill, *et al.*, and Defendant Nike, Inc. regarding this motion, and the matters contained herein.  Plaintiffs support Media Intervenors' request to unseal the documents referred to in this motion.  Nike does not support Media Intervenors' request to fully unredact the documents addressed in this motion.  As such, the Parties and Intervenors were unable to resolve the dispute.

## RENEWED MOTION TO UNSEAL JUDICIAL RECORDS

Non-party media organizations Insider, Inc. *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal* (collectively, the "Media Intervenors") respectfully move this Court to order the Parties to file unredacted versions of the following seven documents in this proceeding:

- Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-6.

- Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-7.

- Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-8.

- Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 285-1.

- Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 285-2.

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 1 -**

- Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification.  ECF No. 288.

- Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification.  ECF No. 290-4.

Pursuant to the Magistrate's September 30, 2022 Findings and Recommendation, Media Intervenors' renewed motion is now timely because the Court has issued its final disposition denying Plaintiffs' motion for class certification and, moreover, the Court of Appeals has denied Plaintiffs' motion for leave to appeal that ruling.

## MEMORANDUM OF LAW IN SUPPORT

## I.     INTRODUCTION

This case centers on allegations of discrimination and abuse involving one of the most well-known multinational corporations in the world.  Accordingly, this Court has granted the Media Intervenors' intervention to represent the significant public interest in accessing information about this important judicial proceeding.  ECF No. 273.  Media Intervenors respectfully renew their motion to challenge redactions to seven judicial records related to class certification.  There is a presumptive right of access to these records, which include newsworthy information of public concern.  The rationale underlying disclosure is most applicable where, as here, the judicial records are considered by a Court in ruling on a dispositive motion, like class certification.  Furthermore, the continued redaction of these records is no longer stipulated to by all Parties, with Plaintiffs clarifying their current position in favor of disclosure.

## II.     BACKGROUND AND SEALED DOCUMENTS AT ISSUE

### A. The Parties' Protective Order and Intervenors' Initial Motion to Intervene and Unseal

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 2 -**

On June 17, 2019, this Court entered a stipulated umbrella protective order, ECF No. 82 ("Protective Order"), modeled on the Court's Tier II template to govern the Parties' exchange of discovery materials. Invoking the Protective Order, the Parties thereafter filed thousands of pages of documents under seal. *See* ECF No. 205 Appendix A. In March 2022, Media Intervenors notified the Parties of their intent to intervene for the limited purpose of moving to unseal those documents to vindicate the press and public's presumptive right of access to judicial records. ECF No. 205 at 5–7. Media Intervenors conferred with the Parties to reach a resolution, leading to the public filings of four docket entries previously submitted by Defendant under seal. *Id.* But Defendant ultimately declined to unseal most of the documents at issue, including its Response to the Class Motion, and instead filed a motion to seal the documents the parties had to that point filed under seal pursuant only to their Protective Order. *Id.* at 7; ECF No. 171. On April 8, 2022, Media Intervenors moved to intervene pursuant to Fed. R. Civ. P. Rule 24(b) to challenge the sealed filings in this case, and to oppose Defendant's then-pending motion to seal. ECF No. 205.

Defendant opposed Media Intervenors' Motion, contesting the public's presumptive right of access to the sealed judicial records and arguing that "[t]hose redactions w[ould] be addressed in due course" under the auspices of the Protective Order. ECF No. 219 at 2. Plaintiffs took no position on Media Intervenors' Motion, emphasizing that their lack of a position stemmed not from opposition to unsealing, but from a desire not to disturb the outcome of "months" of "negotiating in good faith with Nike about what documents should remain sealed." ECF No. 218 at 2. Plaintiffs clarified that they "[were] not advocating that any documents should remain sealed," and were "cognizant of the presumption that documents filed with the Court should not be sealed." *Id.* Indeed, in the weeks following Media Intervenors' Motion, the Parties would go on to unseal

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 3 -**

multiple judicial records, even before the Magistrate reached its Findings and Recommendation on the Motion to Intervene. *See* ECF Nos. 224, 230, 247, 263, 270.

### B. This Court's Findings and Recommendation on Intervention and Unsealing

On September 30, 2022, Magistrate Judge Russo recommended granting the Motion to Intervene and the Court subsequently entered the Magistrate's Findings and Recommendation on intervention. ECF Nos. 273, 275. The Magistrate recognized that the Media Intervenors' interests were not represented with respect to stipulated redactions produced under the Parties' Protective Order. ECF No. 273 at 11. Because of the Parties' ongoing efforts to unseal and unredact existing filings, and the pendency of the Plaintiffs' class certification motion, Media Intervenors' request for further briefing and to unseal additional documents was denied. *Id.* at 12–14. However, in its Findings and Recommendation, the Magistrate made clear that "following the final resolution of plaintiffs' Motion for Class Certification, the non-party media organizations may file a renewed motion for the purposes of opposing any remaining stipulated redactions." *Id.* at 14. Meanwhile, Magistrate Judge Russo continued to oversee the Parties' ongoing efforts to "review previously sealed documents and re-lodge unsealed or redacted versions where appropriate." *Id.* at 13. This process led the Parties to refile redacted versions of all but one of the previously sealed documents identified in Appendix A of the Motion to Intervene. *See* ECF No. 229 Updated Appendix A; ECF Nos. 276–309.

### C. Denial of Plaintiffs' Motion for Class Certification

On November 22, 2022, Magistrate Judge Russo entered her Findings and Recommendation concluding that Plaintiffs' motion for class certification should be denied. On March 21, 2023, the District Court adopted those Findings and Recommendation. ECF No. 335. Plaintiffs petitioned the Ninth Circuit for leave to appeal their motion for class certification. *See* ECF No. 337. On June 1, 2023, the Ninth Circuit denied Plaintiffs' petition. ECF No. 339.

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 4 -**

### D. Remaining Stipulated Redactions

Media Intervenors have reviewed the remaining redacted judicial records related to Plaintiffs' motion for class certification and identified seven documents where continued redaction withholds key evidence presented in support of class certification:

- Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-6.

- Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-7.

- Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-8.

- Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 285-1.

- Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 285-2.

- Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification.  ECF No. 288.

- Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification.  ECF No. 290-4.

Although redactions limit Media Intervenors' ability to ascertain the full contents of these judicial records, they appear to contain information concerning allegations of harassment and abuse involving Nike executives.

### E. Media Intervenors' Renewed Outreach to the Parties

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 5 -**

ER-0507

On May 2, 2023, Media Intervenors notified the Parties of their intent to file a renewed motion to unseal, predicated on the public's presumptive right to access judicial records. On May 15, 2023, counsel for Media Intervenors and the Parties conferred regarding the redacted documents at issue. On May 23, 2023, Plaintiffs stated their position in support of Media Intervenors' renewed motion to unseal and Defendant provided its position against full un-redaction. On August 4, 2023, counsel for Media Intervenors contacted Plaintiffs and Defendant to verify their stated positions. Plaintiffs confirmed that they support un-redaction of the documents at issue. Nike confirmed that it does not support Media Intervenors' request to fully unredact the documents addressed in this motion. Unable to ascertain the exact contents of the redactions, and mindful of the now-heightened equities favoring disclosure, Intervenors now move this Court to unredact the documents at issue.

## III.    ARGUMENT

As Magistrate Judge Russo made clear, Media Intervenors enjoy "well-established common law and First Amendment rights to challenge the sealing of judicial records." ECF No. 273 at 13. The documents at issue are now post-decisional judicial materials, and the already-sufficient rationales for their disclosure apply with even greater force following the disposition of Plaintiffs' motion for class certification. And Plaintiffs' position in favor of disclosure further bolsters the need for unsealing.

### A.    The Press and Public Enjoy a Presumptive Right to Access Judicial Records Submitted in Support of Class Certification Which Can Only Be Overcome By a Stringent "Compelling Reasons" Standard.

The press and public enjoy a strong, presumptive right of access to judicial records. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Consequently, a party seeking to seal judicial records must meet a "compelling reasons" standard. *Kamakana v. City & Cnty. of*

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 6 -**

*Honolulu*, 447 F.3d 1172 (9th Cir. 2006). To fulfill this demanding standard, a party seeking sealing must show compelling reasons supported by specific factual findings that outweigh the historic presumption and public interest in favor of openness. *Id.* at 1178–79. This showing is particularized to **each** document or portion of a document the party seeks to seal. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1138–39 (9th Cir. 2003).

The Ninth Circuit has sometimes applied a more lenient "good cause" standard to justify sealing documents filed in connection with non-dispositive motions. *See In re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (per curiam). In considering Defendant's motion to seal, Magistrate Judge Russo did not reach the question of which standard should apply because she found that "defendant's motion largely fail[ed] to present even 'good cause' for the proposed non-disclosures." ECF No. 273 at 5 n.3. The Ninth Circuit has made clear that the relevant standard "turn[s] on whether the motion is more than tangentially related to the merits of a case." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016) (applying the compelling reasons standard to documents related to putative class plaintiffs' motion for preliminary injunction). Proceedings demanding a higher threshold for sealing involve "the presentation of substantial evidence," "requir[ing] the court to address the merits of [the] case." *Id.* at 1099. Adjudication of Plaintiffs' motion for class certification, which required assessments of voluminous evidentiary submissions and the merits of the case, unquestionably requires application of the "compelling reasons" standard to any requests to seal related judicial records. *See* ECF No. 310 at 31–32; ECF Nos. 148–167, 185–187.

Motions for class certification are unquestionably "more than tangentially related to the merits of a case." *Ctr. for Auto Safety*, 809 F.3d at 1101. To adjudicate motions for class certification, courts' rigorous analysis "will entail some overlap with the merits of the plaintiff's

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 7 -**

underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  The Findings and Recommendation adopted by this Court on class certification is no exception.  ECF No. 310 at 44–50 (analyzing Plaintiffs' disparate impact claims), 50–53 (analyzing Plaintiffs' disparate treatment claims), 53–54 (analyzing Plaintiffs' Oregon Equal Pay Act claim), 54–55 (analyzing the typicality and adequacy requirements of Rule 23).  In addition, class certification proceedings typically demand a higher threshold for sealing in the Ninth Circuit because courts take substantial evidence into consideration before rendering a decision granting or denying certification.  *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  Here, Magistrate Judge Russo reviewed voluminous evidence submitted by the Parties,[1] spanning thousands of pages, including the evidence contained within the seven redacted documents Media Intervenors now seek to unseal.  ECF No. 310 at 19–21.  Accordingly, Defendant must show compelling reasons, particularized to each redaction in the seven identified documents, to maintain their non-disclosure.  *See Ctr. for Auto Safety*, 809 F.3d at 1099; *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 860 F.3d 1244, 1261 (9th Cir. 2017) (holding that a party seeking continued sealing had failed to meet the compelling reasons standard where it only made vague claims of national security interests); *Uniloc 2017 LLC v. Apple, Inc.*, 964 F.3d 1351, 1362 (Fed. Cir. 2020) ("[A]ll filings [are] presumptively accessible . . . [and] the proponent of sealing bears the burden with respect to sealing." (quoting *Kamakana*, 447 F.3d at 1182)); *Fodera v. Equinox Holdings, Inc.*, 341 F.R.D. 616, 635 (N.D. Cal. 2022) (applying compelling reasons standard to deny proposed sealing of

---

[1]    ECF No. 310 at 41 (citing Deposition of Shine Thomas at 215 (unsealed at ECF No. 287-9)); *id.* at 42–43 (referencing Plaintiffs' multiple regression analysis); *id.* at 44 (citing Rebuttal Expert Report of David Neumark at 4 (unsealed at ECF No. 278-2)); *id.* at 47 (citing ECF Nos. 148-1 and 149-2 (unsealed with redactions at ECF Nos. 277-1 and 278-2, respectively)); *id.* at 48 (citing ECF Nos. 149-2 and 159-1 (unsealed at ECF Nos. 278-2 and 284-1, respectively)); *id.* at 49 (citing ECF No. 159-2 (unsealed at ECF No. 284-2)); *id.* at 52 (citing ECF Nos. 149-1 and 182 (unsealed with redactions at ECF Nos. 278-1 and 293, respectively)).

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 8 -**

materials the court considered in granting plaintiffs' motion for class certification); *Maldonado v. Apple, Inc.*, 333 F.R.D. 175, 194 (N.D. Cal. 2019) (same); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 312 F. Supp. 3d 966, 969 (D. Or. 2018) (applying compelling reasons standard to deny proposed sealing involving alleged proprietary trade secret information); *Schmidt v. I.R.S.*, 533 F. Supp. 3d 952, 954 (E.D. Cal. 2020) (applying compelling reasons standard to deny proposed sealing involving alleged personal and confidential information tax information).

### B.  Additional Factors Now Favor Access.

#### i.  Now that a final determination has been rendered on class certification, there is increased public interest in accessing documents that informed judicial decision-making.

Regardless of which standard this Court applies to the stipulated redactions, this Circuit recognizes a heightened public interest in accessing documents filed in connection with post-decisional matters.  The presumptive press and public right to judicial records flows from the rationale that the public is entitled to learn about the judicial process itself, including the bases behind judicial decisions that often exert far-reaching effects on society.  *Foltz*, 331 F.3d at 1135. Court documents filed in connection with post-decisional matters are crucial to this understanding because "court records often provide important, sometimes the only, bases or explanations for a court's decision."  *Oliner v. Kontrabecki*, 745 F.3d 1024, 1025 (9th Cir. 2014) (citation omitted).

This rationale applies to the documents filed in connection with Plaintiffs' motion for class certification.  *See Fodera*, 341 F.R.D. at 635 ("[G]ranting [proponent's sealing requests] would make it difficult, if not impossible, for the public to understand the basic facts underlying the motion for class certification as well as [any] rationale for granting it.").  Plaintiffs' claims will have far-reaching implications, involving the application of Oregon's Equality Act and the federal and Oregon Equal Pay Act to one of the most well-known multinational corporations in the world. The denial of Plaintiffs' motion for class certification is a significant decision in the case, and the

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 9 -**

public has a compelling interest in accessing the underlying information that informed this Court's adjudication.  *See Ctr. for Auto Safety*, 809 F.3d at 1102 ("Nothing in our precedent suggests that the right of access turns on any particular result.").  This rationale applies irrespective of whether the specific documents at issue were mentioned in the Court's decision.  *See Uniloc 2017 LLC*, 964 F.3d at 1362 ("The district court was not required to seal any information that was not 'directly relevant' to its ruling on [a dispositive motion]; instead, all filings were presumptively accessible, and it was [the sealing proponent's] duty to provide compelling reasons for shielding particular materials from public view.").

Furthermore, it is well-established that the heightened public interest in post-decisional judicial records applies to significant stages of litigation, even where additional discovery and determinations on the merits of a case remain.  *See Maldonado*, 333 F.R.D. at 194 (denying a motion to seal even where the class action litigation involved further determinations on the merits, ruling "I will not seal information that is necessary to understand plaintiffs' theory of liability and hence this Order"); *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 164 (3d Cir. 1993) ("[T]here is a presumptive right of public access to pretrial motions . . . whether preliminary or dispositive, and the material filed in connection therewith."); *Romero v. Drummond Co.*, 480 F.3d 1234, 1245–46 (11th Cir. 2007) (pretrial motions, even those unrelated to discovery, are subject to the presumptive right of access).  To assess whether there is heightened public interest in accessing documents related to a judicial determination, the relevant inquiry is whether the judicial determination "is more than tangentially related to the merits," irrespective of whether additional questions on the merits remain.  *Ctr. for Auto Safety*, 809 F.3d at 1101.  It is therefore immaterial that the Parties have entered a schedule for additional discovery and hearings on Defendant's motion for summary judgment.  *See* ECF No. 342.  Following resolution of the motion

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 10 -**

for class certification, the heightened rationales underlying public access to judicial records have attached to the documents at issue and require their disclosure.

### ii.    Plaintiffs have clarified their position in favor of disclosure.

In the September 30, 2022 Findings and Recommendation, Magistrate Judge Russo opted to revisit the Parties' stipulated redactions, including the redactions challenged here, at a later point. ECF No. 273 at 12. And Judge Russo only upheld redactions that both Parties agreed upon, denying Defendant's unilateral motion to seal additional, unstipulated information. *Id.* at 7; *see also id.* at 13 (decision to leave stipulated redactions intact motivated in part by desire not to "disturb the existing compromise between the parties" (citing *In re Nat'l Sec. Agency Telecomms. Records Litig.*, No. 06-1791 VRW, 2007 WL 549854, *4 (N.D. Cal. Feb. 20, 2007))). Defendant's sealing motion sought to shield information referencing Nike employees identified in Project Starfish as alleged perpetrators of harassment and abuse: implicating the same purported privacy interests as the documents at issue here. *Id.* However, Magistrate Judge Russo found those privacy interests, advanced solely by Defendant, insufficient to justify sealing. *Id.* Accordingly, Media Intervenors' renewed motion concerns redactions that are no longer stipulated to by all Parties pertaining to the same alleged privacy interests Judge Russo has already found to be insufficient to justify sealing.

## IV.    CONCLUSION

For the foregoing reasons, Media Intervenors respectfully renew their motion to unseal and ask this Court to recommend the filing of unredacted versions of the seven identified documents.

/s/Lisa Zycherman

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 11 -**

ER-0513

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 12 -**

**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Counsel for Plaintiffs, Opt-in Plaintiffs and Putative Class

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>                                                    Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>                                                    Defendant. | Case No. 3:18-cv-01477-JR<br><br>**PARTIES' JOINT STIPULATION AND [PROPOSED] ORDER REQUESTING AN EXTENSION TO FILE A STATUS REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE** |

**PARTIES' JOINT STIP. & [PROPOSED] ORDER REQUESTING AN EXTENSION TO FILE A STATUS REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE**

ER-0515

Plaintiffs Kelly Cahill, *et al.* ("Plaintiffs") and Nike, Inc. ("Nike" or "Defendant") (collectively, the "Parties"), through their respective counsel hereby present the following stipulated and agreed upon request for a short extension to file a Status Report and Proposed Case Management Schedule.

**The Parties Have a Good Faith Basis for Revising the Default Deadlines**

On April 4, 2023, this Court issued an Order requiring, if Plaintiffs' Rule 23(f) Petition was denied, the Parties to "confer and file a formal Joint Status Report which includes proposed case management deadlines within 14 days of the Ninth Circuit Court's ruling." ECF No. 338. On June 1, 2023, the Ninth Circuit, in its discretion, denied the petition. The current deadline for the Parties is thus June 15, 2023.

Since the petition was denied, the Parties have been conferring but have not completed the process. The Parties believe they can complete the conferral process by June 29, 2023. In the absence of any other impacted litigation deadlines, the Parties stipulate to and respectfully request that the Court enter an order revising the due date for the Status Report to June 29, 2023.

**STIPULATED REVISED DEADLINES**

The Parties hereby stipulate and agree and request the Court order that the Parties complete their conferral and file a Status Report with proposed case management deadlines by June 29, 2023.

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD**.

Dated:  June 14, 2023                    Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

 */s/Craig Ackermann*
Laura L. Ho (admitted *pro hac vice*)
Barry Goldstein, Of Counsel (admitted *pro hac vice*)
James Kan (admitted *pro hac vice*)
Byron Goldstein (admitted *pro hac vice*)

**PARTIES' JOINT STIP. & [PROPOSED] ORDER REQUESTING AN EXTENSION TO FILE A STATUS
REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE
PAGE 1**

Katharine L. Fisher (admitted *pro hac vice*)
Mengfei Sun (admitted *pro hac vice*)

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Kathryn P. Roberts, OSB #064854

ACKERMANN & TILAJEF PC
Craig Ackerman (admitted *pro hac vice*)
cja@ackermanntilajef.com
1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035
Tel:  (310) 277-0614
Fax:  (310) 277-0635

INDIA LIN BODIEN LAW
India Lin Bodien (admitted *pro hac vice*)
india@indialinbodienlaw.com
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Tel:  (253) 503-1672
Fax:  (253) 276-0081

Attorneys for Plaintiffs and Opt-In Plaintiffs

Dated:  June 14, 2023                Respectfully submitted,

                                     */s/Daniel Prince*
                                     Daniel Prince (pro hac vice)
                                     danielprince@paulhastings.com
                                     Felicia A. Davis (pro hac vice)
                                     feliciadavis@paulhastings.com
                                     PAUL HASTINGS LLP
                                     515 South Flower Street, Twenty-Fifth Floor
                                     Los Angeles, CA 90071-2228
                                     Tel: (213) 683-6000
                                     Fax: (213) 627-0705

                                     Laura E. Rosenbaum, OSB No. 110061
                                     Laura.rosenbaum@stoel.com
                                     STOEL RIVES LLP
                                     760 SW Ninth Avenue, Suite 300
                                     Portland, OR 97205
                                     Telephone: (503) 224-3380
                                     Facsimile: (503) 220-2480

                                     Attorneys for Nike, Inc.

**PARTIES' JOINT STIP. & [PROPOSED] ORDER REQUESTING AN EXTENSION TO FILE A STATUS REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE**
**PAGE 2**

## SIGNATURE ATTESTATION

In accordance with Civil Local Rule 11(b)(2), I attest that concurrence in the filing of this document has been obtained from the signatories on this e-filed document.

Dated:  June 14, 2023                    Respectfully submitted,

ACKERMANN & TILAJEF, P.C.

_/s/Craig Ackermann_
Craig Ackermann (admitted *pro hac vice*)

**PARTIES' JOINT STIP. & [PROPOSED] ORDER REQUESTING AN EXTENSION TO FILE A STATUS REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE PAGE 3**

ER-0518

## **[PROPOSED] ORDER**

The Court has reviewed the Parties' Joint Stipulation Requesting An Extension To File A Status Report And Proposed Case Management Schedule and hereby enters the same.  The Parties shall confer and file a formal Joint Status Report which includes proposed case management deadlines by June 29, 2023.

**IT IS SO ORDERED.**

Dated:                          _____
                                JOLIE A. RUSSO
                                United States Magistrate Judge

**PARTIES' JOINT STIP. & [PROPOSED] ORDER REQUESTING A ONE WEEK EXTENSION TO FILE A STATUS REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE PAGE 4**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | No. 3:18-cv-01477-JR |
| | ORDER |
| Plaintiffs, | |
| v. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

HERNÁNDEZ, District Judge:

Magistrate Judge Jolie A. Russo issued a Findings and Recommendation on

November 22, 2022, in which she recommends that the Court deny Defendant's Motions to

Exclude the Opinions of Kathleen Lundquist and David Neumark, deny Plaintiffs' Motions to

Rule as Inadmissible Parts of the Expert Reports of Chester Hanvey and Ali Saad, and deny

1 – ORDER

ER-0520

Plaintiffs' Motion to Certify the Class. F&R, ECF 310. The matter is now before the Court

pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).

## I.    Portions of the Findings and Recommendation to which the parties do not object

The parties did not object to the portions of the Findings and Recommendation in which

Judge Russo recommended the Court deny Defendant's Motions to Exclude the Opinions of

Kathleen Lundquist and David Neumark and Plaintiffs' Motions to Rule as Inadmissible Parts of

the Expert Reports of Chester Hanvey and Ali Saad. The Court, therefore, is relieved of its

obligation to review those portions of the Findings and Recommendation *de novo*. *United States*

*v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(en banc); *see also United States v.*

*Bernhardt*, 840 F.2d 1441, 1444 (9th Cir. 1988)(*de novo* review required only for portions of

Magistrate Judge's report to which objections have been made). Having reviewed the legal

principles *de novo*, the Court finds no error as to those portions of the Findings and

Recommendation.

## II.    Portions of the Findings and Recommendation to which Plaintiffs object

Plaintiffs object to the portion of the Findings and Recommendation in which Judge

Russo recommends the Court deny Plaintiffs' Motion to Certify the Class. The Court, therefore,

must make a *de novo* determination of that portion of the Magistrate Judge's report. 28 U.S.C.

§ 636(b)(1); *Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir. 2009); *United States v. Reyna-*

*Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(en banc).

The Court has carefully considered Plaintiffs' objections and concludes there is no basis

to modify the Findings and Recommendation. The Court has also reviewed the pertinent portions

of the record *de novo* and finds no error in the Magistrate Judge's Findings and

Recommendation.

2 – ORDER

ER-0521

**CONCLUSION**

The Court adopts Magistrate Judge Russo's Findings and Recommendation [310].

Accordingly, Defendant's Motions to Exclude the Opinions of Kathleen Lundquist and David

Neumark [179, 181] are denied, Plaintiffs' Motions to Rule as Inadmissible Parts of the Expert

Reports of Chester Hanvey and Ali Saad [192, 221] are denied, and Plaintiffs' Motion to Certify

the Class [146] is denied.

IT IS SO ORDERED.


DATED: _____March 21, 2023_____


_____
MARCO A. HERNÁNDEZ
United States District Judge

3 – ORDER

ER-0522

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

KELLY CAHILL, SARA JOHNSTON,                          3:18-cv-1477-JR
LINDSAY ELIZABETH, and HEATHER
HENDER, individually and on behalf of others
similarly situated,                          FINDINGS & RECOMMENDATION

                          Plaintiffs,

            v.

NIKE, INC., an Oregon Corporation,

                          Defendant.
_____

RUSSO, Magistrate Judge:

        Named plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender bring

this putative class and collective action alleging that defendant Nike systematically discriminates

against them and other similarly situated women at Nike headquarters regarding salary and

promotions.    Plaintiffs move to certify this case as a class action.    Related to the motion to certify,

the parties raise challenges to each other's experts and evidentiary objections.    For the reasons

stated below, plaintiffs' motion to certify should be denied.

Page 1  - FINDINGS & RECOMMENDATION

ER-0523

<u>ALLEGATIONS</u>

Named plaintiffs bring this action on behalf of the following collective/class members:

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed by Nike at any time from three years prior to opting-in through the resolution of this action, in a salaried, corporate position that was or is a lower-level position than Vice-President.

First Amended Complaint (ECF 42) at ¶ 165. Plaintiffs exclude Nike retail store employees, lawyers within Nike's legal department, and employees in Nike's finance and human resources departments. <u>Id.</u> at ¶ 166.

Plaintiffs allege defendant has engaged in systemic sex discrimination against the collective/class members by paying them less than male employees with substantially equal job duties requiring substantially similar skill, effort, and responsibility performed under similar working conditions. <u>Id.</u> at ¶ 167. Plaintiffs also allege defendant has contributed to, and perpetuated, sex-based pay disparities through common policies, patterns, or practices, including, but not limited to, those relating to starting salary and "band level," annual ratings, promotions, performance management policies or practices, centralized decision-making, and a work environment hostile to women. <u>Id.</u> at ¶ 168.

Plaintiffs assert defendant pays lower salaries and promotes women with less frequency than defendant's male employees. Plaintiffs allege those disparities occur because a small group of primarily male decision-makers implement the policies below, patterns, or practices which have an adverse impact on and otherwise discriminate against Class/Collective Members based on their sex:

> First, Nike sets starting pay and other compensation-related terms based, in part, on prior compensation. Around May 2018, Nike stated that it will "remove bias from critical moments of the hiring process by . . . eliminating the collection of candidate

Page 2 - FINDINGS & RECOMMENDATION

salary history . . . ." The collection of prior compensation history causes women to receive lower starting salaries and other less favorable compensation-related terms.

Second, as part of its annual performance evaluation process, Nike rates each of its corporate employees. The ratings are assigned according to a forced ranking system. Nike utilizes a curve that limits the number of employees at Nike headquarters who can receive ratings in the top two levels. This system causes Class/Collective Members to receive lower ratings than their male colleagues. Lower ratings cause women to receive less compensation, including smaller annual salary increases, lower annual bonuses, and smaller equity distributions. Ratings also affect promotions. Lower ratings preclude promotions whereas higher ratings can lead to promotions.

Third, Nike's budgeting system for finalizing annual salary increases and annual bonuses adversely impacts and otherwise discriminates against women. Each year, Nike creates a set pool of money for each of its organizations that is then used to provide annual salary increases and bonuses. A disproportionately low amount of these budgets is distributed towards women's annual salary increases and bonuses.

Fourth, Nike's Organizational Talent Planning system identifies a disproportionately low number of women for promotional opportunities.

Fifth, Nike has a pattern or practice of channeling women into positions and job assignments that Nike views as less valuable and that are less likely to lead to promotions or increased compensation.

Nike has neither validated nor established the job relatedness of its policies or practices for its systems that determine starting pay, ratings, pay raises, bonuses, equity distributions, and promotions.

Nike has intentionally and willfully discriminated against Class/Collective Members with respect to pay, promotions, and conditions of employment. Two of Nike's most-senior executives – Trevor Edwards (Nike Brand President and the second most senior executive after the CEO from July 2013 to August 2018) and David Ayre (Vice-President in charge of HR from 2007 through July 2017) – caused and reinforced a workplace that was, and continues to be, hostile towards women and that devalues women. The above-described policies or practices reflect Nike's discriminatory intent. In addition, since before the class and collective action periods, Nike has been aware that Class/Collective Members are paid and promoted less than male employees at Nike headquarters. Nike has known that the above-described policies or practices caused women to receive less pay and fewer promotions. Nike has likewise long known that Nike headquarters' workplace is hostile towards and devalues women. For years, women have reported hostility, sexual harassment, and inequality in pay and promotions to Nike's Employee

Page 3  - FINDINGS & RECOMMENDATION

Relations department, which is the department within Nike Human Resources that is primarily tasked with addressing workplace complaints, and to Nike's Human Resources department ("HR"). Instead of addressing these complaints, HR has reinforced and exacerbated the hostile work environment. Regardless of the evidence, HR has regularly found such complaints unsubstantiated, avoided taking any meaningful corrective or preventive actions, and otherwise failed to act to end either the inequality in pay and promotions or the hostility towards women in the workplace.

Id. at ¶¶ 4, 5-12 (footnotes and parentheticals omitted).

The named plaintiffs are as follows:

- Heather Hender, who had nearly 20 years of engineering experience and a B.S. in Manufacturing Engineering when she started working at Nike in April 2015. She was hired initially as a process engineer II until September 2018 when she was promoted to senior process engineer. Hender filed a sex discrimination charge with the EEOC on November 9, 2018, alleging harm due to defendant's alleged pattern and practice of discrimination with respect to pay and promotions, and received a right to sue notice on November 15, 2018.

- Sara Johnston, who had four years of experience in human resources and analytics along with an M.B.A. when she started working at Nike as a part-time employee in June 2008 in the employee services department. Johnston began working full-time in February 2010 when she was hired as a senior account service representative. In August 2012, Johnston became a junior business systems analyst and then promoted in 2014 to an intermediate business system analyst. In November 2017, Johnston resigned asserting she had fewer promotions than her male counterparts and due to a hostile work environment that defendant refused to cure.

- Kelly Cahill, who had nearly eight years of work experience in marketing, business

Page 4  - FINDINGS & RECOMMENDATION

development, and advertising, and a B.S. in Sports Marketing, when Nike hired her in November 2012 as an independent contractor in a senior producer position. Nike then hired Cahill as a full-time director in October 2013.   On July 26, 2017, Cahill resigned asserting Nike refused to address her complaints of a hostile work environment and discriminatory promotional practices.

- Lindsay Elizabeth, who had nearly four years of experience in product design and a B.F.A. in apparel design when Nike hired her as an independent contractor in March 2015 in a design position.   In January 2017, Nike hired Elizabeth as a full-time apparel designer.   On August 23, 2018, Elizabeth filed a sex discrimination charge against Nike with the EEOC alleging harm due to defendant's alleged pattern and practice of discrimination with respect to pay and promotions. Elizabeth received a right to sue notice on September 28, 2018.   Elizabeth left Nike's employment in October 2018.

Id. at ¶¶ 13-40.

Plaintiffs allege defendant has a disproportionately low number of women in higher level positions.   Specifically, plaintiffs allege 71% of Nike's vice presidents are men, 62% of its directors and senior directors are men, with significantly more men making up senior directors. Also, Nike's "band level" ranks influence employees' salaries and bonuses.   Plaintiffs assert that, as the band level increases, the percentage of women within that band level decreases.   Id. at ¶¶ 53-56.

Plaintiffs allege that despite many and long-standing complaints about male supervisors subjecting women to a hostile work environment and sexual harassment, defendant did not conduct

Page 5  - FINDINGS & RECOMMENDATION

sexual harassment training for its headquarter employees until March 2018.  Id. at ¶¶ 64-65. Plaintiffs relate their personal experiences with sexual harassment and hostile working conditions as well as their formal complaints, and assert the male perpetrators were promoted while they suffered retaliation.  Id. at ¶¶ 72-90.

Plaintiffs allege that defendant acknowledged in May 2018 that it has a policy or practice of setting employees' starting pay and band levels based on past compensation which disproportionately places women in lower pay and band levels.  Id. at ¶¶ 97-103.  Plaintiffs also allege employee ratings are decided by a majority of male managers based on criteria that are not job-related causing women to receive smaller salaries, bonuses, and fewer promotions.  Id. at ¶¶ 104-17.

Plaintiffs assert defendant has a pattern or practice of channeling women into positions that are less likely to lead to promotions by, for example, providing smaller budgets to teams with higher percentages of women.  Id. at ¶¶ 118-24.  Plaintiffs allege defendant acknowledges it has failed to implement changes in hiring and promotion decisions to eliminate discriminatory impact on women and that it needs to change its hiring, compensation, and promotion systems.  Id. at ¶¶ 126, 129.

Cahill alleges when she left defendant, she was replaced with a male who received a higher title and band level resulting in a higher salary and bonuses than she received despite having substantially the same job responsibilities.  Id. at ¶¶ 132-36.

Johnston alleges that two months after she was hired, defendant hired a male employee to perform substantially the same work in the same conditions, at a higher rate of pay even though Johnston had to train him, and he had a lower level of education and less experience.  Id. at ¶ 137.

Page 6  -  FINDINGS & RECOMMENDATION

Johnston further alleges she received fewer and slower promotional opportunities than her less qualified or equally qualified male counterparts.  Id. at ¶ 140-43.  Johnston asserts that when she left, defendant hired two men to fill her position at higher pay.  Id. at ¶ 144.

Elizabeth and Hender also allege they were paid and promoted less than their similarly situated male counterparts.  Id. at ¶¶ 145-55.

Plaintiffs allege six claims for relief: (1) violation of the Equal Pay Act, 29 U.S.C. § 206(d); (2) violation of the Civil Rights Act via disparate impact, 42 U.S.C. §§ 2000e et seq; (3)   violation of the Civil Rights Act via disparate treatment, 42 U.S.C. §§ 2000e et seq; (4) violation of the Oregon Equal Pay Act, Or. Rev. Stat. § 652.220; (5) violation of the Oregon Equality Act via disparate impact, Or. Rev. Stat. § 659A.030; and (6) violation of the Oregon Equality Act via intentional discrimination, Or. Rev. Stat. § 659A.030.  Defendant moves to dismiss or strike the class and collective claims in the first, third, fourth, and sixth causes of action.

## BACKGROUND

The putative class includes at least 5,200 current and former female employees at Nike's World Headquarters (WHQ) in salaried corporate positions in Bands L, U, E, or S.[1]  Report of Ali Saad at ¶ 43 (ECF 186-1 at p. 30).   As result, the proposed class includes employees in 1249 different job codes.  Id. at ¶ 44.[2]

Nike's WHQ consists of a broad array of employees including, but not limited to, shoe and apparel designers, manufacturing and software engineers, event planners, sports marketers,

---

[1]  Nike places employees under the executive level in six bands known as VALUES.  Declaration of Mengfei Sun at Ex. 27 at p. 6 (ECF 157-7 at p. 6).   The L Band includes supervisors, intermediate professional, and entry professional.  The U Band includes managers, lead professionals and senior professionals.  The E Band includes directors and expert professionals.   The S Band includes senior directors and professional consultants.   Id.

[2]  In addition, there are over 13,000 position titles for the putative class.   Report of Chester Hanvey at ¶ 14, fn. 6 (ECF 185-1 at p. 9).

Page  7  - FINDINGS & RECOMMENDATION

information and technology security professionals, security professionals, supply chain experts, and airplane pilots and mechanics.  See id. at Appx. D (ECF 186-1 at pp. 185-266).  The WHQ jobs are organized within a uniform hierarchy according to "type of work" and "level of work." Declaration of Mengfei Sun at Ex. 27 (ECF 156-2 at p. 24) (defining job code via "type of work" such as finance and "level of work" such as intermediate professional).  "Type of Work" includes job functions and job family.  Job functions are broad categories of work that can be logically grouped together based on having similar characteristics or prerequisite skills.  Nike has identified about 20 job functions that categorizes the work it does.  Job families are the unique roles within a job function that can be performed at various levels based on Nike's leveling criteria. The number of job families varies with each job function. Id. at p. 25 (description from Nike "2019 Job Training Program").

"Level of work" provides a common framework used to determine the scope and complexity of various roles.  "Level of work" consists of bands and job levels.  Id.  The combination of "level of work" and "type of work" results in a job code.  Id. at p. 27.

A.       Starting Pay

The putative class's positions span 21 different job functions which are then divided across 109 different job families and 198 different job subfamilies.  Report of Ali Saad at ¶¶ 44-45 (ECF 186-1 at p. 31).  As noted, within this proposed class there over 1200 different job codes and each job code has its own pay range which managers use to place new hires and determine their compensation.  ECF 187-3 at 41 (importance of job code and its relation to pay range); Deposition of Shane Walker at p. 60 (ECF 187-2 at p. 334) (managers are responsible for making pay decisions); p. 86 (ECF 187-2 at p. 336) (job codes tied to job titles and there is a position title

Page 8  - FINDINGS & RECOMMENDATION

which provides the generic description of job role); p. 411-12 (ECF 187-2 at pp. 355-56) (managers are responsible for making pay adjustments); ECF 187-3 at p. 47 (sections of pay range); Deposition of Jessica Elizabeth Stuckey at p. 67-68 (ECF 187-2 at pp. 270-71) (job code and title drives pay range and without link to job code, there is no driver for pay range).

Nike uses global jobs and global job descriptions "to level jobs across the organization, regardless of the location of the role, and facilitates career pathing, talent planning, and organizational design." ECF 160-8 at p. 1. The pay ranges are "developed from market pay data and used to guide pay decisions and provide a common span of pay for people in similarly valued jobs," but "[i]ndividual pay within that range can be influenced by performance/potential, experience, length of time in job, previous pay rate or strategic talent focus." ECF 155-2 at p. 10. Nike specifically denotes that, "[w]hile individual pay may vary, there should not be systematic differences based on gender or race." Id.

Despite the leveling of jobs across the organization, Nike's Senior Director of Global Retail Compensation confirms

> Nike's job codes are the most differentiated type of work and level of work within our corporate architecture (but even then, individuals working in the same job code do not necessarily perform similar work). Job codes that share the same Job Subfamily and Job Level may not be the same from a compensation survey or actual day-to-day perspective at Nike – it depends on the job. In fact, there are a number of job codes that share the same Job Subfamily and Job Level but are readily distinguishable, involving the application of differing skillsets.

Declaration of Jessica Stuckey at ¶ 4 (ECF 187-1 at pp. 270-71).

> Managers determine base salaries by considering the experience and sustained performance of the employee while also recognizing pay levels in the external market.

> Although employees' backgrounds vary widely, each should be paid within the portion of the market zone* that reflects their level of experience and performance.

Page 9 - FINDINGS & RECOMMENDATION

ER-0531

> Employees with less experience and lower performance will generally be lower in NIKE's relevant market zone for that job, while employees with more experience and/or higher sustained performance in that job will generally be paid higher (at or above the median\*\*) in the market zone.

ECF 159-5 at p. 1.

When beginning a new job, whether new to Nike or moving into a new role at Nike,

managers could consider these factors when offering base salary:

- External market zone for the job
- Internal peer base salaries
- Relevant work experience, education, and skills
- Total rewards package
- Historical salary progression
- Business financial conditions
- Past NIKE job performance (for internal employees changing jobs)

Id. Managers are also free to consider and weigh whatever factors they deem relevant to the

position being hired. E.g., Declaration of Cynthia Peele (Service Delivery Manager) at ¶ 9 (ECF

187-1 at p 126):

> I have also been involved in the hiring process in my roles at Nike. No one has to approve my decision to post a job. I am typically posting jobs that existed on my team previously, but now are vacant. Accordingly, the band level and job title are pre-set and cannot change based on the candidate or any other factor. I also am involved in setting starting salary. To make this decision, I look at the candidate's experience, whether they have any certifications, and sometimes, what company they are coming from. For example, I know that candidates from Microsoft have a lot of technical experience, so I would likely give someone from Microsoft a higher salary than someone from a smaller, less technical company. Certifications are also very important for roles on my team because it shows whether candidates are keeping up with their technical skills. In IT and Tech Ops, it is easy to fall behind, so it is imperative that candidates actively seek to develop and refine their skills.[3]

---

[3] See also, e.g., Declaration of Alyssa Levison (Director Digital Design Operations) at ¶¶ 14-15 (ECF 187-1 at pp. 72-73) (have ultimate responsibility for setting starting pay, consult HR and Nike's salary range but then consider education, experience, room for growth, mastery of soft skills — may have to consult manager one level above to offer staring salary above pay range); Declaration of Mac Caputo (Former Recruiter-Global HR) at ¶¶ 9-11 (ECF 187-1 at pp. 187-88) ("Ultimately, while I typically do provide a recommendation to the hiring manger, the hiring manager is responsible for making the final decision on the starting salary" and they consider factors such as years of experience, related progressive experience to the job, education, complexity of the applicant's prior organization, level of prior influence and responsibility, and communication style, among many other possible factors).

Page 10 - FINDINGS & RECOMMENDATION

In May 2019, Nike internal documents indicate that, "[i]n the past, we often focused on the new hire's prior salary and/or the size of the increase the new hire would receive," but that it did not "want to carry over poor pay practices from a prior company or start a candidate from a disadvantage—we want to create an equal playing field from day one."   ECF 158-2 at p. 8.

In September 2019, Nike issued a directive that recruiters, hiring managers, etc. may no longer ask external applicants or their employers questions about their compensation history. ECF 155-6 at p. 1.   After that, Nike policy permitted asking a candidate about salary expectations. Id.

As noted above, Shane Walker, Senior Director of Global Compensation, indicates the hiring managers receive pay ranges for a job and are responsible for making the pay decision within that range.   Deposition of Shane Walker at pp. 48-49, 60 (ECF 187-2 at pp. 332-33, 344):

> So for new hires, the guidance is to position someone between 85 percent to the maximum of the pay range. For promotions is to position 85 percent to 95 percent in the pay range. And for lateral moves it is generally no increase.
>
> But each individual situation needs to be reviewed and may call for an increase, and our guidance is that managers are responsible for making pay adjustments and that all newly hired or promoted employees should always be above the minimum of the pay range.

Id. at pp. 411-12 (ECF 187-2 at pp. 355-56).

According to Shine Thomas (Senior Director for Talent Acquisition, Innovation, Enterprise Data Science, and Analytics, Consumer Creation), decisions related to hiring, in some cases, should be approved by Talent Acquisition, but that hiring decisions are approved by multiple people.   Deposition of Shine Thomas at pp. 49-50 (ECF 162-9 at pp. 9-10).[4]   That said, "[t]he

---

[4] Thomas made this statement in the context of a situation in which a manager is asked to hire a relative of a friend for a summer internship whom they know is not qualified and whether that is considered a form of bribery.   See ECF

Page  11  - FINDINGS & RECOMMENDATION

onus of the decision making for the offer rests on the hiring manager. The recruiter is involved in facilitating that process, but the decision is made by the hiring manager." Id. at p. 123 (ECF 187-2 at p. 299).

Thomas states that before September 2017:

> [P]rior salary was a data point that we looked at, but it was always, our guideline has always been that is a data point. The position and the range is also a data point. Every single offer is unique, and every single offer has different nuances associated with the candidate and their experiences and qualifications.

Id. at p. 220 (ECF 187-2 at p. 307).

B.    Pay Increases and Bonuses

From 2015 until 2019, lump-sum merit awards and pay increases were based on a percentage of employees' base pay.   Deposition of Shane Walker at p. 357 (ECF 162-11 at p. 32). In March 2019, Nike adjusted its annual salary increase policy (core pay) such that it is not purely percentage based and would account for an employee's position within Nike's pay range.   ECF 158-5 at pp. 34-35.   Even so, using the new competitive pay management (CPM) system still has a percent increase to base pay component.   ECF 156-6 at pp. 2-4.   The pay adjustment also includes consideration of the employee's current position in pay range, prior year performance, future potential, impact of loss, risk of loss, time in role and pay relative to peers.   Id. at pp. 3-4.

Nike's performance review process  - i.e., Coaching for Excellence (CFE) - assigns a rating of exceptional, highly successful, successful, inconsistent, or unsatisfactory.   ECF 187-3 at p. 85.   Prior to 2019, Nike assigned a minimum and maximum percentage for each rating and then managers used discretion to determine what increase the employee would receive, but whether that was within or outside the guideline depended on each manager.   Deposition of Shane Walker at

---

159-2 at p. 18.

Page 12  - FINDINGS & RECOMMENDATION

p. 360 (ECF 162-11 at p. 33). Beginning in 2019, managers select among four options (max invest, invest, market, and zero) which then presents a percent increase based on where the employee is in the pay range. ECF 158-5 at p. 35.

Nike does not have a forced CFE distribution. ECF 187-3 at p. 139. Individual CFE ratings seldom need to be approved by higher level managers. E.g., Declaration of Rebecca Edington (Vice President of Footwear Technical Development) at ¶ 13 (ECF 187-1 at p. 24) ("Lower-level managers are also the ones who made decisions on their direct reports' CFE ratings. While I do run calibration sessions to review the CFE ratings for the higher-level managers in my organization to ensure we are aligned and consistent in how we are rating employees, lower-level employees are reviewed through separate calibration sessions. I do not rate or review ratings for every single employee in my organization. I have never encountered a situation where I have over-ridden any manager's rating for his or her direct report."); Declaration of Kimberly Mack (Vice President for Men's Sport Performance Apparel) at ¶ 14 (ECF 187-1 at p. 97) ("During the annual pay and performance review cycles, I provide a performance rating for each of my direct reports. I then select a base pay increase for each direct report based on their performance rating. Each manager on my team rates and reviews each of their direct reports and selects a base pay increase accordingly. It is the manager's responsibility to select the employee's rating and base pay increase, not mine. If a manager cannot decide on a rating or base pay increase, that manager and I may have a conversation about ratings and pay, and I may provide input or guidance, but it ultimately is the direct manager's decision. In fact, I rarely question a manager's perspective on their direct report's performance or pay. I have never seen a base pay or ratings decision changed by anyone in a higher level."); but see ECF 158-6 at p. 13 (executive review does include using

Page 13 - FINDINGS & RECOMMENDATION

reporting to ensure pay outcomes align with talent perspective and ability to make any necessary changes); ECF 159-3 at p. 3 ("[S]ystem requires 'manger+1' approvals for merits and PSP awards.").

Despite the Nike guidelines, managers had discretion regarding pay increases and even employees with the same CFE ratings could receive different percent merit increases. E.g., Declaration of Ronni Worboys (Director of Retail Operations) at ¶ 12 (ECF 187-1 at p. 173) ("As a manager, I have the discretion to set base pay increases within this budget. I allocate this budget based on each employee's performance rating and each employee's compensation within a competitive salary range. I try to be as equitable as possible in providing base pay increases for each of the employees I supervise, but I do not always provide the same base pay increases to employees with the same ratings. For example, if two employees both received the same performance rating, but one employee's base pay is further from the midpoint of the salary range, I would give that employee a higher base pay increase. My goal is to try to increase pay so that all my employees are situated equitably within the same percentage of the pay range for the job."); see also ECF 187-3 at p. 141:

> Merit awards are discretionary and merit award guidelines vary within each performance rating category. When determining the size of increase, managers should consider a variety of factors:
>
>> o Performance: employee's performance for the entire fiscal year, and the most important factor in merit pay decisions.
>> o Position to Market: employee's pay relative to external market zone
>> o Internal Equity: employee's pay relative to peers in similar jobs within NIKE
>> o Employee's experience, skill levels, etc.
>> o Available Budget

The same is true after the 2019 introduction of the CPM system. See ECF 187-3 at p. 65

Page 14  - FINDINGS & RECOMMENDATION

(managers have the ability to further invest using a dropdown list); Deposition of Shane Walker at p. 365 (ECF 187-2 at p. 353) (The core pay investment table "is a data point that is available during that process, but how each individual manager, manager +1, uses that information will vary or if they use it at all.").

Nike uses a Performance Sharing Plan (PSP) to award annual cash bonuses to employees who receive a CFE rating above unsatisfactory. See, e.g., ECF 187-3 p. 78 (fiscal year 2017 CFE modifier guidelines: exceptional = 75-150%; highly successful = 50-125%; successful = 25-110%; inconsistent = 0-75%; and unsatisfactory = 0%). Prior to 2019, the award consisted of team and discretionary shares; the latter was determined by the manager based on the CFE rating. Id. Both shares consider an employee's job band and fiscal year earnings (i.e., base pay for salaried employees). Id.; Deposition of Shelli White at p. 122 (ECF 162-13 at p. 9). Starting in 2019, the performance modifier was set at 100% for all employees. ECF 158-5 at p. 11. The manager+1 approves the PSP award. Deposition of Shelli White at pp. 68-69 (ECF 187-2 at pp. 370-71).

C.    Promotions

At Nike, Talent Acquisition helps manage the process for competitive promotions or other job changes but does not manage the process independent of hiring managers. Deposition of Shine Thomas at pp. 28-29 (ECF 162-9 at pp. 6-7). Nike has a fill strategy which allows a job role to be posted internally, externally, or the hiring manager can promote someone within the company into a position. Deposition of Shine Thomas at pp. 80-81 (ECF 180-10 at pp. 2-3). Fill strategy and promotions do not require approval from Human Resources but may require a manager's direct supervisor (manager+1). See, e.g., Deposition of Treasure Heinle at pp. 62-63 (ECF 187-2 at pp. 144-45 (manager needs to get her direct manager's approval for noncompetitive

Page 15  - FINDINGS & RECOMMENDATION

job change); ECF 156-5 (noncompetitive job changes described as when an employee moves into a different role without formal interview process and requires approval of manager+1 or Human Resources partner).

Until 2018, employees in Bands L though S could receive a noncompetitive promotion, but it was really up to the manager.   Deposition of Treasure Heinle at pp. 211-12 (ECF 161-10 at pp. 25-26).   In December 2018, Nike required all E Band positions and below to be posted for a competitive hiring process.   ECF 156-10 at pp. 1-3.   Nike noted the changes in response to, among other things, recent employee surveys revealing that employees feel excluded from career opportunities due to perceived lack of transparency and visibility into open roles.   ECF 157-1 at p. 5.   Plaintiff's expert, Dr. David Neumark, found that, during the period from January 1, 2013, to September 1, 2019, promotions among entry level professionals to senior director consisted of 5,688 non-competitive promotions and 1,974 competitive promotions.   Expert Report of David Neumark, Ph.D. at p. 78 (ECF 149-1 at p. 79).

This case is distinguishable from Ellis v. Costco Wholesale Corp., 285 F.R.D. 492 (N.D. Cal. 2012) where the court acknowledged that (1) the derivative effects of a companywide policy could themselves present issues common to the class; and (2) a "common mode of exercising discretion that pervades the entire company" (recruiting internally and without necessarily making employees aware of openings) – coupled with evidence of working culture that reinforces stereotypes was enough to establish commonality regarding Title VII claims brought by woman surrounding the defendant's allegedly promotion practices. There, however, the class was much narrower (nationwide but concerning only two "closely related management-level" positions), and significantly, there were upper level managers that had direct oversight in the selection process.

Page  16  - FINDINGS & RECOMMENDATION

D.    Initial Job Assignments

As noted above, in the context of bribery and corruption practices by third parties seeking employment, all decisions related to hiring should be approved by Talent Acquisition.   ECF 159-2 at p. 18.   Talent Acquisition's role is to ensure compliance and provide guidance throughout the competitive hiring process, ensure a diverse slate when hiring for E-band+ open roles, and regularly communicate with hiring managers.   ECF 157-1 at p. 7.   Human Resources Business Partners associate with Talent Acquisition to ensure all E-band and below open roles are posted competitively.   Id.   Hiring managers attend regular manger training on the hiring process.   Id.   In December 2018, Nike instituted these policy guidelines to prioritize inclusion, transparency, and equal opportunity throughout the hiring process.   Id. at p. 4.   To that end, Nike asked all employees, managers, and Talent Acquisition to follow consistent guidelines during each stage of the hiring process.   Id.

Maggie Baird, who has held positions ranging from Category Sales Director for Men's Training to Senior Director for Jordan North America, describes the initial hiring process she has used:

> We typically post an open position both internally and externally. There was one occasion that we posted the job internally only because we had an immediate business need for a position that managed a category, which comprised 65-70% of the business. We needed someone who understood the business to come in and pick up the work quickly. Prior to posting a job, I determine the band level based on what I think the scope of the work is in the current state and what I think the scope will be in the future. I also look at the work structure of my team, including each employee's band level, and figure out what our needs are. For example, when we hired the Retail Concepts Director, we knew that position would not have a team at the time of hiring, but we wanted a candidate that had leadership skills because we knew we would build out a team of direct reports into that role eventually.

Declaration of Maggie Baird at ¶¶ 4, 8, 13 (ECF 187-1 at pp. 7, 9, 11).

Page  17  - FINDINGS & RECOMMENDATION

Although a hiring manager may partner with the Human Resources manager around the best approach for an open position, "the hiring manager will make the decision because it is their team and their business around what the open position should be."  Deposition of Shine Thomas at p. 107 (ECF 187-2 at p. 295).

A hiring manager may work with Human Resources and their manager to set the level for the job posting. "The level is set for each role when the job is approved for headcount and cannot be changed once the job is approved."  Declaration of Ronni Worboys at ¶ 15 (ECF 187-1 at p. 174); see also Declaration of Cynthia Peele at ¶ 9 (ECF 187-1 at p. 126) ("the band level and job title are pre-set and cannot change").

Recruiters may extend invitations to applicants for one job to apply for another open job. Deposition of Julian Miller at pp. 68-69 (ECF 187-2 at pp. 203-04) (a recruiter might extend an invitation to another job—they can invite candidates to apply to the specific requisition and it is up to the discretion of the recruiter).   As for the guidelines provided recruiters:

> The guidelines are very specific. It has to be a job that meets the same band level. Right? It's the same seniority, the same job code. We're recruiting within those roles within a similar time frame, so it's still a valid application. And the screening criteria, as we mentioned, those pre-screening questions are the same amongst those requisitions. Those are -- Those are the guidelines that we educate them on. Right? So we can show in the system that -- that those roles use the same criteria, that recruiters screen candidates based on the same criteria based on -- across multiple requisitions.

Id. at p. 100 (ECF 187-2 at p. 205).

For example, Cahill notes that she planned to apply for a senior manager position, but the Vice President of Global Digital Brand wanted her to be at the higher level of Director instead. Deposition of Kelly Cahill at p. 106 (ECF 182 at p. 104).   The record demonstrates that none of the named plaintiffs were channeled into a lower position than the one for which they had planned

Page  18  - FINDINGS & RECOMMENDATION

to apply.  See Defendant's Opposition (ECF 183) at p. 21, n. 25 (collecting transcript entries noting plaintiffs were hired into the positions for which they applied).

E.      Complaints of Harassment and Discrimination

In 2018, several Nike employees made complaints about discrimination and harassment referenced as the Starfish Survey.  See, e.g., Declaration of Mengfei Sun at Ex. 46 (ECF 159-6 at pp. 1-3)[5]; at Ex. 48 (ECF 159-8 at pp. 1-6)[6]; at Ex. 24 (ECF 157-4 at pp. 1-2);[7] at Ex. 50 (ECF 159-10 at pp. 1-4).[8]  Plaintiff identifies approximately 22 Nike executives who were alleged to have discriminated or condoned discrimination and approximately 30 complaints.[9]  Declaration of Byron Goldstein at ¶ 16 (ECF 163 at pp. 9-10).   Some complainants noted that Human Resources refused to act or apparently condoned the discriminatory and harassing behavior.  See,

---

[5] Gender bias and leadership complaint summarized as:
  • Was completely disrespected by []. No problems until he came on board. Almost left NIKE because of him. Terrorized her. He wouldn't stop. Boys club attitude. Knows he can get away with it. Sad to say, [] turned a blind eye.
• Gender bias. On team with other men. They had no issues. They didn't get demeaned. She was top performer but was not set up for career advancement. Her male colleague moved up, doesn't understand how. Biggest concern is that she already reported this situation to HR and nothing was done except she was moved to another role deeper in the organization, with no track for development. []
  • Fails or refuses to communicate with his team regarding key facts (e.g., new hires, project details and assignments, promotion of new boss); displays lack of interest in developing careers of his reports; in his current role, has never called a group meeting of his direct reports on any issues, including recent MOR-related events and []'s termination; indignantly refused team member request for huddle to discuss []'s promotion and impact on team.

[6] Describing a broken culture of pay inequities, diminished female talent, old-school lack of modern approach, male oriented supervision, disparaging behavior, "[b]oys club, biased selection process," and lack of HR action.

[7] Responses by Nike to the New York Times regarding complaints of harassment and discrimination.

[8] Female vice president alleges a more senior male denied her request for consideration of three females for a position and was told, "no, you need a man in that role."

[9] Plaintiff refers to the 2018 complaints as the Starfish survey.   While there is evidence in the record that refers to "Nike Project Starfish" (ECF 159-6 at p. 2), the record does not demonstrate who created the survey, how it was distributed, how recipients were selected, the sample size, or the response rate.   See Deposition of Kathleen Lundquist at pp. 275-80 (ECF 187-2 at pp. 184-89).   Nike's Human Resources Chief doesn't know who created the survey or who completed it but did receive a hard copy of the complaints.  Deposition of Monique Matheson at p. 93 (ECF 187-2 at p. 196).

Page 19 - FINDINGS & RECOMMENDATION

e.g., Declaration of Mengfei Sun at Ex. 49 (ECF 159-9 at p. 2) (unable to do anything about being called a "bitch" by a manger who "is protected by the European Boys Club" and nothing happened after reported to HR); at Ex. 47 (ECF 159-7 at p. 3) ("ER and HR at this company are a joke… [former Head of Human Resources] himself was a well-known sexual harasser").[10]

Nike's internal portals provide avenues to raise complaints (anonymously or otherwise). See, e.g., ECF 187-3 at pp. 83-84 (anti-harassment and antidiscrimination policy with definitions and directing: "Anyone who experiences, witnesses, or learns of harassment in the workplace must immediately report the incident by contacting their manager, HR Direct or Matter of Respect" and providing phone numbers, web links, and email address); id. at p. 86 (providing a link to provide feedback to HR); id. at pp. 87-90 (portal to "speak up," provided by an external issue reporting firm, to report concerns related to "harassment, retaliation, [and] discrimination" and if reporter chooses to remain anonymous, no identifying information is passed on to Nike); id. at pp. 92-99 (speak-up portal overview and instructions on reporting).

Monique Matheson, Nike's Chief Human Resources Officer since July 2017, notes that Nike shared the Starfish complaints with third-party counsel.   Deposition of Monique Matheson at pp. 86, 93 (ECF 187-2 at pp. 195-96).   Third-party counsel led an investigation and follow-up for the concerns raised.   Id. at pp. 86, 97-98 (ECF 187-2 at pp. 197-98).   Opt-in plaintiff Lauren Anderson states that after third-party counsel investigated her complaint of sexual harassment, the subject of the complaint was no longer with Nike and her complaint was taken seriously. Deposition of Lauren Anderson at pp. 220-21 (ECF 187-2 at pp. 40-41).

---

[10] This complainant reported "bullying" to HR which also included bullying by female managers but did not report sexual harassment because "it has not happened to me personally."   Declaration of Mengfei Sun at Ex. 47 (ECF 159-7 at p. 3).

Page  20  - FINDINGS & RECOMMENDATION

Near the conclusion of the investigation conducted in response to the Starfish complaints,

Nike CEO Mark Parker stated:

> … the main set of complaints that gave rise to this process have been acted on ... and employee exits from this larger investigation will be behind us after this next week.
>
> It's also important to remember that not all employment action is visible. Just because someone didn't leave, does not necessarily mean that they've not had consequences. People have the potential to change and grow ... we have to believe in that as well.
>
> And as I said in my email, people leave and join Nike every day. With a workforce of 74,000 people, not everyone who leaves during this time is being exited.
>
> It's clear that people have raised broader concerns. Please remember that system changes, compensation reviews, and changes to organizations take time.
>
> There is no finish line here. We continue to review our HR processes from top to bottom so we can take our learnings from this experience.

ECF 155-4 at pp. 6-7.

Nike confirmed to the New York Times that, "[b]esides the resignations of Trevor Edwards and Jayme Martin, Nike has also confirmed the departures of Antoine Andrews; Vikrant Singh, a senior brand director for basketball; Daniel Tawiah, a VP for global brand innovation; and Greg Thompson, the VP for footwear."   ECF 157-3 at p. 2.   Nike also stated: "There was conduct where an insular group of high-level managers, in pockets of the organization, protected each other and looked the other way. This is something Nike will not tolerate."   Id. at p. 3.

<div align="center">DISCUSSION</div>

A.      Defendant's Motion to Exclude the Opinions of Plaintiffs' Expert, Kathleen Lundquist, Ph.D.

Nike seeks to exclude the expert reports and testimony of Dr. Lundquist, an

Industrial/Organizational (I/O) psychologist, pursuant to Fed. R. Evid. 702.

> Dr. Lundquist opines that:
>
> Nike groups its jobs into substantially similar job groups based on the Job Function, Job Family, Job Subfamily, Band and Job Level architecture into which all jobs at Nike are categorized. Nike uses this job architecture to apply a consistent set of policies and practices for employees within these groups for compensation, talent acquisition, talent management and performance management. Despite a common architecture for classifying jobs, Nike's policies and practices for compensation and promotion have not been substantiated as job related according to professional and legal guidelines.

ECF 148-1 at p. 48.

Nike asserts Dr. Lundquist's report is not based on any reliable methodology. Specifically, Nike contends she failed to describe any objective principles, standards, definitions, or other methodologies she applied to support her finding.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This court must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593 (1993). The court's task is to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Id. at 597.

Although Daubert listed specific factors for assessing scientific testimony, the test for

Page 22 - FINDINGS & RECOMMENDATION

reliability is a flexible one and not all factors[11] necessarily apply in every case.   Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010).

> When considering the applicability of <u>Daubert</u> criteria to the particular case before the court, the inquiry must be flexible. Peer reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be in the literature. Lack of certainty is not, for a qualified expert, the same thing as guesswork. Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline. [T]he factors identified in <u>Daubert</u> may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible.

Id. at 565 (internal citations omitted).

"<u>Daubert's</u> general holding--setting forth the trial judge's general 'gatekeeping' obligation--applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).  This Court has broad latitude when it decides how to determine reliability.  Id.  In the end, an opinion is admissible if it is reliable and will assist the trier of fact in understanding the evidence at issue.

Certainly, Dr. Lundquist qualifies as an expert and her knowledge is connected to facts in issue, e.g., the relationship of Nike's Human Resources in developing and monitoring implementation of Nike's employment practices.  It is true that Dr. Lundquist provides scant analysis of, for example, whether certain job groupings actually perform similar work.  However, the Court is able to weigh the evidence adduced regarding Nike's Human Resources policies and determine what weight to give expert opinion, if any, for purposes of class certification.  See

---

[11] The Court listed criteria such as testability, publication, peer review, and general acceptance.

Page 23 - FINDINGS & RECOMMENDATION

Primiano 598 F.3d at 564–65 ("Under Daubert, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony.").[12]  When and if this action proceeds to a merits decision, the parties may wish to revisit the relevance of this opinion. Yet, as noted below, given the evidence regarding Nike's employment policies and discretion afforded individual managers, plaintiffs' experts provide little useful information for determining the core issue of whether commonality exits.[13]  Accordingly, the motion to exclude the opinions of Dr. Lundquist should be denied at this time.

B.      Defendant's Motion to Exclude the Opinions of Plaintiffs' Expert, David Neumark, Ph.D.

Nike also seeks to exclude the expert reports and testimony of statistical expert Dr. Neumark pursuant to Fed. R. Evid. 702.

Dr. Neumark opines that:

a. Women and men come to Nike with similar human capital (education, experience), and women get performance ratings as high or higher than men.
b. Women are hired at lower Job Levels than are men who come to Nike with similar human capital.
c. Once hired, women are promoted more slowly than men; this is driven by non-competitive promotions.
d. The lower Job Levels at hire, and the slower progress to higher Job Levels, creates a large pay shortfall for women in the class period.
    i. A simple estimate of this pay shortfall is $11,363 lower pay (in December 2019 dollars) per woman per year. [footnote omitted]
e. In addition, women doing substantially similar work to men, and with similar qualifications to men and similar performance to men, are paid less at hire. This

---

[12] For purposes of this motion, the Court itself has the discretion to determine whether a class should be certified and conducts a rigorous analysis to consider whether a claim meets Rule 23's requirements.  Thus, the Court, for certification purposes, decides how much weight to give the expert testimony.

[13] The core issue of commonality is generally capable of resolution without resort to expert analysis as the Court can review the evidence of whether Nike mandates an applicable policy that results in disparate treatment or impact. While a statistical analysis has some bearing on this issue, it becomes more useful in understanding an issue once the policy is or standard operating procedure is identified.  In addition, Dr. Lundquist's opinion regarding the job relatedness of Nike's policies becomes important once an actual company-wide policy has been identified.

Page  24  - FINDINGS & RECOMMENDATION

starting pay gap persists into the class period, during which women are paid less than men who are doing substantially similar work and have similar qualifications and performance. This happens because, after being hired, subsequent pay increases for women and men with similar performance are based on the same percentage pay increase, perpetuating the starting pay gap.

> i. The pay gap within the same job creates a large pay shortfall for women in the class period. A simple estimate of this pay shortfall is $3,138 lower pay (in December 2019 dollars) per woman per year. Note that these amounts, while sizable, are smaller than the amounts in paragraph 8.d.i. above, because they do not reflect the female pay shortfall attributable to women being hired at lower Job Levels and being promoted more slowly.

ECF 149-1 at pp. 4-5

Dr. Neumark further opines:

In reaching these conclusions, my analysis uses an aggregated model that includes detailed controls for differences across women and men in the jobs they are in (or "Job Cells" defined by the interactions of Job Subfamilies and Levels), and their bona fide qualifications. This provides precise estimates of potential gender differences in pay and other outcomes. Dr. Saad insists, instead, that a disaggregated model must be used; this means that there has to be a separate model for each job (which he incorrectly insists should be based on Job Code rather than Job Cells). However, Dr. Saad's proposed disaggregation reduces statistical precision, which predictably often eliminates statistical significance, and masks common mechanisms that, as my evidence shows, cause discrimination.

ECF 149-2 at p. 5.

Nike asserts Dr. Neumark's opinions and/or analyses: (1) are based on the kind of aggregated analyses that the United States Supreme Court found were insufficient to establish whether pay discrimination claims can be proved on a class-wide basis; (2) do not show whether women are paid less than men for performing comparable or substantially equal work; (3) fail to consider the effect that different decision-makers have on the pay and promotion decisions challenged by plaintiffs; (4) incorporate data from outside the relevant claims periods, which leads to misleading and irrelevant results; (5) fail to account for fundamental variables and rely on unsubstantiated assumptions; (6) are based on a purported disparity that is not statistically

Page 25 - FINDINGS & RECOMMENDATION

significant or derives from the misapplication of his own models and standards; (7) are based on scientifically unsound and unreliable analyses of work experience and education background that fail to apply the facts here, and lack support within the scientific community; and (8) accepted the reliability of the opinions of Dr. Lundquist without question, despite admitting that he never analyzed her report.

Dr. Neumark, like Dr. Lundquist, is qualified and offers an opinion that is relevant to the facts at issue. However, as addressed below, the weight afforded this opinion is limited given the failure of the evidence to demonstrate a common policy or a standard operating procedure. Nonetheless, the motion should be denied at this time.

C.    Plaintiffs' Motion to Rule as Inadmissible Part of the Expert Report of Chester Hanvey, Ph.D.

Plaintiffs seek to exclude paragraphs 3, 5-8, 19-234, 247-48, and 251-52 of Dr. Hanvey, an I/O psychologist, pursuant to Fed. R. Evid. 702.

Dr. Hanvey opines that Nike employees are not sufficiently similar to be examined as a single group.  ECF 185-1 at p. 5, ¶ 3.  After analyzing the jobs performed by certain individuals in covered positions, Dr. Hanvey concluded:

> I designed and conducted an extensive job analysis involving over 200 hours of interviews with Nike employees to gather systematic data about the work performed by Nike employees and skill, effort, responsibility, and working conditions associated with that work. I selected two random samples of employee to evaluate the degree of variability across Job Codes and within Job Codes and conducted detailed interviews with each individual in the samples regarding various aspects of their work that relate to the factors specified in equal pay statutes and regulations.
>
> I found that employees in both samples varied substantially on factors that commonly impact pay, such as: work performed; KSAs required to perform that work; prior work experience; education; decision-making authority; supervisory

Page 26 - FINDINGS & RECOMMENDATION

responsibility; level of stress in the job; work hours; travel; and exposure to physical hazards. Many of these differences are also present when I examined responses from multiple Nike employees with the same Job Code, Level, Function, Family, and Subfamily. I also found that certain factors that impact pay such as prior experience and education are not uniformly applicable to all Job Codes.   In order to determine which roles do perform substantially equal or similar work, it would be necessary to conduct a full assessment of actual job content for each of the more than 1,400 Job Codes.

Finally, I found that rather than conducting a job analysis, Dr. Lundquist relied entirely on existing documents to reach her conclusions, which directly contradicts professional standards and her own statements in a prior case. She did not employ any scientific methods to support her conclusions about Nike employees and did not perform any analysis to determine whether employees are "substantially similar" for evaluating pay. As a result, there is no scientific basis to support her position that Nike employees in the same Subfamily/level are substantially similar.

ECF 185-1 at pp. 144-45, ¶¶ 251-53.

Plaintiffs assert they do not seek to establish that all jobs at Nike are comparable.   They also argue Dr. Hanvey's conclusions are not based on sufficient facts, and he did not understand Nike's policies or plaintiffs' challenge to those policies.   Plaintiffs also contend Dr. Hanvey did not use generally recognized methodologies and his sample sizes were too small to be reliable.

As with the other experts discussed above, Dr. Hanvey's qualifications are not in question. As for the merits of plaintiffs' claims, the opinion is relevant, and the weaknesses identified are more appropriately confined to the weight of the opinion, at least at this stage of the proceedings. As noted above, the Court can resolve the core issue of class certification without much resort to expert opinion.   The parties disagree regarding how to demonstrate the important issue of whether there is a pay differential based on gender. Plaintiffs believe they can establish that difference by showing generally, regardless of job variability, that men as a whole earn more than women as a whole even when controlling for experiential differences.   Nike, on the other hand, asserts the question must be answered by comparing similar work performed in a similar manner to determine

Page 27  - FINDINGS & RECOMMENDATION

whether any differences in pay exist.   But at this stage, the Court is more concerned whether plaintiffs can point to any common company-wide policy or standard operating procedure that impacted the pay of all class members.   It is unclear, at this stage, to what extent the various expert opinions may assist the trier of fact, but the Court can determine the existence of the policy or procedure by examining the underlying facts generally with or without the aid of the expert opinions.   Accordingly, the motion should be denied at this time.

D.      Plaintiffs' Motion to Rule as Inadmissible Parts of the Expert Report of Ali Saad, Ph.D.

Plaintiffs seek to exclude portions of the opinion of statistical expert Dr. Saad pursuant to Fed. R. Evid. 702.

Dr. Saad reviewed Dr. Neumark's report and opined:

a. **Incumbent Pay**: There is no common pay shortfall for women across the Covered Positions. When I examine pay outcomes on a job-by-job basis, I find that for 97.1% of job codes, in which 92.4% of all women in the Covered Positions worked, there are no statistically significant adverse outcomes for women. Moreover, only 35 of the 1,204 job codes show a statistically significant adverse outcome for women, and those 35 job codes include just 7.6% of women in the Covered Positions. When I examine female pay outcomes by manager, I find that just 5.7% of managers have teams in which women earn statistically significantly less than men. The relatively small number of statistically significant disparities that the analyses do yield (for incumbent pay only) are sporadic and isolated, linked to a relatively small number of job codes and a small percentage of decision-makers, and do not appropriately account for legitimate, business-related factors that explain pay.

b. **Prior Pay**: There is no statistical evidence of sex-based disparities in prior pay because this data is not available to analyze. Nor is there any statistical evidence using the approach of Dr. Neumark that Nike consistently used prior pay to set starting pay at Nike, or that any such practice disparately impacted women.

c. **Starting Pay**: There is no consistent statistical evidence of sex-based disparities in starting pay when proper analysis groups are constructed. I estimated Dr. Neumark's starting pay model separately by Job Family in order to compare employees with prior education and work experience backgrounds one would expect to be similar. I find that 48% of Job Families analyzed show that female new hires are paid more than men on average (covering 39% of female new hires), even without suitable controls for prior experience and education. Only four Job Families

Page 28  - FINDINGS & RECOMMENDATION

show that women earn statistically significantly less than men. One Job Family shows that women earn statistically significantly more than men. Using Dr. Neumark's approach there is no common starting pay shortfall for women.

d. **Starting Level**: There is no statistical evidence of sex-based disparities in starting level once I correct Dr. Neumark's analysis to account for a critical variable — the job level a candidate applied to — which is essential for any analysis of whether "under-leveling" occurred.

e. **Prior Relevant Experience**: Dr. Neumark's methodology for measuring and comparing prior relevant experience among new hires is completely unscientific and full of obvious errors. Indeed, the clusters of purportedly similar prior jobs generated by Dr. Neumark's methodology are preposterous on their face. One cluster, for example, contains as supposedly similar prior jobs: Library Page; Deckhand; Spanish-English GED Tutor; Nanny; CEO; Handyman; Armory Chief; Journeymen; Bank Teller; Sign Painter; Penetration Tester; Tennis Captain; Model; Master Black Belt; and Caregiver.[footnote omitted] Dr. Neumark claims this is irrelevant because his alternative method of calculating prior experience returns the same results, but his alternative method omits 70% of the data used in the analysis. Neither method produces scientifically reliable results. Both should be disregarded.

f. **Relevant Education**: Dr. Neumark's attempts to control for education are equally deficient. Rather than control for college major, or degrees from schools that are valued by Nike, he controls for schools' rank based on three publicly-available "top 500"-type lists, which do not contain a single art or design school. Considering that Nike is a footwear and athletic apparel design company, the fact that not a single art or design school appears on those lists should have given Dr. Neumark pause as to their relevance for hiring at Nike (and his methodology as a whole).

g. **Merit Increases**: There is no statistical evidence of sex-based disparities in merit increases. In fact, Dr. Neumark finds that women actually receive larger merit increases than men. It is only by omitting job level – which is a key factor in determining the amount of merit pay awarded, regardless of gender – that Dr. Neumark manufactures an issue where none exists.

h. **Promotions**: Finally, there is no statistical evidence of sex-based disparities in promotions. Again, Dr. Neumark's own analysis confirms this is true. And once again, only by contorting the data does Dr. Neumark manufacture an issue where there is none.

Not only is the analysis flawed, but the Neumark Corrected Report fails to address the legal claims at issue in this case. I understand that for claims under the federal Equal Pay Act ("federal EPA") and the Oregon Equal Pay Act ("Oregon EPA"), the jury must decide whether women are paid less than men for substantially equal or comparable work, respectively. [footnote omitted] In order to answer this question, the statistical analysis must present results at the level of the question presented – substantially equal or comparable work. Yet none of Dr. Neumark's analyses do so. Nowhere in Dr. Neumark's report can one find the answer to the

Page 29  - FINDINGS & RECOMMENDATION

question of whether women in job code A1046 (like named Plaintiff Cahill) are paid less than men in job code A1046. Nor does he answer the question whether women in job code A0692 (like named Plaintiff Johnston) are paid less than men in job code A0692. Instead, he combines all employees in the over 1,200 different Covered Positions [footnote omitted] in a single analysis, and presents one singular alleged female pay difference. In other words, he purports to find a 2.03% average shortfall across all of these disparate jobs (from his Table 2, column 4, panel C (which, when technical errors of timing and other mechanical issues are corrected, actually reveals itself to be 1.33%)). Yet even Dr. Neumark testified that this alleged shortfall does not apply to all of the Covered Positions, and is not likely to be the shortfall for any one Covered Position. In fact, I show that the overwhelming majority of within-job analyses show no statistically significant sex disparity in pay. Dr. Neumark's analysis, on the other hand, does not identify jobs in which women are paid more than men performing substantially equal or comparable work, jobs where women and men are paid the same, and jobs where women are paid less than men. Thus he cannot answer the question presented by the federal and Oregon EPAs: are women are paid less than men for substantially equal or comparable work? The alleged "average" provided by Dr. Neumark is not the correct metric to employ for a statistical analysis in an EPA setting.

Furthermore, to the extent that the Court must decide issues of commonality regarding Plaintiffs' disparate impact or treatment claims under Title VII or the Oregon Equality Act, Dr. Neumark presents no analyses at the level of decision-makers as I understand is required by Wal- Mart Stores, Inc. v. Dukes. [footnote omitted] In fact, Dr. Neumark never mentions decision-makers at all. Thus, none of Dr. Neumark's aggregated incumbent pay analyses speak to the issues in this case, or to the statistical issues relevant to class certification.

To summarize, Dr. Neumark conducts the wrong analysis to address Plaintiffs' federal and Oregon EPA claims, and he fails to show statistical commonality supporting certification of Plaintiffs' Title VII or Oregon Equality Act claims. His aggregated analyses of incumbent pay do not identify a single job in which men and women are paid differently. Using his model but correcting for flaws in timing and various technical errors demonstrates that the vast majority of the putative class did not experience a statistically significant pay shortfall. In addition, none of the various other employment outcomes studied by Dr. Neumark (for which he claims women share an adverse experience) are found to show any adverse outcomes, once errors are corrected.

ECF 186-1 at pp. 5-10.

Plaintiffs assert portions of the report are inadmissible because they contain legal conclusions, Dr. Saad lacks a reliable basis in knowledge and experience in the relevant discipline,

Page 30 - FINDINGS & RECOMMENDATION

and portions of the report are not relevant. Again, the Court should decline to grant the motion at this time as the report, while useful as to certain merits issues, is not entirely necessary to resolve a core issue regarding class certification. To the extent Dr. Saad offers his own legal analysis and conclusions on issues related to class certification,[14] the Court should not consider those opinions. See, e.g., Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (an expert witness cannot give an opinion as to their legal conclusion, i.e., an opinion on an ultimate issue of law).

E.      Evidentiary Objections

Nike argues the Declaration of Byron Goldstein improperly raises discovery disputes despite the close of pre-certification discovery. Defendant also raises specific hearsay objections and objections to conclusions of law offered by a witness.

Plaintiffs object to: (1) the declaration of Jessica Stuckey as inadmissible lay testimony about scientific matters; (2) statements relying on privileged pay equity studies and investigation of Starfish complaints because Nike uses both as a shield and sword; and (3) evidence based on the Talent Acquisition playbook regarding "Match to Job" because Nike failed to produce the playbook.

In evaluating a motion for class certification, the Court may consider all material evidence submitted by the parties to determine whether the Rule 23 requirements are satisfied. Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975). Strict adherence to the Federal Rules of Evidence is not required. Gonzalez v. Millard Mall Servs., Inc., 281 F.R.D. 455, 459 (S.D. Cal. 2012). In considering the background facts applicable to class certification, the Court has endeavored to

---

[14] In addition to paragraphs 6 through 7 of the report quoted above, Dr. Saad concludes that Dr. Neumark's analysis provides no "glue" holding together plaintiffs' claims. ECF 186-1 at p. 151.

Page 31 - FINDINGS & RECOMMENDATION

consider only evidence upon which both parties had access. To the extent that the Court discusses any attorney-client privileged material, it is merely to provide historical background information leading up this litigation.[15]

F.     Class Certification

Initially, plaintiffs filed their class certification motion seeking to certify a class of:

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed at any time from October 11, 2017 through the resolution of this action for claims under Title VII, and for the period from August 9, 2017 through the resolution of this action for claims under ORS 652.220 and ORS 659A.030, in a salaried, corporate position in Bands L, U, E, or S2 ("Putative Class")

Motion For Class Certification (ECF 146) at p. 1.

Nike asserted this definition precluded Cahill's inclusion in the putative class given that she resigned from Nike on July 26, 2017.  Thus, in their reply brief, plaintiffs modified their proposed class as follows:

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed at any time from October 11, 2017 through the resolution of this action for claims under Title VII, for the period from July 25, 2017 through the resolution of this action for claims under ORS 659A.030, and for the period from August 9, 2017 through the resolution of this action for claims under ORS 652.220, in a salaried, corporate position in Bands L, U, E, or S ("Putative Class").

Reply (ECF 240) at p. 2.

The proposed change expands the claims under the Oregon Equality Act to begin 15 days earlier.  Defendant objects contending the amendment to the class definition causes it to suffer prejudice.

---

[15] The Court does consider Stuckey's declaration regarding job codes given her position as Senior Director of Global Retail Compensation.   The declaration is based on her personal knowledge and qualifies as lay testimony. See United States v. Flores, 536 F. App'x 709, 711 (9th Cir. 2013) (testimony rationally based on personal knowledge offering observation that is common and requires limited expertise is admissible).

Page 32 - FINDINGS & RECOMMENDATION

Generally, the Court is bound by the class definitions provided in the complaint and, absent an amendment to the operative complaint, will not consider certification beyond that definition. See Berlowitz v. Nob Hill Masonic Mgmt., Inc., 1996 WL 724776, at *2 (N.D. Cal. Dec. 6, 1996) (rejecting plaintiff's attempt to certify a class different from that alleged in the complaint, because the "court is bound by the class definition provided in the complaint ... and will not consider certification of the class beyond the definition provided in the complaint unless plaintiffs choose to amend it"); see also Ortiz v. McNeil–PPC, Inc., 2009 WL 1322962, at *2 (S.D. Cal. May 8, 2009); Stuart v. Radioshack Corp., 2009 WL 281941, at *2 (N.D. Cal. Feb. 5, 2009).

Plaintiffs assert they are willing to amend if the Court prefers. Thus, in the Court is not prohibited from considering certification of a class as modified in a reply brief. See Garcia v. Schlumberger Lift Sols., 2021 WL 1259737, at *18 (E.D. Cal. Apr. 6), report and recommendation adopted, 2021 WL 5321669 (E.D. Cal. Nov. 16, 2021) ("As an initial matter, the Court may consider class definitions first raised in a plaintiff's reply brief."). As noted in Garcia, "the Court has the authority to redefine a class, and as such there is no reason the Court should not consider the amended definitions proposed." Id. Nonetheless, the modification should be permitted only if it is minor and non-prejudicial. Cancino Castellar v. Mayorkas, 2021 WL 4081559, at *8 (S.D. Cal. Sept. 8, 2021).

Defining the class is critical because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(b)(2) to the "best notice practicable" in a Rule 23(b)(3) action. Naylor Farms v. Anadarko OGC Co., 2009 WL 8572026, at *3 (W.D. Okla. Aug. 26, 2009). In this case, the parties engaged in a rancorous discovery process related to class certification over a nearly four-year period including extensive expert analysis based on the

Page 33 - FINDINGS & RECOMMENDATION

definition asserted in the First Amended Complaint which did not include dates but included all current and former female employees employed by Nike at any time from three years prior to opting-in through resolution of this action. First Am. Compl. ¶ 165 (ECF 42). The complaint alleged Cahill was a full-time employee from October 2013 to July 26, 2017. Cahill filed a BOLI complaint on July 25, 2018, which was withdrawn due to the filing of the initial complaint on August 9, 2018. Id. at ¶¶ 28, 32. Cahill filed the BOLI complaint on behalf of herself and all other similarly situated female Nike employees. Id. at ¶ 33. Further, Cahill filed her consent to be a party in the EPA collective action on August 9, 2018. Id. at ¶ 31. Accordingly, the First Amended Complaint made clear that the proposed class included claims up to one year before the filing of the BOLI charge which includes claims of former female employees, such as Cahill, as far back as July 25, 2017. See Or. Rev. Stat. § 659A.875; Or. Admin. R. § 839-003-020(3).

The inclusion of modified specific dates within the time frame alluded to in the First Amended Complaint is a minor adjustment to the class definition. Moreover, Nike does not demonstrate a need to conduct further discovery, only a potential need to have their expert re-run his analysis to reflect the 15-day change to the class definition. However, pre-liability data is relevant and thus Nike already had incentive to conduct such analysis. See, e.g., Ellis v. Costco Wholesale Corp., 285 F.R.D. 492, 528 (N.D. Cal. 2012) (pre-statute of limitations data is generally both relevant and frequently used in such matters as evidence of the alleged discriminatory practice, even when a plaintiff may not directly recover as to events occurring outside the applicable period). In addition, Nike's primary dispute about expert analysis revolves around whether that analysis should be aggregated or disaggregated and the 15-day difference in the modified class does not impact this argument. Accordingly, the Court should consider class

Page 34 - FINDINGS & RECOMMENDATION

certification based on the modified definition asserted in plaintiffs' reply brief.

Besides certifying the above modified class, plaintiffs also ask the Court to appoint the four named plaintiffs, Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender, as class representatives and appoint named plaintiffs' counsel as class counsel.

Plaintiffs challenge four purported class-wide polices that allegedly resulted in the putative class receiving lower pay than their male counterparts: (1) using prior pay or salary expectations when setting starting salary; (2) using a percentage of current salary when awarding annual merit increases and bonuses; (3) determining whether to fill promotions non-competitively or competitively; and (4) using hiring policies or practices that place women into lower job-levels based on initial job assignments.

Defendant asserts plaintiffs fail to provide sufficient evidence of a company policy or practice that both uniformly applies and harmed the entire putative class of 5,200 female employees. Defendant thus asserts plaintiffs fail to establish commonality, typicality, and predominance for purposes of Fed. R. Civ. P. 23. Defendant also argues certain putative class members themselves exercised discretion in their jobs and made the allegedly discriminatory decisions having a disparate impact, thus raising issues as to the adequacy of representation by the named plaintiffs. Defendant also contends plaintiffs lack standing for injunctive relieve on behalf of the class given that they are former employees. Finally, defendant argues plaintiffs fail to show a class action is superior to other methods of adjudication.

Rule 23 imbues "district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings." Dukes v. Wal-Mart, Inc., 509 F.3d 1168, 1176 (9th Cir. 2007). The party seeking certification bears the burden

Page 35 - FINDINGS & RECOMMENDATION

of showing the proposed class meets the requirements of Federal Rule of Civil Procedure 23(a) and (b). See id. Although a court should accept the substantive allegations of the complaint as true, a court must also consider the nature and range of proof necessary to establish those allegations and conduct a "rigorous analysis" to determine whether the claim satisfies the Rule 23(a) requirements. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160-61 (1982); see also Zinser v. Accuflx Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001). Thus, this Court may look to supplemental information to "allow an informed judgment." Id. Although it may be necessary to inquire into the substance of a case to ascertain satisfaction of the Rule 23 requirements, the Court should not "advance a decision on the merits to the class certification stage." Staton v. Boeing Co., 327 F.3d 938, 954 (9th Cir. 2003).

To meet plaintiffs' burden, they must satisfy the requirements of Fed. R. Civ. P. 23(a) and 23(b). Rule 23(a) provides that plaintiffs may represent a class of similarly situated persons in a class action lawsuit only where:

(1) the class is so numerous that joinder of all members is impracticable,
(2) there are questions of law or fact common to the class,
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Plaintiffs seek Rule 23 certification for three class claims: (1) disparate impact under Title VII, 42 U.S.C.§ 2000e et seq. and the Oregon Equality Act (OEA), Or. Rev. Stat. 659A.001 et seq.; (2) disparate treatment under Title VII and the OEA; and (3) pay discrimination under the Oregon Equal Pay Act (OEPA).

1.    Numerosity

Page 36 - FINDINGS & RECOMMENDATION

There are at least 4,913 potential class members who were employed at Nike Headquarters in Oregon in a salaried, corporate position that was a lower-level position than Vice-President between October 11, 2017, and August 31, 2019.[16]   Rebuttal Expert Report of David Neumark at ¶ 27 (ECF 149-2 at p. 17).   Accordingly, this requirement for certification is met.   See Harrison v. Harry & David Operations, Inc., 2020 WL 8367533, at *6 (D. Or. Oct. 21, 2020), report and recommendation adopted, 2021 WL 1135022 (D. Or. Mar. 24, 2021) (numerosity is met when the proposed class size in excess of 2000 is so large that joinder would be impractical).

### 2.    Commonality

A class has sufficient commonality "if there are questions of fact and law which are common to the class." Fed. R. Civ. P. 23(a)(2). The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

The class members' claims "must depend on a common contention ... that is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

Plaintiffs assert that all three of the of the claims upon which they seek certification are capable of class-wide resolution.   Plaintiffs contend the four challenged practices (using prior pay when setting starting salary, using a percentage of current salary when awarding annual merit increases and bonuses, filling promotions non-competitively, and placing women into lower job-

---

[16] As noted, discovery and expert reporting were completed before plaintiffs' modification of the class period.

Page 37 - FINDINGS & RECOMMENDATION

levels based on initial job assignments) result in disparate impact and disparate treatment.   In other words, plaintiffs contend that resolution of whether these policies result in lower pay for women will decide a common question impacting the whole class.   Plaintiffs also contend resolution of Nike's affirmative defense that any pay gap is due to a factor other than sex will resolve a common question related to the OEPA claim.   At the core of this argument is whether the purported policies are in fact company-wide policies applied to all employees regardless of job or at least all employees within the 1200+ different jobs plaintiffs occupy.

> a.     Disparate Impact Claims

To establish a prima facie case of disparate impact under Title VII, the plaintiffs must: (1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) show a causal relationship between the challenged practices or criteria and the disparate impact. Atonio v. Wards Cove Packing Co., Inc., 810 F.2d 1477, 1482 (9th Cir. 1987).[17]   If plaintiffs establish a prima facie case, the burden shifts to the employer to show that its challenged practices are consistent with business necessity and that there was no less discriminatory alternative.   Moussouris v. Microsoft Corp., 2018 WL 3328418, at *14 (W.D. Wash. June 25, 2018), aff'd, 799 F. App'x 459 (9th Cir. 2019).

For purposes of plaintiff's disparate impact claims, proof of commonality overlaps with the merits because both look at the reason for a particular employment decision.   See, e.g., Cooper v. Fed. Rsrv. Bank of Richmond, 467 U.S. 867, 876 (1984).   Thus, in order to demonstrate commonality, it is not enough for plaintiffs to show they disproportionately are paid less than men, they must show that the reason behind that discrimination is the same for all class members.

---

[17]  The parties agree that the OEA claims are analyzed similarly to the Title VII claims.

Page 38 - FINDINGS & RECOMMENDATION

ER-0560

However, by using an aggregate statistical analysis as their primary evidence of disparate impact, plaintiffs put the cart before the horse and essentially argue the impact provides the common thread as to the reason for the discrimination. The four purported company-wide policies to which plaintiffs' point are the ostensive class-wide glue that binds their claims together permitting resolution at one fell swoop. The question thus becomes whether the policies are in essence mandatory principles upon which hiring managers must adhere together with whether those policies caused the disparate pay shown by the statistical analysis.

### 1.    Starting Pay

As noted above, before September 2017, Nike hiring managers were free to consider and weigh whatever factors they deemed relevant to the position being hired including historical salary progression. In September 2017, Nike issued a directive that recruiters, hiring managers, etc. may no longer ask external applicants or their employers questions about their compensation history. ECF 155-6 at p. 1. After that, Nike policy permitted asking a candidate only about salary expectations. Id. Nike internal documents specifically indicated that, "[i]n the past, we often focused on the new hire's prior salary and/or the size of the increase the new hire would receive," but it did not "want to carry over poor pay practices from a prior company or start a candidate from a disadvantage—we want to create an equal playing field from day one." ECF 158-2 at p. 8.

Plaintiffs assert Nike had a class-wide policy of using prior pay when setting starting salaries and uniformly implemented this policy via active involvement of Human Resources including final decision-making by Human Resources and high-level executives. However, the evidence presented does not tip the scales in favor of a class-wide policy, rather it demonstrates that hiring managers possessed significant discretion.

Page 39 - FINDINGS & RECOMMENDATION

Hiring managers receive pay ranges for a posted job but then make an independent decision within that range. While hiring decisions may involve multiple people providing approval, the onus for the offer decision rests on the hiring manager. In that respect, the prior salary (before September 2017) was merely a data point the manager could consider. The record does not demonstrate a centralized decisionmaker(s) inserting themself into the hiring decision to adjust the offer to align with prior pay. Indeed, there appear to be many times a hiring manager did not inquire into prior pay. See e.g., Declaration of Kimberly Louder at ¶ 6 (ECF 187-2 at p. 84) ("After the hiring manager offered me the job, I asked for a higher starting salary, which she approved. Nobody at Nike asked me about my prior salary or salary expectations before making the offer."); Declaration of Amber Dockter at ¶ 10 (ECF 187-1 at p. 203) ("Nike does not ask new graduate hires for prior salary information and it plays no role in the compensation for new graduate hires."); Declaration of Adrienne Lore at ¶ 6 (ECF 187-1 at p. 77) ("I do not recall if anyone asked me about my current salary or salary expectations during the hiring process, but I would not have answered the question if asked."); Declaration of Julia Hansen at ¶ 6 (ECF 187-1 at p. 39) ("I do not believe anyone asked me about my prior salary or my salary expectations before I received an offer, nor did anyone communicate to me what my starting salary was based on."); Declaration of Taya Saxton at ¶ 5 (ECF 187-1 at p. 136) ("I do not recall being asked for my current salary during the interview or hiring process. I recall discussing salary generally and the hiring manager was open about the salary range for the position, so I knew the salary range during the interview process. My starting salary at Nike was higher than my salary at PGE at the time.").[18]

---

[18] There were candidates who did recall being asked about prior pay. See, e.g., Deposition of Kelly Cahill at p. 112 (ECF 241-1 at p. 30) ("I remember discussing salary and pay. They asked me what I had made prior or what I currently made as a Flex contractor."); Deposition of Samantha Phillips at p. 103-05 (ECF 241-1 at pp. 104-06) (candidate noted that the offer was lower than prior pay and was told it was because cost of living is lower in Portland).

Page 40 - FINDINGS & RECOMMENDATION

Plaintiffs assert Nike not only collected prior pay information from candidates, it also collected such information from employers and public records.   See ECF 157-10 at p. 2 (in response to legislation prohibiting gathering compensation, Nike notes under new policy it may no longer search public records for compensation history); ECF 241-1 at p. 1 (HireRight background check seeking, from Hender, documentation verifying previous employment which may include W-2 forms, pay stubs and/or 1099 forms).[19]

> The Senior Director for Talent Acquisition, Shine Thomas, specifically notes that she has:
>
> never asked an employer about someone's previous compensation history. … It's not a standard part of our recruiting process. We would ask, a follow-on change, we would ask a compensation history of a candidate. I can't think of a single scenario where the question went to their previous employer because of confidentiality. And currently we ask the candidate expectations, but we also do not contact the candidate's previous employer around compensation.

Deposition of Shine Thomas at p. 215 (ECF 162-9- at p. 21).   Nike also asserts it is routine to confirm employment history.   Moreover, there is insufficient evidence that Nike had a company-wide policy of collecting prior pay data from other sources.   As with directly asking about prior pay either in the interview process or via public records search/background checks, some hiring managers inquired about it and some did not.   The evidence does not demonstrate a centralized decision-making process that collected prior pay data used to make starting pay decisions.

Plaintiffs suggest the statistical analysis showing little variability among the class demonstrating women overall received lower pay than men at a statistically significant level is strong evidence of commonality. However, when using an aggregated statistical analysis, plaintiffs

---

[19] Plaintiffs similarly contend background checks sought prior pay information from plaintiffs Sara Johnston and Emily Tucker (ECF 241-1 at pp. 3-4, 7-8).

Page 41 - FINDINGS & RECOMMENDATION

must first demonstrate a class-wide policy that is the alleged cause of the pay gap. The evidence here more likely suggests an individual analysis of whether a particular hiring manager gathered prior pay history and used that information to set the starting pay with respect to individual hires.

In Wal-Mart Stores, Inc., 564 U.S. 338, the Supreme Court recognized the difficulty of maintaining a class action for disparate impact claims where hiring managers have discretion to make employment decisions such as setting starting pay. As noted above, while Nike permitted consideration of historical salary progression, mangers were free to consider and weigh whatever factors they deemed relevant to the position. While prior salary may have been a permissible data point, every offer was unique. In other words, hiring managers were given discretion to set starting pay, within a guideline range, using whatever factors they deemed relevant which may or may not include prior pay history. Use of such a discretionary system requires an individualized assessment as to whether the consideration of prior pay resulted in a disparate impact on the starting pay for women. As the Supreme Court noted:

> recognition that this type of Title VII claim "can" exist does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common. To the contrary, left to their own devices most managers in any corporation—and surely most managers in a corporation that forbids sex discrimination—would select sex-neutral, performance-based criteria for hiring and promotion that produce no actionable disparity at all. Others may choose to reward various attributes that produce disparate impact…. And still other managers may be guilty of intentional discrimination that produces a sex-based disparity. In such a company, demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's. A party seeking to certify a nationwide class will be unable to show that all the employees' Title VII claims will in fact depend on the answers to common questions.

Id. at 355–56.

Certainly, plaintiffs have shown that, in the aggregate, there is a statistically significant disparity among pay for women compared to pay for men at Nike. Plaintiffs have not, however,

Page 42  - FINDINGS & RECOMMENDATION

provided a statistical analysis demonstrating on a class-wide basis that starting pay is lower for women and higher for men where prior pay was a data point used by hiring managers in determining starting pay. Plaintiffs merely offer a broad analysis of starting pay at Nike headquarters showing a significant statistical disparity and assume the gathering of prior pay history is to blame without showing that the gathering of such information was common class-wide regardless of the job applied for, the department in which the job was located, or the educational, experiential, and other requirements for the job. Plaintiffs simply point to one document showing managers may consider historical salary progression (which is not defined in the document)[20] and assumed Nike did not permit managers to exercise discretion in implementing factors for setting starting pay. The evidence demonstrates otherwise. At best, plaintiffs demonstrate that some hiring managers considered prior pay. Nike similarly demonstrates that some hiring managers did not. The evidence squarely supports that an individualized inquiry will be necessary for each plaintiff to determine whether the imposition of the factor (or lack of imposition of that factor) had a disparate impact on pay.

Plaintiffs assert their multiple regression analysis demonstrates common impact. See Olean Wholesale Grocery Coop., 31 F.4th at 679 (finding well-developed expert testimony and regression modeling support common impact). The Court does not disagree that there is a

---

[20] The seven factors listed apply to "beginning a new job," but do not necessarily mean starting fresh with Nike. For example, one factor is past Nike job performance for internal employees changing jobs. Thus, it is not clear that historical salary progression applies to pay before coming to Nike. The evidence does, however, demonstrate that prior salary was a factor that may have been considered, but it does not demonstrate that it was a required factor class-wide. Plaintiffs argue that such an issue is itself a common question, but the Court must resolve the question of commonality at this stage of the litigation. See, e.g., Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 667 (9th Cir. 2022) ("A district court must also resolve disputes about historical facts if necessary to determine whether the plaintiffs' evidence is capable of resolving a common issue central to the plaintiffs' claims. For instance … a district court [must] resolve factual disputes at certification regarding whether decisions regarding promotions were made at the local level or by upper management").

Page 43 - FINDINGS & RECOMMENDATION

statistically significant difference in pay even when controlling for factors such as education and experience. However, the issue in this case is whether the common impact results from a common policy.

As noted above, Dr. Neumark opines that generally women came to Nike with similar or better education and/or experience than men but the starting pay for women was lower because of the purported company-wide policy of using prior pay as a factor in setting starting pay. (ECF 149-2 at p. 4). In reaching this conclusion, Dr. Neumark used an aggregate model controlling for differences in job families and subfamilies rather than for each job. Dr. Neumark justifies this level of statistical analysis asserting the prior pay policy was common across all jobs at Nike. Id. at p. 5. While it is true that for a short period encompassed within the proposed class period prior salary was a permissible data point at Nike, the evidence does not establish hiring managers were required to or even did actually use such data uniformly across all jobs. An aggregated statistical analysis is only appropriate in analyzing practices that are uniform across a company because it would conform to the level of decision for the challenged practice. Ellis, 285 F.R.D. at 523. "[I]n the absence of a common policy or procedure, mere statistics could not 'produce a common answer to the crucial question why was I disfavored.'" Jones v. Nat'l Council of Young Men's Christian Assocs. of the U.S. of Am., 34 F. Supp. 3d 896, 909 (N.D. Ill. 2014) (quoting Wal-Mart Stores, Inc., 564 U.S. at 352).[21] The evidence supports a finding that hiring managers exercised discretion and determined what factors to apply in setting starting pay. The existence of a factor that may or may not be used is not "common direction" and there is no evidence that Nike

---

[21] Additionally, prior pay data for either men or women employed at Nike was unavailable for the analysis. This reinforces that plaintiffs' experts presumed prior pay must be the reason behind the aggregated lower starting pay.

executives directed their hiring managers to use that factor. Generalized statistics notwithstanding, "it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction." Wal-Mart Stores, Inc. 564 U.S. at 356. That an intervening change in the law required Nike to issue directives not to use the factor is not evidence of a prior directive requiring its use.[22]

In Olean, plaintiff sought class certification for price fixing where the common practice was already established via a conspiracy and thus the use of a common aggregated model to show class-wide impact was appropriate.  See Olean Wholesale Grocery Coop., 31 F.4th at 661   (DOJ investigation uncovered a price-fixing scheme among tuna suppliers and Bumble Bee and StarKist, and three tuna industry executives pleaded guilty to the conspiracy); id. at 685 (statistical evidence capable of providing class-wide proof, sufficient to sustain a jury verdict on antitrust impact for the entire class).

While plaintiffs offer evidence of impact, they fail to establish a common mode of exercising discretion applied to virtually all hiring decisions made at Nike headquarters. Plaintiffs' theory is that use of prior pay or obtaining pay history resulted in women receiving disproportionately lower pay than men despite similar qualifications.  However, because of the discretion afforded hiring managers, during the brief period in which such data could have been

---

[22]  Plaintiffs assert they need not prove the existence of the challenged practice at this stage, merely that their evidence is capable of proving a key element on a class-wide basis.  See Maney v. State, 2022 WL 986580, at *18 (D. Or. Apr. 1, 2022) ("based on Plaintiffs' theory of the case, they will be able to rely on the same evidence of centralized policies, practices, and decisions to attempt to prove that Defendants' alleged deliberate indifference and negligence caused the class members' injuries. Whether or not Plaintiffs can so prove is a merits question for trial, but these common questions predominate over individual questions for the purpose of class certification.").  However, the Court must resolve factual disputes at the certification stage regarding whether starting pay decisions were at the hiring manager level or at the highest level of Nike management.  Plaintiffs' theory is that differences in starting pay resulted in the disparate impact but resolving that question will require individualized inquiries as to whether each hiring manager utilized prior pay to set that pay.  Plaintiffs would not just place the issue of determining the merits of its case to the jury but leave to the jury whether plaintiffs establish commonality.  That is an issue the Court must decide before certifying the class.

Page 45  - FINDINGS & RECOMMENDATION

used, for each putative class member it will be necessary to determine did the applicant provide the salary data or did the hiring manager obtain it from another source and did the hiring manager use such data to set pay. The evidence already shows that some hiring managers did not use such data in the hiring process, while also showing some managers had the data. Accordingly, it is necessary to resolve not just whether the use of such data had a disparate impact (plaintiffs' theory) but whether each plaintiff was subject to such treatment. Simply resolving the issue of whether the data caused the disparate impact will not resolve a common question, it will instead turn on individualized inquiries. The resolution of those individualized inquires will then present the added complication of whether there is some other reason for the disparate pay, in the aggregate. Of course, offering a different reason for the pay differential (presumably one that is legitimate and nondiscriminatory) could itself present a common question. Nonetheless, in this case, it is first necessary to delve into each plaintiff's hiring process to determine what happened that may have caused any disparate impact. The failure to point to a common and required policy in the hiring process precludes a common analysis.

Plaintiffs attempt to certify a class of over 5,200 women in widely varying job positions with myriad qualifications from entry professionals to senior directors. There is insufficient evidence that starting pay was a required factor in making starting pay decisions throughout all these varied jobs. Plaintiffs fail to establish a common question of law or fact capable of class-wide resolution for starting pay and their disparate impact claims.

### 2.    Pay Increases and Bonuses

Plaintiffs assert that Nike had a policy of calculating merit awards and pay increases based on a percentage of base pay and that this policy exacerbates the starting pay gap based on the

Page 46 - FINDINGS & RECOMMENDATION

purported policy of using prior pay to set starting pay.

The evidence again establishes considerable discretion on the part of managers and manager+1, with some managers providing a higher percentage increase to an employee with the same CFE rating as another employee if one of the employee's base pay is further from the midpoint.

Dr. Neumark opines:

This starting pay gap persists into the class period, during which women are paid less than men who are doing substantially similar work and have similar qualifications and performance. This happens because, after being hired, merit pay increases and bonuses for women and men with similar performance are based on the same percentage pay increase relative to their base pay, which perpetuates the starting pay gap.

ECF 149-2 at p. 4.[23]

Dr. Lundquist opines:

In addition to the problem of setting starting pay based on prior pay, Nike awarded merit increases using a percentage increase approach based on performance ratings from 2015 to 2018 …. This approach is problematic because gender differences in starting salary tend to be perpetuated, and sometimes exacerbated, over time when increases are based on a percentage of base pay …. These differences can be exacerbated both within the current job and magnified in promotional increase decisions which typically also are based on a percentage of pay . . . The issues with percentage increases in merit decisions discussed above are also applicable to Nike's annual bonus plan, or PSP, which determined payouts based on percentage of base pay…. As with merit increases, a reward based on a percentage of the employee's base pay will continue to exacerbate existing gender differences in pay.

ECF 148-1 at pp. 33-35.

Plaintiffs point to a company-wide policy of using percentages of base pay for increases, but to the extent that this policy results in a disparate impact it requires Nike to also have a

---

[23] Dr. Neumark also opines that the purported policy of hiring women into lower job levels and promoting them more slowly further exacerbates the disparate impact of the use of a percentage of base pay to calculate increases and bonuses. ECF 149-2 at p. 5. The placement and fill strategy is addressed in the next sections.

Page 47 - FINDINGS & RECOMMENDATION

company-wide policy of using prior pay to set starting salaries.   As noted above, the evidence fails to demonstrate that Nike had such a policy.   Moreover, managers had considerable discretion and could adjust the pay percentage to accommodate different employees with lower base pay in the same CFE rating. They had discretion to account for lower base pay, and upper-level management involvement was generally limited to manager+1.   As noted above, the absence of a common mode of exercising discretion that pervades throughout Nike headquarters prevents a finding of commonality.   See, e.g., Moussouris v. Microsoft Corp., 2018 WL 3328418, at *19-21 (W.D. Wash. June 25, 2018), aff'd, 799 F. App'x 459 (9th Cir. 2019) (use of common criteria for pay determinations insufficient where the class was large involving myriad positions along with discretion of managers to make decisions within the framework).

### 3.   Promotions

Until 2018, employees in Bands L through S could receive promotions noncompetitively. Dr. Neumark opines women at Nike experience a 6.26% lower rate of promotion, despite similar qualifications and performance ratings, when promotions are made noncompetitively.   ECF 149-2 at pp. 36-38, ¶ 59 and Table R8.

However, the evidence again demonstrates managers exercise discretion in determining whether to promote noncompetitively.   In addition, beyond a manager+1, upper-level Nike executives played no role in that decision.[24]   When upper-level executives did get involved in response to employee surveys, it was to require all E Band and below jobs to be posted for a competitive hiring process.   As with the other purported company-wide policies above, the

---

[24] Plaintiffs did present an instance in which Talent Acquisition posted competitively for a U Band position in 2016. ECF 159-1 at p. 1.   However, the record does not support a broad HR policy enforced upon hiring managers to post non-competitive positions.

Page 48 - FINDINGS & RECOMMENDATION

discretion afforded managers with little upper management involvement is insufficient to present a common question that will resolve an issue relative to the entire class.

<div align="center">

4.      Initial Job Assignments

</div>

Plaintiffs assert Nike has a policy of hiring women into lower job levels than men despite more education and work experience.   Expert Report of Dr. David Neumark at ¶ 102 (ECF 149-1 at p. 50).   Plaintiffs primarily assert the policy is company-wide based on a Nike document which stated: "All decisions related to hiring should be approved by Talent Acquisition."   ECF 159-2 at p. 18.   As noted previously, this statement is made in the very specific context of bribery and corruption.   The full context is as follows, which appears in a code of conduct document under the heading "BRIBERY AND CORRUPTION":

> The rule is simple:
> Don 't bribe anybody, anytime, for any reason.
>
> We do not offer, promise, give or accept money or anything of value to or from third parties to get an improper business advantage. Any of these actions constitutes a bribe.  Anti-bribery laws apply in every country where Nike does business. Criminal penalties to you and Nike for violating these laws are severe. There is no monetary threshold, so even a small or minor improper gift or donation could be construed as a bribe. Maintain accurate and transparent books and records, so all payments can be honestly described and documented.  We take particular care when working with or evaluating prospective third parties, including agents who may interact with government officials or business partners on behalf of Nike. We don't use them to do anything that is prohibited by law, our Code or Nike policies.
>
> WHAT I F. . .?
> I know someone who works in the Department of Customs. This person asked if I would be willing to hire their relative as an intern for the summer even though I know they aren't qualified. Would it be OK if I offer the relative a position or recommend them to another department for a position?
> **No. All decisions relating to hiring should be approved by Talent Acquisition.** Offering the official's relative a position or ensuring they receive special consideration in the hiring process could be considered a form of bribery. Please direct all requests for employment or internships to Talent Acquisition or reach out to Human Resources or the Ethics & Compliance Office for help.

Page 49  - FINDINGS & RECOMMENDATION

> We are in the middle of negotiating a big contract with a potential vendor. The vendor just gave me NBA courtside tickets. Is it OK to accept the tickets ? Probably not . Accepting anything of value - including event tickets, gifts, excessive meals or hospitality - from a vendor while negotiating a contract with them creates a potential conflict of interest and could also violate our policy on gifts, hospitality and other payments. Discuss with your manager to determine the best course of action to take.

ECF 159-2 at p. 18 (emphasis added).

This does not support a conclusion that all hiring decisions must be approved by Talent Acquisition. Indeed, the record supports a finding that, while hiring managers attend training sessions to understand guidelines, those managers make the decision on posting open positions. Even though a hiring manager may work with Human Resources to set the level for the posting, it cannot be changed once approved and the record does not support an effort to channel women into applying for postings at a lower level once an application is received. To the extent that hiring managers tend to deny applications from women for the higher-level jobs in favor of men, that is again a function of discretion that does not involve the application of any required company policy or upper management. The presence of centralized guidelines along with discretion is insufficient to present a common question — the resolution of which will apply to all putative class members. Whether any given candidate was channeled into a lower paying job requires an individualized assessment. See Moussouris, 2018 WL 3328418, at *19-21 (use of common criteria for pay determinations insufficient where managers exercise discretion within that framework).

Plaintiffs fail to establish the requirement of commonality for the disparate impact claims.

### b.    Disparate Treatment Claims

To demonstrate commonality in a disparate treatment claim, plaintiffs need not identify a specific company-wide employment practice, rather they must provide evidence of a "systemwide

Page 50 - FINDINGS & RECOMMENDATION

pattern or practice" of pervasive discrimination against the class, such that the discrimination is "the regular rather than the unusual practice." Kassman v. KPMG LLP, 416 F. Supp. 3d 252, 281 (S.D. N.Y. 2018) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)). Plaintiffs may satisfy their burden of showing a pattern or practice of discrimination through statistics alone. Teamsters, 431 U.S. at 339–40.[25]   Still, plaintiffs must show discrimination was the company's standard operating procedure.   Wal-Mart Stores, Inc., 564 U.S. at 352 n.7.

As in the Wal-Mart case, Nike's announced policy forbids discrimination.   In addition, as in Wal-Mart, plaintiffs presented significant statistical evidence of disparities between men and women.   Nonetheless, Wal-Mart concluded:

> Even if they are taken at face value, these studies are insufficient to establish that respondents' theory can be proved on a classwide basis. In Falcon, we held that one named plaintiff's experience of discrimination was insufficient to infer that "discriminatory treatment is typical of [the employer's employment] practices." 457 U.S., at 158, 102 S.Ct. 2364. A similar failure of inference arises here. As Judge Ikuta observed in her dissent, "[i]nformation about disparities at the regional and national level does not establish the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." 603 F.3d, at 637. A regional pay disparity, for example, may be attributable to only a small set of Wal–Mart stores, and cannot by itself establish the uniform, store-by-store disparity upon which the plaintiffs' theory of commonality depends.
>
> There is another, more fundamental, respect in which respondents' statistical proof fails. Even if it established (as it does not) a pay or promotion pattern that differs from the nationwide figures or the regional figures in all of Wal–Mart's 3,400

---

[25] In a case involving discretion among many decisionmakers, use of statistics to demonstrate common answers to the question of whether discrimination occurred requires something more to show a pattern and practice of discrimination.   In Wal-Mart Stores, the Supreme Court found that, despite statistical evidence, plaintiffs could not establish commonality for purposes of their disparate treatment claims because the discretion afforded managers prevented finding a uniform corporate culture of bias against women.   Wal-Mart Stores, Inc., 564 U.S. at 345, 352 (resolving a Title VII claim focuses on the reason for a particular employment decision that must have a uniform answer to permit class action status); see also Stephanie S. Silk, More Decentralization, Less Liability: The Future of Systemic Disparate Treatment Claims in the Wake of Wal-Mart v. Dukes, 67 U. Miami L. Rev. 637, 656 (2013) (after the Supreme Court's rejection of this evidence in Dukes, it seems increasingly unlikely that plaintiffs asserting systemic employment discrimination claims will be able to meet the evidentiary threshold necessary to prove a pattern or practice of discrimination especially when dealing with large corporations).

Page 51 - FINDINGS & RECOMMENDATION

stores, that would still not demonstrate that commonality of issue exists. Some managers will claim that the availability of women, or qualified women, or interested women, in their stores' area does not mirror the national or regional statistics. And almost all of them will claim to have been applying some sex-neutral, performance-based criteria—whose nature and effects will differ from store to store. In the landmark case of ours which held that giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory, the plurality opinion conditioned that holding on the corollary that merely proving that the discretionary system has produced a racial or sexual disparity is not enough. "The plaintiff must begin by identifying the specific employment practice that is challenged." … That is all the more necessary when a class of plaintiffs is sought to be certified. Other than the bare existence of delegated discretion, respondents have identified no "specific employment practice"—much less one that ties all their 1.5 million claims together. Merely showing that Wal–Mart's policy of discretion has produced an overall sex-based disparity does not suffice.

Wal-Mart Stores, Inc., 564 U.S. at 356–57.

While this case does not involve 1.5 million putative class members, it does involve over 5200 women employed in a vast array of positions from apparel designers to pilots and mechanics in many separate departments at Nike's sprawling world headquarters.   And as noted above, Nike has delegated substantial authority for hiring and promotion within each of those departments. Plaintiffs' statistical analysis, while accounting for certain human capital, does not account for the differences from department to department and job to job.   Plaintiffs' experts merely pooled data across all 1,200 jobs and reported a single percentage in difference between men and women in all jobs combined.   See ECF 149-1 at p. 6.   The disparities might be attributable to only a small set of Nike managers, rather than a standard Nike operating procedure.   See Deposition of Deposition of David Neumark, Ph.D. at p. 297 (ECF 182 at p. 91) (it is possible that there are a couple or a handful of large job subfamily and level groupings that are driving the negative results).   As noted above, the aggregated data presume commonality, however, it does not present a common mode of proving it.

Page 52  - FINDINGS & RECOMMENDATION

Plaintiffs also allege a standard operating procedure exists at Nike based on anecdotal evidence. Plaintiffs present approximately 30 complaints from the Starfish Survey and no declarations from opt-in plaintiffs. Given the size of the putative class, this is insufficient to demonstrate a standard operating procedure of discrimination. Courts generally require a significant amount of anecdotal evidence to demonstrate commonality and even accepting the 30 complaints, that amount is insufficient. Compare Teamsters, 431 U.S. at 331, 338 (1 complaint per 8 class members), Brown. Nucor Corp., 785 F.3d 895, 913 (4th Cir. 2015) (1 for every 6.25 class members); Rollins v. Traylor Bros., 2016 WL 258523, at *5, 7-8 (W.D. Wash Jan. 21, 2016) (about 1 for every 4 class members). Here, by contrast, there is 1 complaint per 173 class members. Plaintiffs' assessment of Nike's response to the Starfish Survey otherwise fails to show Nike had a standard operating procedure of failing to address discrimination. Plaintiffs fail to establish commonality sufficient to maintain a class action with respect to their disparate treatment claims.

### c.      Oregon Equal Pay Act Claim

To establish a claim under OEPA, plaintiffs must show they were performing work comparable to that of men and were paid less than the male comparators. Smith v. Bull Run Sch. Dist. No. 45, 80 Or. App. 226, 229, 722 P.2d 27, 29 (1986). "Work of comparable character" means work that requires substantially similar knowledge, skill, effort, responsibility and working conditions in the performance of work, regardless of job description or title. Or. Rev. Stat. § 652.210(16).

Plaintiffs assert the expert opinions of Drs. Neumark and Lundquist demonstrate that, for a given set of job requirements men were paid more than women even with the same level of

Page 53  - FINDINGS & RECOMMENDATION

knowledge, experience, scope, effort, and responsibility.   However, the reports do not adequately address job-to-job work and are too generalized to demonstrate work of comparable character. Nor do plaintiffs even identify specific job comparators for the named plaintiffs.   And, as noted above, plaintiffs do not present a common thread as to the reason for the purported discrimination. Accordingly, plaintiffs fail to establish the requirement of commonality sufficient to support a class action with respect to their OEPA claim.

3. and 4.        Typicality and Adequacy of Representation

The typicality prerequisite of Rule 23(a) is fulfilled if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under the Rule's permissive standards, representative claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical. Hanlon, 150 F.3d at 1020.   In determining typicality, the court asks, "whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks omitted) (quoting Hanon v. Dataprods. Corp., 976 F.2d 497, 508 (9th Cir. 1992)). Individualized defenses applicable to class representatives do not preclude a finding of typicality unless there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it. Hanon, 976 F.2d at 508.

> To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them. See Hansberry v. Lee, 311 U.S. 32, 42-43, 85 L. Ed. 22, 61 S. Ct. 115 (1940). Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

Page 54  - FINDINGS & RECOMMENDATION

class? See Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978).

Hanlon, 150 F.3d at 1020.

Because the evidence establishes discretion on the part of hiring managers in setting pay, promoting, and granting pay increases and bonuses, the inquiry will be fact intensive and individualized for all putative plaintiffs. Commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether, under the particular circumstances, maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest. Wal-Mart Stores, Inc.,564 U.S. at 338 n.5. Accordingly, plaintiffs fail to meet these requirements sufficient to support a class action.

5.      Predominance and Superiority

A class action may be maintained only if one of three factors noted in Fed. R. Civ. P. 23(b) is present. Plaintiffs rely primarily on Rule 23(b)(3) requiring that:

> questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Page 55  - FINDINGS & RECOMMENDATION

Fed. R. Civ. P. 23(b)(3).[26]

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods. v. Windsor, 521 U.S. 591, 623 (1997).

> Rule 23(b)(3) focuses on the relationship between the common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis. …[T]he examination must rest on legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement.

Hanlon, 150 F.3d at 1022.

The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case. Id. at 1023. This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution. Id.

The predominance standard is even more stringent than commonality. As noted above, common questions do not predominate and thus pursuit of individual claims is the better method to litigate claims of discrimination. Accordingly, plaintiffs' motion to certify the class should be denied.

CONCLUSION

---

[26] Plaintiffs also assert Rule 23(b)(2) is satisfied because they seek injunctive relief to halt the purported company-wide polices that result in discrimination. However, as noted, the evidence does not support a finding of common issues about the purported policies. Thus, plaintiffs would necessarily seek to enjoin individual hiring managers from engaging in the allegedly discriminatory conduct. Accordingly, plaintiffs fail to present a class action that may be maintained for injunctive relief.

Page 56 - FINDINGS & RECOMMENDATION

Plaintiffs' motion to certify the class (ECF 146) should be denied. Defendant's motions to exclude the opinions of Kathleen Lundquist and David Neumark (ECF 179, 181) should be denied. Plaintiffs' motions to rule as inadmissible parts of Chester Hanvey's and Ali Saad's expert reports (ECF 192, 221) should be denied.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will waive a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 22nd day of November, 2022.


 /s/ Jolie A. Russo                                    
JOLIE A. RUSSO
United States Magistrate Judge


Page 57 - FINDINGS & RECOMMENDATION

ER-0579