No. 24-2199
_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

KELLY CAHILL, <u>et</u> <u>al.</u>,

Plaintiffs-Appellees,

v.

INSIDER INC., <u>et</u> <u>al.</u>

Media Intervenors-Appellees,

NIKE, INC.,

Defendant-Appellant.
_____

On Appeal from the United States District Court
for the District of Oregon Case No. 3:18-cv-01477

─────────────────────────────────────

## <u>AMICI CURIAE</u> BRIEF IN SUPPORT OF PETITION FOR REHEARING

─────────────────────────────────────

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER, CA Bar No. 120162
DAN LAIDMAN, CA Bar No. 274482
HALEY B. ZOFFER, CA Bar No. 334968
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800

Attorneys for <u>Amici</u> <u>Curiae</u>
  (see list on following page)

Allied Daily Newspapers of Washington
American Broadcasting Companies, Inc. (d/b/a ABC News)
CalMatters
Dow Jones
First Amendment Coalition
Forbes Media LLC
Freedom of the Press Foundation
The Intercept Media, Inc.
Los Angeles Press Club
Los Angeles Public Press
Los Angeles Times Communications LLC
New York News Publishers Association
The New York Times Company
Oregon Newspaper Publishers Association
Pro Publica, Inc.
The Seattle Times Company
The Society of Environmental Journalists
Southern California Public Radio
TEGNA Inc.
Voice of Orange County
Washington Newspaper Publishers Association
Washington State Association of Broadcasters

## <u>CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF COMPLIANCE</u>

Pursuant to FRAP 29(a)(4)(E), <u>Amici</u> <u>Curiae</u> ("Amici" or "Media Amici") state that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person other than Media Amici or their counsel contributed money intended to fund preparing or submitting this brief.

Pursuant to FRAP 26.1(a), Media Amici state as follows:

Allied Daily Newspapers of Washington is a non-profit trade association representing 23 daily newspapers in the State of Washington. It has no parent company and issues no stock.

American Broadcasting Companies, Inc. (d/b/a "ABC News") is an indirect, wholly owned subsidiary of the Walt Disney Company, a publicly traded company. No other publicly held corporation owns 10% or more of the Walt Disney Company's stock.

CalMatters is a nonpartisan, nonprofit news organization based in Sacramento bringing Californians stories that probe, explain and explore solutions to quality of life issues while holding our leaders accountable. With more than 270 media partners, its work reaches 8 million readers in every corner of the state through newspapers, websites, radio, TV, apps and educational materials. It has no parent company and does not issue any stock, or own stock in the parties.

i

Dow Jones is a Delaware corporation with its principal place of business in New York. News Corporation, a publicly held company, is the indirect parent corporation of Dow Jones. Ruby Newco, LLC, a subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. No publicly held company directly owns 10% or more of the stock of Dow Jones.

First Amendment Coalition ("FAC") is a non-profit advocacy organization based in San Rafael, California. It has no parent company and does not issue any stock or own stock in any of the parties.

Forbes Media LLC ("Forbes") is a privately owned company, and no publicly held corporation owns 10% or more of its stock.

Freedom of the Press Foundation is a not-for-profit association and has no parent corporations, subsidiaries, or affiliates. No publicly held corporation owns ten percent or more of its stock.

The Intercept Media, Inc. is an independent 501(c)(3) organization. It has no parent corporation and issues no stock.

Los Angeles Press Club is a 501(c)(3) nonprofit organization with no parent corporation and no stock. The organization has more than 1,000 member journalists in Southern California and has operated since 1913 to support, promote and defend quality journalism.

Los Angeles Public Press is a local newsroom serving the residents of Los Angeles County. It is published by the Foundation for Los Angeles Journalism ("FLAJ"), a nonprofit California corporation that has no parent company and does not issue any stock, or own stock in the parties.

Los Angeles Times Communications LLC ("Los Angeles Times") is a wholly owned subsidiary of NantMedia Holdings, LLC, which is a privately held company. No company with a 10 percent or greater ownership share in NantMedia Holdings, LLC is publicly traded.

New York News Publishers Association is a non-profit trade association representing the daily, weekly and online newspapers of New York State. It has no parent company and issues no stock.

The New York Times Company ("New York Times") is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

Oregon Newspaper Publishers Association is a non-profit trade association representing 71 Oregon daily and weekly newspapers. It has no parent company and issues no stock.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

iii

The Seattle Times Company ("Seattle Times") publishes the daily newspaper *The Seattle Times*, as well as the *Yakima Herald-Republic* and *Walla Walla Union-Bulletin*. The Blethen Corp. is its parent company. No publicly traded corporation owns 10% or more of its stock.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization. It has no parent corporation and issues no stock.

Southern California Public Radio ("SCPR") operates KPCC/LAist and local news site LAist.com. It is a non-profit organization wholly owned by its nonprofit parent support organization, American Public Media Group, which has no parent corporation and no stock.

TEGNA Inc. ("TEGNA"), which owns or controls television stations in Arizona, California, Idaho, Oregon, and Washington, among other places, has no parent company. BlackRock, Inc., a publicly held corporation, owns 10% or more of TEGNA Inc.'s stock.

Voice of Orange County is a non-profit newsroom based in Santa Ana, California. It has no parent company and does not issue any stock, or own stock in the parties.

Washington Newspaper Publishers Association ("WNPA") is a nonprofit organization representing 65 community newspapers in Washington State. It has no parent corporation and no stock.

Washington State Association of Broadcasters is a nonprofit trade association representing 29 television stations and over 300 radio stations in Washington State.  It has no parent corporation and no stock.

RESPECTFULLY SUBMITTED this 11th day of April, 2025.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
DAN LAIDMAN
HALEY B. ZOFFER


By /s Kelli L. Sager
       Kelli L. Sager

Attorneys for Amici Curiae

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

IDENTITY AND INTEREST OF AMICI AND SOURCE OF
AUTHORITY TO FILE THIS BRIEF ....................................................1

SUMMARY OF ARGUMENT ..............................................................2

ARGUMENT ........................................................................................2

    I.    The Panel's Decision Conflicts With Well-Established First
        Amendment Jurisprudence. ......................................................2

        A.    The Decision Misinterprets "Limited Intervention"
            Rights Under The First Amendment To Seek Access To
            Court Records. ..............................................................2

        B.    The Decision Is Inconsistent With Constitutional
            Protections From Prior Restraints. ................................6

        C.    The Decision Will Have Dramatic Negative Effects On
            News Reporting About Court Proceedings ...............................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

ALADS v. L.A. Times Commc'ns LLC,
239 Cal.App.4th 808 (2015) ........................................................ 10-11

Ashcraft v. Conoco, Inc.,
218 F.3d 288 (4th Cir. 2000) ...........................................................10

Bank Julius Baer & Co. v. Wikileaks,
535 F.Supp.2d 980 (N.D. Cal. 2008) .................................................13

Bartnicki v. Vopper,
532 U.S. 514 (2001).........................................................................9

Beckman Indus., Inc. v. International Ins.,
966 F.2d 470 (9th Cir. 1992) .............................................................3

Blum v. Merrill Lynch Pierce Fenner & Smith Inc.,
712 F.3d 1349 (9th Cir. 2013) ...........................................................4

Brown v. Maxwell,
929 F.3d 41 (2d Cir. 2019) ..............................................................14

Cahill v. Non-Party Media Orgs. Insider Inc.,
2025 WL 841196 (9th Cir. Mar. 18, 2025) .........................................12

Courthouse News Serv. v. Planet,
750 F.3d 776 (9th Cir. 2014) ........................................................6, 18

Empire Blue Cross & Blue Shield v. Janet Greeson's A Place For Us, Inc.,
62 F.3d 1217 (9th Cir. 1995) ..........................................................3, 4

Florida Star v. B.J.F.,
491 U.S. 524 (1989)................................................................9, 11, 12

Flynt v. Lombardi,
782 F.3d 963 (8th Cir. 2015) .......................................................... 5-6

FMC Corp. v. Cap. Cities/ABC,
    915 F.2d 300 (7th Cir. 1990) ...............................................................11

Foltz v. State Farm Mut. Auto. Ins. Co.,
    331 F.3d 1122 (9th Cir. 2003) ...........................................................2, 19

Globe Newspaper Co. v. Super. Ct.,
    457 U.S. 596 (1982)............................................................................ 2-3

Hurvitz v. Hoefflin,
    84 Cal.App.4th 1232 (2000) ...............................................................12

In re Charlotte Observer,
    921 F.2d 47 (4th Cir. 1990) .................................................................13

In re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.,
    686 F.3d 1115 (9th Cir. 2012) .............................................................19

In re Providence Journal Co.,
    820 F.2d 1342 (1st Cir. 1986)..............................................................10

Kamakana v. City of Honolulu,
    447 F.3d 1172 (9th Cir. 2006) ........................................................... 3-4

Landmark Commuc'ns, Inc. v. Virginia,
    435 U.S. 829 (1978)...............................................................8, 12, 19

Leigh v. Salazar,
    677 F.3d 892 (9th Cir. 2012) ...............................................................18

Near v. Minnesota,
    283 U.S. 697 (1931)...............................................................................7

Nebraska Press Ass'n v. Stuart,
    427 U.S. 539 (1976)...........................................................................7, 8

New York Times v. United States,
    403 U.S. 713 (1971)..........................................................................7, 11

Nicholson v. McClatchy Newspapers,
    177 Cal.App.3d 509 (1986) .................................................................19

Okla. Publ'g Co. v. Dist. Ct.,
    430 U.S. 308 (1977) ........................................................................ 8-9

Oregonian Publ'g Co. v. Dist. Ct.,
    920 F.2d 1462 (9th Cir. 1990) ......................................................... 2

Procter & Gamble Co. v. Bankers Trust Co.,
    78 F.3d 219 (6th Cir. 1996) ...................................................... 9, 10, 11

Richmond Newspapers, Inc. v. Virginia,
    448 U.S. 555 (1980) .................................................................... 17-18

Robert Ito Farm, Inc. v. County of Maui,
    842 F.3d 681 (9th Cir. 2016) ........................................................... 4

Seattle Times Co. v. Rhinehart,
    467 U.S. 20 (1984) ......................................................................... 7

Smith v. Daily Mail Publishing Co.,
    443 U.S. 97 (1979) ..................................................................... 8, 19

Stokes v. Life Ins. Co. N. Am.,
    2009 WL 8397036 (D. Id. Aug. 31, 2009) ...................................... 4

U.S. ex rel. Eisenstein v. City of New York,
    556 U.S. 928 (2009) ....................................................................... 4

United Nuclear Corp. v. Cranford Ins. Co.,
    905 F.2d 1424 (10th Cir. 1990) ...................................................... 5

United States v. Cal. Mobile Home Park Mgmt. Co.,
    107 F.3d 1374 (9th Cir. 1997) ...................................................... 4-5

United States v. Index Newspapers LLC,
    766 F.3d 1072 (9th Cir. 2014) ....................................................... 19

United States v. Jones,
    2024 WL 1700033 (S.D.N.Y. Apr. 19, 2024) ................................ 17

Van Hoomissen v. Xerox Corp.,
    497 F.2d 180 (9th Cir. 1974) .......................................................... 3

**Rules**

S.D.N.Y. LR 7.1(d) ....................................................................17

C.D. Cal. LR 79-7.2 ..................................................................17

**Constitutional Provisions**

United States Constitution, First Amendment ................................*passim*

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, 7C Fed. Prac. & Proc. Civ.
§§ 1920, 1922 (3d ed. 2024) ................................................................5

Amy Taxin, "Amid decline, newspapers press less for records in court," A.P.
(Mar. 15, 2020),
https://apnews.com/article/13ea494a8d9bcc201eef34a5c8cfff51 .....................17

David Bauder, "Decline in local news outlets is accelerating despite efforts
to help," A.P. (Nov. 16, 2023), https://apnews.com/article/local-
newspapers-closing-jobs-3ad83659a6ee070ae3f39144dd840c1b ....................16

Denise Lavoie, "'Spotlight' Movie Shows How Boston Globe Exposed
Church Sex Abuse Scandal," A.P. (Oct. 27, 2015),
https://www.cbsnews.com/boston/news/spotlight-boston-globe-catholic-
church-priest-sex-abuse/ .....................................................................15

Harriet Ryan & Matt Hamilton, "A 'blood money' betrayal: How corruption
spoiled reparations for Armenian genocide victims," L.A. Times (Mar.
23, 2022), https://www.latimes.com/california/story/2022-03-23/fraud-
los-angeles-cheated-armenian-genocide-victims.................................................16

Jon Henley, "How the Boston Globe exposed the abuse scandal that rocked
the Catholic Church," The Guardian (Apr. 21, 2010),
https://www.theguardian.com/world/2010/apr/21/boston-globe-abuse-
scandal-catholic............................................................................ 14-15

Matt Hamilton & Harriet Ryan, "Why and how we reported the Armenian
genocide story," L.A. Times (Mar. 23, 2022),
https://www.latimes.com/california/story/2022-03-23/how-why-reported-
armenian-genocide-story ...................................................................16

Oliver Darcy & Jon Passantino, "News industry off to brutal 2024 start as mass layoffs devastate publishers, raising questions about the future of journalism," CNN (Jan. 25, 2024), https://www.cnn.com/2024/01/25/media/news-industry-future/index.html ......16

"Perversion of Justice: Jeffrey Epstein," Miami Herald, https://www.miamiherald.com/topics/jeffrey-epstein ........................................14

Tiffany Hsu, "The Jeffrey Epstein Case Was Cold, Until a Miami Herald Reporter Got Accusers to Talk," N.Y. Times (July 9, 2019), https://www.nytimes.com/2019/07/09/business/media/miami-herald-epstein.html...............................................................................................14

Tim Golden & Sebastian Rotella, "Operation Encore and the Saudi Connection: A Secret History of the 9/11 Investigation," ProPublica (Jan. 23, 2020), https://www.propublica.org/article/9-11-investigation-saudi-connections-operation-encore-fbi .....................................................................15

Tim Golden, "At Least Two Saudi Officials May Have Deliberately Assisted 9/11 Hijackers, New Evidence Suggests," ProPublica (Sept. 11, 2024), https://www.propublica.org/article/saudi-officials-may-have-assisted-911-hijackers-new-evidence-suggests ...............................................................15

## <u>IDENTITY AND INTEREST OF AMICI AND SOURCE OF AUTHORITY TO FILE THIS BRIEF</u>

The <u>Amici</u> identified above ("Media Amici") have consent from the parties to file this brief, and file it pursuant to FRAP 29(a)(2) and Circuit Rule 29-2(a).

Media Amici are media and non-profit organizations that regularly engage in, or protect the rights of individuals and groups engaged in gathering information for dissemination to the public. They include media companies that routinely report on court proceedings by obtaining court records and attending court proceedings, along with other reporting methods. Media Amici have a strong interest in protecting journalists' constitutional rights to seek access to court records through motions to unseal, and to gather information from other sources, as well as the strong First Amendment prohibitions against prior restraints on publication.

## SUMMARY OF ARGUMENT

The panel decision mistakenly treats a media company that files a motion to unseal court records as a "party," rather than a limited-purpose intervenor representing the public's interest. It then uses this incorrect designation as a justification for ordering the return of records that were obtained through independent newsgathering activities. These rulings upend longstanding constitutional protections against prior restraints and the seizure of newsgathering materials. If this decision remains unchanged, journalists will be forced to choose between vindicating constitutional rights of access to court records, and protecting their First Amendment rights to gather information without being subjected to an otherwise unconstitutional prior restraint. Ultimately, the public's interest in knowing what happens in the courts will suffer from forcing the press into this unconstitutional Hobson's choice.

## ARGUMENT

### I. THE PANEL'S DECISION CONFLICTS WITH WELL-ESTABLISHED FIRST AMENDMENT JURISPRUDENCE.

#### A. The Decision Misinterprets "Limited Intervention" Rights Under The First Amendment To Seek Access To Court Records.

The public and press have a longstanding constitutional right of access to court records and proceedings. <u>Oregonian Publ'g Co. v. Dist. Ct.</u>, 920 F.2d 1462, 1467 (9th Cir. 1990); <u>Foltz v. State Farm Mut. Auto. Ins. Co.</u>, 331 F.3d 1122, 1135-36 (9th Cir. 2003). As the Supreme Court has made clear, this necessarily

2

includes the right to be heard by the court in challenging sealing or closure orders. Globe Newspaper Co. v. Super. Ct., 457 U.S. 596, 609 n.25 (1982).

"Limited intervention" for this purpose is a procedural mechanism used to vindicate these constitutional rights. Beckman Indus., Inc. v. International Ins., 966 F.2d 470, 473 (9th Cir. 1992) (recognizing right of "limited intervention" where nonparty intervenors seek only to modify a confidentiality order, and "do not ask the [court] to rule on additional claims or seek to become parties to the action"); Petition For Rehearing ("Petition") at 9 (citing cases). It differs significantly from an ordinary request to intervene as a party. As the name indicates, it confines the intervenor's participation to certain specified issues. See Van Hoomissen v. Xerox Corp., 497 F.2d 180, 181 (9th Cir. 1974) (court has "discretion to limit intervention to particular issues"). Intervenors who file "limited-purpose motion[s]" do not seek "substantive[]" participation in the case, "but only to gain access to the documents sealed thereby." Empire Blue Cross & Blue Shield v. Janet Greeson's A Place For Us, Inc., 62 F.3d 1217, 1219 (9th Cir. 1995); see also Beckman, 966 F.2d at 473 (intervenors seeking access to documents "do not seek to litigate a claim on the merits").

This is an important distinction: a newspaper filing a motion to unseal court records does not gain the rights of a party to file briefs on the merits, attend chambers conferences, or present evidence at trial; nor is its consent needed for a

3

magistrate judge to conduct proceedings.  Kamakana v. City of Honolulu, 447 F.3d 1172, 1178 n.2 (9th Cir. 2006) (media companies "as limited intervenors, are not parties whose consent [to magistrate judge] is required for appellate jurisdiction").[1] Limited-purpose intervenors can appear "in long-concluded litigation," where the merits are no longer at issue.  See Blum v. Merrill Lynch Pierce Fenner & Smith Inc., 712 F.3d 1349, 1353 (9th Cir. 2013).  In short, there are vast differences between "motions to intervene as a party" and "motions to intervene for ancillary purposes, like the modification of a protective order."  Stokes v. Life Ins. Co. N. Am., 2009 WL 8397036, at *5 (D. Id. Aug. 31, 2009) (citing Empire, 62 F.3d at 1219).

The panel decision conflates these two different types of intervention by relying on cases involving requests to intervene as a party.  See Opinion at 8 (citing U.S. ex rel. Eisenstein v. City of New York, 556 U.S. 928, 932-33 (2009) (intervention to obtain primary responsibility for prosecuting False Claims Act case); Robert Ito Farm, Inc. v. County of Maui, 842 F.3d 681, 684 (9th Cir. 2016) (intervention to uphold challenged ballot initiative); United States v. Cal. Mobile Home Park Mgmt. Co., 107 F.3d 1374, 1376 (9th Cir. 1997) (intervenor seeking to

---

[1] The record shows that The Oregonian was not treated as a "party"; among other things, it did not receive access to discovery, sealed records, or similar materials that a "party" would have received.  See Petition at 9.

file new complaint demanding jury trial)).  None of these cases involved unsealing requests like The Oregonian's, or any similarly limited intervention.

Consequently, the "general rule" that "intervenors are permitted to litigate fully once admitted to a suit" does not apply here.  Opinion at 8.  Although an intervening party ordinarily "is treated as … an original party and has equal standing with the original parties," Charles Alan Wright & Arthur R. Miller, 7C Fed. Prac. & Proc. Civ. § 1920 (3d ed. 2024), that does <u>not</u> apply to limited intervention, or when "conditions have been imposed" on intervention.  <u>Id.</u>  One of the "[m]ost common[]" qualifications involves limiting an intervenor's participation "to certain issues," including "the limited purpose of gaining access to discovery materials that were subject to a protective order."  <u>Id.</u> § 1922 n.4 (citing <u>United Nuclear Corp. v. Cranford Ins. Co.</u>, 905 F.2d 1424 (10th Cir. 1990)).  Under those circumstances, the limited-purpose intervenor is a "collateral litigant," not a party.  <u>United Nuclear</u>, 905 F.3d at 1427.

The panel decision acknowledges that "some procedural requirements … differ" for intervenors who seek to "modify[] protective orders or sealing orders" (Opinion at 9 n.5), but overlooks the rationale behind these distinctions.  Limited-purpose intervention has less stringent procedural requirements because it is vastly different from a motion to intervene as a party.  In the former, it is "the public's interest" in court records, not any interest in the

5

merits of the case, that underlies intervention "for the limited purpose of unsealing judicial records." Flynt v. Lombardi, 782 F.3d 963, 967 (8th Cir. 2015).[2]

The conclusion that The Oregonian became a "party" to the litigation to obtain personal "benefits" (Opinion at 11) – and thereby waived its other First Amendment newsgathering rights and protections against prior restraints – misapprehends the unique nature of intervention to unseal court records. "[T]he news media, when asserting the right of access, are surrogates for the public." Courthouse News Serv. v. Planet, 750 F.3d 776, 786 (9th Cir. 2014) (emphasis added). By asserting a right held by the public, through the procedural mechanism of limited-purpose intervention, The Oregonian did not become a party to this case.

**B.** **The Decision Is Inconsistent With Constitutional Protections From Prior Restraints.**

Here, The Oregonian did not obtain the records at issue through the court. See Petition at 5-6. Instead, one of The Oregonian's reporters independently obtained the documents from one of Plaintiff's attorneys, during an interview about different allegations made against Nike by an employee not named in the lawsuit. Id. The Petition ably details why such newsgathering is "independent of

---

[2] The decision states that "the limited purpose for The Oregonian's intervention was closely related to the documents it received." Opinion at 11. But the newspaper did not receive the documents at issue from the court, or through its limited intervention in the case. See Section I.B.

the court's processes," and why an order to return or destroy the documents contravenes well-established prohibitions against prior restraints. Id. at 12-16 (quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 34 (1984)).

The Supreme Court's modern prior restraint jurisprudence dates back almost a century, when it vacated a prior restraint against a newspaper that disturbed the "public peace" and provoked "assaults and the commission of crime." Near v. Minnesota, 283 U.S. 697, 722 (1931). After discussing the Framers' hostility toward prior restraints, Chief Justice Hughes indicated that such orders might be justified only in "exceptional" circumstances, such as to block publication of information revealing troop movements during wartime. Id. at 716. Forty years later, in New York Times v. United States, 403 U.S. 713 (1971), the Court reaffirmed the high constitutional barrier against prior restraints, unanimously rejecting the government's request to bar newspapers from publishing highly sensitive national security documents about the Vietnam War that a source allegedly stole from the Department of Defense.

The Court has been especially strict in rejecting prior restraints that preclude the press from reporting on court proceedings. In Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976), the Court reversed an order barring publication of information about a defendant's alleged confession in a highly-publicized mass-murder case, rejecting the argument that potential prejudice to the defendant's

7

constitutional fair trial rights trumped the press' First Amendment rights.  Id. at

556-61.  Notwithstanding those competing constitutional rights, the Court held that

prior restraints are "presumptively unconstitutional" and "the most serious and the

least tolerable infringement on First Amendment rights."  Id. at 558-59.

The Court applied the same principles in a series of cases that are

particularly instructive here.  In Smith v. Daily Mail Publishing Co., 443 U.S. 97

(1979), it struck down a West Virginia law prohibiting unauthorized publication of

the names of minors charged with crimes.  Id. at 98.  The case arose from the

prosecution of a newspaper that identified a 14-year-old murder suspect; his

identity was protected during court proceedings, but the newspaper learned his

name by monitoring a police scanner and interviewing witnesses at his school.  Id.

at 99.  Recognizing that those were "routine newspaper reporting techniques," the

Court observed that "if a newspaper lawfully obtains truthful information about a

matter of public significance then state officials may not constitutionally punish

publication of the information, absent a need to further a state interest of the

highest order."  Id. at 103.  The state's asserted "interest in protecting juveniles"

and furthering rehabilitation was insufficient.  Id. at 104.[3]

---

[3] See also Landmark Commuc'ns, Inc. v. Virginia, 435 U.S. 829, 831-32
(1978) (striking newspaper's conviction for publishing information from
confidential judicial disciplinary proceedings in violation of criminal statute);
Okla. Publ'g Co. v. Dist. Ct., 430 U.S. 308, 309-11 (1977) (striking prior restraint

In <u>Florida Star v. B.J.F.</u>, 491 U.S. 524 (1989), the Court made clear that these principles apply even if the press obtains information from a source that was prohibited from sharing it. There, the Court rejected a claim against a newspaper for divulging the name of a rape victim in violation of Florida law, holding that the reporter "lawfully obtained" the name from a police report, even though the Sheriff's Department should not have disclosed it. <u>Id.</u> at 525-27.

> [T]he fact that state officials are not required to disclose such reports does not make it unlawful for a newspaper to receive them when furnished by the government. <u>Nor does the fact that the Department apparently failed to fulfill its obligation under [the statute] not to 'cause or allow to be … published' the name of a sexual offense victim make the newspaper's ensuing receipt of this information unlawful.</u>

<u>Id.</u> at 536 (emphasis added). <u>See</u> <u>also</u> <u>Bartnicki v. Vopper</u>, 532 U.S. 514, 517-18 (2001) (rejecting liability for broadcaster that aired illegally intercepted phone call about matter of public concern, even though he knew or "had reason to know" that recording by third-party violated the law).

Applying these core First Amendment decisions, courts across the country have rejected prior restraints in situations analogous to this case. For example, in <u>Procter & Gamble Co. v. Bankers Trust Co.</u>, 78 F.3d 219 (6th Cir. 1996), the Sixth Circuit vacated an injunction barring Business Week magazine from publishing the

---

barring media from revealing identity of 11-year-old criminal defendant, where newspaper photographed the minor leaving the courthouse).

contents of documents that were designated as "confidential" under a protective order in a civil lawsuit.  Id. at 221-22.  The magazine learned of the documents from one of the parties, and obtained them from the opposing party's attorney, who claimed to have been unaware of their confidential status.  Id. at 223.

The appellate court deemed the injunction a "classic case of a prior restraint" and "the essence of censorship," explaining that under well-established Supreme Court jurisprudence, such an order was "allowed only under exceptional circumstances."  Id. at 225 (quotations omitted).  It held that litigants' "interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds for imposing a prior restraint."  Id.  See also Ashcraft v. Conoco, Inc., 218 F.3d 288, 293 n.2, 301 (4th Cir. 2000) (reversing contempt order against reporter who published confidential settlement amount after court clerk inadvertently provided reporter with sealed documents); In re Providence Journal Co., 820 F.2d 1342, 1349 (1st Cir. 1986) (vacating "transparently invalid" prior restraint barring newspaper from publishing records released by the FBI; "[e]ven if the materials had been given to the Journal improperly or unlawfully, a prior restraint against publication would still be improper"); ALADS v. L.A. Times Commc'ns LLC, 239 Cal.App.4th 808, 819 (2015) (rejecting request to order newspaper to return and not publish background files about sheriff's deputies that allegedly were stolen by newspaper's source, citing the "wealth of both State and Federal case law,

discussing the protection journalists and the press enjoy under the First Amendment where there have been allegations that published or disclosed content had been illegally obtained").[4]

The panel incorrectly applied "relaxed First Amendment scrutiny" here (Opinion at 3), rather than using the proper, strict standard: prior restraints are presumptively unconstitutional, and only may be justified if "narrowly tailored to a state interest of the highest order." Florida Star, 491 U.S. at 541. The order plainly could not survive such scrutiny. The only state interest the decision identifies is the district court's interest in managing its "dockets and courtrooms with a view toward the efficient and expedient resolution of cases," and the need to "enforce its orders and ensure efficient discovery proceedings." Opinion at 10. But courts consistently find such interests fall far short of "that 'single, extremely narrow class of cases' where publication would be so dangerous to fundamental government interests as to justify a prior restraint." Proctor & Gamble, 78 F.3d at 225 (quoting N.Y. Times, 403 U.S. at 726 (Brennan, J. concurring)) (prior restraint

---

[4] Other courts similarly have applied prior restraint analysis to demands to claw-back newsgathering material, because it prevents the press from using the records to disseminate information publicly. E.g., FMC Corp. v. Cap. Cities/ABC, 915 F.2d 300, 305 (7th Cir. 1990) (rejecting claim against ABC News for allegedly revealing stolen documents, holding ABC was "free to retain copies" of documents in its possession and "disseminate any information contained in them[] in the name of the First Amendment").

not justified where party's attorney improperly shared confidential discovery documents); <u>Landmark Commc'ns</u>, 435 U.S. at 841 (prior restraint against disclosure of confidential court records not justified by state's "interest in maintaining the institutional integrity of its courts").

Although not mentioned in the decision, privacy or reputational interests do not justify prior restraints either. Even in cases with far more compelling circumstances than this one, courts consistently have rejected prior restraints against the press for information lawfully obtained about matters of public concern. <u>E.g.</u>, <u>Florida Star</u>, 491 U.S. at 540 (state could not justify punishing newspaper for publishing rape victim's name "in the name of privacy"); <u>Hurvitz v. Hoefflin</u>, 84 Cal.App.4th 1232, 1244 (2000) (rejecting prior restraint in case involving court records containing sensitive medical information; "sparing citizens from embarrassment, shame, or even intrusions into their privacy has never been held to outweigh the guarantees of free speech in our federal and state Constitutions").

This Court already rejected similar arguments as a basis for confidentiality, in affirming the district court's order unsealing documents attached to Plaintiffs' Motion For Class Certification. <u>See</u> Opinion at 6 n.3; <u>Cahill v. Non-Party Media Orgs. Insider Inc.</u>, 2025 WL 841196, at *1-2 (9th Cir. Mar. 18, 2025)

(unpublished). If these interests could not justify sealing, they certainly cannot meet the higher threshold required to justify a prior restraint.

Moreover, the unsealing of those documents likely means that most of the same information in the records at issue is publicly-available. That also affects the propriety of a claw-back order; prior restraints are not warranted if the information at issue already is public. See In re Charlotte Observer, 921 F.2d 47, 50 (4th Cir. 1990) (vacating injunction prohibiting reporters from publishing information disclosed in open court in violation of confidentiality laws; "[o]nce announced to the world, the information lost its secret characteristic, an aspect that could not be restored by the issuance of an injunction"); Bank Julius Baer & Co. v. Wikileaks, 535 F.Supp.2d 980, 985 (N.D. Cal. 2008) (where "there is evidence in the record that 'the cat is out of the bag' … an injunction would therefore be ineffective….").

Rehearing is necessary to consider this matter under applicable prior restraint principles, consistent with controlling constitutional authorities.

## C. The Decision Will Have Dramatic Negative Effects On News Reporting About Court Proceedings.

Subjecting media organizations that enforce constitutional rights of access to court records to otherwise unconstitutional prior restraints and seizures of lawfully obtained newsgathering materials casts a terrible pall over vital news reporting. It effectively penalizes news outlets that intervene to unseal court records while also gathering information on the same topic through other reporting methods, like

13

interviews and archival research.  Much critical news reporting has been

accomplished through such combinations of "shoe leather" reporting and legal

intervention.  For example:

• Miami Herald reporter Julie K. Brown's investigative series about Jeffrey

Epstein, including a history of lenient treatment by some law enforcement

officials,[5] is widely credited with contributing to Epstein's arrest.  E.g., Tiffany

Hsu, "The Jeffrey Epstein Case Was Cold, Until a Miami Herald Reporter Got

Accusers to Talk," N.Y. Times (July 9, 2019),

https://www.nytimes.com/2019/07/09/business/media/miami-herald-epstein.html.

Brown conducted scores of interviews and collected extensive documentary

evidence, but her groundbreaking reporting also relied on years-long legal efforts

by the Miami Herald to unseal court records.  Id.; see also Brown v. Maxwell, 929

F.3d 41, 44-46 (2d Cir. 2019) (discussing history of newspaper's intervention in

one case to get records unsealed).

• The Boston Globe uncovered widespread sexual abuse of children by

priests, both through motions to unseal court records and journalists' independent

work to interview and obtain documents from victims, lawyers, and others.  See

Jon Henley, "How the Boston Globe exposed the abuse scandal that rocked the

---

[5] "Perversion of Justice: Jeffrey Epstein," Miami Herald, collected at
https://www.miamiherald.com/topics/jeffrey-epstein.

Catholic Church," The Guardian (Apr. 21, 2010),

https://www.theguardian.com/world/2010/apr/21/boston-globe-abuse-scandal-

catholic; Denise Lavoie, "'Spotlight' Movie Shows How Boston Globe Exposed

Church Sex Abuse Scandal," A.P. (Oct. 27, 2015),

https://www.cbsnews.com/boston/news/spotlight-boston-globe-catholic-church-

priest-sex-abuse/.

     • Investigative journalism nonprofit ProPublica reported extensively on

connections between Saudi Arabia and hijackers from the 9/11 terrorist attacks,

utilizing court records that a media coalition moved to unseal, along with

interviews and documents from other sources. <u>See</u> Tim Golden, "At Least Two

Saudi Officials May Have Deliberately Assisted 9/11 Hijackers, New Evidence

Suggests," ProPublica (Sept. 11, 2024), https://www.propublica.org/article/saudi-

officials-may-have-assisted-911-hijackers-new-evidence-suggests; Tim Golden &

Sebastian Rotella, "Operation Encore and the Saudi Connection: A Secret History

of the 9/11 Investigation," ProPublica (Jan. 23, 2020),

https://www.propublica.org/article/9-11-investigation-saudi-connections-

operation-encore-fbi.

• The Los Angeles Times published an investigation[6] into the dysfunction and fraud that marred the handling of a high-profile class-action settlement meant to compensate relatives of Armenian Genocide victims, relying both on court records that the newspaper successfully moved to unseal and independently obtained documents and interviews. <u>See</u> Matt Hamilton & Harriet Ryan, "Why and how we reported the Armenian genocide story," L.A. Times (Mar. 23, 2022), https://www.latimes.com/california/story/2022-03-23/how-why-reported-armenian-genocide-story.

The panel decision will have devastating effects on such reporting, which already faces daunting hurdles. The financial challenges long faced by the news media have escalated in recent years, leading to mass layoffs and closure of thousands of local newspapers.[7] Cash-strapped news organizations take on fewer

---

[6] Harriet Ryan & Matt Hamilton, "A 'blood money' betrayal: How corruption spoiled reparations for Armenian genocide victims," L.A. Times (Mar. 23, 2022), https://www.latimes.com/california/story/2022-03-23/fraud-los-angeles-cheated-armenian-genocide-victims.

[7] <u>E.g.</u>, David Bauder, "Decline in local news outlets is accelerating despite efforts to help," A.P. (Nov. 16, 2023), https://apnews.com/article/local-newspapers-closing-jobs-3ad83659a6ee070ae3f39144dd840c1b; Oliver Darcy & Jon Passantino, "News industry off to brutal 2024 start as mass layoffs devastate publishers, raising questions about the future of journalism," CNN (Jan. 25, 2024), https://www.cnn.com/2024/01/25/media/news-industry-future/index.html.

legal challenges to the sealing of court records and closure of proceedings.[8]  The

cost of litigating access matters is exacerbated in this Circuit, where district courts

typically require journalists to engage in formal motion practice to request

unsealing, in contrast to courts elsewhere with streamlined procedures.  Compare

C.D. Cal. LR 79-7.2 (requiring formal noticed motion to request unsealing) with

S.D.N.Y. LR 7.1(d) (authorizing letter-motions); United States v. Jones, 2024 WL

1700033, at *1 (S.D.N.Y. Apr. 19, 2024) (unsealing records in response to letter-

motion from media intervenor).

　　　　When a news organization does expend its limited resources on legal fees to

vindicate the right of access, it knows that if it succeeds, the newly-open records or

proceedings will be available simultaneously to the public at large, including free-

riding competitors.  That belies the suggestion that media intervenors should forfeit

their constitutional rights because they receive personal "benefits."  Opinion at 11.

To the contrary, intervening for the limited purpose of seeking access to court

proceedings or records benefits the public, as the Supreme Court made clear

decades ago:

> Instead of acquiring information about trials by firsthand observation
> or by word of mouth from those who attended, people now acquire it
> chiefly through the print and electronic media.  In a sense, this

---

[8] See Amy Taxin, "Amid decline, newspapers press less for records in court," A.P. (Mar. 15, 2020), https://apnews.com/article/13ea494a8d9bcc201eef34a5c8cfff51.

> validates the media claim of functioning as surrogates for the public….
> This contribute[s] to public understanding of the rule of law and to
> comprehension of the functioning of the entire criminal justice system.

Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 573-74 (1980) (Burger,

C.J., announcing judgment) (quotation omitted).

The Ninth Circuit similarly has noted that "the news media, when asserting

the right of access, 'are surrogates for the public....  The free press is the guardian

of the public interest, and the independent judiciary is the guardian of the free

press.'"  Courthouse News, 750 F.3d at 786 (quoting Leigh v. Salazar, 677 F.3d

892, 900 (9th Cir. 2012)).  By converting media intervenors into all-purpose

litigants, rather than "surrogates for the public," the decision strips them of vital

constitutional protections against prior restraints and seizure of newsgathering

materials.  That will force news outlets to choose between enforcing the public's

constitutional right of access, or sitting on the sidelines to preserve their own First

Amendment rights.

If the decision remains, newspapers and journalists may well choose the

latter path, because protections against prior restraints are vital to investigative

reporting.  Journalists often obtain information that is alleged to be confidential, or

from sources tasked with keeping it confidential.  As one court explained, although

"the government may desire to keep some proceedings confidential and may

impose the duty upon participants to maintain confidentiality, it may not impose

criminal or civil liability upon the press for obtaining and publishing newsworthy information through routine reporting techniques," which include "asking persons questions, including those with confidential or restricted information." Nicholson v. McClatchy Newspapers, 177 Cal.App.3d 509, 519-20 (1986) (citing, inter alia, Smith, 443 U.S. at 103; Landmark Commc'ns, 435 U.S. at 837-38).

The decision creates significant risks that news organizations will be targeted with claw-back demands, and become embroiled in even more-costly legal battles, if they intervene to unseal records while simultaneously conducting other independent reporting. Even garden-variety unsealing requests could snowball into protracted litigation, based on overbroad and invalid assertions of privilege or confidentiality, as demonstrated by the many cases where parties sought to conceal newsworthy information without justification, or district courts entered confidentiality orders that were vacated on appeal. E.g., United States v. Index Newspapers LLC, 766 F.3d 1072, 1097 (9th Cir. 2014) (reversing district court order with directions to unseal records); In re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig., 686 F.3d 1115, 1117 (9th Cir. 2012) (reversing denial of motion to unseal); Foltz, 331 F.3d at 1138 (noting overbroad assertion of confidentiality).

Faced with these daunting prospects, media outlets already reeling from financial pressures might simply capitulate to meritless claw-back demands, forgo potentially meritorious appeals, or decline to intervene altogether. Because the

media often are the only third-parties willing to enforce the public's right of access – as the Supreme Court and this Circuit consistently have recognized – the public ultimately will suffer, if this decision causes the press to abandon these efforts.

For all these reasons, Media Amici respectfully urge the Court to grant the Petition and reconsider this decision, or withdraw it entirely.

RESPECTFULLY SUBMITTED this 11th day of April, 2025.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
DAN LAIDMAN
HALEY B. ZOFFER

By /s Kelli L. Sager
Kelli L. Sager

Attorneys for Amici Curiae

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5) and 32(g)(1), and Circuit Rule 29-2(c)(3), according to the word processing system used to prepare this brief, the word count is 4,180 words, not including the caption, tables, signature block, Corporate Disclosure Statement And Statement of Compliance, and this certificate.

RESPECTFULLY SUBMITTED this 11th day of April, 2025.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
DAN LAIDMAN
HALEY B. ZOFFER


By /s Dan Laidman
      Dan Laidman

Attorneys for Amici Curiae